**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

AMERICAN ORDNANCE LLC,

Plaintiff,

vs.

UNITED STATES,

Defendant.

Case No. 07-867C
Judge Wheeler

**PLAINTIFF AMERICAN ORDNANCE LLC'S**
**MOTION FOR SUMMARY JUDGMENT**

Of Counsel:

Timothy R. Odil
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
Telephone: (303) 634-4000
Facsimile: (303) 634-4400
E-mail: todil@mckennalong.com

Steven M. Masiello
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
Telephone: (303) 634-4000
Facsimile: (303) 634-4400
E-mail: smasiello@mckennalong.com

ATTORNEY FOR PLAINTIFF, AMERICAN ORDNANCE LLC

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ........................................................................................ iii

TABLE OF CONTENTS OF APPENDIX TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ........................................................................................ vii

I. INTRODUCTION ........................................................................................ 1

A. Summary of the Facts ........................................................................................ 2

B. The Uncontroverted Facts Require Entry of Summary Judgment for AO ............ 7

II. STANDARD OF REVIEW ........................................................................................ 8

III. TITLE TO THE LINE 3A EQUIPMENT IS VESTED IN AO BECAUSE THE M795 CONTRACT REQUIRES IT ........................................................................................ 9

A. The Plain Language of the M795 Contract Requires That AO Retains Title to the Line 3A Equipment ........................................................................................ 9

1. The M795 Contract's FFP Property Clause Mandates That Title Vest in the Government Only for Property the Contract Requires AO to Acquire and Deliver to the Government ...................................... 10

a. The Plain and Ordinary Meaning of the Phrase "Acquired . . . for the Government" Establishes That the Government Is Vested Title Only in Items Required for Delivery Under FFP Contracts .................................................. 11

b. The FAR Council Has Definitively Verified AO's Interpretation of "Acquired . . . for the Government" .................. 14

c. AO's Interpretation of "Acquired . . . for the Government" Gives Meaning to All Terms of the M795 Contract and Avoids Creating Internal Conflict .............................................. 15

2. The Government Deliberately Structured the M795 Contract to Require That AO Take Title to the Line 3A Equipment .......................... 17

a. The Parties Specifically Removed from the M795 Contract's Scope of Work a Paragraph That Required AO's Acquisition of the Line 3A Equipment for the Government and Conferred Title Upon the Government ................................ 17

**TABLE OF CONTENTS (cont.)**

**Page**


b. The Parties Specifically Removed from the M795 Contract a Separate SubCLIN That Once Required AO To Deliver the Line 3A Equipment to the Government ................................ 18

3. The M795 Contract Would Have Been Structured Differently If the Parties Had Intended That the Government Take Title to the Line 3A Equipment ................................ 20

B. The Parties' Contemporaneous and Subsequent Conduct Confirms the Plain Language of the M795 Contract ................................ 23

C. All Extrinsic Evidence Supports the Parties' Intent That AO Would Own the Equipment ................................ 25

1. The Parties' Negotiation Correspondence and Actions Conclusively Demonstrate That the Government Required That AO Agree to Take Title to the Line 3A Equipment as a Condition of Being Awarded the M795 Contract ................................ 26

2. The Government Acknowledged AO's Ownership of the Line 3A Equipment After Execution of the M795 Contract ................................ 30

IV. THE GOVERNMENT'S CLAIM OF OWNERSHIP OF THE LINE 3A EQUIPMENT IS BARRED BY THE STATUTE OF LIMITATIONS ................................ 31

A. The Contract Disputes Act Six-Year Statute of Limitations Applies to the Government's Claim Under the M795 Contract ................................ 32

B. The Government's Claim of Ownership of the Line 3A Equipment Accrued Under the M795 Contract When the M795 Contract Was Executed on August 15, 1996 ................................ 33

1. The Events That Fix Liability Occurred at the Time the M795 Contract Was Executed ................................ 34

2. The Government Was on Notice That It Had a Potential Claim as of August 20, 1996 ................................ 35

V. CONCLUSION ................................ 38

# TABLE OF AUTHORITIES

**Page**

## Cases

*Aluminum Co. of Am. v. United States*, 2 Cl. Ct. 771 (1983)........ 23

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)........ 9

*Arko Executive Servs., Inc. v. United States*, 78 Fed. Cl. 420 (2007)........ 11

*Axion Corp. v. United States*, 68 Fed. Cl. 468 (2005)........ 33, 34

*Bataco Indus., Inc. v. United States*, 29 Fed. Cl. 318 (1993)........ 16

*Blinderman Constr. Co. v. United States*, 695 F.2d 552 (Fed. Cir. 1982)........ 23

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)........ 8

*Coastal Gov't Servs., Inc.*, ASBCA No. 50283, 01-1 B.C.A. ¶ 31,353........ 23

*Corning Glass Works v. Brennan*, 417 U.S. 188 (1974)........ 10

*Fireguard Sprinkler Sys., Inc. v. Scottsdale Ins. Co.*, 864 F.2d 648 (9th Cir. 1988)........ 18

*First Nationwide Bank v. United States,* 48 Fed. Cl. 248 (2000)........ 25

*Forsyth v. Barr*, 19 F.3d 1527 (5th Cir. 1994)........ 9

*Fortec Constructors v. United States*, 760 F.2d 1288 (Fed. Cir. 1985)........ 10, 16

*Gray Pers., Inc.*, ASBCA No. 54652, 06-2 B.C.A. ¶ 33,378........ 34, 35

*In re Am. Pouch Foods, Inc.*, 769 F.2d 1190 (7th Cir. 1985)........ 15

*Johnson Controls World Servs., Inc. v. United States,* 48 Fed. Cl. 479 (2001)........ 23

*Julius Goldman's Egg City v. United States*, 697 F.2d 1051 (Fed. Cir. 1983)........ 9

*Kearfott Guidance & Navigation Corp.*, ASBCA No. 45536, 01-2 B.C.A. ¶ 31,496........ 10

*Macke Co. v. United States*, 467 F.2d 1323 (Ct. Cl. 1972)........ 23, 30

*Marine Midland Bank v. United States*, 687 F.2d 395 (Ct. Cl. 1982)........ 15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)........ 8, 9

*McAbee Constr., Inc. v. United States*, 97 F.3d 1431 (Fed. Cir. 1996)........ 25

**TABLE OF AUTHORITIES (cont.)**

**Page**


*Means v. N. Cheyenne Tribal Court*, 154 F.3d 941 (9th Cir. 1998)........................................... 14

*Motorola, Inc. v. West*, 125 F.3d 1470 (Fed. Cir. 1997) .......................................................... 33

*Northrop Grumman Corp. v. County of Los Angeles*, 36 Cal. Rptr. 3d 71 (Cal. Ct. App. 2005). 16

*PCL Constr. Servs., Inc. v. United States*, 47 Fed. Cl. 745 (2000) ............................................ 16

*Perry-McCall Constr., Inc. v. United States*, 46 Fed. Cl. 664 (2000)......................................... 25

*Royal Indem. Co. v. John F. Cawrse Lumber Co.*, 245 F. Supp. 707 (D. Or. 1965) .................. 18

*SAB Constr., Inc. v. United States*, 66 Fed. Cl. 77 (2005)......................................................... 34

*San Carlos Irrigation & Drainage Dist. v. United* States, 111 F.3d 1557 (Fed. Cir. 1997) ........ 35

*Sankey v. United States*, 22 Cl. Ct. 743 (1991)............................................................................ 36

*Sarang Corp. v. United* States, 76 Fed. Cl. 560 (2007)............................................................... 32

*Saul Subsidiary II Ltd. P'ship v. Barram*, 189 F.3d 1324 (Fed. Cir. 1999) ............................... 23

*Shell Petroleum, Inc. v. United States*, 182 F.3d 212 (3d Cir. 1999)......................................... 10

*Tilley Constructors & Eng'rs, Inc. v. United States*, 15 Cl. Ct. 559 (1988)............................... 23

*United Int'l Investigative Serv. v. United States*, 109 F.3d 734 (Fed. Cir. 1997) ........................ 11

*United States v. Diaz*, 245 F.3d 294 (3rd Cir. 2001).................................................................. 14

*United States v. Enas*, 255 F.3d 662 (9th Cir. 2001).................................................................. 14

*United States v. Goines*, 357 F.3d 469 (4th Cir. 2004) .............................................................. 14

*United States v. Hartec Enter., Inc.*, 967 F.2d 130 (5th Cir. 1992) ........................................... 15

*United States v. Johnson Controls, Inc.*, 713 F.2d 1541 (Fed. Cir. 1983).................................. 16

*United States v. Robie*, 166 F.3d 444 (2d Cir. 1999) ................................................................. 15


**Statutes**


Contract Disputes Act of 1978, 41 U.S.C. § 605(a)......................................................32, 33, 38

**TABLE OF AUTHORITIES (cont.)**

**Page**

**Other Authorities**

*Restatement (Second) of Contracts* § 202 (1981) ........ 10

*Restatement (Second) of Contracts* § 212 (1981) ........ 23

**Rules**

United States Court of Federal Claims Rule 56 ........ 1, 8

United States Court of Federal Claims Rule 57 ........ 1

**Regulations**

48 C.F.R. § 16.202-1 ........ 13

48 C.F.R. § 2.101 ........ 32

48 C.F.R. § 33.201 ........ 34

48 C.F.R. § 33.206 ........ 33

48 C.F.R. § 43.103(a) ........ 22

48 C.F.R. § 45.102 ........ 11, 20

48 C.F.R. § 45.104 ........ 25

48 C.F.R. § 45.301 ........ 20

48 C.F.R. § 45.302-6(d) ........ 21

48 C.F.R. § 45.402 ........ 11

48 C.F.R. § 45.402(a) ........ 14

48 C.F.R. § 45.505 ........ 24

48 C.F.R. § 52.232-16 ........ 15

48 C.F.R. § 52.232-16(d)(1) ........ 15

48 C.F.R. § 52.232-16(d)(6) ........ 15

48 C.F.R. § 52.245-1(e)(2)(ii) ........ 14

**TABLE OF AUTHORITIES (cont.)**

**Page**

48 C.F.R. § 52.245-10 .......... 20, 21

48 C.F.R. § 52.245-11 .......... 21

48 C.F.R. § 52.245-2(c) .......... 11, 12

48 C.F.R. § 52.245-2(c)(3) .......... 4, 8, 10

48 C.F.R. § 52.245-5(c) .......... 12

48 C.F.R. § 52.245-7 .......... 21

**TABLE OF CONTENTS OF APPENDIX**
**TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

*American Ordnance LLC v. United States, Case No. 07-867C*


| Exhibit No. | Description | Page No. |
|---|---|---|
| 1. | Declaration of Marilyn S. Daniel | 1 |
| 2. | Declaration of Daniel W. Darley | 11 |
| 3. | Department of Defense Manual for the Performance of Contract Property Administration, dated December, 1991 (DoD 4161.2-M) | 17 |
| 4. | Request for Proposal ("RFP") – Solicitation Offer and Award for DAAE30-96-R-0004, dated October 11, 1995 | 26 |
| 5. | Memorandum, dated November 2, 1995, re: Army Authority to Issue Letter Contract | 180 |
| 6. | Letter Contract DAAE30-96-C-0013, dated December 12, 1995 (the "Letter Contract") | 181 |
| 7. | Fax Transmission, dated March 14, 1996, Negotiation Timeline/Action Items | 190 |
| 8. | Letter Contract Amendment P00001, dated April 30, 1996 | 192 |
| 9. | Fax Transmission, dated May 16, 1996, forwarding Draft Facilitization Scope of Work | 195 |
| 10. | Letter, dated May 16, 1996, from David M. Banashefski ("Banashefski") to Mason & Hanger Corporation ("MHC") re: CLIN 0001AA. | 198 |
| 11. | Memorandum, dated May 17, 1996, from Jeff Hibler ("Hibler") to Banashefski re: MHC Position on ARDEC Offer for Facilitization for the M795 | 200 |
| 12. | E-mail, dated May 17, 1996, from D. Reed ("Reed") to Internal MHC re: M795 Proposal/Negotiations | 207 |
| 13. | Fax Transmission, dated May 28, 1996, re: Internal MHC Discussion of draft Facilitization Statement of Work | 209 |

