**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES,<br><br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**PLAINTIFF AMERICAN ORDNANCE LLC'S PROPOSED FINDINGS OF UNCONTROVERTED FACT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56(h)(1) of the Rules of the United States Court of Federal Claims ("R.C.F.C."), Plaintiff, American Ordnance LLC ("AO"), respectfully submits its Proposed Findings of Uncontroverted Fact ("Pl. Facts") in Support of its Motion for Summary Judgment (the "Motion") stating the material facts upon which AO bases its Motion and for which AO believes there is no genuine dispute. All citations to the exhibits contained in AO's Appendix in Support of its Motion for Summary Judgment are referred to herein by Exhibit Number ("Ex."), Page Number ("p."), and, where appropriate, by identifying section or paragraph number on the cited page.

**Proposed Findings of Uncontroverted Fact**

1. AO, or its predecessors-in-interest, have operated the Iowa Army Ammunition Plant ("IAAAP") for the United States Army (the "government" or the "Army") since 1951. Defendant's Answer ("Answer"), Docket No. 8, ¶ 11.

2. AO was formed in 1998 as a joint venture of its predecessors in interest, Mason & Hanger Corporation ("MHC") and General Dynamics Ordnance Systems, Inc. ("GDOS"). Declaration of Marilyn S. Daniel ("Daniel Dec."), Ex. 1, p. 1, ¶ 2; Declaration of Daniel W. Darley ("Darley Dec."), Ex. 2, p. 11, ¶ 2.[1]

3. On September 26, 2007, the Army issued a written final decision (the "Final Decision") pursuant to 41 U.S.C. § 605(a) which claimed that the Army holds title to certain production equipment (the "Line 3A Equipment") under Contract No. DAAE30-96-C-0013, Modification No. PZ0001, dated August 15, 1996 (the "M795 Contract"). Answer, ¶¶ 3, 5 (admits documents are the best evidence; admits that decision issued pursuant to 41 U.S.C. § 605(a)); Final Decision, Ex. 46, p. 396.

4. IAAAP is operated as a government-owned contractor-operated ("GOCO") facility for production of ammunition items such as warheads and large-caliber ammunition. Darley Dec., Ex. 2, p. 11, ¶ 2; Answer, ¶ 9.

5. Prior to the early 1990s, AO operated IAAAP under cost-plus-fixed-fee arrangements. Answer, ¶ 12 (asserting that Mason & Hanger and Silas Mason Company, AO's predecessor-in-interest operated IAAAP under such contracts prior to 1990).

6. In the early 1990s, however, the government began to replace its prior contracting arrangements with "facilities use" contract arrangements, under which contractors make capital investments in the government facility and related personal property, even though the government owns the real property and much of the personal property located at the production facility. Answer, ¶ 15.

[1] For simplicity, references to AO in this document include AO's predecessors-in-interest.

7. The government entered into two facilities use contracts with AO, one in 1993 (Contract No. DAAH09-94-E-0005), and another in 1998 (Contract No. DAAA09-98-E-0003), and AO currently operates and maintains IAAAP and another production facility, the Milan Army Ammunition Plant ("MLAAP"), pursuant to such facilities use contracts. Answer, ¶¶ 19, 20; Daniel Dec., Ex. 1, p. 9, ¶ 24.

8. In 1995, the government announced that it had a need for production of M795 Projectiles and requested that AO's predecessor-in-interest, MHC, produce the projectiles. Answer, ¶ 25; Daniel Dec., Ex. 1, p. 2, ¶ 5.

9. The government issued Request for Proposal DAAE30-96-R-0004 (the "M795 RFP") on October 11, 1995. Daniel Dec., Ex. 1, p. 2, ¶ 5; M795 RFP, Ex. 4, p. 26.

10. The M795 RFP contains Statement of Work ("SOW") paragraph C.3.9, which states, "Equipment purchased/fabricated by the contractor under this procurement shall be property of the U.S. government. A partial list of equipment includes: Preheat Ovens, Grid Melter, Melt Kettles, Pour Machines, Controlled Cooling Apparatus, and Post Cyclic Conditioners." M795 RFP, Ex. 4, p. 34; Daniel Dec., Ex. 1, p. 2, ¶ 5.

