**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

AMERICAN ORDNANCE LLC,
Plaintiff,
vs.
UNITED STATES,
Defendant.

Case No. 07-867C
Judge Wheeler

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

Steven M. Masiello
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
(303) 634-4000
Facsimile: (303) 634-4400
E-mail: smasiello@mckennalong.com

ATTORNEY FOR PLAINTIFF,
AMERICAN ORDNANCE LLC

Of Counsel:

Timothy R. Odil
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
(303) 634-4000
Facsimile: (303) 634-4400
E-mail: todil@mckennalong.com

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**DECLARATION OF MARILYN S. DANIEL**

I, Marilyn S. Daniel, make the following declaration:

1. I have personal knowledge of all facts set forth in this declaration.

2. American Ordnance LLC ("AO") began in 1998 as a joint venture of its predecessors-in-interest, Mason & Hanger Corporation ("MHC") and General Dynamics Ordnance Systems, Inc. ("GDOS").

3. I was employed by MHC from January 1982 to August 1999. During my employment at MHC, I held various positions, including Corporate Counsel, Assistant Secretary, General Counsel, Vice President, Senior Vice President, and Counsel to the President.

4. During my employment at MHC, I participated on behalf of MHC in the negotiations of Contract No. DAAE30-96-C-0013, Modification No. PZ0001, dated August 15, 1996, for the production of M795 Projectiles (the "M795 Contract").

5. The document identified as DAAE30-96-R-0004 issued October 11, 1995 was the government's request for proposal ("RFP") for what became the M795 Contract. The RFP sought a fixed-price proposal for production of M795 Projectiles. The RFP contained a Contract Line Item Number ("CLIN") 0001AA for "facilitization," the design, fabrication, and modification of existing facilities, and the purchase and installation of the equipment needed to produce M795 Projectiles. *See* RFP, page 5 of 121 (CLIN 0001AA: "Design, Fabricate, and install equipment in accordance with statement of work Section C.3.9."). Scope of work section C.3.9 provided that equipment purchased would be property of the government. *See id.*, page 10 of 121. At the time of issuance of the RFP, and based upon review of the terms thereof, I understood the government would take title to the equipment the government required MHC to acquire for the government and deliver to the government pursuant to the contract that would follow.

6. MHC submitted a proposal to the government pursuant to the RFP, and the government awarded MHC the Letter Contract (the "Letter Contract") DAAE30-96-C-0013 on December 14, 1995.

7. The Letter Contract allowed MHC to immediately begin to take steps to become ready to produce M795 Projectiles through design, fabrication and procurement of slow-cool equipment. By letter dated December 12, 1995, the government's Contracting Officer ("CO") responsible for the M795 Projectile procurement, David M. Banashefski, directed MHC to "proceed immediately to commence performance of work,

and to pursue such work will all diligence to the end that the supplies may be delivered or services performed" as set forth in the Letter Contract. *See also* Letter Contract, Attachment A, page 3 ("Upon acceptance by both parties, the Contractor shall proceed with performance of work including purchase of necessary materials."). The Letter Contract provided a schedule for MHC and the government to negotiate the terms of, or "definitize" the terms of the M795 Contract. *Id.* at 3. In addition, the Letter Contract incorporated the scope of work Section C from the RFP. *Id.* at 4.

8. Following several delays, the parties began negotiating the definitized M795 Contract in approximately March 1996.

9. MHC did not believe it was advantageous to the company to produce M795 Projectiles pursuant to a fixed-price contract because the projectiles had never been in mass production prior to 1996. During the negotiations, MHC attempted to convince the government to issue the M795 Contract as a cost plus incentive type contract.

10. From March 1996 through approximately May 1996, the parties worked to negotiate a scope of work for facilitization. I believed that if the contract was going to be structured as a fixed-price contract, it would have to be detailed so that each party would know exactly what MHC was required to acquire for the government and deliver. The parties negotiated a scope of work for such facilitization. MHC suggested Federal Acquisition Regulation ("FAR") clauses that should be included in order for MHC to acquire equipment for, and deliver such equipment to the government that MHC

purchased to facilitize its production line to produce M795 Projectiles (the "Line 3A Equipment"). Both parties proposed alternative language for the contract scope of work.