| Exhibit No. | Description | Page No. |
| --- | --- | --- |
| 14. | Letter, dated May 30, 1996, from Valerie E. Colello, ARDEC CO, to Marilyn Daniel of MHC re: Statement Of Work Language Exclusion | 215 |
| 15. | Memorandum, dated June 3, 1996, from Hibler to Steve Talmadge ("Talmadge") re: Additional Issues for Discussion | 221 |
| 16. | Letter, dated June 5, 1996, from Colonel James Unterseher ("Unterseher") re: M795 Contract Negotiations | 222 |
| 17. | Memorandum, dated June 6, 1996, from Hibler to Internal MHC re: June 6, 1996 Telephone Conference with Banashefski and Talmadge | 224 |
| 18. | Memorandum June 10, 1996, re: Internal MHC Discussion of Negotiation Status | 230 |
| 19. | Memorandum, dated June 10, 1996, from Hibler to Talmadge re: Action Items from Telephone Call of June 6, 1996 | 234 |
| 20. | Fax transmission, dated June 14, 1996, from Mike Devine to Darl Heffelbower ("Heffelbower") re: Omitted Topics in Heffelbower June 12, 1996 Letter | 236 |
| 21. | Letter, dated June 18, 1996, from Heffelbower to Unterseher re: MHC Agreement to Accept Title to Line 3A Equipment | 238 |
| 22. | Memorandum, dated June 18, 1996, from Hibler to Talmadge re: Action Items for M795 Negotiations | 241 |
| 23. | Fax Transmission, dated June 20, 1996, from Talmadge to MHC forwarding Government's Revision of CLIN Structure | 243 |
| 24. | Meeting Summary, dated June 21, 1996, re: "Open Issues" as of June 25, 1996 | 245 |
| 25. | Memorandum, dated June 29, 1996, from Hibler to Internal MHC re: Continuation of M795 Negotiations | 247 |
| 26. | Memorandum, dated July 9, 1996, from Hibler to Internal MHC re: Record of Telephone Conversation with Banashefski | 251 |

| Exhibit No. | Description | Page No. |
|---|---|---|
| 27. | Memorandum, dated July 10, 1996, from Hibler to Internal MHC re: Telephone Conversation with Banashefski | 252 |
| 28. | Letter, dated July 17, 1996, from Hibler to Banashefski re: Confirmation of Price Agreement | 254 |
| 29. | Memorandum, dated August 13, 1996, from Hibler to Talmadge re: Comments on Draft M795 Contract | 255 |
| 30. | Memorandum, dated August 14, 1996, from Hibler to Internal MHC re: M795 Contract Final Execution | 257 |
| 31. | Definitized Contract, Modification PZ0001 to Contract No. DAAE30-96-C-0013, dated August 15, 1996 (the "M795 Contract") | 258 |
| 32. | Letter, dated August 19, 1996, from Hibler to Banashefski re: Liquidation of CLIN 0001AA and 0001AB | 339 |
| 33. | Memorandum, dated August 20, 1996, from Fred Taylor ("Taylor") (ACO) to Banashefski re: MHC Ownership of Line 3A Equipment | 340 |
| 34. | September 4, 1996 E-mail from ACO Taylor to current ACO Nelson re: Possible Future Request that MHC Return Title to Line 3A Equipment to the Government | 342 |
| 35. | Memorandum, dated October 7, 1996, from Banashefski to Taylor re: Receipt of August 20, 1996 Letter | 343 |
| 36. | Email, dated February 28, 1997 Internal MHC re: Slippage in Government's Material Delivery and Possible Earlier Payment | 344 |
| 37. | Letter, dated March 3, 1997, from J.R. Lohmann to Talmadge re: Payment of Facilitization at FAT under CLIN 0001AA instead of CLIN 0001AB | 346 |
| 38. | Modification P00003 to M795 Contract, dated March 13, 1997 | 348 |
| 39. | Letter, dated October 21, 1997, from Talmadge to MHC Directing MHC to Submit Invoice for CLIN 0001AA | 352 |

| Exhibit No. | Description | Page No. |
|---|---|---|
| 40. | Invoice and form DD250, dated October 24, 1997, for Payment of CLIN 0001AA | 353 |
| 41. | Memorandum, dated February 13, 1998, re: Facilities Use Sole Source Justification and Approval | 355 |
| 42. | Letter, dated August 12, 1999, from Frank Evans, DCAA, to Mickey Burkett ("Burkett") re: DCAA Review | 373 |
| 43. | Letter, dated September 14, 1999, from Burkett to DCAA re: DCAA Review | 376 |
| 44. | Letter, dated November 15, 1999, from Frank Evans, DCAA, to Mickey Burkett re: Response to AO re: DCAA Review | 384 |
| 45. | E-mail, dated July 13, 2000, Internal Government re: Line 3A Equipment that American Ordnance Owns | 387 |
| 46. | Contracting Officer's Final Decision letter, dated September 26, 2007 | 396 |
| 47. | Letter, dated October 26, 2007, from Charles Smith to Kristen Barnard re: Directive to American Ordnance to Retag Property and to Change Records | 405 |
| 48. | Trudy Hallgren presentation entitled: Acquisition Strategy for Milan and Iowa Army Ammunition Plants | 406 |
| 49. | Federal Acquisition Regulation ("FAR") Provisions (Jan. 1, 1996) | |
| | FAR § 2.101 | 408 |
| | FAR § 16.202-1 | 412 |
| | FAR § 33.201 | 413 |
| | FAR § 33.206 | 415 |
| | FAR § 45.102 | 416 |
| | FAR § 45.104 | 418 |
| | FAR § 45.301 | 420 |

| Exhibit No. | Description | Page No. |
| --- | --- | --- |
| | Federal Acquisition Regulation ("FAR") Provisions (Jan. 1, 1996) (continued) | |
| | FAR § 45.302-6 | 422 |
| | FAR § 45.402 | 423 |
| | FAR § 45.505 | 424 |
| | FAR § 52.232-16 | 425 |
| | FAR § 52.245-2 | 430 |
| | FAR § 52.245-5 | 436 |
| | FAR § 52.245-7 | 441 |
| | FAR § 52.245-10 | 445 |
| | FAR § 52.254-11 | 448 |
| 50. | Defendant's Response to Plaintiff's First Set of Interrogatories, First Request for Production of Documents, and First Requests for Admissions | 452 |
| 51. | Property Audit Report dated November 10, 1999 | 464 |
| 52. | Talmadge Deposition Transcript | 469 |
| 53. | Colello Deposition Transcript | 475 |
| 54. | James Nelson Deposition Transcript | 484 |
| 55. | Michael Walker Deposition Transcript | 493 |
| 56. | Banashefski Deposition Transcript | 497 |

Pursuant to Rules 56 and 57 of the Rules of the United States Court of Federal Claims ("R.C.F.C."), Plaintiff, American Ordnance LLC ("AO"), respectfully submits its Motion for Summary Judgment (the "Motion") on its Complaint seeking declaratory judgment. As established below, AO is entitled to declaratory judgment that AO owns the equipment comprising Production Line 3A (the "Line 3A Equipment") at the Iowa Army Ammunition Plant ("IAAAP") in Middletown, Iowa.

## I. INTRODUCTION

Eleven years after requiring that AO take title to the Line 3A Equipment as a condition to being awarded an ammunition production contract, the government informed AO that the government now claims ownership of the Line 3A Equipment so that it can offer the equipment as government furnished property to bidders in a current solicitation effort. In 1996, the government directed AO to take title to the Line 3A Equipment, along with assigning AO the obligations and risks associated with such ownership, and the government structured the resulting contract to achieve that result.

The government is not now permitted unilaterally to claim title to the Line 3A Equipment. The government's claim contradicts the plain language of the parties' contract, directly opposes eleven years of the parties' conduct regarding the Line 3A Equipment, and repudiates the parties' expressed intent in executing the contract. Even if the government's claim of ownership were meritorious, which it is not, the claim was asserted eleven years after the claim accrued, and is therefore barred by the applicable six-year statute of limitations. Both the law and basic fairness require that the Court hold the government to the bargain it struck eleven years ago by declaring that AO still owns the Line 3A Equipment, as it always has, despite the government's recent claim to the contrary.

### A. Summary of the Facts[1]

AO, or its predecessors-in-interest, have operated IAAAP for the United States Army (the "government" or the "Army") since 1951.[2] Pl. Facts, ¶ 1. IAAAP is operated as a government-owned contractor-operated ("GOCO") facility for production of ammunition items such as warheads and large-caliber ammunition. *Id.*, ¶ 3. Prior to the early 1990s, AO operated IAAAP under cost-plus-fixed-fee contract arrangements. *Id.*, ¶ 5. In the early 1990s, however, the government began to replace its prior contracting arrangements with "facilities use" contract arrangements, under which it is anticipated that contractors may make private investments and improvements in the facility and related personal property. *Id.*, ¶ 6. Under facilities use contracts, the government and other third-parties enter into separate contracts for the production of supplies at GOCO facilities such as IAAAP. *Id.*, ¶ 7. The government entered into two facilities use contracts with AO, one in 1993 (Contract No. DAAH09-94-E-0005), and another in 1998 (Contract No. DAAA09-98-E-0003). *Id.* (Together, AO and the government are referred to as the "parties.") AO currently operates and maintains IAAAP and another production facility, the Milan Army Ammunition Plant ("MLAAP"), pursuant to such facilities use contracts. *Id.*

As contemplated under facilities use arrangements, the government entered into separate contracts with AO for the production of ammunition. On December 12, 1995, the government

---

[1] AO sets forth the uncontroverted facts relevant to this matter in its Proposed Findings of Uncontroverted Fact ("Pl. Facts") filed herewith. R.C.F.C. 56(h)(1). AO relies upon the Plaintiff's Facts as the basis of its Motion. AO additionally references herein the Exhibits Contained in its Appendix in Support of its Motion ("Pl. App.").