11. On December 12, 1995, the government issued "Letter Contract" No. DAAE30-96-C-0013 to AO for the production of supplies; specifically, production of 155mm M795 Projectiles (the "Letter Contract"). Answer, ¶ 25 (admits documents are the best evidence); November 2, 1995 Army Letter Authorizing Issuance of Letter Contract to MHC, Ex. 5, p. 180; December 12, 1995 Letter Contract, Ex. 6, p. 181; Daniel Dec., Ex. 1, p. 2, ¶ 7.

12. The Letter Contract expressly incorporated M795 RFP Section C, the SOW. Letter Contract, Ex. 6, p. 188, ¶ 5; Daniel Dec., Ex. 1, p. 3, ¶ 7.

13. The Letter Contract contains a specific SubCLIN, a Contract Line Item Number, or "CLIN," requiring delivery to the government of "slow cool equipment," pursuant to SOW paragraph C.3.9, as follows:

> Deliveries are to be made in accordance with the following schedule:

| Line Item | Description | Quantity | [Date] |
|---|---|---|---|
| 0001AA | Design, Fabricate and Install Slow Cool Equipment | 1 lot | 21 Months [after award] |

Letter Contract, Ex. 6, p. 189.

14. The Letter Contract contemplated that the parties would negotiate the terms of a firm, fixed-price ("FFP") contract, a "definitized contract," no later than April 29, 1996. Letter Contract, Ex. 6, p. 187, § 3.

15. The parties exchanged a list of "Action Items" for negotiation of the terms of a definitized contract on March 14, 1996, including Action Item No. 5, "Determine how facilitization SOW gets into the contract." Action Item List, Ex. 7, p.191.

16. The parties executed Modification P00001 to the Letter Contract on April 30, 1996, which inserted FAR progress payments clause 48 C.F.R. § 52.232-16 Alternate II into the Letter Contract. P00001, Ex. 8, p. 193.

17. MHC drafted a proposed Facilitization Scope of Work in preparation for negotiations. Ex. 9, p. 196; Daniel Dec., Ex. 1, p. 3, ¶ 10; Ex. 13, p. 210.

18. During the negotiation period, the government told AO that the government would <u>not</u> take title in, or be responsible for, the equipment AO procured to manufacture M795 Projectiles, including Line 3A Equipment, and AO informed the government that the language of

the resulting contract would need to be modified from that contained in the M795 RFP and Letter Contract to accommodate the title issue. Daniel Dec., Ex. 1, p. 4, ¶ 11.

19. By letter dated May 16, 1996, the government Contracting Officer ("CO") responsible for negotiating the M795 Contract, David Banashefski ("Banashefski"), specifically directed AO that:

> It is important that the parties fully understand that this requirement is a production contract for the LAP [Load, Assemble, and Pack] of M795 projectiles and is not a facilities contract. Any facilities being procured are being done solely to meet the required LAP capacity for the M795 projectile. As such, the Government will not have title to the equipment and therefore, will not be responsible for maintenance of the same.

May 16, 1996 Letter from Banashefski ("Banashefski Letter"), Ex. 10, p. 199; Daniel Dec., Ex. 1, p. 4, ¶ 11.

20. The Banashefski Letter was coordinated with, and authorized by, the government's legal adviser. Banashefski Letter, Ex. 10, p. 199.

21. MHC correspondence to Banashefski on May 17, 1996 confirmed the government's position, stating: "With the ARDEC position that M&H will own the equipment, the insurance rate of 0.92% may not be valid. M&H has to discuss this internally and will get back with you." Ex. 11, p. 206.

22. MHC recognized the government's position that MHC would own the Line 3A Equipment, and discussed the issue internally. Ex. 12, p. 208 (e-mail dated May 17, 1996, stated that the proposed facilitization scope of work "of course will change if the government really means they do not intend to take title. We need to make a decision if we want the equipment and how we will dispose of it when the contract is complete."); Daniel Dec., Ex. 1, p. 4, ¶ 12.

23. By letter dated May 30, 1996, CO Valerie Colello ("Colello") stated that:

> After thoroughly reviewing M&H's draft SOW for the facilitization efforts needed to meet the required LAP production delivery schedules, the Government has determined that such language is not necessary for this contract.

("Colello Letter"), Ex. 14, p. 215, ¶ 2.

> As previously mentioned in ARDEC's letter dated 16 May 96, Subject: M795 Projectile LAP Negotiations, this is a production requirement for the LAP of the M795 projectile, and is not in any way a facilitization contract.