11. Following negotiation sessions on approximately May 13 and 14, 1996, government negotiators, including CO Banashefski and Contract Specialist Steven Talmadge, informed MHC that the government would not take title to the Line 3A Equipment. I and other MHC negotiators informed the government negotiators, including CO Banashefski, that the language of the RFP, specifically, CLIN 0001AA for facilitization, the scope of work Section C, and subsection C.3.9, which specifically stated that the government would take title to the Line 3A Equipment and provided a partial equipment list, would need to be changed if the government intended for MHC to take title to the Line 3A Equipment. The negotiations of the issue of title to the Line 3A Equipment resulted in contention between the parties.

12. The issue of title to the Line 3A Equipment was a significant issue in the negotiations of the M795 Contract. The issue of title to the Line 3A Equipment was significant to MHC because, at the time, MHC was moving away from conducting the majority of its work pursuant to Government Owned Contractor Operated ("GOCO") cost reimbursement arrangements for production for the government, and toward both work for non-government third-parties and fixed price work for the government. The transition posed great risk to MHC as a company. The risk to the company posed by the M795 Contract was the primary reason I became involved in the negotiation of the M795 Contract.

13. CO Banashefski confirmed his statement that the government did not intend to take title to the Line 3A Equipment by letter to MHC dated May 16, 1996, in which he stated, "It is important that the parties fully understand that this requirement is a *production contract for the LAP [Load, Assemble, and Pack] of M795 projectiles and is not a facilities contract.* Any facilities being procured are being done solely to meet the required LAP capacity for the M795 projectile. As such, the Government will not have title to the equipment and therefore, will not be responsible for maintenance of the same." May 16, 1996 Letter at 2 (emphasis in original).

14. MHC proposed to the government alternative language to the M795 Contract scope of work for facilitization intended to clarify the government's intent that MHC take title to the Line 3A Equipment.

15. The government responded to MHC's concerns by letter addressed to me dated May 30, 1996 from CO Valerie E. Colello (the "Colello Letter"). The Colello Letter stated, "After thoroughly reviewing M&H's draft SOW for the facilitization efforts needed to meet the required LAP production delivery schedules, the Government has determined that such language is not necessary for this contract." Colello Letter at 1. Further, the Colello Letter stated that "[t]his is a production requirement . . . and is not in any way a facilitization contract," that "[i]n the RFP, the Government had asked the contractor to separately break out the costs for any necessary facilitization efforts for evaluation purposes only." *Id.* Further, the government directed MHC that "in order to alleviate any further misunderstandings regarding the facilitization efforts, the resultant

contract *will not* have a separate CLIN for the facilitization costs, but rather such costs will be included with the LAP production CLIN for the basic quantity," *id.*, and "there will be no separate line item for any facilitization efforts which M&H would have to accomplish in order to meet the required basic/option delivery requirements of the contract." *Id.* at 4.

16. MHC was concerned about the risk it would face due to taking title to the Line 3A Equipment as the government directed. I was concerned that MHC was now going to take ownership of almost $10 million worth of equipment, which had never been done before. If an unforeseen consequence occurred during production, and a piece of the Line 3A Equipment was destroyed or damaged, MHC would bear the risk of replacing it. The issues regarding risk of loss necessitated a great deal of discussion and evaluation at MHC's corporate office in making its decision whether to accept the government's direction that MHC take title to the Line 3A Equipment.

17. By letter dated June 18, 1996, from MHC Vice President Darl J. Heffelbower to Colonel James E. Unterseher (the "June 18, 1996 Letter"), MHC informed the government that MHC agreed to take title to the Line 3A Equipment. June 18, 1996 Letter at 2. In addition to the June 18, 1996 Letter, I and other MHC negotiators expressed to government negotiators, including CO Banashefski and Mr. Talmadge, that MHC agreed to take title to the Line 3A Equipment. I and other MHC negotiators discussed with CO Banashefski that MHC's decision to accept title to the Line 3A Equipment rendered moot certain other issues raised during the negotiations, such as a

facilitization scope of work and the terms and conditions required to be added to the M795 Contract for facilitization.

18. Government negotiators, including CO Banashefski and Mr. Talmadge, acknowledged MHC's agreement to take title to the Line 3A Equipment. No government negotiator indicated to me at any time after June 18, 1996 that the government had changed its requirement that MHC take title to the Line 3A Equipment.