[2] AO was formed in 1998 as a joint venture of its predecessors in interest, Mason & Hanger Corporation ("MHC") and General Dynamics Ordnance Systems, Inc. ("GDOS"). Pl. Facts, ¶ 1. References in this Brief to "AO" include its predecessors-in-interest.

issued "Letter Contract" No. DAAE30-96-C-0013 to AO for the production of supplies; specifically, production of 155mm M795 Projectiles (the "Letter Contract"). *Id.*, ¶ 11. On August 15, 1996, the parties reached agreement regarding the terms and final price and executed (*i.e.*, "definitized") the firm, fixed-price ("FFP") contract for production of M795 Projectiles in Modification No. PZ0001 (the "M795 Contract"). *Id.*, ¶ 34. During the negotiation period of the M795 Contract, AO informed the government that it would "facilitize," or procure, whatever equipment was necessary to create a production line to produce M795 Projectiles, *i.e.*, the Line 3A Equipment. *Id.*, ¶¶ 26-27. Also during the negotiation period, the government told AO that the government would not take title to, or be responsible for, the equipment AO procured to manufacture M795 Projectiles, including Line 3A Equipment. *Id.*, ¶¶ 18, 19, 21, 23.

The government Contracting Officer ("CO") responsible for negotiating the M795 Contract, David Banashefski ("Banashefski"), specifically directed AO that:

> It is important that the parties fully understand that this requirement is a production contract for the LAP [Load, Assemble, and Pack] of M795 projectiles and is not a facilities contract. Any facilities being procured are being done solely to meet the required LAP capacity for the M795 projectile. As such, the Government will not have title to the equipment and therefore, will not be responsible for maintenance of the same.

*Id.*, ¶ 19; Ex. 10, p. 199, May 16, 1996 Letter from Banashefski (emphasis in original).

CO Valerie Colello ("Colello") further confirmed that:

> This is a production requirement . . . and is not in any way a facilitization contract . . . . [I]n order to alleviate any further misunderstandings regarding the facilitization efforts, the resultant contract *will not* have a separate CLIN for the facilitization costs, but rather such costs will be included with the LAP production CLIN for the basic quantity. . . . [T]here will be no separate line item for any facilitization efforts which [AO] would have to accomplish in order to meet the required basic/option delivery requirements of the contract.

Pl. Facts, ¶ 23; Ex. p. 215, 218, May 30, 1996 Letter from Colello (emphasis in original). Collello further confirmed that the government was examining AO's price for facilitization for evaluation purposes only:

> In the [M795] RFP, the Government had asked the contractor to separately break out the costs for any necessary facilitization efforts for evaluation purposes only.

*Id*.

Based upon the government's direction, the parties agreed that AO would not be required to acquire the Line 3A Equipment for the government as a deliverable under the M795 Contract, and, thus, the government would not take title to the Line 3A Equipment. Pl. Facts, ¶ 29. Specifically, the parties included the standard FAR government property clause for FFP contracts (the "FFP Property Clause"), which provides that title to property acquired under a FFP-type contract only vests in the government for property acquired by the contractor for the government. *Id.*, ¶ 35. The FFP Property Clause provides:

> Title to each item of facilities…acquired by the Contractor for the Government under this contract shall pass to and vest in the Government when its use in performing this contract commences or when the Government has paid for it, whichever is earlier, whether or not title previously vested in the Government.

Ex. 31, p. 325; *see also* 48 C.F.R. § 52.245-2(c)(3) (1996) (emphasis added).[3] The parties purposely structured the M795 Contract to conform to the parties' intent and the terms of the FFP Property Clause, removing any requirement from the M795 Contract that AO acquire property for the government and deleting specific contract clauses that would have conveyed title to the government of the Line 3A Equipment. Pl. Facts, ¶¶ 37, 39, 40. Indeed, the parties

[3] Cited non-current provisions of the FAR are provided in the Appendix at Ex. 49, p. 408-451.

deleted all provisions of the Letter Contract that would have required AO to acquire the Line 3A Equipment for the government, including a separate Contract Line Item Number ("CLIN") for facilitization, and its associated Statement of Work ("SOW") paragraph. *Id.*

The parties' conduct following execution of the M795 Contract confirmed the contractual intent and AO's ownership of the Line 3A Equipment. Five days after the execution of the M795 Contract, the Administrative Contracting Officer ("ACO") at IAAAP, Fred W. Taylor ("Taylor"), one of the ACOs responsible for the administration of the M795 Contract, issued a memorandum confirming that AO was not required to acquire the Line 3A Equipment for the government, that the Line 3A Equipment would not be deliverable under the M795 Contract, and that the government would not take title to the equipment. *Id.*, ¶ 59. A month later, CO Banashefski confirmed ACO Taylor's understanding of the parties' agreement, discussing with Taylor the possibility of approaching AO at some future time to ask AO to consider returning title to the Line 3A Equipment to the government the next time a facilities contract was negotiated. *Id.*, ¶ 60.

On March 3, 1997, AO requested a contract modification that would shift a portion of its price for delivery of 1000 each, M795 Projectiles (SubCLIN 0001AB), described to relate to facilitization, and amortized over and meant to be paid at the time of delivery of this first production lot of M795 Projectiles, to the earlier First Article Test ("FAT") quantity of M795 Projectiles (SubCLIN 0001AA). This request was made to permit AO to receive timely payment from the government, despite the slippage of the government's schedule for the provisioning of certain government furnished materials needed to produce the M795 Projectiles (the "March 3, 1997 Request"). *Id.*, ¶ 67. The parties executed Modification P00003 ("P00003") to the M795 Contract on March 13, 1997, to address MHC's March 3, 1997 Request. *Id.*, ¶ 68. P00003

moved the portion of the M795 Projectiles' price from SubCLIN 0001AB to SubCLIN 0001AA, but had no other effect on the M795 Contract. *Id.*, ¶ 69. On October 21, 1997, the government directed AO to submit an invoice to the government for payment of the FAT quantity price for SubCLIN 0001AA, and AO submitted its Invoice and form DD250 for payment and liquidation of SubCLIN 0001AA. *Id.*, ¶¶ 70-71.

In 1998, an IAAAP CO recognized AO's ownership of Line 3A Equipment in describing AO's ownership of property at IAAAP. *Id.*, ¶ 73. In 1999, a Defense Contract Audit Agency ("DCAA") audit of AO's cost accounting practices regarding the M795 Contract concluded that AO owned the Line 3A Equipment, and that DCAA would not pursue any further investigation of AO's accounting for the Line 3A Equipment. *Id.*, ¶¶ 74-76. In addition, following execution of the M795 Contract, and continuing without interruption through September 2007, AO conspicuously tagged the Line 3A Equipment as AO-owned property (rather than government-owned property), and AO recorded the Line 3A Equipment as AO-owned property. *Id.*, ¶¶ 79-83. Indeed, AO's exercise of possession, ownership, and control of the Line 3A Equipment since the inception of the M795 Contract was "obvious" to the government ACO responsible for the administration of the M795 Contract at IAAAP. *Id.*, ¶ 86. Prior to May 2007, no government review or annual audit of AO's recording and tagging of Line 3A Equipment as AO-owned property ever identified such recording or tagging as erroneous. *Id.*, ¶¶ 87-88.

In August 2007, the Army initiated a competitive procurement for a follow-on contract for operation and maintenance ("O&M") of IAAAP and MLAAP. *Id.*, ¶ 92. On February 21, 2008, the Army issued Request for Proposal ("RFP") No. W52P1J-06-R-0201. *Id.*, ¶ 93. The Army contemplates in the current RFP, and thereby compels offerors to assume as part of their proposals, that the Line 3A Equipment will be government-furnished property that any new

contractor could use for its own production activities. *Id*. The estimated date of award of the new O&M contract is September 2008.

Only in its written final decision issued September 26, 2007 (the "Final Decision"), after eleven uninterrupted years of AO's possession, ownership, and control of the Line 3A Equipment, did the Army ever assert its claim of ownership. The Army ordered AO to re-tag the Line 3A Equipment as government-owned property, and to change its records to reflect government ownership, in preparation for the Army's competitive procurement for a follow-on O&M contract for IAAAP. *Id*., ¶ 94.

On October 30, 2007, AO complied with the Army's directive to re-tag the Line 3A Equipment and to change its records to reflect government ownership of the Line 3A Equipment. *Id*., ¶ 95. AO did not agree with the Army's directive, however, and thus, AO reserved its right to dispute the government's ownership claim. On December 10, 2007, AO filed its Complaint in this matter seeking a declaratory judgment that AO holds title to the Line 3A Equipment, and that the government's claim is barred by the applicable statute of limitations.

### B. The Uncontroverted Facts Require Entry of Summary Judgment for AO

As shown below, AO is entitled to summary judgment because the uncontroverted facts establish that, as a matter of law, AO owns the Line 3A Equipment. The plain language of the M795 Contract confirms that the contract is deliberately structured to require that AO take title to the Line 3A Equipment. The government purposely tailored the M795 Contract's existing CLIN structure to remove the Line 3A Equipment as a deliverable, eliminated the pre-established provision of the SOW that would have required AO's acquisition of the Line 3A Equipment for the government as part of the contract work requirement, and included or excluded other clauses based upon the understanding of AO's ownership of the Line 3A Equipment. The M795

Contract expressly requires only AO's delivery of M795 Projectiles. Accordingly, the M795 Contract's plain language establishes that the Line 3A Equipment was not acquired by AO for the government. The Line 3A Equipment is AO property. 48 C.F.R. § 52.245-2(c)(3) (1996). Moreover, the contemporaneous and subsequent conduct of the parties confirms the plain language of the contract. AO conspicuously tagged and recorded the Line 3A Equipment as AO-owned property for nearly eleven years, with full knowledge of the government, and without government dispute.