*Id.*

> In the [M795] RFP, the Government had asked the contractor to separately break out the costs for any necessary facilitization efforts for evaluation purposes only. Although the parties may end up negotiating the costs associated with the equipment/facilities separately from the production deliverables, in order to better understand the price of the facilitization efforts vs. the unit price of the end item; understand that the contractor will solely be responsible for performing whatever facilitization efforts are necessary to meet the required delivery schedules within the final negotiated overall price of the basic contract.

*Id.*

> In fact, it has been determined that in order to alleviate any further misunderstandings regarding the facilitization efforts, the resultant contract <u>will not</u> have a separate CLIN for the facilitization costs, but rather such costs will be included with the LAP production CLIN for the basic quantity.

*Id.* (emphasis in original).

> As delineated above, in order to alleviate any misunderstanding by the parties that this requirement is a production effort, and is not a facilities contract, the resultant definitized contract will be constructed in such a manner that their [sic] will be <u>no separate line item</u> for any facilitization efforts which M&H would have to accomplish in order to meet the required basic/option delivery requirements of the contract.

*Id.*, Ex. 14, p. 218, ¶ 12; *see also* Daniel Dec., Ex. 1, p. 5, ¶ 15.

24. Banashefski confirmed that the government did not want a separate SubCLIN for the facility items in the M795 Contract, and that the government had listed facilitization as a separate line item in the M795 RFP so they would "get visibility." MHC Record of Negotiations on June 6, 1996, Ex. 17, p. 224, Clause 2.

25. CO Colello testified that it is "common practice . . . that we would require a breakout of all the costs," and "a completed detail cost breakdown" "in order to properly have our supporting people evaluate those costs, from a technical and a pricing standpoint." Colello Dep., Ex. 53, p. 481, 101:7-24.

26. By agreeing to take title to the Line 3A Equipment and to do so at a fixed price, AO bore the risk associated with correctly estimating the manhours of effort and the equipment needed to meet the required production quantities and schedule. Daniel Dec., Ex. 1, p. 7-8, ¶ 20.

27. AO also bore the risk that unforeseen consequences might occur during production, such as the damage or destruction of a piece of Line 3A Equipment, which would result in significant additional costs to AO to replace the equipment. Daniel Dec., Ex. 1, p. 6, ¶ 16.

28. Consistent with the direction provided in the Colello Letter, the price of facilities was negotiated only so that the government could evaluate the reasonableness of MHC's price. *See* Colello Letter, Ex. 14, p. 215, ¶ 2 ("the Government had asked the contractor to separately break out the costs for any necessary facilitization efforts for evaluation purposes only"); *see also* Daniel Dec., Ex. 1, p. 8, ¶ 21.

29. Based upon the government's direction, AO agreed to take title to the Line 3A Equipment. Letter from Darl Heffelbower to Col. Unterseher (the "Heffelbower Letter"), Ex. 21,

p. 239 ("We have also agreed to take title to the equipment acquired as a part of our facilitization efforts under this proposed contract."); Daniel Dec., Ex. 1, p. 6, ¶ 17.

30. In addition to the Heffelbower Letter, AO negotiators expressed to government negotiators, including Banashefski and Talmadge, that AO agreed to take title to the Line 3A Equipment. Daniel Dec., Ex. 1, p. 6, ¶ 17.

31. AO's decision to accept title to the Line 3A Equipment rendered moot certain other issues raised during the negotiations, such as a facilitization SOW that defined the specific equipment that would be delivered, or the terms and conditions required to be added to the M795 Contract for facilitization. Daniel Dec., Ex. 1, p. 6, ¶ 17.

32. The parties discussed how the government would structure the M795 Contract "to determine how to present facilitization clause language so M&H cash flow is not negatively impacted yet M&H ultimately owns the equipment," as stated in Action Item 2 of an Action Item List of June 18, 1996 ("Action Item 2"). Ex. 22, p. 242, Item 2.

33. In response to Action Item 2, on June 20, 1996, Steven Talmadge, a government Contract Specialist working on the M795 Contract negotiations, provided to AO a draft of a revised CLIN structure which would accomplish Action Item 2. Ex. 23, p. 244 ; Daniel Dec., Ex. 1, p. 7, ¶ 19; Deposition ("Dep.") of Steven Talmadge, Ex. 52, p. 470-74, 84:20-88:24 (agreeing that the government proposed the revised CLIN structure in response to Action Item No. 2).

34. On August 15, 1996, the parties executed the M795 Contract, the definitized contract for production of M795 Projectiles, in Modification No. PZ0001. M795 Contract, Ex. 31, p. 258.