19. Following MHC's agreement to accept title to the Line 3A Equipment, and in response to an "action item" list developed during negotiations, Mr. Talmadge provided MHC with a revised CLIN structure for the M795 Contract. *See* June 20, 1996 Facsimile from Steven Talmadge to Jeff Hibler; *see also* June 18, 1996 Action Item List (Item 2: "ARDEC to determine how to present facilitization clause language so M&H cash flow is not negatively impacted yet M&H ultimately owns the equipment."). The revised CLIN structure that the government provided removed CLIN 0001AA, which previously required that MHC acquire the Line 3A Equipment to produce the M795 Projectiles for the government in accordance with statement of work Section C.3.9. June 20, 1996 Facsimile from Steven Talmadge to Jeff Hibler. The new CLIN structure contained deliverables of projectiles only, including a First Article Test ("FAT") quantity, a production quantity, and an option quantity. The government also removed scope of work Section C.3.9 from the M795 Contract entirely.

20. Because MHC had agreed to take title to the Line 3A Equipment, and to provide the government a fixed price for the contract, MHC bore the additional risk

associated with correctly estimating the manhours of effort and the equipment needed to meet the required production quantities and schedule. Had MHC been incorrect in its estimated level of effort and equipment needs to manufacture M795 Projectiles, MHC would have been required to purchase additional equipment while still being bound by its fixed price.

21. Consistent with CO Collello's prior direction in her May 30, 1996 letter, the price of facilities was negotiated so that the government could evaluate the reasonableness of MHC's price. *See* Colello Letter at 1 ("the Government had asked the contractor to separately break out the costs for any necessary facilitization efforts for evaluation purposes only"). Negotiations of a final price for the M795 Contract were difficult because MHC wished to include in its price for the delivery of the M795 projectiles its anticipated equipment needs, but the government negotiators did not believe that every piece of anticipated equipment was reasonably necessary. The parties compromised by agreeing that the government would provide some unused government property from a government owned production facility in Louisiana for the M795 Contract, and MHC would reduce its price for the delivery of M795 Projectiles accordingly.

22. The final, negotiated M795 Contract deleted the Letter Contract CLIN 0001AA and any reference to any requirement that MHC acquire equipment for the government in the SOW. Thus, the final, negotiated M795 Contract, consistent with the CO's letters stating that the M795 Contract was "a production requirement . . . and is not

in any way a facilitization contract," contained no separate CLIN for facilitization, no reference to any requirement in the scope of work for facilitization, no requirement that MHC deliver the Line 3A Equipment, no acceptance or inspection criteria that would ordinarily accompany a requirement for delivery of equipment, none of the required FAR clauses for facilities acquisition, no language for disposition direction by the government for the equipment at the conclusion of production, and no demilitarization or decontamination language that would be included were the Line 3A Equipment to be acquired for and delivered to the government.

23. On August 20, 1996, an authorized IAAAP Administrative Contracting Officer ("ACO") for the M795 Contract, Fred W. Taylor, Jr., stated his understanding that the government intended under the M795 Contract that "all new facilities (equipment and buildings) acquired by [MHC] under the facilitization phase of the M795 program will not be called out as deliverables under the contract . . . . The Government does not intend to take title to the facilities even though they are to be direct costed." *See* August 20, 1996 Memorandum at 1. Neither CO Banashefski, nor Mr. Talmadge, nor any other government negotiator communicated to me any disagreement with ACO Taylor's independent confirmation of MHC's ownership of the Line 3A Equipment expressed in the August 20, 1996 Memorandum.

24. MHC treated the Line 3A Equipment as its property. When MHC and GDOS jointly formed AO in 1998, MHC listed the Line 3A Equipment as part of its capital contribution to the new company rather than as government property. MHC

ownership of this equipment was acknowledged by government representatives prior to and during the negotiation of the 1998 Facility Use Contract with AO for operation of the IAAP and Milan Army Ammunition Plant.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED this 19th day of June, 2008.

Marilyn S. Daniel

Marilyn S. Daniel

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 2

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**DECLARATION OF DANIEL W. DARLEY**

I, Daniel W. Darley, make the following declaration under penalty of perjury that the following is true and correct:

1. I have personal knowledge of all facts set forth in this declaration.

2. American Ordnance LLC ("AO") began in 1998 as a joint venture of its predecessors-in-interest, Mason & Hanger Corporation ("MHC") and General Dynamics Ordnance Systems, Inc. ("GDOS"). Among other things, AO operates the Iowa Army Ammunition Plaint ("IAAAP"), a government-owned contractor-operated ("GOCO") ammunition production facility located in Middletown, Iowa. IAAAP's mission is to produce ammunition items such as warheads and large-caliber ammunition. MHC operated the IAAAP facility prior to AO's formation in 1998. References in this declaration to AO include AO's predecessors-in-interest.