Even if the M795 Contract is found to be ambiguous, however, all extrinsic evidence supports AO's ownership of the Line 3A Equipment. During negotiations of the M795 Contract, the government repeatedly expressed its intent that AO take title to the Line 3A Equipment, but it demanded contractor ownership as a prerequisite to awarding the M795 Contract to AO. The government's intent that AO take title to the Line 3A Equipment is set forth in a number of written communications, dated before and after the execution of the M795 Contract.

Finally, even if the government's claim of ownership of the Line 3A Equipment could be supported, which it cannot, the claim is barred by the applicable statute of limitations because the claim was raised for the first time eleven years after the government first knew that AO took title in the Line 3A Equipment, and that AO was treating the equipment as AO-owned property rather than as government-owned property.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue of material fact and a party is entitled to judgment as a matter of law. R.C.F.C. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), *cert. denied*, 484 U.S. 1066 (1988); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986), *cert. denied*, 481 U.S. 1029 (1987). "By its

very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Once the moving party has carried its burden under R.C.F.C. 56(c), the non-moving party must do more than merely show that there is some metaphysical doubt as to the material facts. *Matsushita*, 475 U.S. at 586. To meet this burden, the nonmovant must "identify specific evidence in the record and articulate the 'precise manner' in which that evidence supported their claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994).

## III. TITLE TO THE LINE 3A EQUIPMENT IS VESTED IN AO BECAUSE THE M795 CONTRACT REQUIRES IT

The M795 Contract was deliberately drafted and structured to achieve the parties' desired goal – AO ownership of the Line 3A Equipment. After execution of the M795 Contract, both the government and AO treated the Line 3A Equipment as AO-owned property. Prior to the execution of the M795 Contract, the parties both expressed their understanding of the government's intent that AO would take title to the Line 3A Equipment. As established below, the M795 Contract requires that AO is vested title in the Line 3A Equipment.

### A. The Plain Language of the M795 Contract Requires That AO Retains Title to the Line 3A Equipment

To understand the parties' intent from the plain language of a contract, the Court should consider the contract language in its entirety. Thus, "[p]rovisions of a contract must be so construed as to effectuate [the] spirit and purpose [of the contract] . . . and interpreted so as to harmonize and give meaning to all of its provisions." *Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1057-58 (Fed. Cir. 1983). To that end, an interpretation that gives

meaning to the entire agreement will be favored over one that renders a portion of the agreement meaningless. *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed. Cir. 1985). Moreover, in interpreting contractual agreements, the words used therein should be read consistent with their common meaning or, if technical, consistent with their technical definition, unless the agreement defines otherwise. *Restatement (Second) of Contracts* § 202 (1981); *see Kearfott Guidance & Navigation Corp.*, ASBCA No. 45536, 01-2 B.C.A. ¶ 31,496, at 155,555 (*citing Corning Glass Works v. Brennan*, 417 U.S. 188, 201-02 (1974) and *Shell Petroleum, Inc. v. United States*, 182 F.3d 212, 217 (3d Cir. 1999)). The plain language of the M795 Contract establishes that the parties intended for AO to own the Line 3A Equipment.

**1. The M795 Contract's FFP Property Clause Mandates That Title Vest in the Government Only for Property the Contract Requires AO to Acquire and Deliver to the Government**

The M795 Contract contains the standard FFP Property Clause, FAR § 52.245-2, which provides, in relevant part, that "[t]itle to each item of facilities and special test equipment acquired by the Contractor for the Government under this contract shall pass to and vest in the Government." *See* M795 Contract, Part II, Section I.8 (emphasis added); *see also* 48 C.F.R. § 52.245-2(c)(3) (1996). The phrase "acquired . . . for the [g]overnment" is central to the proper interpretation of the M795 Contract, as well as the determination of whether title to the Line 3A Equipment was to transfer to the government. The plain and ordinary meaning of the phrase "acquired . . . for the government," together with the government's own guidance regarding the FFP Property Clause, supports AO's interpretation of the M795 Contract's relevant provision. Further, the FAR Council has verified the long-established understanding that the phrase "acquired . . . for the government" results in title transferring to the government under a FFP contract only for those items specifically identified as a deliverable end item. *See* 48 C.F.R.

§ 45.402 (2008). The relationship between different provisions in the FAR as it existed at the time of contracting establishes that "for the government" relates to and requires title transfer only for those items specifically provided for in the contract or the accompanying SOW. Accordingly, the M795 Contract's FFP Property Clause mandates that, for title to transfer to the government, the FFP contract must require the contractor to acquire something and deliver it to the government.

**a. The Plain and Ordinary Meaning of the Phrase "Acquired . . . for the Government" Establishes That the Government Is Vested Title Only in Items Required for Delivery Under FFP Contracts**

The Court "must interpret a contract as a whole and 'in a manner which gives reasonable meaning to all of its parts and avoids conflict or surplusage of its provisions.'" *Arko Executive Servs., Inc. v. United States*, 78 Fed. Cl. 420, 424 (2007) (*citing United Int'l Investigative Serv. v. United States*, 109 F.3d 734, 737 (Fed. Cir. 1997). This interpretive principle applies "with particular force in the context of the FAR, which, after all, is designed to provide a set of integrated procurement rules." *Arko Executive Servs., Inc.*, 78 Fed. Cl. at 424. FAR Part 45 provides the relevant context for government property matters, including the FFP Property Clause.

FAR Subpart 45.1 dictates that contractors under FFP contracts ordinarily are required to furnish "all property necessary to perform Government contracts . . . ." 48 C.F.R. § 45.102 (2008). This means that upon completion of performance of all the obligations of a FFP contract, title to all property which had not been delivered to, and accepted by the government, or which had not been incorporated in supplies delivered to and accepted by the government, remains vested in the contractor. *See* 48 C.F.R. § 52.245-2(c). Logically, unless a contractor is permitted to retain title to its property that it uses in performance of a FFP contract, the

government would gradually acquire all property of its contractors performing FFP contracts. Consequently, title to contractor-acquired property under FFP contracts will result in the government owning such property only if the contract contains a special term or separate CLIN directing the contractor to acquire and to deliver to the government the relevant property.

This fundamental background for understanding of the FFP Property Clause is firmly established, and is a view shared by the government. The Department of Defense ("DoD") guidance, dated December 1991, entitled "DoD Manual for the Performance of Contract Property Administration" ("DoD 4161.2-M"), explains the government's rights in title to contractor-acquired property under FFP contracts, as follows:

> Cost-type and time-and-materials contracts allow the contractor to acquire material for the Government as a direct charge to the contract. Title vests with the Government through the provisions of the Government property clause FAR 52.245-5(c). Fixed-price type contracts may provide for the contractor to acquire material for the Government as a direct charge to the contract when specifically listed as a line item in the contract. Title vests with the Government through the provisions of the Government property clause FAR 52.245-2(c). The method the contractor selects to acquire material for the Government is based upon several factors (determination of items needed, schedules of production or delivery, source identification, and quantities required).

DoD 4161.2-M, ¶ C3.5.1.2.2.1. (emphasis added).[4] Accordingly, the government has long-recognized that the FFP Property Clause requires that title transfer to the government only for those items specifically listed in a line item of the Contract for the contractor to acquire and deliver to the government.

[4] Cited provisions of DoD 4161.2-M are included as an Exhibit in Plaintiff's Appendix in Support of Plaintiff's Motion for Summary Judgment ("Ex."), Ex. 3, p. 17.

The plain and ordinary meaning of the operative title-vesting phrase "acquired…for the government" of the FFP Property Clause supports this shared interpretation that an FFP contract must specifically require the contractor's acquisition and delivery of property to the government for title transfer to occur. Where a contractor simply acquires and uses a piece of facilities or equipment in connection with its production of some product or service delivered to the government, the contractor is not "acquiring" the facilities or equipment "for the government." DoD 4161.2-M, ¶ C3.5.1.2.2.1. Rather, as here, the contractor is acquiring the facility or equipment for itself – to provide the product or service to the government that is the subject matter of the contract.

Finding that the FFP Property Clause phrase "acquired . . . for the government" means that title transfers to the government only for those items specifically required to be acquired and delivered by the contractor is consistent with the principles set forth in the FAR describing FFP contracts. A fixed price contract "places upon the contractor maximum risk and full responsibility for all costs and resulting profit and loss." 48 C.F.R. § 16.202-1 (2008). Thus, a FFP contract anticipates a situation where a contractor is responsible for performing the contract, including acquiring and maintaining whatever equipment and property is necessary to perform the contract for the fixed price. The government, on the other hand, assumes no such risk in a FFP contract and receives the items specifically set forth in the contract. To allow the government to assume title to property such as the Line 3A Equipment – equipment that it did not purchase or maintain, for which it bore no risk beyond its mere payment of the fixed-price for the delivery of the M795 Projectiles, and which was not included in the Contract as a deliverable – is contrary to the plain and ordinary meaning of the FFP Property Clause in the context of the principles set forth in the FAR governing fixed-price contracts.

**b. The FAR Council Has Definitively Verified AO's Interpretation of "Acquired . . . for the Government"**

The drafters of the FAR have settled any doubt concerning the proper interpretation of the phrase "acquired . . . for the government." In the context of fixed price contracts, the title-vesting requirements of the phrase mean that title transfers only for those items specifically identified as a deliverable end item. *See* 48 C.F.R. § 45.402(a) (2008). The FAR was amended, effective June 14, 2007, to state with respect to the title-vesting language of the relevant FAR property clause that:

> Under fixed price type contracts, the contractor retains title to all property acquired by the contractor for use on the contract, except for property identified as a deliverable end item.

48 C.F.R. § 45.402(a) (2008). Importantly, the FAR currently maintains in the standard property clause the very same prescriptive title-vesting language found in the M795 Contract's FFP Property Clause, stating that under fixed price type contracts, title passes to the government only for facilities "acquired by the Contractor for the Government." *See* 48 C.F.R. § 52.245-1(e)(2)(ii) (2008).[5] The legal effect of the applicable FAR title-vesting language for FFP contracts remains unchanged, but the FAR Council has now definitively verified the language to conform to the established understanding and practical operation of the provision.

---

[5] Because the amendment clarified, rather that substantively changed, the existing regulation, the amendment may be relied upon by the Court to provide interpretive guidance as to the underlying regulation. *See Means v. N. Cheyenne Tribal Court*, 154 F.3d 941, 951 (9th Cir. 1998) (a clarification is a statement "of what [Congress] believed the law already was"), *overruled on other grounds by United States v. Enas*, 255 F.3d 662 (9th Cir. 2001); *see also United States v. Goines*, 357 F.3d 469, 474 (4th Cir. 2004) (clarifying amendment changes nothing concerning the legal effect of the regulation, but merely clarifies what the enacting body deems the regulation to have already meant). If the amendment overrules a prior judicial construction of the guidelines, it is substantive; if it confirms a prior reading of the guidelines and does not disturb prior precedent, it is clarifying. *United States v. Diaz*, 245 F.3d 294, 303 (3rd Cir. 2001).