35. The parties included the standard FAR government property clause (the "FFP Property Clause") for FFP contracts:

> Title to each item of facilities . . . acquired by the Contractor for the Government under this contract shall pass to and vest in the Government when its use in performing this contract commences or when the Government has paid for it, whichever is earlier, whether or not title previously vested in the Government.

*See* 48 C.F.R. § 52.245-2(c)(3) (1996) (emphasis added); M795 Contract, Ex. 31, p. 325.

36. The M795 Contract states that: "The contractor shall deliver M795 projectiles as delineated in Section F of this contract. The deliverable items include; 155mm, HE, M795 Projectiles (9312769), Obturator (10542907), Supplemental Charge (8797090), Liner Cup (9331677), Spacers (8797088)." M795 Contract, Ex. 31, p. 271, ¶ C.3.1.1.

37. The parties deleted the Letter Contract SOW paragraph C.3.9 from the M795 Contract. M795 Contract, Ex. 31, p. 275; Daniel Dec., Ex. 1, p. 4, ¶ 11 and p.7, ¶ 19.

38. CO Colello testified that if the Army were requiring delivery of the equipment, she "would expect to see a discussion of or a statement that the contractor shall provide the equipment." Colello Dep., Ex. 53, p. 478, 24:3-13.

39. The parties deleted from the M795 Contract the Letter Contract's SubCLIN 0001AA. M795 Contract, Ex. 31, p. 262 (deleting SubCLIN 0001AA); Daniel Dec., Ex. 1, p. 4, ¶ 11, p.7, ¶ 19, and p. 8, ¶ 22.

40. The M795 Contract replaced the Letter Contract's CLIN structure with a new CLIN structure that included only M795 Projectiles as deliverables. M795 Contract, Ex. 31, p. 263 (adding SubCLIN structure in response to Action Item 2).

41. Under the CLIN structure of the M795 Contract, AO was required to deliver one First Article Test ("FAT") lot quantity of M795 Projectiles pursuant to SubCLIN 0001AA. M795 Contract, Ex. 31, p. 263.

42. AO was also required to deliver 1,000 each M795 Projectiles pursuant to SubCLIN 0001AB, and 76,968 M795 Projectiles pursuant to SubCLIN 0001AC. M795 Contract, Ex. 31, p. 263.

43. SubCLIN 0001AB provides "descriptive data" stating that "this subclin includes 1,000 each M795 Projectiles at a total price of $173,920 and $9,310,071 in facilitization costs." M795 Contract, Ex. 31, p. 263.

44. The Continuation Sheet contained in the M795 Contract states that the supplies and services required by SubCLIN 0001AB are "Load, Assemble, and Package M795 Projectiles in accordance with TDP [Technical Data Package] and Statement of Work Section C." M795 Contract, Ex. 31, p. 269.

45. The quantity required for delivery relating to SubCLIN 0001AB is "1,000 units," – a quantity which exclusively refers to units of M795 projectiles, not Line 3A Equipment. M795 Contract, Ex. 31, p. 269.

46. A note states that "[t]his subclin includes the costs for 1,000 ea M795 Projectiles (1,000 units x $173.92 = $173,920) as well as $9,310,071 in costs associated with special tooling, equipment, and facilitization efforts required by the contractor to perform the M795 LAP Contract." M795 Contract, Ex. 31, p. 269.

47. No number of "deliverable units" of equipment is associated with the Line 3A Equipment in the M795 Contract's CLIN structure. M795 Contract, Ex. 31, p. 269.

48. No separate SubCLIN number is assigned to the Line 3A Equipment in the M795 Contract's CLIN structure. M795 Contract, Ex. 31, p. 263, 269.

49. CO Colello testified that "you would have CLINs associated with whatever you were buying, that the equipment was associated to," and that "in a production-type contract, I would expect to see a CLIN for the items that the contractor was required to produce under the contract." Colello Dep., Ex. 53, p. 480, 35:12-24.

50. The standard FAR progress payments clause for FFP contracts, 48 C.F.R. § 52.232-16, is included in the M795 Contract. M795 Contract, Ex. 31, p. 300.

51. The M795 Contract does not include 48 C.F.R. § 52.245-7, -10, or -11. *See* M795 Contract, Ex. 31, 258-338.

52. The M795 Contract contains no reference to any required facilitization or acquisition of equipment by AO for the government in the SOW. *See* M795 Contract, Ex. 31, p. 271-277, § C; *see also* Daniel Dec., Ex. 1, p.8-9, ¶ 22.