3. I was employed by MHC from 1983 until 1998, at which time I became an AO employee. I am currently AO Materiel Director at IAAAP. During my employment

at MHC and AO, I have held various positions, including Industrial Engineer, Master Scheduler, Production Superintendent, and my current position, Materiel Director. I have held my current position since 2001.

4. As AO Materiel Director, I supervise property records, storage and transportation functions, and disposal of excess property at IAAAP and another similar facility, the Milan Army Ammunition Plant ("MLAAP"). I am personally familiar with the production lines at IAAAP, including the production line known as Line 3A at issue in this case, and I am familiar with the equipment located on Production Line 3A (the "Line 3A Equipment").

5. AO places a property tag on each piece of equipment that identifies the ownership of the equipment, and provides a unique control number identifying the equipment. Property tags are placed on all equipment, whether such equipment is government-owned or AO-owned property. Property tags are placed of on each piece of equipment in a conspicuous manner. The only exception to AO's tagging of equipment applies to small items of property with a low value, *i.e.*, screwdrivers or a staplers, which are instead marked merely to identify ownership. When viewing a piece of equipment, the property tag is clearly visible. The property tag provides a statement of ownership, such as "American Ordnance Property," "US Government Property," or "Third Party Property," and the tag also contains a unique control number that identifies each individual piece of property. Such property tags are color-coded to provide identification of ownership and approximate value of the equipment. Government-owned property tags are white (under $5,000 value) or fluorescent pink (over $5,000 value), and AO-owned

property tags are blue (under $5,000 value) or gold (over $5,000 value). The unique property tag control number corresponds to the identification number for each item that is tracked within AO's property control system.

6. In addition to property tagging, AO maintains as part of its property control system detailed property records of all government-owned and all AO-owned property located at the IAAAP facility. AO recorded the Line 3A Equipment as AO-owned property in its records following execution of the M795 Contract. AO's property records include both a computer system database that tracks all property transactions and identifies all property control numbers, and a manual, handwritten logbook that identifies all property numbers against a description for the property.

7. The government awarded MHC Letter Contract DAAE30-96-C-0013 (the "Letter Contract") on December 14, 1995. The Letter Contract required AO's predecessor-in-interest, MHC, to immediately begin to acquire equipment for the government for the purpose of facilitizing a production line to produce M795 Projectiles. MHC began purchasing equipment that became Line 3A Equipment following execution of the Letter Contract on December 12, 1995.

8. Prior to the execution of the M795 Contract on August 15, 1996, MHC tagged and recorded equipment purchased under the Letter Contract as government-owned property pursuant to the Letter Contract.

9. Immediately after execution of the M795 Contract on August 15, 1996, however, on or about September 1, 1996, MHC re-tagged and re-recorded as AO-owned property the Line 3A Equipment that had been previously tagged and recorded as

government-owned property when purchased pursuant to the Letter Contract. AO tagged and recorded subsequently purchased Line 3A Equipment as AO-owned property.

10. Following execution of the M795 Contract, and through September 2007, AO maintained AO property tags on the Line 3A Equipment, and recorded the Line 3A Equipment in its property records as AO-owned.

11. The government's IAAAP Property Administrator conducts annual audits or reviews of AO's records and property tagging. In addition, the government's Property Administrator has access to the entire facility and all property records at any time. As part of each audit or review, the government Property Administrator conducted "walkthroughs" of AO's production lines. The government Property Administrator also reviewed property records during such audits or reviews. No Property Administrator audit ever identified as erroneous AO's recording and tagging of Line 3A Equipment as AO-owned property.

12. In addition to having complete access to the entire IAAAP facility, the government property administrator has had complete access to all of AO's records for government property since execution of the Letter Contract in 1995. The government property administrator has also had complete access to AO's entire property records computer system at IAAAP, which includes a full and detailed inventory of both government-owned and AO-owned property at IAAAP, since 2000.

13. In August 2007, the Army initiated a competitive procurement for a follow-on contract for operation and maintenance of IAAAP and MLAAP, now identified as Request for Proposal ("RFP") No. W52P1J-06-R-0201 (the "Current Procurement"). The

Army contemplates in the Current Procurement that the Line 3A Equipment will be government furnished property that any new contractor could use for its own production activities.

14. Pursuant to the Current Procurement, in approximately September 2007, the Army allowed prospective bidders to participate in a site visit, which allowed them to view the facilities located at IAAAP. Prior to such visit, AO covered all equipment that it had on record as AO-owned property, including the Line 3A Equipment, to signify to prospective bidders that the covered property was not part of the government facility. The government's property administrator, Julie Solinski, did not question AO's covering of the Line 3A Equipment at the time the equipment was covered.