**c. AO's Interpretation of "Acquired . . . for the Government" Gives Meaning to All Terms of the M795 Contract and Avoids Creating Internal Conflict**

The progress payments clause contained in the M795 Contract, 48 C.F.R. § 52.232-16 (1996) (the "Progress Payments Clause"), is the mechanism used to finance the contractor's performance of an FFP contract. Pl. Facts, ¶ 50; Ex. 31, p. 300. "Progress payments" financing requires that, as a security, the government will temporarily hold title to any items acquired by the contractor for which progress payments are paid. *Id*. at § 52.232-16(d)(1) ) and (6) ). Once such progress payments are "liquidated," or repaid to the government as a result of a credit applied to the government's payment of the fixed-price for completed performance, the Progress Payments Clause <u>requires</u> that the government <u>return title</u> to the contractor for any items not "delivered to, and accepted by, the Government," or "incorporated in supplies delivered to, and accepted by the Government . . . ." *Id*. at § 52.232-16(d)(6). Thus, the Progress Payments Clause explicitly confirms, and is harmonious with, AO's position that title to property that a contractor acquires under a FFP contract, but is not required to deliver to the government, is contractor property.

To interpret the FFP Property Clause in some other manner would result in an irreconcilable conflict, rendering the relevant Progress Payments Clause title-vesting language without effect. The temporary title obtained by the government pursuant to the Progress Payments Clause are analogous to a security interest such as a lien. *See, e.g., Marine Midland Bank v. United States*, 687 F.2d 395, 403-04 (Ct. Cl. 1982); *United States v. Robie*, 166 F.3d 444, 453 (2d Cir. 1999); *United States v. Hartec Enter., Inc.*, 967 F.2d 130, 133 (5th Cir. 1992). Other courts have held that the Army actually takes title during this period. *See, e.g., In re Am. Pouch Foods, Inc.*, 769 F.2d 1190, 1196 (7th Cir. 1985); *Northrop Grumman Corp. v. County of*

*Los Angeles*, 36 Cal. Rptr. 3d 71, 76-78 (Cal. Ct. App. 2005). In either case, if AO's interpretation of "acquired . . . for the government" is not accepted in favor of some improperly broad interpretation advanced by the government, title to all property acquired by AO for performance of the Contract, including items subject to progress payments, would permanently transfer to the government. Such an overly broad interpretation of the meaning of the term "acquired . . . for the government" would grant the government title to items not required specifically to be delivered under an FFP Contract, and would render the Progress Payments Clause's title transfer language inoperative surplusage.

The Court must "construe contract language so as to give consistent meaning to all of the terms of a contract." *See Bataco Indus., Inc. v. United States*, 29 Fed. Cl. 318, 325 (1993); *see also Fortec Constructors*, 760 F.2d at 1292 (interpretation that gives meaning to all parts of the contract is preferred to one that leaves portions of the contract meaningless); *PCL Constr. Servs., Inc. v. United States*, 47 Fed. Cl. 745, 784 (2000) (same). No contract provision should "be construed as being in conflict with another [provision] unless no other reasonable interpretation is possible." *See United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir. 1983). To accept any government position that asserts a meaning of the phrase "acquired . . . for the government" that would grant title to the government in property acquired by AO for performance of the M795 Contract, the Court would be required to read portions of the Progress Payments Clause out of the M795 Contract. In contrast, AO's interpretation gives meaning to all terms, and is harmonious with, the title-vesting language of the M795 Contract's Progress Payments Clause. Thus, the M795 Contract's FFP Property Clause mandates AO's ownership of all property that AO was not required under the M795 Contract to acquire and deliver to the government.

### 2. The Government Deliberately Structured the M795 Contract to Require That AO Take Title to the Line 3A Equipment

The M795 Contract requires that the deliverables pursuant to the contract are 155mm M795 Projectiles, together with their associated obturators, supplemental charges, liner cups, and spacers. Pl. Facts, ¶ 36; M795 Contract, Ex. 31, p. 271, § C.3.1.1. The M795 Contract provides only that "[t]he contractor shall Load, Assemble, and Pack (LAP) a quantity of 79,468 each M795 projectiles . . . ." *Id.* Comparison of the plain language of the entire contract – both the Letter Contract and the definitized M795 Contract – reveals that the M795 Contract's language was purposely and significantly revised to remove any requirement that AO acquire the Line 3A Equipment for the government within the meaning of the M795 Contract's relevant FFP Property Clause.

#### a. The Parties Specifically Removed from the M795 Contract's Scope of Work a Paragraph That Required AO's Acquisition of the Line 3A Equipment for the Government and Conferred Title Upon the Government

The RFP that resulted in the M795 Contract, identified as DAAE30-96-R-0004 (the "M795 RFP"), contains paragraph C.3.9, which specifically required that the contractor acquire equipment for the government that would become government property:

> C.3.9, Equipment – Equipment purchased/fabricated by the contractor under this procurement shall be property of the U.S. government. A partial list of equipment includes: Preheat Ovens, Grid Melter, Melt Kettles, Pour Machines, Controlled Cooling Apparatus, and Post Cyclic Conditioners.

Pl. Facts, ¶ 10; Ex. 4, p. 34, M795 RFP. Paragraph C.3.9 was incorporated into the Letter Contract. Pl. Facts, ¶ 12 ("Incorporated herein and made part hereof is Section C of the solicitation DAAE30-96-R-0004.").

During negotiations of the M795 Contract, to achieve the government's directive that AO take title to the Line 3A Equipment, paragraph C.3.9 was specifically deleted from the definitized M795 Contract. Pl. Facts, ¶ 37. The plain language of the M795 Contract, which deletes the only contractual provision that would support the government's claim of title to the Line 3A Equipment, confirms that AO was <u>not</u> required to acquire the Line 3A Equipment for the government, and, instead, that the parties structured the M795 Contract to leave AO free to acquire whatever equipment it needed for its own production purposes to perform the contract and take title to such Line 3A Equipment. *Fireguard Sprinkler Sys., Inc. v. Scottsdale Ins. Co.*, 864 F.2d 648, 651 (9th Cir. 1988) ("Words deleted from a contract may be the strongest evidence of the intention of the parties"); *Royal Indem. Co. v. John F. Cawrse Lumber Co.*, 245 F. Supp. 707, 711 (D. Or. 1965) (deletion of the only language that specifically dealt with a subject is "of more than ordinary significance" when attempting to discovery the parties' intent). The parties' action to <u>delete</u> a specific paragraph from the Letter Contract that would require AO to acquire the Line 3A Equipment for the government, and convey title to the government, establishes the parties' intent to remove the <u>effect</u> of the deleted paragraph, and instead require AO to take title to the Line 3A Equipment.

**b. The Parties Specifically Removed from the M795 Contract a Separate SubCLIN That Once Required AO To Deliver the Line 3A Equipment to the Government**

The Letter Contract contains a specific SubCLIN requiring delivery to the government of "slow cool equipment," pursuant to SOW paragraph C.3.9:

> Deliveries are to be made in accordance with the following schedule:

| Line Item | Description | Quantity | [Date] |
|---|---|---|---|
| 0001AA | Design, Fabricate and Install Slow Cool Equipment | 1 lot | 21 Months [after award] |

Pl. Facts, ¶ 13; Ex. 6, p. 189. SubCLIN 0001AA in the Letter Contract required AO to acquire the "Slow Cool Equipment" for the government.

As with SOW paragraph C.3.9, however, the parties completely removed from the definitized M795 Contract the Letter Contract's SubCLIN 0001AA. Pl. Facts, ¶ 39. The M795 Contract replaced the Letter Contract's CLIN structure with a new CLIN structure that included only M795 Projectiles as deliverables. *Id.*, ¶ 40. Under the CLIN structure of the M795 Contract, AO was required to deliver one First Article Test ("FAT") lot quantity of M795 Projectiles pursuant to SubCLIN 0001AA. *Id.*, ¶ 41. AO was also required to deliver 1,000 each M795 Projectiles pursuant to SubCLIN 0001AB, and 76,968 M795 Projectiles pursuant to SubCLIN 0001AC. *Id.*, ¶ 42. SubCLIN 0001AB provides "descriptive data" stating that "this subclin includes 1,000 each M795 Projectiles at a total price of $173,920 and $9,310,071 in facilitization costs." *Id.*, ¶ 43. The Continuation Sheet contained in the M795 Contract provides further description, stating that the supplies and services required by SubCLIN 0001AB are "Load, Assemble, and Package M795 Projectiles in accordance with TDP [Technical Data Package] and Statement of Work Section C." *Id.*, ¶ 44. The quantity required for delivery relating to SubCLIN 0001AB is "1,000 units," – a quantity which <u>exclusively</u> refers to units of M795 projectiles, not Line 3A Equipment. *Id.*, ¶ 45. A note states that "[t]his subclin includes the costs for 1,000 ea M795 Projectiles (1,000 units x $173.92 = $173,920) as well as $9,310,071 in costs associated with special tooling, equipment, and facilitization efforts required by the

contractor to perform the M795 LAP Contract." *Id.*, ¶ 46.[6] No delivery of Line 3A Equipment is specified in the M795 Contract's CLIN structure. *Id.*, ¶ 47. The M795 Contract's SOW confirms this result by requiring only that "[t]he contractor shall deliver M795 projectiles as delineated in section F of this contract," *id.*, M795 Contract, Ex. 31, p. 271, § C.3.1, and by purposely excluding the preexisting paragraph C.3.9.

**3. The M795 Contract Would Have Been Structured Differently If the Parties Had Intended That the Government Take Title to the Line 3A Equipment**

The M795 Contract was deliberately structured to achieve the parties' desired result – a production contract for M795 Projectiles, with AO retaining title to and the risks associated with ownership of the Line 3A Equipment. In the Final Decision, the government in effect argues that the government actually intended to enter into a facilities acquisition contract for the Line 3A Equipment. As discussed above, such a position is not supported by the plain language of the M795 Contract. The government's position would require additional provisions in the M795 Contract that are nowhere included in the final agreement, further confirming that the M795 Contract does not require AO to acquire the Line 3A Equipment for the government.

FAR § 45.301 defines "facilities" as "property used for production, maintenance, research, development, or testing." 48 C.F.R. § 45.301 (1996). In addition to requiring that facilities to be delivered are described in the contract, inclusion of 48 C.F.R. § 52.245-10 (1996) is mandatory "when a facilities acquisition contract is contemplated." *See* 48 C.F.R. § 45.302-

[6] This language is consistent with the general rule that FFP contractors are required to furnish "all property necessary to perform Government contracts . . . ." 48 C.F.R. § 45.102 (2008). As CO Colello explained, this language was provided to document the government's receipt of facilitization pricing information "for evaluation purposes only." Pl. Facts, ¶¶ 23-25; Ex. 14, p. 215.