53. The M795 Contract contains no list of facilities that AO is required to acquire and deliver to the government. *See* M795 Contract, Ex. 31, p. 271-277, § C; *see also* Daniel Dec., Ex. 1, p.8-9, ¶ 22.

54. CO Colello testified that "I would assume that there should be a list in either the specifications, the section C . . . . I would expect that somewhere in the contract document it would describe the equipment that was required under the contract." Colello Dep., Ex. 53, p. 482-83, 150:23-151:12.

55. The M795 Contract contains no reference to delivery of Line 3A Equipment in the Delivery Schedule, as it once did in the Letter Contract. *See* M795 Contract, Ex. 31, p. 288-291, § F; *see also* Daniel Dec., Ex. 1, p. 8-9, ¶ 22.

56. CO Colello testified that a "delivery schedule would identify the required schedule for delivery of the deliverable," and that she would expect to see a date that the deliverable would be delivered. Colello Dep., Ex. 53, p. 476-77, 22:18-23:14 and p. 479, 34:4-21.

57. The M795 Contract's Delivery Schedule requires only deliveries of M795 Projectiles, consistent with the SOW. *See* M795 Contract, Ex. 31, p. 288-291, § F; *see also* Daniel Dec., Ex. 1, p. 8-9, ¶ 22.

58. The M795 Contract contains no language directing AO regarding disposition of the Line 3A Equipment at the conclusion of production, such as storage, demilitarization, or decontamination requirements. *See* M795 Contract, Ex. 31, 258-338; Daniel Dec., Ex. 1, p. 8-9, ¶ 22.

59. On August 20, 1996, five days after the execution of the M795 Contract, the Administrative Contracting Officer ("ACO") at IAAAP, Fred W. Taylor ("Taylor"), one of the ACOs responsible for the administration of the M795 Contract, issued a memorandum stating the following:

> The ACO staff at this installation has been delegated Contract Administration for subject contract.

Taylor Memorandum, Ex. 33, p. 340, ¶ 1.

> We understand that all new facilities (equipment and buildings) acquired by Mason & Hanger under the facilitization phase of the M795 program will not be called out as deliverables under the contract even though they are being direct costed versus being depreciated.

*Id.*, ¶ 3.

> The Government does not intend to take title to the facilities even though they are to be direct costed.

*Id.; see also* Daniel Dec., Ex. 1, p. 9, ¶ 23.

60. CO Banashefski confirmed ACO Taylor's understanding of the parties' agreement, discussing with Taylor the possibility of approaching AO at some future time to ask AO to consider returning title to the Line 3A Equipment to the government upon the negotiation of a new facilities contract. September 4, 1996 Email from Taylor, Ex. 34, p. 342, ¶ 4.

61. Banashefski responded in writing to ACO Taylor's August 20, 1996 Memorandum by letter dated October 7, 1996, but did not communicate any dispute with ACO Taylor's statements regarding AO's ownership of the Line 3A Equipment. October 7, 1996 Letter, Ex. 35, p. 343.

62. No government representative, including Banashefski and Talmadge, communicated to AO any disagreement with ACO Taylor's independent confirmation of AO's ownership of the Line 3A Equipment. Daniel Dec., Ex. 1, p.9, ¶ 23; Banashefski Dep., Ex. 56, p. 499, 62:10-23.

63. AO began purchasing equipment that became the Line 3A Equipment following execution of the Letter Contract on December 12, 1995. Darley Dec., Ex. 2., p. 13, ¶ 7.

64. Prior to the execution of the M795 Contract on August 15, 1996, AO tagged and recorded such Line 3A Equipment as government-owned property pursuant to the Letter Contract. Darley Dec., Ex. 2., p. 13, ¶ 8.

65. Immediately after execution of the M795 Contract, on or about September 1, 1996, AO re-tagged the equipment that had been previously tagged and recorded as government-owned property when purchased pursuant to the Letter Contract, and began tagging and recording subsequently purchased Line 3A Equipment as AO-owned property. Darley Dec., Ex. 2., p. 13-14, ¶ 9.

66. In February 1997, the government schedule for delivery of metal parts, TNT, and metal pallets became delayed. Ex. 36, p. 344.