15. The Army first claimed that it owned the Line 3A Equipment in its written final decision issued September 26, 2007 (the "Final Decision"). Prior to that time, AO at all times relevant since the execution of the M795 Contract on August 15, 1996, conspicuously possessed, owned, and controlled the Line 3A Equipment.

16. In the Final Decision, the Army ordered AO to re-tag the Line 3A Equipment as government-owned property, and to change its records to reflect such ownership. AO complied with the Army's directive to re-tag the Line 3A Equipment and to change its records to reflect government ownership of the Line 3A Equipment. I supervised the re-tagging and re-recording of the Line 3A Equipment. AO provided a list of the equipment that had been re-tagged and re-recorded to the government property administrator, Julie Solinski.

17. AO and the government have agreed to various government property plans as part of the Facilities Use Contracts that allow AO to operate the IAAAP facility. AO is required pursuant to its Facilities Use Contract to maintain a comprehensive list of government-owned property at IAAAP. The Line 3A Equipment was not included on the list of government property prior to issuance of the Final Decision.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED this 26 day of June, 2008.

Daniel W. Darley

DN:32144746.2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AMERICAN ORDNANCE LLC,
Plaintiff,
vs.
UNITED STATES,
Defendant.

Case No. 07-867C
Judge Wheeler

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 3

DoD 4161.2-M

# DoD Manual for the Performance of Contract Property Administration

December 1991

Assistant Secretary of Defense
(Production and Logistics)

THE ASSISTANT SECRETARY OF DEFENSE

WASHINGTON, DC 20301-8000

PRODUCTION AND LOGISTICS

December 31, 1991

FOREWORD

This Manual is issued under the authority of DoD Instruction 4161.2, "Acquisition, Management, and Disposal of Government-owned Contract Property," December 31, 1991. It provides uniform policies and procedures for accomplishing the contract property administration requirements of Federal Acquisition Regulation (FAR), Part 45, "Government Property," and Defense Federal Acquisition Regulation Supplement (DFARS), Part 245, "Government Property," current editions. This Manual applies to the Office of the Secretary of Defense; the Military Departments; the Defense Agencies; and the DoD Field Activities (hereafter referred to collectively as "the DoD Components").

This Manual's policies, procedures, and guidance relate to and are consistent with the FAR and the DFARS. A software program developed by the Air Force Institute of Technology (AFIT) may be used with this Manual for statistical sampling, instead of the hard copy sample tables in the Manual. This AFIT computer diskette is public property and DoD personnel may obtain copies through the headquarters of the DoD Components' Contract Property Administration offices.

This Manual is effective immediately and is mandatory for use by all DoD Components. The DoD Components shall limit supplemental instructions to unique requirements. This Manual cancels and replaces DFARS Supplement #3, which will be removed from the Defense Acquisition Regulation (DAR) System.

Implementing instructions and any proposed changes to this Manual shall be sent through channels to:

Assistant Secretary of Defense (Production and Logistics)
Attn: Government Contract Property Policy, Room 2A318
The Pentagon, Washington, DC 20301-8000

The DoD Components may obtain copies of this Manual through their own publications channels. Other Federal Agencies and the public may obtain copies from the Department of Commerce, National Technical Information Service, 5285 Port Royal Road., Springfield, VA 22161.