6(d) (FAR § 52.245-10, "Government Property (Facilities Acquisition)," provides that the CO "*shall* insert [FAR § 52.245-10] . . . in solicitations and contracts when a facilities acquisition contract is contemplated") (emphasis added); *see also* DoD 4161.2-M (directing that the contract include 48 C.F.R. § 52.245-7, -10, and -11. Pl. Facts, ¶ 51. The M795 Contract does not include 48 C.F.R. § 52.245-10,, a clause *required* to be included in contracts for the acquisition of facilities. The M795 Contract does not include 48 C.F.R. § 52.245-7, -10, or -11. The omission of such clauses from the M795 Contract illustrates the parties' intent that the M795 Contract was not a contract for the acquisition of facilities for the government, and is instead a production contract requiring AO to deliver to the government only M795 Projectiles.

Agency guidance echoes the requirements of FAR § 45.302-6(d) (1996):

> C2.4.5. Facilities. Facilities may be either Government-furnished or contractor-acquired. The facilities contract clauses, FAR 52.245-7, -10, and -11 set forth the title provisions. Facilities may also be acquired on contracts other than facilities contracts. In this instance, the title provisions in the Government property clause included in that instant contract will prevail.
>
> C3.5.5.2. Contractor-Acquired Facilities. All Government facilities to be acquired by a contractor shall be described in the facilities contract schedule, or as otherwise authorized.

DoD 4161.2-M, Ex. 3, p. 22, 25.

Because AO acquired the Line 3A Equipment, it became and remained contractor-acquired facilities. Therefore, DoD 4161.2-M anticipates that if the government wanted AO to acquire the Line 3A Equipment for the government, the CO would have included a description of the precise Line 3A Equipment in the Contract. It did not.

In fact, as described above, the government purposely removed from the M795 Contract any description of any kind of the Line 3A Equipment, as well as the requirement previously mandated by the Letter Contract for AO to acquire the Line 3A Equipment for the government.

Pl. Facts, ¶ 52-54. First, the M795 Contract contains no reference to any required facilitization or acquisition of equipment by AO for the government in the SOW. *Id.*, ¶ 52. Second, the M795 Contract contains no list of facilities that AO is purportedly required to acquire for and deliver to the government. *Id.*, ¶ 53-54. Third, the M795 Contract contains no reference to delivery of Line 3A Equipment in the Delivery Schedule, as it once did in the Letter Contract, because like SubCLIN 0001AA and SOW paragraph C.3.9 of the Letter Contract, any reference as to an obligation of AO to acquire equipment and deliver it to the government was purposely deleted from the M795 Contract pursuant to the parties intent.[7] *Id.*, ¶ 55. Instead, the M795 Contract's Delivery Schedule requires only deliveries of M795 Projectiles. *Id.*, ¶ 57. Finally, the M795 Contract contains no language directing AO regarding disposition of the Line 3A Equipment at the conclusion of production, such as storage, demilitarization, or decontamination requirements. *Id.*, ¶ 58. CO Colello's deposition testimony confirms that she would expect each clause to be included. *Id.*, ¶ 49, 54, 56. The absence of provisions that would have been included in the M795 Contract if AO were required to acquire facilities for the government reinforces the conclusion that the government did not take title to the Line 3A Equipment under the M795 Contract's plain language.

[7] The government contends that AO's Invoice and form DD250, submitted to receive payment from the government for the price for M795 Projectiles delivered for FAT purposes, somehow alter the plain language of the M795 Contract. An Invoice and DD250, however, are not part of the contract agreement and cannot modify or supplement the terms of the M795 Contract. *See* 48 C.F.R. § 43.103(a) (modification reflects agreement of the parties to modify the contract, and must be signed by contracting officer and contractor). Thus, the documents cannot alter the parties agreement reflected in the M795 Contract that AO owns the Line 3A Equipment.

### B. **The Parties' Contemporaneous and Subsequent Conduct Confirms the Plain Language of the M795 Contract**

The Court may confirm the plain language of the M795 Contract by reference to the parties' conduct and actions. Actions related to an agreement that are consistent with the language of the agreement always may be considered to determine the parties' intent. *Restatement (Second) of Contracts* § 212 cmt. b (1981); *see also Johnson Controls World Servs., Inc. v. United States,* 48 Fed. Cl. 479, 493 (2001). Parties' actions prior to the time a controversy arose are highly relevant in determining intent. *Tilley Constructors & Eng'rs, Inc. v. United States*, 15 Cl. Ct. 559, 565 (1988) (relevant evidence of conduct connected with the controversy rendered other evidence inapt to determine intent of parties); *Aluminum Co. of Am. v. United States*, 2 Cl. Ct. 771, 777 (1983) (recognizing that "contemporaneous 'external indications of the parties joint understanding'" may be considered in contract interpretation). In fact, the parties' conduct may reveal more about their intent than the language of the agreement alone. *See Johnson Controls*, 48 Fed. Cl. at 494; *Saul Subsidiary II Ltd. P'ship v. Barram*, 189 F.3d 1324, 1326 (Fed. Cir. 1999) (noting "[i]t is a familiar principle of contract law that the parties' contemporaneous construction of an agreement before it has become the subject of a dispute, is entitled to great weight in its interpretation"), *citing Blinderman Constr. Co. v. United States*, 695 F.2d 552, 558 (Fed. Cir. 1982); *Coastal Gov't Servs., Inc.*, ASBCA No. 50283, 01-1 B.C.A. 31,353 at 154,832. Thus, in construing the meaning of the M795 Contract, the Court should give "the parties' contemporaneous actions 'great weight' in determining their intentions." *Coastal Gov't Serv., Inc.*, 01-1 B.C.A. at 154,832. "[H]ow the parties act under the arrangement before the advent of a controversy, is often more revealing than the dry language of the written agreement by itself." *Macke Co. v. United States*, 467 F.2d 1323, 1325 (Ct. Cl. 1972).

AO consistently treated the Line 3A Equipment as its property until the government issued the Final Decision requiring it to do otherwise. Pl. Facts, ¶ 79-86, 91-92. When MHC and GDOS jointly formed AO in 1998, MHC listed the Line 3A Equipment as part of its capital contribution to the new company rather than as government property. *Id.*, ¶ 78. Government representatives acknowledged AO ownership of the Line 3A Equipment prior to and during the negotiation of the newly formed 1998 Facility Use Contract with AO for operation of the IAAAP and Milan Army Ammunition Plant. *Id.*, ¶ 72-73.

Moreover, AO has worked closely with authorized government representatives for many years concerning the identification of the parties' ownership of contractor-acquired property (e.g., marking of the parties' respective property) and the administration of government property under the Facilities Use Contracts and FFP contracts at IAAAP. To administer the government property requirements of AO's contracts, the government continuously has employed property administrators at IAAAP and MLAAP to verify that the proper identification of government property occurs and to ensure proper marking and administration of such property. *Id.*, ¶ 87. Additionally, AO produces, maintains, and submits to the government numerous government property records pursuant to the parties' agreed-upon procedures and the terms of AO's contracts. *Id.*, ¶ 87-88; *see also* 48 C.F.R. § 45.505 (1996).

The government property administrator has had complete access to all of AO's records for government property since execution of the Letter Contract in 1995, and has had complete access to AO's entire property records system at IAAAP since 2000. Pl. Facts, ¶ 87. The government's property administrator receives information concerning AO's property acquisitions and performs annual audits that specifically evaluate AO's property acquisitions and AO's related records for the purpose of confirming that AO's property system accurately identifies the

ownership of contractor-acquired property at IAAAP and MLAAP in compliance with contract requirements. *See* 48 C.F.R. § 45.104 (1996). Such audits did not identify any issue with AO's tagging and recording the Line 3A Equipment as AO-owned property. Pl. Facts, ¶ 87.

AO's treatment of the Line 3A Equipment as AO-owned property, and not as government-owned property, including AO's clearly visible marking of such as AO property and its annually-reviewed property records identifying the Line 3A Equipment as AO-owned property, demonstrates the parties' intent that title to the Line 3A Equipment remain in AO. Indeed, AO's actions of possession, ownership, and control of the Line 3A Equipment were "obvious" to the relevant government representatives who administered the M795 Contract and the other contracts at IAAAP since the inception of the M795 Contract on August 15, 1996. *Id.,* ¶ 86 (fact that contractor tagged Line 3A Equipment as AO-owned was "pretty obvious"). Following execution the M795 Contract, both AO and the government have recognized for over eleven years that AO owns the Line 3A Equipment, and they have acted accordingly.

### C. <u>All Extrinsic Evidence Supports the Parties' Intent That AO Would Own the Equipment</u>

As discussed above, the M795 Contract's plain language establishes that AO holds title to the Line 3A Equipment, and the parties' conduct confirms this result. When the plain language of an agreement is clear because there exists only one reasonable interpretation that is supported by the parties' intent, as demonstrated by the agreement's wording and the parties' conduct, the Court need not inquire any further. *See First Nationwide Bank v. United States,* 48 Fed. Cl. 248, 260-61 (2000). If an ambiguity exists, however, the Courts may examine the extrinsic evidence to determine the intent of the parties. *See McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434 (Fed. Cir. 1996); *Perry-McCall Constr., Inc. v. United States*, 46 Fed. Cl. 664 at 671 (2000). The extrinsic evidence, including the government's written and verbal directions to AO

during the negotiation of the M795 Contract and the parties' written exchanges after the M795 Contract was executed, overwhelmingly supports that the parties intended that AO take title to the Line 3A Equipment.

### 1. The Parties' Negotiation Correspondence and Actions Conclusively Demonstrate That the Government Required That AO Agree to Take Title to the Line 3A Equipment as a Condition of Being Awarded the M795 Contract

Following negotiation sessions on approximately May 13 and 14, 1996, government negotiators, including CO Banashefski and Contract Specialist Steven Talmadge ("Talmadge"), informed AO that the government would not take title to the Line 3A Equipment. Pl. Facts, ¶ 18-19. AO informed Banashefski that the language of the RFP (and by incorporation, the Letter Contract), including SubCLIN 0001AA and SOW paragraph C.3.9, would need to be changed if the government intended for AO to take title to the Line 3A Equipment. *Id.*

Banashefski confirmed the government's intent that AO would take title to the Line 3A Equipment in a letter sent May 16, 1996 (the "Banashefski Letter"). *Id.*, ¶ 19; Banashefski Letter, Ex. 10, p. 199. The Banashefski Letter confirmed that the government did not intend to take title to the Line 3A Equipment:

> It is important that the parties fully understand that this requirement is a *production contract for the LAP [Load, Assemble, and Pack] of M795 projectiles and is not a facilities contract.* Any facilities being procured are being done solely to meet the required LAP capacity for the M795 projectile. As such, the Government will not have title to the equipment and therefore, will not be responsible for maintenance of the same.