67. On March 3, 1997, MHC requested a contract modification that would shift a portion of its price for the delivery of 1,000 each, M795 Projectiles (SubCLIN 0001AB), described to relate to facilitization and amortized over and meant to be paid at the time of delivery of this first production lot of M795 Projectiles, to the earlier First Article Test ("FAT") quantity of M795 Projectiles (SubCLIN 0001AA). The request was made to permit MHC to receive timely payment from the government, despite the slippage of the government's schedule for provisioning of certain government furnished materials needed to produce the M795 Projectiles (the "March 3, 1997 Request"). Ex. 36, p. 344; Ex. 37, p. 346.

68. The parties executed Modification P00003 ("P00003") to the M795 Contract on March 13, 1997, to address MHC's March 3, 1997 Request. P00003, Ex. 38, p. 348.

69. P00003 moved the portion of the M795 Projectiles' price from SubCLIN 0001AB to SubCLIN 0001AA. P00003, Ex. 38, p. 349-351

70. On October 21, 1997, the government directed MHC to submit an invoice to the government for payment of the price for FAT quantity, including the portion of its price moved to SubCLIN 0001AA from SubCLIN 0001AB. Ex. 39, p. 352.

71. On October 24, 1997, MHC submitted its Invoice and form DD250 for payment and liquidation of SubCLIN 0001AA. Ex. 40, p. 353-354.

72. On February 13, 1998, the Army recognized that AO owned equipment at IAAAP and MLAAP facilities in a Justification and Approval for the Facility Use and Management of Iowa and Milan Ammunition Plants. Ex. 41, p. 361, ¶ c ("current contractor investment in

equipment at the two sites has an estimated replacement value of $19.5 million"), and p. 363, ¶ 2 (noting that lead time would be required to "replace contractor-owned equipment").

73. In 1998, IAAAP CO Trudy Hallgren gave a presentation in which she recognized AO's ownership of Line 3A Equipment. Ex. 48, p. 407 (Slide entitled "Examples of Existing Contractor Investment" notes $10 million for M795 production equipment, and notes that "contractor investment reduces government risks"); see also Daniel Dec., Ex. 1, p. 10, ¶ 24.

74. On August 12, 1999, a letter from the Defense Contract Audit Agency ("DCAA") relating to an audit of AO's cost accounting practices regarding the M795 Contract noted:

> We have reviewed all the negotiation correspondence provided by AO and the Army concerning the M795 Basic Contract Negotiations. We can find no documents indicating that the Army ever intended for the facility and equipment to be "special purpose." In fact to the contrary, we found Army correspondence indicating clearly that the government did not want title to the facility and equipment.

Ex. 42, p. 374, 2nd bullet.

75. DCAA concluded that it would not pursue any further investigation of AO's cost accounting for the Line 3A Equipment. November 15, 1999 DCAA Letter, Ex. 44, p. 384, 1st paragraph; Dep. of Mike Walker ("Walker Dep."), Ex. 55, p. 495-96, 29:24-30:8 (DCAA declined to pursue any further audit issue regarding a potential cost accounting standards noncompliance because of "buying in" to AO's audit response position and the "unique nature of the situation surrounding the M795 facilities").

76. DCAA auditor Mike Walker concluded, after investigation and consultation with relevant ACOs responsible for administering the M795 Contract, that he had no reason to believe that AO did not own the Line 3A Equipment. Walker Dep., Ex. 55, p. 494, 27:8-13

77. On July 17, 2000, Judith Morgan, the government Property Administrator at IAAAP, produced a list of AO-owned Line 3A Equipment. Ex. 45, p. 387-395.

78. When MHC and GDOS jointly formed AO in 1998, MHC listed the Line 3A Equipment as part of its capital contribution to the new company rather than as government property. Daniel Dec., Ex. 1, p. 9-10, ¶ 24.

79. AO places a property tag on each piece of equipment that identifies the ownership of the equipment, and provides a unique control number identifying the equipment. Darley Dec., Ex. 2, p. 12, ¶ 5.

80. Property tags are placed on all equipment, whether such equipment is government-owned or AO-owned property. Darley Dec., Ex. 2, p. 12, ¶ 5.

81. Property tags are placed on each piece of equipment in a conspicuous manner. Darley Dec., Ex. 2, p. 12, ¶ 5.

82. The property tag provides a statement of ownership, such as "American Ordnance Property," "US Government Property," or "Third Party Property," and the tag also contains a unique control number that identifies each individual piece of property. Darley Dec., Ex. 2, p. 12, ¶ 5.