Colin McMillan

# TABLE OF CONTENTS


| | Page |
|---|---|
| FOREWORD | 2 |
| TABLE OF CONTENTS | 3 |
| REFERENCES | 5 |
| DEFINITIONS | 6 |
| ABBREVIATIONS AND/OR ACRONYMS | 18 |
| CHAPTER 1 - GENERAL INFORMATION | 20 |
| C1.1. PURPOSE OF MANUAL | 20 |
| C1.2. OBJECTIVES OF PROPERTY ADMINISTRATION | 21 |
| C1.3. DUTIES AND RESPONSIBILITIES OF THE PROPERTY ADMINISTRATOR | 22 |
| C1.4. PROPERTY ADMINISTRATOR ROLE IN THE CONTRACT ADMINISTRATION MISSION | 24 |
| C1.5. APPOINTMENT OF PROPERTY ADMINISTRATORS | 24 |
| CHAPTER 2 - CONTRACTUAL ELEMENTS OF THE PROPERTY ADMINISTRATION PROCESS | 25 |
| C2.1. INTRODUCTION | 25 |
| C2.2. INITIATION OF PROPERTY ADMINISTRATION | 26 |
| C2.3. ADMINISTRATION OF PROPERTY-RELATED CONTRACT PROVISIONS | 28 |
| C2.4. TITLE TO GOVERNMENT PROPERTY | 28 |
| C2.5. LIABILITY FOR LOSS, DAMAGE, OR DESTRUCTION OF GOVERNMENT PROPERTY | 30 |
| C2.6. OTHER CONTRACTUAL ACTIONS | 36 |
| C2.7. CLOSEOUT OF PROPERTY ADMINISTRATION | 36 |
| CHAPTER 3 - TECHNICAL ELEMENTS OF THE PROPERTY ADMINISTRATION PROCESS | 39 |
| C3.1. SCOPE | 39 |
| C3.2. GENERAL | 39 |
| C3.3. POLICY ON PROVIDING GOVERNMENT PROPERTY | 41 |
| C3.4. CONTRACTOR MANAGEMENT OF GOVERNMENT PROPERTY | 43 |
| C3.5. ACQUISITION OF GOVERNMENT PROPERTY | 44 |
| C3.6. RECEIPT OF GOVERNMENT PROPERTY | 52 |
| C3.7. IDENTIFICATION OF GOVERNMENT PROPERTY | 56 |
| C3.8. RECORDS OF GOVERNMENT PROPERTY | 56 |

C3.9. MOVEMENT OF GOVERNMENT 58
C3.10. STORAGE OF GOVERNMENT PROPERTY 59
C3.11. PHYSICAL INVENTORIES OF GOVERNMENT PROPERTY 60
C3.12. REPORTS OF GOVERNMENT PROPERTY 65
C3.13. CONSUMPTION OF MATERIALS 69
C3.14. UTILIZATION OF GOVERNMENT PROPERTY 70
C3.15. MAINTENANCE OF GOVERNMENT PROPERTY 74
C3.16. SUBCONTRACTOR AND ALTERNATE LOCATION PROPERTY MANAGEMENT 77
C3.17. DISPOSITION OF GOVERNMENT PROPERTY 86
C3.18. CLOSURE OF CONTRACTS FOR PROPERTY ADMINISTRATION 87
C3.19. INFORMATION REQUIREMENTS 88

CHAPTER 4 - SYSTEMS ANALYSIS ELEMENTS OF THE PROPERTY ADMINISTRATION PROCESS 89

C4.1. PROPERTY CONTROL SYSTEM ANALYSES 89
C4.2. SAMPLING 100
C4.3. SYSTEM ANALYSIS TECHNIQUES BY PROPERTY FUNCTION 105

CHAPTER 5 - SPECIAL TOPICS RELATED TO THE PROPERTY ADMINISTRATION PROCESS 115

C5.1. PROPERTY ADMINISTRATOR SUPPORT TO PROGRAM MANAGERS AND LOGISTICS PERSONNEL 115
C5.2. MANAGEMENT CONTROL ACTIVITY 116
C5.3. MATERIAL MANAGEMENT AND ACCOUNTING SYSTEM (MMAS) 118
C5.4. PROGRESS PAYMENTS INVENTORY 120
C5.5. ADMINISTRATION OF SPECIAL TOOLING CLAUSE PROVISIONS 121
C5.6. AUTOMATED DATA PROCESSING EQUIPMENT 123
C5.7. GOVERNMENT-OWNED REUSABLE CONTAINERS 125
C5.8. SENSITIVE PROPERTY 126
C5.9. PROPERTY AT NON-PROFIT CONTRACTORS 129
C5.10. MILITARY STANDARDS REQUISITION AND ISSUE PROCEDURES 131
C5.11. NASA PROPERTY 133

APPENDICES

AP1. FUNCTIONS, FUNCTIONAL SEGMENTS, AND CRITERIA 137
AP2. DOUBLE SAMPLING PLAN 148
AP3. TABLE OF RANDOM NUMBERS 149
AP4. CONSUMPTIONS ANALYSIS WORKSHEET AND INSTRUCTIONS 156
AP5. INSTRUCTION FOR THE USE, COMPLETION, AND DISTRIBUTION OF DD FORM 1149, "REQUISITION AND INVOICE/SHIPPING DOCUMENT" 163