*Id.* (emphasis in original). Moreover, the Banashefski Letter was coordinated with, and authorized by, the government's legal adviser. *Id.*; Pl. Facts, ¶ 20.

Following the Banashefski Letter, AO proposed to the government alternative language to the M795 Contract scope of work for facilitization that would clarify in the M795 Contract

that the government's intent that AO would take title to the Line 3A Equipment. Pl. Facts, ¶ 22. The government rejected AO's proposed language in a letter response dated May 30, 1996 from CO Valerie E. Colello (the "Colello Letter"). *Id.*, ¶ 23. The Colello Letter states as follows:

> After thoroughly reviewing M&H's draft SOW for the facilitization efforts needed to meet the required LAP production delivery schedules, the Government has determined that such language is not necessary for this contract.

*Id*. Further, the Colello Letter states that:

> This is a production requirement . . . and is not in any way a facilitization contract . . . . In the [M795] RFP, the Government had asked the contractor to separately break out the costs for any necessary facilitization efforts <u>for evaluation purposes only</u>.

*Id*. (emphasis added). Further, the government directed that:

> in order to alleviate any further misunderstandings regarding the facilitization efforts, the resultant contract *will not* have a separate CLIN for the facilitization costs, but rather such costs will be included with the LAP production CLIN for the basic quantity.

*Id*. The government confirmed that:

> there will be no separate line item for any facilitization efforts which [AO] would have to accomplish in order to meet the required basic/option delivery requirements of the contract.

*Id*.

The government's requirement that AO take title to the Line 3A Equipment presented a significant risk to AO because AO was concerned that unforeseen consequences that might occur during production, such as the damage or destruction of a piece of Line 3A Equipment, would result in significant additional costs to AO to replace the equipment. *Id.*, ¶ 27. AO took over a month to consider the increased risk that accepting ownership of the Line 3A Equipment would inject into the M795 Contract. *Id.*, ¶ 29.

By letter dated June 18, 1996, from AO representative Darl J. Heffelbower to Army Colonel James E. Unterseher (the "Heffelbower Letter"), AO informed the government that MHC agreed to the government's requirement that AO take title to the Line 3A Equipment. *Id.* In addition to the Heffelbower Letter, AO negotiators expressed to government negotiators, including Banashefski and Talmadge, that AO agreed to take title to the Line 3A Equipment. *Id.*, ¶ 30. Banashefski and Talmadge acknowledged AO's agreement to take title to the Line 3A Equipment. *Id.*, ¶ 30.

AO's decision to accept title to the Line 3A Equipment rendered moot certain other issues raised during the negotiations, such as a facilitization SOW paragraph that defined the specific equipment that would be delivered, or the terms and conditions required to be added to the M795 Contract for facilitization. *Id.*, ¶ 31. The parties continued negotiations related to the M795 Contract, and developed an action item list for completing the negotiations. *Id.*, ¶ 32. Item 2 from the Action Item List required the government to revise the contract language so that AO would be timely paid for its efforts pursuant to the M795 Contract, and would ultimately own the Line 3A Equipment. *Id.* On June 20, 1996, Talmadge provided to AO a draft of a revised CLIN structure which would accomplish Action Item 2. *Id.*, ¶ 33. The revised CLIN structure provided by the government deleted the Letter Contract's separate SubCLIN 0001AA, which previously required that MHC acquire and deliver the Line 3A Equipment to the government in accordance with SOW Section C.3.9. *See* Ex. 23, p. 244. The new CLIN structure contained deliverables of projectiles only. *Id.* The government also removed SOW paragraph C.3.9 associated with the Letter Contract's SubCLIN 0001AA from the M795 Contract entirely. Pl. Facts, ¶ 37.

By agreeing to take title to the Line 3A Equipment and to do so at a fixed price, AO bore the risk associated with correctly estimating the manhours of effort and the equipment needed to meet the required production quantities and schedule. *Id.*, ¶ 26. Had AO underestimated the effort and equipment needed to manufacture M795 Projectiles, AO would have been required to purchase and install additional equipment while still being bound by its fixed price for the delivery of M795 Projectiles. *Id.* Consistent with the direction provided in the Colello Letter, the price of facilities was negotiated only so that the government could evaluate the reasonableness of MHC's price for M795 Projectiles. *Id.*, ¶ 23-25 ("the Government had asked the contractor to separately break out the costs for any necessary facilitization efforts for evaluation purposes only," a "common practice").

The final, negotiated M795 Contract deleted the Letter Contract's SubCLIN 0001AA and any reference to any requirement that AO would acquire equipment for the government in the M795 Contract SOW. *Id.*, ¶ 39. Thus, the final, negotiated M795 Contract, consistent with the government's direction that the M795 Contract was "a production requirement . . . and is not in any way a facilitization contract," contained no separate CLIN for facilitization, no reference to any requirement in the scope of work for facilitization, and no requirement that MHC deliver the Line 3A Equipment. *See* Daniel Dec., Ex. 1, p. 8-9, ¶ 22; Pl. Facts, ¶ 38, 49, 54, 56 (CO Colello stating that she would expect the contract to have included each).

All evidence from the negotiations of the M795 Contract confirm that the parties took specific actions to draft a contract that allowed AO to be paid a price for delivering M795 Projectiles that would permit AO to recover the costs of facilitization built into its price, while conveying title to the Line 3A Equipment to AO. Indeed, all evidence from the negotiation confirms that eleven years before any controversy arose, the government unambiguously directed

AO that it must take title to the Line 3A Equipment. *See, e.g.*, Ex. 10, p. 199, May 16, 1996 Banashefski Letter; *Macke Co.,* 467 F.2d at 1325. As the *Macke* court recognized, the government's statements made eleven years ago, contemporaneous with the negotiation of the M795 Contract, reveal the government's intent in drafting the final M795 Contract.

### 2. The Government Acknowledged AO's Ownership of the Line 3A Equipment After Execution of the M795 Contract

On August 20, 1996, an authorized IAAAP Administrative Contracting Officer ("ACO") for the M795 Contract, Fred W. Taylor, Jr., stated his understanding of the terms of the M795 Contract:

> [A]ll new facilities (equipment and buildings) acquired by [AO] under the facilitization phase of the M795 program will not be called out as deliverables under the contract . . . . The Government does not intend to take title to the facilities even though they are to be direct costed.

Pl. Facts, ¶ 59; Ex. 33, p. 340 (the "August 20, 1996 Memorandum"). No government representative, including Banashefski and Talmadge, communicated to AO any disagreement with ACO Taylor's independent confirmation of AO's ownership of the Line 3A Equipment. Pl. Facts, ¶ 62. Banashefski responded to the August 20, 1996 Memorandum by letter dated October 7, 1996, but did not communicate any dispute with ACO Taylor's statements regarding AO's ownership of the Line 3A Equipment. *Id.*, ¶ 61.

Again, in 1998, the government's CO for IAAAP and MLAAP, Ms. Trudy Hallgren, acknowledged AO's ownership of property AO acquired under its FFP contracts. Hallgren Presentation. *Id.*, ¶ 73. CO Hallgren prepared a presentation in which she justified an Army sole-source contract award to AO based, in part, upon AO's ownership of over $10 million of equipment at IAAAP, including certain of the Line 3A Equipment. *Id.* The Army's relevant contracting personnel, therefore, long understood that AO owned the Line 3A Equipment.

In 1999, DCAA conducted a post-award audit of the M795 Contract relating to AO's cost accounting practices regarding the Line 3A Equipment. *Id.*, ¶ 74; Ex. 42, p. 374. After conducting an investigation, DCAA's auditor stated that:

> We have reviewed all the negotiation correspondence provided by AO and the Army concerning the M795 Basic Contract Negotiations. We can find no documents indicating that the Army ever intended for the facility and equipment to be "special purpose." In fact to the contrary, we found Army correspondence indicating clearly that the government did not want title to the facility and equipment.

*Id*. The Army provided documents and information to DCAA in connection with the 1999 audit, but provided no document that led DCAA to conclude that AO's ownership of the Line 3A Equipment was not correct. Pl. Facts, ¶ 75-76 (DCAA auditor stating that, after investigation and consultation with relevant ACOs responsible for administering the M795 Contract that he had no reason not to believe the contractor's assertion that it owned the Line 3A Equipment was erroneous). After further investigation, DCAA declined to pursue any further audit issue regarding a potential cost accounting standards noncompliance because of DCAA "buy in" with respect to AO's audit response and the "unique nature of the situation surrounding the M795 facilities." Pl. Facts, ¶ 75-76. The voluminous extrinsic evidence created contemporaneously with, and subsequent to, the execution of the M795 Contract verifies that, even if the M795 Contract is ambiguous, the parties intended that AO take title to the Line 3A Equipment.

## IV. <u>THE GOVERNMENT'S CLAIM OF OWNERSHIP OF THE LINE 3A EQUIPMENT IS BARRED BY THE STATUTE OF LIMITATIONS</u>

In 1996, the parties negotiated the M795 Contract. Just five days after execution of the M795 Contract, on August 20, 1996, ACO Taylor drafted a memorandum that confirmed that AO would take title to the Line 3A Equipment. To produce the M795 Projectiles required to be delivered pursuant to the M795 Contract, AO acquired the Line 3A Equipment. AO

conspicuously tagged the Line 3A Equipment as AO-owned property using different colored tags for AO-owned equipment than the tags for government-owned equipment, and AO recorded the Line 3A Equipment as AO-owned property. Each year since the Line 3A Equipment was acquired, the government property administrator audited Production Line 3A at IAAAP and AO's property records without raising any concern regarding AO's ownership of the Line 3A Equipment. The government issued its Final Decision asserting as a matter of right its alleged ownership in the Line 3A Equipment on September 26, 2007.[8] Because the government has actually known of AO's ownership of the Line 3A Equipment since the execution of the M795 Contract, as confirmed in ACO Taylor's August 20, 1996 memorandum, without ever asserting a claim in a CO decision that AO's ownership was not correct until late 2007, the government's claim is barred by the statute of limitations.