83. Such property tags are color-coded to provide identification of ownership and approximate value of the equipment. Government-owned property tags are white (under $5,000 value) or fluorescent pink (over $5,000 value), and AO-owned property tags are blue (under $5,000 value) or gold (over $5,000 value). Darley Dec., Ex. 2, p. 12-13, ¶ 5.

84. AO maintains detailed property records of all government-owned and all AO-owned property located at the IAAAP facility. Darley Dec., Ex. 2, p. 13, ¶ 6.

85. AO recorded the Line 3A Equipment as AO-owned property in its records. Darley Dec., Ex. 2, p. 13, ¶ 6.; Nelson Dep., Ex. 54, p. 488-89, 26:19-27:10 ("I believe that the contractor recorded [the Line 3A Equipment] as their property"); *id*., p. 490, 35:14-16 (M795 CO notified of the property issue in 1996).

86. AO's possession, ownership, and control of the Line 3A Equipment was "obvious" to the government representatives authorized to administer the M795 Contract. Nelson Dep., Ex. 54, p. 91-92, 88:17-89:3 (fact that AO tagged Line 3A Equipment as AO-owned was "pretty obvious").

87. The government property administrators at IAAAP have had complete access to AO's property records, have verified that AO has properly identified government property, and have reviewed the property records that AO has submitted to the government on numerous occasions since 1995. No Property Administrator audit identified AO's tagging and recording of the Line 3A Equipment as AO-owned to be erroneous. Darley Dec., Ex. 2, p. 14, ¶¶ 11, 12.

88. The government's property administrator specifically reviewed the Line 3A Equipment tagging and records in her annual audits, and found AO's records to be satisfactory. Property Audit Report November 10, 1999, Ex. 51, p. 465, 468 (noting that DAAE30-96-C-0013 (the M795 Contract) was analyzed, and that "no deficiencies were found during the review" of "the contractor's process of properly identifying Government property," and that "assets are labeled, tagged or otherwise identified according to the approved property control procedures upon fabrication or receipt").

89. The M795 CO was notified of a potential issue regarding ownership of the Line 3A Equipment in 1996. Nelson Dep., Ex. 54, p. 490, 35:14-16 (M795 CO notified of the property issue in 1996).

90. The government admitted in its written discovery responses that government personnel at IAAAP were aware of AO's tagging of the Line 3A Equipment as AO-owned property prior to 2001. Ex. 50, p. 457, Defendant's Response to Plaintiff's First Set of Interrogatories, First Request for Production of Documents, and First Requests for Admissions (the "Government Discovery Responses"), Request for Admission No. 6.

91. The government admitted in its written discovery responses that government personnel at IAAAP were aware of AO's recording of the Line 3A Equipment as AO-owned property prior to 2001. Ex. 50, p. 458, Government Discovery Responses, Request for Admission No. 7.

92. In August 2007, the Army initiated a competitive procurement for a follow-on contract for operation and maintenance ("O&M") of IAAAP and MLAAP. Darley Dec., Ex. 2, p. 14-15, ¶ 13.

93. On February 21, 2008, the Army issued Request for Proposal ("RFP") No. W52P1J-06-R-0201. The Army contemplates in the current RFP that the Line 3A Equipment will be government-furnished property that any new contractor could use for its own production activities. Darley Dec., Ex. 2, p. 14-15, ¶ 13.

94. On October 26, 2007, the Army ordered AO to re-tag the Line 3A Equipment as government-owned property, and to change its records to reflect such ownership, in preparation for the Army's competitive procurement for a follow-on contract for O&M of IAAAP. Ex. 47, p. 405; Answer, ¶ 70.

95. On October 30, 2007, AO complied with the Army's directive to re-tag the Line 3A Equipment and to change its records to reflect government ownership of the Line 3A Equipment. Answer, ¶¶ 71, 72.

Respectfully submitted this 30th day of June, 2008.

*s/ Steven M. Masiello*

Steven M. Masiello
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
Telephone: (303) 634-4000
Facsimile: (303) 634-4400
E-mail: smasiello@mckennalong.com

ATTORNEY FOR PLAINTIFF, AMERICAN ORDNANCE LLC

Of Counsel:

Timothy R. Odil
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
Telephone: (303) 634-4000
Facsimile: (303) 634-4400
E-mail: todil@mckennalong.com

DN:32144845.2