REFERENCES

(a) Federal Acquisition Regulation (FAR), December 1990
(b) Department of Defense Federal Acquisition Regulation Supplement (DFARS), November 1988
(c) Joint Service Regulation, AR 55-38, NAVSUPINST 4610.33C, AFR 75-18, MCO P4610-19D, and DLAR 4500.15, "Reporting of Transportation Discrepancies in Shipment," April 15, 1985
(d) Joint Service Regulation, DLAR 4140.55, AR 735-11-2, SECNAVINST 4355.18, AFR 400-54, MCO 4430-3E, "Reporting of Item and Packaging Discrepancies," October 1, 1986
(e) DLAH 4105.4, "DoD Directory of Contract Administration Services Components," July 1990
(f) DoD Instruction 4140.48, "Control and Access to DoD Material Inventories Required by Defense Contracts," March 6, 1984
(g) DoD 7950.1-M, "Defense Automation Resources Management Manual," September 1988
(h) DoD 5100.76-M, "Physical Security of Sensitive Conventional Arms, Ammunition and Explosives at Contractor Facilities," February 1983
(i) DoD 4145.26-M, "Contractor's Safety Manual for Ammunition and Explosives," March 1986
(j) DoD 4000.25-1-M, "Military Standard Requisition and Issue Procedures," May 1, 1987
(k) National Aeronautics and Space Administration Federal Acquisition Regulation Supplement

C2.4.4.3. Special tooling may also be acquired or manufactured by a contractor for the performance of a fixed-price contract that does not contain the special tooling clause and does not specify that special tooling is to be acquired for the Government. When this occurs, the Government has no rights to the tooling.

C2.4.4.4. Production Special Tooling. In these cases, special contract provisions may provide the Government the option to take title to production special tooling acquired by the contractor. The PA shall follow the directions in the special clause on title and control.

C2.4.5. Facilities. Facilities may be either Government-furnished or contractor-acquired. The facilities contract clauses, FAR 52.245-7, - 10, and - 11 set forth the title provisions. Facilities may also be acquired on contracts other than facilities contracts. In this instance, the title provisions in the Government property clause included in that instant contract will prevail.

## C2.5. LIABILITY FOR LOSS, DAMAGE, OR DESTRUCTION OF GOVERNMENT PROPERTY

C2.5.1. Scope. This section provides policy and guidance to the PA and other Government and contractor personnel regarding loss, damage, or destruction (LDD) of Government property provided to contractors.

C2.5.2. General. Definitions:

C2.5.2.1. "Lack of Good Faith." Failure to honestly carry out a duty including gross neglect or disregard of the terms of the Government property clause or of appropriate directions from the PA. Examples are a failure to establish and maintain proper training and supervision of employees, or failure to apply adequate controls to ensure compliance with contract terms.

C2.5.2.2. "Willful Misconduct." Includes either a deliberate act or failure to act that causes or results in loss, damage, or destruction to Government property.

C2.5.2.3. "Managerial Personnel." Includes the contractor's directors, officers, and any of the contractor's managers, superintendents, or equivalent representatives who have supervision or direction of:

C2.5.2.3.1. All or substantially all of the contractor's business.

C3.5.1.2.1.1.2. "Contractor Requisitioned" Government material is provided to a contractor when the contractor requests the material in accordance with the contract terms. The form of the request will be dictated by contract, utilizing the MILSTRIP system, that includes electronic transmission of orders (requisitions), requisitioning by telephone, mailed requisitions, or formatted messages (teletype).

C3.5.1.2.1.1.3. The PA must be fully aware of the contractor's authority to requisition GFM and be similarly aware of the GFM that is authorized for each Government contract. The PA must ensure that the contractor's property control system requisitions only those items and quantities of GFM authorized and fully accounts for those assets. The PA must also ensure that GFM delivered from the Government is received, controlled, and consumed in accordance with the contract provisions. In the event that the contractor receives items or quantities of GFM that are not contractually authorized, it must be reported in accordance with FAR 45.502(g). The PA shall encourage contractors to advise the CO of such discrepancies and request disposition instructions or contractual authorization for retention.

C3.5.1.2.1.2. "Transferred" Government material means that the Government has authorized the accountability of material to be transferred to a contract from another contract or Government source. When beneficial to the Government, and when consideration has been received, for fixed-price gaining contracts usually in the form of a reduction in the contract price, the Government may authorize a transfer from one contract to another; the material provided to the gaining contract is considered to be Government-furnished material (GFM). When COs give verbal approval for transfer, the approvals must be confirmed by the COs in writing, as required by the Government property clauses under changes in Government-furnished property. These written approvals should be in the form of appropriate contract modifications. In situations where the PA finds that contracts have not been modified, the facts should be provided to the CO for action. The practice of verbal approvals is discouraged, and should only be implemented due to the exigency of the situation. Written follow-up shall be provided.