### A. **<u>The Contract Disputes Act Six-Year Statute of Limitations Applies to the Government's Claim Under the M795 Contract</u>**

The Contract Disputes Act of 1978 ("CDA") includes a six-year statute of limitations for all contract claims. 41 U.S.C. § 605(a). The pertinent provision provides:

> All claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting

[8] FAR § 2.101 defines a "claim" as "'a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract.'" *Sarang Corp. v. United* States, 76 Fed. Cl. 560, 564 (2007) (quoting 48 C.F.R. § 2.101 (2007)) ; *see also Precision Pine & Timber, Inc. v. United States*, 62 Fed. Cl. 635, 643 (2004) (a final decision by a contracting officer that demanded "something due or believed to be due" constitutes a claim by the government). Because the government's Final Decision removes ownership of the Line 3A Equipment from AO, seeks as a matter of right validation of its interpretation of the M795 Contract terms, and requires AO to adjust its tagging and records, the decision both seeks adjustment and interpretation of contract terms and seeks other relief arising under or relating to the M795 Contract. Thus, the government's Final Decision states a government claim.

> officer. Each claim by a contractor against the government relating to a contract and each claim by the government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim. The preceding sentence does not apply to a claim by the government against a contractor that is based on a claim by the contractor involving fraud.

*Id.* (emphasis added).

The United States Congress added the six-year limitations period to the CDA in 1994. Thereafter, the Office of Federal Procurement Policy issued FAR § 33.206 (48 C.F.R. § 33.206), which provides that the CDA statute of limitations applies to contracts awarded on or after October 1, 1995. *See Motorola, Inc. v. West*, 125 F.3d 1470, 1473 (Fed. Cir. 1997); 48 C.F.R. § 33.206. The government issued the Letter Contract on December 12, 1995, and the parties executed the M795 Contract on August 15, 1996. By either date, the CDA statute of limitations applies to the government's claim of ownership of the Line 3A Equipment as the asserted in the September 26, 2007 Final Decision.

### B. The Government's Claim of Ownership of the Line 3A Equipment Accrued Under the M795 Contract When the M795 Contract Was Executed on August 15, 1996

A claim accrues under the CDA statute of limitations when (1) the events that fix the alleged liability have occurred, and (2) the claimant knows or should have known about such events. *Axion Corp. v. United States*, 68 Fed. Cl. 468, 481 (2005). Similarly, the FAR defines "accrual of a claim" as follows:

> "Accrual" of a claim means the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known. For liability to be fixed, some injury must have occurred. However, monetary damages need not have been incurred.

48 C.F.R. § 33.201 (2008). Each of these elements were satisfied at the time the M795 Contract was executed, resulting in the government's claim accruing well in excess of the six-year limitations period applicable to its September 26, 2007 Final Decision.

**1. The Events That Fix Liability Occurred at the Time the M795 Contract Was Executed**

A claim accrues under the CDA when "all events that fix liability have occurred. *Axion Corp.*, 68 Fed. Cl. 480. This includes "some injury." *Id.* at 480-81 (citing *SAB Constr., Inc. v. United States*, 66 Fed. Cl. 77, 88 (2005)). Monetary damages are not necessary to determine the injury and to fix liability. *Gray Pers., Inc.*, ASBCA No. 54652, 06-2 B.C.A. ¶ 33,378.

The Court's inquiry to determine when liability is fixed requires it to examine the legal basis of the claim at issue. *Id.* In this case, the government's claim of ownership of the Line 3A Equipment is straightforward – the government claims that the M795 Contract itself gives the government title to the Line 3A Equipment, and has since the contract was executed in 1996. Accordingly, only two events fix liability in this case: (1) the execution of the M795 Contract; and (2) AO's possession, ownership, and control of the Line 3A Equipment that is inconsistent with the government's purported ownership.

The M795 Contract was executed on August 15, 1996. As of that date, the government's legal bases for claiming ownership of the Line 3A Equipment were complete. Accordingly, as soon as AO took any action that contradicted the government's purported ownership, liability was fixed and legal injury occurred. AO began purchasing equipment that became the Line 3A Equipment following execution of the Letter Contract on December 12, 1995. Pl. Facts, ¶ 63. Prior to the execution of the M795 Contract on August 15, 1996, AO tagged and recorded such Line 3A Equipment as government-owned property pursuant to the Letter Contract clause C.3.9. *Id.*, ¶ 64. After execution of the M795 Contract, on or about September 1, 1996, AO re-tagged

the equipment that had been previously tagged and recorded as government-owned property when purchased pursuant to the Letter Contract, and began tagging and recording subsequently purchased Line 3A Equipment as AO-owned property. *Id.*, ¶ 65. In addition, AO maintains detailed property records of all government-owned and all AO-owned property located at the IAAAP facility. *Id.*, ¶ 84. AO recorded the Line 3A Equipment as AO-owned property in its records. *Id.*, ¶ 85. AO's possession, ownership, and control of the Line 3A Equipment was "obvious" to the government representatives authorized to administer the M795 Contract. *Id.*, ¶ 86.

If, as the government claims, AO were required to deliver the Line 3A Equipment to the government pursuant to the M795 Contract, and the government owned the Line 3A Equipment, AO breached the M795 Contract immediately upon execution by failing to deliver the Line 3A Equipment, by tagging the Line 3A Equipment as AO-owned property, and by recording the Line 3A Equipment as AO-owned property rather than as government-owned property. A breach of contract claim has four elements: (1) a valid contract between the parties; (2) a duty arising from the contract; (3) a breach of that duty; and (4) damages caused by that breach. *See San Carlos Irrigation & Drainage Dist. v. United* States, 111 F.3d 1557, 1563 (Fed. Cir. 1997). The amount of damages need not be precisely determined when responsibility for them is clear. *Id.* If the Line 3A Equipment were in fact government-owned property, the government would have been injured by AO's assertion of title to that property immediately after execution of the M795 Contract when AO retagged Line 3A equipment as its own.

**2. The Government Was on Notice That It Had a Potential Claim as of August 20, 1996**

"Once a party is on notice that it has a potential claim, the statute of limitations can start to run." *Gray Pers., Inc.*, ASBCA. No. 54652, 06-2 B.C.A. at 165,476. Furthermore, a potential

claimant will have constructive notice of a possible claim "when the underlying facts of a claim become known or knowable…." *Sankey v. United States*, 22 Cl. Ct. 743, 745 (1991). As described above, the ACO responsible for the administration of the M795 Contract, Fred W. Taylor, Jr., stated his understanding of the terms of the M795 Contract in his memorandum dated August 20, 1996:

> [A]ll new facilities (equipment and buildings) acquired by [AO] under the facilitization phase of the M795 program will not be called out as deliverables under the contract . . . . The Government does not intend to take title to the facilities even though they are to be direct costed.

August 20, 1996 Memorandum, Ex. 33, p. 340. As of this date, then, the government was aware that <u>its own ACO</u> would administer the M795 Contract in such a way as to require AO to take title to the Line 3A Equipment. Accordingly, ACO Taylor's August 20, 1996 Memorandum provided notice to the government of a potential claim regarding title to the Line 3A Equipment. In fact, ACO Nelson testified during his deposition that the M795 CO was notified of a potential issue regarding ownership of the Line 3A Equipment in 1996. Pl. Facts, ¶ 89.

If, however, the August 20, 1996 Memorandum is found not to have given the government sufficient notice of its potential claim, the conspicuous and "obvious" AO possession, ownership, and control of the Line 3A Property, the government's subsequent property audits of the Line 3A Equipment and the M795 Contract, and the 1999 DCAA audit of the M795 Contract certainly did. As discussed above, the government's ACO confirms that AO's tagging of the Line 3A Equipment was "obvious." Pl. Facts, ¶ 86. The government property administrators at IAAAP have had complete access to AO's property records, have verified that AO has properly identified government property, and have reviewed the property records that AO has submitted to the government on numerous occasions since 1995. *Id.*, ¶ 87.

The government's property administrator specifically reviewed the Line 3A Equipment tagging and records in her annual audits, and found AO's records to be satisfactory. *Id.*, ¶ 88 ("no deficiencies were found during the review" of "the contractor's process of properly identifying Government property," and that "assets are labeled, tagged or otherwise identified according to the approved property control procedures upon fabrication or receipt"). Finally, the government admitted in its written discovery responses that government personnel at IAAAP were aware of AO's tagging and recording of the Line 3A Equipment as AO-owned property prior to 2001. Pl. Facts, ¶¶ 90-91.

Further, as discussed above, DCAA conducted a post-award audit of the M795 Contract relating to the Line 3A Equipment in 1999, which concluded that "the government did not want title to the facility and equipment," and found no cause to pursue a potential CAS noncompliance. *Id.*, ¶ 74-76. The DCAA action and findings therefore constitute further explicit notice to the government that AO treated the Line 3A Equipment as AO-owned property, and yet the Final Decision was not issued until late 2007.

The government bases its alleged claim of ownership on the M795 Contract. For the reasons set forth above, the events that fixed the government's claim of ownership to the Line 3A Equipment arise from the M795 Contract and were fixed as of the date of its execution on August 15, 1996. Notice to the government of a potential for claim was given no later than the August 20, 1996 issuance of ACO Taylor's memorandum which stated that the M795 Contract would be administered such that AO owned the Line 3A Equipment. Even were ACO Taylor's memorandum somehow viewed as insufficient notice, the facts establish that AO's "adverse" possession, ownership, and control of the Line 3A Equipment was conspicuous and obvious, and that the government had actual notice of a potential claim well over six years prior to its Final

Decision leading to this litigation. Accordingly, 41 U.S.C. § 605(a) bars the government's claim of ownership of the Line 3A Equipment because the claim was asserted on September 26, 2007, well in excess of six years since the government's claim accrued.

## V. CONCLUSION

Eleven years ago, the government deliberately structured the M795 Contract to require AO to take title to the Line 3A Equipment and to assign to AO the obligations and risks associated with such ownership. The government not only understood that AO would take title to the Line 3A Equipment under the terms of the M795 Contract, but the government required it as a condition of awarding the M795 Contract to AO. Now, the government seeks to alter the deal for the expediency of its current procurement action. As set forth above, the government's claim of title is not supported by the plain language of the M795 Contract, is contrary to the conduct of the parties in administering the M795 Contract, directly contradicts the intent expressed by the parties at the time the M795 Contract was negotiated, and is time-barred by the CDA statute of limitations.

WHEREFORE, for the reasons set forth above, AO respectfully requests that the Court enter summary judgment in its favor, declaring that AO owns the Line 3A Equipment, and that the government's claim of ownership is barred by the applicable statute of limitations.

Respectfully submitted this 30th day of June, 2008.

*s/ Steven M. Masiello*

Steven M. Masiello
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
Telephone: (303) 634-4000
Facsimile: (303) 634-4400
E-mail: smasiello@mckennalong.com

ATTORNEY FOR PLAINTIFF, AMERICAN ORDNANCE LLC

Of Counsel:

Timothy R. Odil
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
Telephone: (303) 634-4000
Facsimile: (303) 634-4400
E-mail: todil@mckennalong.com