C3.5.1.2.2. <u>Contractor-Acquired Material</u>

C3.5.1.2.2.1. Cost-type and time-and-materials contracts allow the contractor to acquire material for the Government as a direct charge to the contract. Title vests with the Government through the provisions of the Government property clause FAR 52.245-5(c). Fixed-price type contracts may provide for the contractor to acquire material for the Government as a direct charge to the contract when specifically listed as a line item in the contract. Title vests with the Government through the

provisions of the Government property clause FAR 52.245-2(c). The method the contractor selects to acquire material for the Government is based upon several factors (determination of items needed, schedules of production or delivery, source identification, and quantities required).

C3.5.1.2.2.2. The first source for acquiring material should be an internal review of available in-house assets that are excess to other requirements. These materials are made available to meet new requirements through internal material transfer practices. Such transfers must be carefully monitored to ensure that they are authorized and properly accomplished.

C3.5.1.2.2.2.1. Credit-Debit System. The preferred method of transfer is a credit-debit system for contractor-acquired material where the losing contract is credited for the cost of the material and the gaining contract is debited for the costs. This supports the FAR 31.205-26 policy that material costs should be home by the contract that consumes material when materials are required for specific contracts. Note that this system applies only to contractor-acquired material. It does not apply to Government-furnished material.

C3.5.1.2.2.2. Transfer of Material through Contract Modification. CAM material may be transferred to a contract when authority to receive such property as GFM is in the schedule or specifications of the gaining contract, or when such items are a suitable substitute for material described in the schedule or specifications of the gaining contract or if the contract contains provisions for unilateral increase in the amount of material furnished by the Government. Transfers should be accomplished according to instructions in the gaining contract or, in the absence of complete instructions in the contract, documentation pertaining to the transfer should be forwarded to the CO for equitable adjustment of the gaining contract and any other required action. Transfers should not be accomplished unless authorized in the receiving contract and no longer required on the losing contract. The Government should receive consideration whenever CAM is so transferred; if not, the Government may pay more than it should and the contractor stands to receive a competitive advantage. Upon transfer CAM becomes GFM.

C3.5.1.2.2.3. Benefits of a Credit-Debit System Over Contract Modification Transfers

C3.5.1.2.2.3.1. Credit-Debit systems charge material costs to the contract that benefits by the transfer that meets the intent of FAR 31.205-26. In contrast, Contract Modification transfers incur costs against one contract or program for property ultimately used on another contract or program. This could constitute a

C3.5.4.1. Special Tooling Containers. Specially designed and fabricated reusable containers for special tooling should be considered as special tools and accountability maintained either jointly with the tool or independently when:

C3.5.4.1.1. Container design and fabrication costs are charged to special tooling accounts.

C3.5.4.1.2. The container is dedicated to the storage, movement, shipment, or protection of specific special tools.

C3.5.4.2. For NASA contracts, Agency screening and return of a NASA certificate of non-availability using a DD Form 1419, or equivalent, is required if the special tooling or components thereof qualify as CRE, as defined in the NASA FAR Supplement.

C3.5.5. Facilities

C3.5.5.1. Government-Furnished Facilities. All facilities to be provided a contractor as Government-furnished property shall be described in the facilities contract schedule, specifications or attachments to the contract. In addition, facilities may be added to a contract through the use of a contract modification.

C3.5.5.2. Contractor-Acquired Facilities. All Government facilities to be acquired by a contractor shall be described in the facilities contract schedule, or as otherwise authorized. Prior to the acquisition of any item of facilities the contractor shall comply with the notification requirements found in the Cost Reimbursement Subcontracts clause, FAR 52.244-2. Contracting Officer consent is required prior to the acquisition of all facilities not stated in the schedule. Prior to acquiring IPE having an item acquisition cost of $10,000 or more, the contractor, shall submit a DoD Industrial Plant Equipment Requisition (DD Form 1419) to DIPEC to ascertain whether existing Government-owned IPE is available for redistribution. In addition, NASA requires a DD Form 1419, or equivalent, to be submitted to NASA for Agency screening for all facilities items that qualify as CRE as defined in the NASA FAR Supplement. NASA will assign a Certificate of Non-Availability (CNA) number if the item is not available. The PA shall ensure that the contractor prepares a DoD property record (DD Form 1342) subsequent to the acquisition and submits it to NASA citing the CNA number.

C3.5.5.2.1. If the item is not available, the DD Form 1419 will be returned by DIPEC to the cognizant CAO for transmittal to the contractor as authorization to procure the facilities item. Although the PA is not specifically tasked