# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 22

From: Jeff Hibler 18 June 1996
To: Steve Talmadge

Subject: Action Item Nos. 4, 7 and M&H Representatives Traveling to ARDEC Next Week

Mason & Hanger drops the requirement for unabsorbed overhead being specifically mentioned in our equitable adjustment language. This closes Action Item 4. This is clause number 9 in your 30 May 1996 letter.

Although Action Item 7 was an ARDEC action, Mason & Hanger wishes to drop the warranty disclaimer term. This is clause number 11 in your 30 May 1996 letter.

The following people will attend ARDEC for negotiations next week:

Marilyn Daniel - Mason & Hanger Counsel (Corporate)
Doug Reed - Mason & Hanger Contract Administration (Corporate)
Pete Schulte - M795 Program Manager (Iowa)
Jeff Hibler - Administration Division Manager (Iowa)
Ken Barker - Plant Controller (Iowa)
John Cortum - Methods Engineering (Iowa)
Terry Lile - Production Engineering (Iowa)

Sincerely,

Jeff Hibler
Administration Division Manager
Mason & Hanger Corporation

J. B. Hibler/D. L. Schleif (2)
P. A. Schulte (1)
K. R. Barker (1)

*Action Item List from Telecon Dated 6-6-96 on the M795 Program*

1. **M&H** to develop a billing schedule/methodology to get paid for facilitization.
2. **ARDEC** to determine how to present facilitization clause language so M&H cash flow is not negatively impacted yet M&H ultimately owns the equipment.
3. **M&H** to revise delivery and component receipt schedule to account for movement of 500 units from 1997 to the FAT quantity. **Complete 6-6-96.**
4. **M&H** to go back and discuss internally clause 9 to determine if equitable adjustment as indicated in current clauses is satisfactory to cover unabsorbed overhead. **Complete 6-18-96.**
5. **M&H** to go back and discuss internally clause 10 to see if protection is adequate for failures due to GFM.
6. **ARDEC** legal to review clause 10 from M&H perspective.
7. **ARDEC** to fax warranty case cite to Ann Render. **Complete 6-13-96.**
8. **M&H** to talk to local Army quality representative to see if provisionally accepted DD 250's are ever used. **Complete 6-10-96.**
9. **M&H** to fax letter on 252 degree allowance on thermal panels. **Complete 6-6-96.**
10. **ARDEC** to assure contract specifically limits "supplies" to M795 projectiles.
11. **M&H** to determine how to handle pricing of disposition of facility items. **Complete 6-7-96.**
12. **ARDEC** to confirm residuals are shipped via GBL.

*AS OF 6-18-96*

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 23

JUN-20-1996 15:10 FROM M&H CONTRACT ADMIN. TO 7774 P.01

96 JUN 20 PM 3:35

M&H-SM CO

# U.S. ARMY ARDEC ACQUISITION CENTER

AMSTA-AR-PCW-A BLDG. 10

Picatinny Arsenal ,NJ 07806-5000

## FAX TO: (DSN) 485 - 7116

**To:** M+H **Date:** 20 JUNE 96

**Attn:** MR. JEFF HIBLER

**Subj:** M795 LAP

**Remarks:** RESPONSE TO ACTION ITEM # 2

**From:** Steve Talmadge

**Desk Phone #:** (201)724- 5663

**Fax #:** (201) 724-4043 [DSN 880-4043]

**Pages Sent** (Incl. this page): 2

Post-it™ brand fax transmittal memo 7671 | # of pages: 2

| | |
|---|---|
| To Jeff Hibler | From Lori Applegate |
| Co. | Co. |
| Dept. | Phone # 7464 |
| Fax # 7774 | Fax # 7116 |

JUN-20-1996 13:56 P.01

0001 Basic Requirement

| | | | | |
|---|---|---|---|---|
| 0001AA | First Article Test in accordance with Statement of Work in Section C. | 1 lot | | $______* |
| 0001AA | Load Assemble, and Pack M795 projectiles in accordance with TDP and Statement of Work under Section C. | 78,468 | $______ | $______ |
| 0002 | Data in accordance with CDRL, DD Form 1423 Exhibit A, of Section J | 1 Lot | Not Separately Priced | |
| 0003 | Option Requirement | | | |
| 0003AA | Load Assemble, and Pack M795 projectiles in accordance with TDP and Statement of Work under Section C. | 130,000 | $______ | $______ |
| 0003AB | Data in accordance with CDRL, DD Form 1423 Exhibit A, of Section J | 1 Lot | Not Separately Priced | |

* The FAT subclin price includes the costs associated with any special tooling, equipment, and/or facilitization efforts required by the contractor to perform the M795 projectile LAP contract.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AMERICAN ORDNANCE LLC,
Plaintiff,
vs.
UNITED STATES,
Defendant.

Case No. 07-867C
Judge Wheeler

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 24

M795 Negotiations
June 25-27,1996

**Mason & Hanger Corporation Proprietary and Confidential Information**

Open issues per ARDEC letter of 30 May 1996

1. Item 1: TDP reflects that "mandatory process control drawings" are for reference only. Is that correct or are they mandatory?

2. Item 2: Adequate payment provisions must be negotiated.

3. Item 3: Will progress payments be appropriate if other payment provisions are negotiated?

4. Item 4: What does the uncertain reject rate do to these numbers?

5. Item 5: What attrition rate is appropriate given the reject rate uncertainty?

6. Item 6: Clarify that the projectile is one of the "parts." Is M&H buying a gasket? Is it the same gasket as listed here?

7. Item 10: See M&H Clause H.10 Contractor Liability (draft 5/12/96)

    The Government Property clause only assures replacement of the defective part. It does not assure payment by the Government of all other impacts of the defective parts, e.g. whole items which must be reworked or scrapped.

8. Item 12: Full payment upon provisional signing of ammo data card. We do not want to liquidate facilitization costs in the manner described.

9. Item 13: See M&H Clause Loss of Facility Use (draft 5/28/96)

    In the event of a Government stop work order or delay delivering parts, the production schedule may slip into this period.

10. Item 14: 250 degrees needs to be described with reasonable variances. Is 250 the maximum?

11. Item 16: Discuss the risk of loss provisions of FAR 52.245-2 in RFP. Also discuss the importance of certain insurance requirements per this clause.

12. Item 18: FAR 52.228-5 requires that the coverages be spelled out in the contract.

13. Item 20: The Government demil clause seems to address this issue, but demil must be priced.

Determine options on payment approaches, including CPIF contract. Prioritize.

Determine what is acceptable risk on reject rate and what contractual language is needed.

Determine how and when cost and pricing data will be submitted.

Determine how to address concerns about management reserve/contingency.

Preparation for price negotiation.

Time frame to exercise option.

Consider proposing a jointly signed document reflecting critical negotiated issues which they refuse to place in the contract.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

AMERICAN ORDNANCE LLC,
Plaintiff,
vs.
UNITED STATES,
Defendant.

Case No. 07-867C
Judge Wheeler

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 25

From: Jeff Hibler 29 June 1996
To: Distribution

Subject: Continuation of M795 Negotiations

On 25, 26, and 27 June 1996, the following Mason & Hanger Corporation (M&H) personnel were at ARDEC to continue the negotiation of the M795 LAP contract:

Marilyn Daniel
Doug Reed
Jeff Hibler
Pete Schulte
Ken Barker
John Cortum
Terry Lile

ARDEC was represented by Steve Talmadge, Dean Booker, Doug Kukla, Faith Harder, and Mike Patriarca. Steve Talmadge, Contract Specialist, was the ARDEC spokesperson.

Steve started out wanting to go through the open action items. He passed out attachment 1 which was the proposed ARDEC CLIN summary for format of the contract. We agreed that this needed discussion as our two (2) main issues were how to get paid and what we can expect the reject rate to be once we start running.

M&H has no problem with the current projectile attrition rate of 1% plus saw samples. We have found in discussions with the ARDEC technical community that, during the work done on this round at Lousiana, up to 5% rejects were encountered. How do we account for TNT over and above the 1% plus funnel scrap. Mike Patriarca stated that any data generated was for 5000 units over a 6 to 8 month period. We stated that our labor assumed a level of rejections but not to the level seen during testing. Tests were not done on a production type run but were more similar to a laboratory setting. Dean Booker said that he is trying to get us flex line parts so we can try the process in advance of first article.

We told them that a 10% reject rate is in the PQT/FAT portion of LAP and a 3% reject rate is in production. We asked them what the process inherent defect rate is since it is their process. They responded by asking us what it should be since we are ammunition producers. We said we did not know because their technical report did not address the reject rate, only that rejects were encountered. They did state that if we need a larger rate of TNT this would not be a problem as they have plenty.

M&H's concern is that the process parameters are dictated to us but once we hit the negotiated rate, we will be responsible for anything over and above this. ARDEC said to throw an attrition rate at them. M&H responded- 20%? We asked if ARDEC would be willing to give us a warranty that the process reject rate would not exceed 5%. They said

leave. Steve said Dave Banashefski wanted to talk to Jeff Hibler privately. We asked if he could talk to our whole team and were told "no".

Dave provided attachment no. 4 to Jeff as ARDEC's final offer. The total was $41,026,151. He said ARDEC could go no farther than this. He asked Jeff if M&H considers a $28,000 move to be negotiating. Jeff stated "yes". Dave said he had never in his 12 years seen such nickel and diming as M&H is doing on T's and C's. He has asked people with 30 years of experience if they have seen anything like it and they tell him they haven't. He said he has 3 options: we come to a settlement, he unilaterally sets the price, or we terminate. He said he would hate to unilateral as this will put a strain on the relationships going into this important contract. He gave his options to Jeff in his order of preference. Jeff stated that it is highly possible that a termination would be the preference for M&H in lieu of Dave setting the price. He pointed out that their offer included a line item for the first 1000 units which allowed full liquidation of the facilitization price at that time. Jeff asked why they were so dead set against a cost plus contract. Dave said that the money simply wasn't there to cover an overrun should one occur. He said Jeff should accept the $41 million if he could or, if it was necessary to discuss this with management, he could let Dave know Thursday. Jeff asked if M&H could use the conference room a little longer and was told this was okay. Jeff told Dave M&H would touch base with him before leaving and Dave said this was fine.

M&H then caucused to develop a position on the ARDEC final offer. We removed 1 pink water system from the facilitization portion of our position which reduced the price by $1 million to $10,260,771. We accepted their position on basic and asked a question as to how they got from a $344K cost line on the FAT/PQT to $355,399; were they only allowing 3.2% profit and insurance combined? (Dave has since told me twice that they bottom lined their figures and this is how the money was distributed. It is not built from the cost line they had previously presented). On the option, we offered a "not to exceed" of $23,181,600 with a firm price to be negotiated by a TBD date. Jeff took this offer to Banashefski's work space and was told by Talmadge that Banashefski had left for the day. We then decided to give the offer to Talmadge. He instructed Jeff to call him at 9 AM Thursday 27 June to see if they wanted us to come back.

On Thursday 27 June, rather than calling, we traveled to the arsenal and Jeff entered the building to talk to Talmadge about ARDEC's desires relative to continuing negotiations. We were there at 9 AM sharp. Jeff was informed that Talmadge and Banashefski were both in meetings and would be available shortly. At 9:35 AM they both came and got Jeff and went to a conference room. Banashefski asked if the $41 million number was acceptable to which Jeff responded "no". Banashefski said that M&H had until Friday to determine if they could live with the $41 million number, otherwise he would have to exercise one of four options currently under consideration. Jeff asked him what the four options were and Banashefski said he would rather not say at this point. He would let M&H know on Monday 1 July. Jeff asked why the option had to be settled now. Dave said they already have the money. Jeff then asked why the option doesn't then become part of the basic. Dave said he wouldn't award an option of this magnitude without first

ATTACHMENT #1

| | | | | |
|---|---|---|---|---|
| 0001 Basic Requirement | | | | |
| 0001AA | First Article Test in accordance with Statement of Work in Section C. | 1 lot | | $______* |
| 0001AA | Load Assemble, and Pack M795 projectiles in accordance with TDP and Statement of Work under Section C. | 78,468 | $______ | $______ |
| 0002 | Data in accordance with CDRL, DD Form 1423 Exhibit A, of Section J | 1 Lot | Not Separately Priced | |
| 0003 | Option Requirement | | | |
| 0003AA | Load Assemble, and Pack M795 projectiles in accordance with TDP and Statement of Work under Section C. | 130,000 | $______ | $______ |
| 0003AB | Data in accordance with CDRL, DD Form 1423 Exhibit A, of Section J | 1 Lot | Not Separately Priced | |

* The FAT subclin price includes the costs associated with any special tooling, equipment, and/or facilitization efforts required by the contractor to perform the M795 projectile LAP contract.

ARDEC LAST OFFER

ATTACHMENT #4

| CLIN | DESCRIPTION | QTY | UNIT PRICE | EXTENDED PRICE |
|---|---|---|---|---|
| 0001 | BASIC REQUIREMENT | | | |
| 0001AA | FAT/PQT | 1 LOT | $ N/A | $ 355,399 |
| 0001AB | LAP PRODUCTION | 1,000 EA | $ N/A | $ 173,920 + * 9,597,936 |
| 0001AC | LAP PRODUCTION | 76,968 EA | $ 173.92 | $ 13,386,275 |
| 0002 | DD 14223'S | 1 LOT | NOT SEPARATELY PRICED | |
| | | | TOTAL PRICE BASIC | $ 23,513,530 |
| 0003 | OPTION REQUIREMENT | | | |
| 0003AA | LAP PRODUCTION | 130,000 EA | $ 134.7124 | $ 17,512,621 |
| 0003AB | DD 1423'S | 1 LOT | NOT SEPARATELY PRICED | |
| | | | TOTAL PRICE OPTION | $ 17,512,621 |
| | TOTAL BASIC AND OPTION REQUIREMENTS | | | $ 41,026,151 |

* THIS SUBCLIN PRICE INCLUDES THE COSTS ASSOCIATED WITH ANY SPECIAL TOOLING, EQUIPMENT, AND/OR FACILITIZATION EFFORTS REQUIRED BY THE CONTRACTOR TO PERFORM THE M795 PROJECTILE LAP CONTRACT.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 26

From: Jeff Hibler
To: Distribution

9 July 1996

Subject: Record of Telephone Conversation with Dave Banashefski Regarding M795 Negotiations

I called Dave today to tell him we would not have an answer to his question until tomorrow. We have had difficulty getting together to discuss what we need to do in order to come to their number. He asked if I thought we could get to their number. I told him we are trying to figure out how to get to their number. The only way we can approach their number is by cutting items out of the facility. He asked if we were still looking at the compressed schedule and I told him we were (this gets the basic portion of the contract done in September of 1998).

I told him that we still believe that there are unresolved terms and conditions that we need to deal with. He asked like what? I told him we need to agree to a payment schedule and line item structure. He said the line item structure will be as presented to us while we were last out there:

PQT/FAT
Lot 1 (including facilitization)
Basic production

I told him that we still need to resolve the interpretation of the clause on M&H liability for Government property and also what our insurance requirements were. He said he thought these were taken care of. I said Marilyn and Steve might have come to agreement on these but I didn't think so.

Also told him we requested 64,380 pounds of TNT in our first delivery and they had not responded. He said he thought they accepted this. I told him my records did not indicate that they accepted this.

He said he would let his PEO (a 2-star) know what is going on. We need to let them know by 11 AM eastern time tomorrow. He again emphasized for my benefit that if we can't close this tomorrow, they would begin exploring other options.

J. B. Hibler
Administration Division Manager

J. B. Hibler/D. L. Schleif (2)
K. R. Barker/F. H. Jones (2)
P. A. Schulte (1)

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 27

From: Jeff Hibler
To: Distribution

10 July 1996

Subject: M795 Negotiations - Telephone Conversation with David Banashefski

At 10:20 A.M. central time on this date, I contacted M795 PCO David Banashefski relative to our current position on the M795 offer ARDEC had on the table to us. I told him we had an emergency meeting at 10:30 A.M. and I would be unable to provide him a written position by 11 A. M. I asked him if he wanted a verbal summary of what we intended to send him and he said that we did. I told him that we are providing him 2 option positions for consideration:

Option A is the same bottom line as ARDEC but the dollars are distributed differently. The FAT/PQT is $643,264, first lot production is $9,483,991, and remaining basic production is $13,386,275. This option is without a pink water recirculating system.

Option B includes a pink water recirculating system. The FAT/PQT line item and the basic production line items remain the same at $643,264 and $13,386,275, respectively. The first lot production line item is $10,913,956.

I told him he would get a letter to Steve Talmadge in the package that outlines what we believe the ARDEC and M&H positions on three (3) key clauses are.

There will be a disclosure containing updated purchase order/requisition information from when we were there last.

Another disclosure will be included that shows a "bare bones" approach to facilitization whereby we would not procure and install some items, we would look for used items instead of new, or we would scavenge from other programs. I told him this approach, when priced, totaled $8.88 million. I told him it was unlikely that we would use this approach 100% so we weren't considering it. He asked what profit was in our number and I told him 15%. He then gave me a lecture on the inconsistency of stating we are at "bare bones" and then tacking on 15% profit. I didn't see a need to debate the reduced facility as it might relate to increased risk to us so I didn't respond. He really gives me the impression that 15% is way out of line.

I told him there were some conditions on our price offers. Progress payments will be available for each line item and could be liquidated in full against each single line item. He said it was their intent that it be done that way.

I told him that the parties must reach agreement on all terms and conditions. He asked about this. I told him that they had not accepted our TNT quantity for the FAT/PQT. He said they did accept it. I said fine. I also stated that we need to get an updated schedule agreed to that could go into the contract. We will take this action.

I told him that since the government defined all process parameters, they will be responsible for M&H costs which arise from unacceptable product when we have produced the product to their parameters. He said this wouldn't fly. He said they need to get this going. If need be, rather than debate this term, he would unilateral it out of the discussions and it wouldn't get into the agreement. I told him I wouldn't comment on this because I didn't know he could "unilateral" T's and C's. He said he could. He then said he would get with the PEO and they would determine what the next course of action would be. He did not commit to a time.

Jeff Hibler
Administration Division Manager

J. B. Hibler/D. L. Schleif (2)
P. A. Schulte (1)
K. R. Barker/F. H. Jones (2)

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

AMERICAN ORDNANCE LLC,
Plaintiff,
vs.
UNITED STATES,
Defendant.

Case No. 07-867C
Judge Wheeler

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 28

bc: J. B. Hibler/D. L. Schleif (2)
K. R. Barker/F. H. Jones (2)
P. A. Schulte
M. S. Daniel, Corporate Legal, Lexington
(RC) Document Control (2)

17 July 1996

JBH 96-00105/L

Mr. David Banashefski
Contract Division, Branch A
Acquisition Center
Department of the Army
United States Army Tank - Automotive and Armaments Command
Armament Research, Development and Engineering Center
Picatinny Arsenal, NJ 07906-5000

Dear Mr. Banashefski:

Subject: Confirmation of Price Agreement on the M795 LAP Contract

Reference: Telephone Conversation Between Mr. Steve Talmadge and Jeff Hibler on 17 July 1996

In confirmation of reference telephone conversation, the prices negotiated for the M795 basic LAP contract are as follows:

| | |
|---|---|
| FAT/PQT | $ 643,264 |
| Lot 1 | $ 9,483,991 |
| Basic LAP | $13,386,275 |
| Total | $23,513,530 |

Point of contact for this letter is the undersigned at (319)-753-7724.

Sincerely,

MASON & HANGER CORPORATION

Original Signed by
J.B. Hibler

J. B. Hibler
Division Manager,
Administration

JBH/js

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

AMERICAN ORDNANCE LLC,
Plaintiff,
vs.
UNITED STATES,
Defendant.

Case No. 07-867C
Judge Wheeler

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 29

From: Jeff Hibler
To: Distribution

13 August 1996

Subject: Comments Sent to Steve Talmadge on the M795 Contract

I started to go through issues I had with the M795 contract we received from ARDEC over the phone with Steve Talmadge today. He asked that I just fax him a handwritten sheet with my comments. I faxed him the attached.

Questions can be addressed to the undersigned at 7724.

J. B. Hibler
Administration Division Manager

J. B. Hibler/D. L. Schleif (1) ~~w/att.~~
P. A. Schulte (1) w/att.
K. R. Barker/F. H. Jones (2) w/2 att.

FROM: JEFF HIBLER 8/13/96
TO: STEVE TALMADGE

M795 Contract Issues:

1- Need to resolve paying activity ASAP! We are incurring cost & not being paid. Letter contract should be sufficient to get us paid.

2- Page 9 is missing.

3- CLAUSE 10 in front should be 245-250°F.

4- CLAUSE 12 in front should refer to building temperature rather than internal cast temperature. Can't measure internal cast temperature.

5- CLAUSE F.3 should be 52.211-16 instead of 52.212-9

6- CLAUSE H-8. Need to define when First Article and Facilitization are fully liquidated (ie First Article CLIN 0001AA is fully liquidated at First Article Acceptance. Facilitization costs are fully liquidated at time of provisionally accepted ammo data card for lot 1 which is CLIN 0001AB).

7- CLAUSE I-2 should state MIL-P-63252 in 2 places.

JB Hibler

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 30

From: Jeff Hibler
To: Distribution

14 August 1996

Subject: M795 Contract Definitization

Talked to Steve Talmadge today about the list I sent him yesterday. He said I would be getting a fax to cover the following:

1- There will be a new page defining a new paying activity.
2- They will fax page 9 which was missing from our package.
3- They will change the temperature requirement in clause 10 to 245-250 degrees F.
4- They said on clause 12, they talked to 3 of our engineers (Steer, Frisbie, and Lile) and were assured we could meet the intent of their clause. I have since asked John Cortum to get with Frisbie and ask him how to assure himself this can be done.
5- There will be a new page 23 correcting the FAR reference for variation in quantity.
6- He said changes to the progress payment paragraph are not necessary as page 12 defines when liquidation occurs through the set up of the line items. I confirmed with him that First Article full liquidation occurs at completion of first article and Facilitization liquidation occurs at completion of the first lot of 1000 units. He said this is correct.
7- He also said there would be a draft ECP on post cyclic heat coming with the package.

He asked if I could get the contract signed today. I said I didn't know if Darl would be in but would try to get this handled.

Questions can be directed to the undersigned at 7724.

J. B. Hibler
Administration Division Manager

J. B. Hibler/D. L. Schleif (1)
K. R. Barker/F. H. Jones/M. L. Brown (3)
P. A. Schulte (1)

D. W. Reed (1)

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

AMERICAN ORDNANCE LLC,
Plaintiff,
vs.
UNITED STATES,
Defendant.

Case No. 07-867C
Judge Wheeler

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 31

68X

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

PAGE 1 OF 81

| 1 AMEND/MODIFICATION OF SOLICITATION/ CONTRACT/ORDER NO. | 2 AMEND/ MODIFICATION NO | 3 EFFECTIVE/ SOLICITATION NO | 4 REQUISITION/PURCHASE REQUEST NO |
|---|---|---|---|
| DAAE30-96-C-0013 | PZ0001 | AUG 15 1996 | |

| 5 ISSUED BY CODE W15QKN | 6 ADMINISTERED BY (If other than block 5) CODE W52P1J |
|---|---|
| DEPARTMENT OF ARMY<br>U. S. ARMY ARDEC<br>PICATINNY ARSENAL, NJ<br>07806-5000<br><br>S. TALMADGE SW<br>AMSTA-AR-PCW-A 201-724-5663 | FINANCE & ACCNTG OFFICER<br>ATTN: SMCRI-RMF-PV<br>ROCK ISLAND, IL<br>61299-5000 |

| 7 CONTRACTOR NAME AND ADDRESS CODE 14912 | FACILITY CODE | 8 PROJECT NO (if applicable) | 9 TYPE CONTRACT |
|---|---|---|---|
| MASON & HANGER<br>SILAS MASON CO., INC.<br>17575 STATE HIGHWAY 79<br>MIDDLETOWN, IA<br>52638 | IF "9" FOR MULTIPLE FACILITIES SEE SEC G | NEW CONTRACT AMOUNT;<br>$23,513,530 | J |

10 THIS BLOCK APPLIES TO AMENDMENTS OF SOLICITATION

☐ The above numbered solicitation is amended as set forth in block 13 The hour and date specified for receipt of Offers ☐ is extended ☐ is not extended

Offerors must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended by one of the following methods: (a) By completing items 7 and 15 and returning ___ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE ISSUING OFFICE PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter provided each telegram or letter makes reference to the solicitation and this amendment and is received prior to the opening hour and date specified.

11 THIS BLOCK APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 13

(a) ☐ This Change Order is issued pursuant to (specify authority) The Changes set forth in item 13 are made in the contract/order no. in item 2

(b) ☐ The above numbered contract/order is modified to reflect the administrative changes (such as changes in paying office, appropriation data, etc.) set forth in item 15.1 pursuant to the Authority of FAR 43.103(b)

(c) ☐ This Supplemental Agreement is entered into pursuant to authority of

(d) ☒ Other (Specify type of modification and authority) Letter Contract Definitization FAR 52.216-25

| KIND OF MOD | MOD ABST RECIPIENT ADP PT | DATE OF SIGNATURE MODIFICATION | CHANGE IN CONTRACT AMOUNT | LOSING PO/CAO ON TRANSFER | GAINING PO/CAO ON TRANSFER | SVC/AGENCY USE ONLY |
|---|---|---|---|---|---|---|
| D | W52H1C | AUG 15 1996 | $ 18,511,340.00 | | | FA |

12 ACCOUNTING AND APPROPRIATION DATA (if required) (SEE FORM 69K)

13 DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/subject matter where feasible)

THIS MODIFICATION DEFINITIZES LETTER CONTRACT DAAE30-96-C-0013.

Except as provided herein, all terms and conditions of the contract/order, as heretofore changed, remain unchanged and in full force and effect

14 ☐ IMPORTANT CONTRACTOR/OFFEROR IS NOT REQUIRED TO SIGN THIS DOCUMENT ☒ CONTRACTOR/OFFEROR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN 2 COPIES TO ISSUING OFFICE

| 15A. NAME OF CONTRACTOR/OFFEROR | 16A. UNITED STATES OF AMERICA |
|---|---|
| BY [signature] (Signature of person authorized to sign) | BY [signature] (Signature of Contracting Officer) |

| 15B. NAME AND TITLE OF SIGNER (Type or print) | 16 DATE SIGNED | 16B. NAME OF CONTRACTING OFFICER (Type or print) | 16C. DATE SIGNED |
|---|---|---|---|
| Darl J. Heffelbower<br>Plant Manager | 8/14/96 | DAVID M. BANASHEFSKI | 8/15/96 |

STD FORM 30/SDA 68X-E (APR 84)

1. This modification definitizes the letter contract DAAE30-96-C-0013 awarded on 14 December 1995 for the Load, Assemble, and LAP of the M795 HE Projectile. All negotiated prices and agreements reached during negotiations have been reflected in this definitized contract. The contractor shall perform all efforts and requirements as delineated herein.

2. The contractor's letter dated July 17,1996 confirming a total negotiated definitized price for the letter contract at $23,513,530 is hereby incorporated into this contract by reference.

3. The following drawings/ECP's delineated in Amendment 0001 to the RFP are hereby incorporated into the contract and the TDP for the M795 HE Projectile:

| ECP's | Drawings |
|---|---|
| M4K3006, M5A9001<br>M5A2011, M5A3007<br>M5A3026, M4A3016<br>M5K3000, M5A2002<br>M5Q2018, M5Q2036 | 12940880 |

4. It is understood that the facilitization costs delineated in the contract are based on meeting a maximum monthly LAP capability rate of 10,300 each M795 projectiles for any out-year production quantities. This does not preclude M&H from including equipment items in out-year production proposals.

5. If M&H meets process parameters in the contract and TDP (including the contractual waiver of the temperature of the thermal panels) and unacceptable product results, M&H shall have the right under the legal theory of implied warranty of specifications to request an equitable adjustment for all related costs.

6. The attrition rate for the M795 Projectile metal parts being supplied as GFM shall be at a rate of 1% of the total quantity deliverables plus 6 each per month for SAW samples. In addition, the attrition rate for the TNT shall be 1% of the total required poundage to load the production quantity deliverables, and 50% of the total required poundage to load the FAT quantity lot.

7. Storage Costs - The contract price covers 60 days of storage costs for GFM prior to its incorporation into the monthly LAP production schedule and 60 days of storage for end items after the Load Assemble and Pack of the ammunition is completed. The storage baseline will be directly related to the GFM and production delivery schedules delineated in the contract. The contractor shall monitor the storage of GFM and production deliverables against the GFM and production schedules in the contract. Furthermore, the contractor will be required to provide the Government with its results of assessment of the storage data for review.

Any storage of GFM components or production deliverables which exceed the above parameters will need to be assessed by the parties to determine cause. Any disagreement between the parties regarding the cause of additional storage space will be handled via the disputes clause.

If however, additional storage is required due to the fault, in whole or in part, of the Government, an appropriate equitable adjustment will be negotiated. If an equitable adjustment is required, the costs for such storage will be based on the number of cubic feet encumbered times a storage rate. For CY96, the rate will be $.0587 per cubic foot per month. For all other out-years, the CY rate shall be the Forward Pricing Rate Agreement determined by M&H and the cognizant DCMC office.

8. The parties agree that the first 1,000 units under the First Article Test (FAT) shall include two (2) exposures for x-ray purposes at 90 degrees rotation.

9. An updated Small Business Subcontracting Plan shall be submitted pursuant to FAR 52.219-9, not later than one month after award of this modification for Government review/approval. The Plan when approved will be incorporated and made a material part of the contract by reference.

10. It should be understood that until the Government approves a waiver to use 260 degrees Fahrenheit for the M795 controlled cooling process, the contractor is required to operate at 245-250 degrees Fahrenheit.

11. Provisional acceptance of a FAT/production lot pending ballistic testing can be accomplished via an Ammunition Data Card or the DD 250 form.

12. Post Cyclic Heat Treatment: The M795 TDP (Drawing Number 9312769, sheet 2, note 4B) requires that "Loaded projectiles be subjected to cool air temperature not colder than 60 degress F and not hotter than 75 degrees F for a minimum of 12 hours.

13. M&H is required to maintain the minimum insurance set forth in FAR 52.307-2(a),(b)(1), and (c). The Government further agrees that no property damage liability insurance is required as we are unaware of any "special circumstances" that may require it (See FAR 28.307-2(b)(2)). Finally, we agree that neither aircraft public and passenger liability, nor vessel liability insurance is required. However, this final agreement is based on M&H's assertion that neither aircraft nor vessel transportation will be conducted in performance of this contract.

14. The payment office is hereby changed from DFAS-Columbus Center, DFAS-CO/Gulf Coast Div, P.O. Box 182231, Columbus, OH 43218-2231, to the address below:

DFAS Rock Island
Operation Location
ATTN: DFAS-RI-FPV, blg 68
Rock Island, IL 61299-8301

15. Section K,L, and M of the solicitation are hereby incorporated into the contract by reference.

69S-E

| FORM 69S (REV 10-83) | CONTINUATION SHEET | PROC INSTR IDENT NO | MOD/ORDER NO | PAGE | OF |
|---|---|---|---|---|---|
| | | DAAE30-96-C-0013 | PZ0001 | 5 | 81 |

## PART I SECTION B & F
## SERVICES LINE ITEM DATA

| ITEM NO | DESCRIPTION OF SERVICES | ACRN | COMPLETION DATE | SVC/AGENCY USE ONLY | TOTAL ITEM AMOUNT * | ITEM/PROJ/ MGR |
|---|---|---|---|---|---|---|
| 0001AA- | DESIGN/FABRICATE/SUPPORT | AA | 99FEB28 | IW5AE0201ANG | -5,002,190.00 | |

DESCRIPTIVE DATA:

THE ABOVE TOTAL AMOUNT REPRESENTS 50% OF $10,004,379.00 TO DESIGN, FABRICATE AND INSTALL THE SLOW COOL EQUIPMENT. THE MAXIMUM NOT-TO-EXCEED CEILING PRICE IS $24,423,866.00.

| ITEM NO. | DESCRIPTION OF SERVICES | ACRN | COMPLETION DATE | SVC/AGENCY USE ONLY | TOTAL ITEM AMOUNT * | ITEM/PROJ/ MGR |
|---|---|---|---|---|---|---|
| 0001AB- | PQT AND FAT | AA | 99FEB28 | IW5AE0201ANG | U | |

DESCRIPTIVE DATA:

| ITEM NO. | DESCRIPTION OF SERVICES | ACRN | COMPLETION DATE | SVC/AGENCY USE ONLY | TOTAL ITEM AMOUNT * | ITEM/PROJ/ MGR |
|---|---|---|---|---|---|---|
| 0001AC- | LAP M795 PROJECTILE | AA | 99FEB28 | IW5AE0201ANG | U | |

DESCRIPTIVE DATA:

| ITEM NO. | DESCRIPTION OF SERVICES | ACRN | COMPLETION DATE | SVC/AGENCY USE ONLY | TOTAL ITEM AMOUNT * | ITEM/PROJ/ MGR |
|---|---|---|---|---|---|---|
| 0002- | DD 1423 | AA | 99FEB28 | IW5AE0201ANG | N | |

DESCRIPTIVE DATA:

CONTRACT DATA REQUIREMENTS LIST.

| ITEM NO | DESCRIPTION OF SERVICES | ACRN | COMPLETION DATE | SVC/AGENCY USE ONLY | TOTAL ITEM AMOUNT * | ITEM/PROJ/ MGR |
|---|---|---|---|---|---|---|
| 0002+ | DD 1423 | AA | 98SEP30 | IW5AE0201ANG | N | |

DESCRIPTIVE DATA:

*REPRESENTS NET AMOUNT OF INCREASE/DECREASE WHEN MODIFYING EXISTING ITEM NOS
E = ESTIMATED
- (IN $) = DECREASE
+ OR - (IN ITEM NO.) = ADDITION OR DELETION

69E-E

| FORM 69E (REV 10-83) | CONTINUATION SHEET | PROC INSTR IDENT NO | MOD/ORDER NO | PAGE | OF |
|---|---|---|---|---|---|
| | | DAAE30-96-C-0013 | PZ0001 | 6 | 81 |

PART I SECTION B
SUPPLIES LINE ITEM DATA

| ITEM NO. | QUANTITY * | PURCH UNIT | UNIT PRICE | TOTAL ITEM AMOUNT * |
|---|---|---|---|---|
| 0001AA | 1 | LT | N | 643,264.00 |

| ACRN | FED STOCK NUMBER | PART NUMBER | ITEM/PROJ. MGR |
|---|---|---|---|
| AA | | | |

| PQA | ACP | FOB | OVER | UNDER | NOUN | CIRR | SVC/AGENCY USE ONLY |
|---|---|---|---|---|---|---|---|
| S | S | S | % | % | FAT | | TW5AE0201ANG |

DESCRIPTIVE DATA :

FIRST ARTICLE TEST QUANTITIES (CONSISTING OF 1,500 EACH UNITS) (Includes PQT quantities).

| ITEM NO. | QUANTITY * | PURCH UNIT | UNIT PRICE | TOTAL ITEM AMOUNT * |
|---|---|---|---|---|
| 0001AB | 1,000 | EA | N | 9,483,991.00 |

| ACRN | FED STOCK NUMBER | PART NUMBER | ITEM/PROJ. MGR |
|---|---|---|---|
| AA | | | |

| PQA | ACP | FOB | OVER | UNDER | NOUN | CIRR | SVC/AGENCY USE ONLY |
|---|---|---|---|---|---|---|---|
| S | S | S | % | % | M795 LAP | | TW5AE0201ANG |

DESCRIPTIVE DATA :

THIS SUBCLIN INCLUDES 1,000 EACH M795 PROJECTILES AT A TOTAL PRICE OF $173,920 AND $9,310,071 IN FACILITIZATION COSTS.

| ITEM NO. | QUANTITY * | PURCH UNIT | UNIT PRICE | TOTAL ITEM AMOUNT * |
|---|---|---|---|---|
| 0001AC | 76,968 | EA | 173.92 | 13,386,274.56 |

| ACRN | FED STOCK NUMBER | PART NUMBER | ITEM/PROJ. MGR |
|---|---|---|---|
| AA | | | |

| PQA | ACP | FOB | OVER | UNDER | NOUN | CIRR | SVC/AGENCY USE ONLY |
|---|---|---|---|---|---|---|---|
| S | S | S | % | % | M795 LAP | | TW5AE0201ANG |

DESCRIPTIVE DATA :

| ITEM NO. | QUANTITY * | PURCH UNIT | UNIT PRICE | TOTAL ITEM AMOUNT * |
|---|---|---|---|---|
| | | | | |

| ACRN | FED STOCK NUMBER | PART NUMBER | ITEM/PROJ. MGR |
|---|---|---|---|
| | | | |

| PQA | ACP | FOB | OVER | UNDER | NOUN | CIRR | SVC/AGENCY USE ONLY |
|---|---|---|---|---|---|---|---|
| | | | % | % | | | |

DESCRIPTIVE DATA :



* REPRESENTS NET AMOUNT OF INCREASE/DECREASE WHEN MODIFYING EXISTING ITEM NO.
N = NOT APPLICABLE
U = UNDEFINITIZED
NSP = NOT SEPARATELY PRICED
E = ESTIMATED
- (IN QTY AND $) = DECREASE
+ OR - (IN ITEM NO.) = ADDITION OR DELETION
CIRR: CONTROLLED ITEM RPT RQMT
SITE CODES : S = SOURCE, D = DESINATION, O = INTERMEDIATE

69H-E

| FORM 69H (REV 10-83) | CONTINUATION SHEET | PROC INSTR IDENT NO | | MOD/ORDER NO | PAGE | OF |
|---|---|---|---|---|---|---|
| | | DAAE30-96-C-0013 | | PZ0001 | 7 | 81 |

## PART I SECTION F
## SUPPLIES SCHEDULE DATA

| ITEM NO. | ACRN | SHIP TO | MARK FOR | DEL SCHED DATE | ENDING DATE (WHEN APPLICABLE) | DEL SCHEDULE QTY * |
|---|---|---|---|---|---|---|
| 0001AA | AA | Y00000 | | 97MAR31 | | 1 |

CONTROL ITEM SERIAL NO. | ENDING SERIAL NO (WHEN APPLICABLE) | TSP PRIORITY | MILSTRIP DOC. NO | SUFFIX | CLIN IDENTIFYING EXHIBIT

DESCRIPTIVE DATA:
FAT SHIP TO YUMA.
FAT/PQT/FIRING TABLE TEST

| ITEM NO. | ACRN | SHIP TO | MARK FOR | DEL SCHED DATE | ENDING DATE (WHEN APPLICABLE) | DEL SCHEDULE QTY * |
|---|---|---|---|---|---|---|
| 0001AB+ | AA | Y00000 | | 97NOV28 | | 1,000 |

CONTROL ITEM SERIAL NO. | ENDING SERIAL NO (WHEN APPLICABLE) | TSP PRIORITY | MILSTRIP DOC. NO | SUFFIX | CLIN IDENTIFYING EXHIBIT

DESCRIPTIVE DATA:
SHIP TO:
TO BE DETERMINED (TBD)

| ITEM NO. | ACRN | SHIP TO | MARK FOR | DEL SCHED DATE | ENDING DATE (WHEN APPLICABLE) | DEL SCHEDULE QTY * |
|---|---|---|---|---|---|---|
| 0001AC | AA | Y00000 | | 97DEC31 | | 2,000 |

CONTROL ITEM SERIAL NO. | ENDING SERIAL NO (WHEN APPLICABLE) | TSP PRIORITY | MILSTRIP DOC. NO | SUFFIX | CLIN IDENTIFYING EXHIBIT

DESCRIPTIVE DATA:
SHIP TO:
TBD

| ITEM NO. | ACRN | SHIP TO | MARK FOR | DEL SCHED DATE | ENDING DATE (WHEN APPLICABLE) | DEL SCHEDULE QTY * |
|---|---|---|---|---|---|---|
| 0001AC | AA | Y00000 | | 98JAN31 | | 8,640 |

CONTROL ITEM SERIAL NO. | ENDING SERIAL NO (WHEN APPLICABLE) | TSP PRIORITY | MILSTRIP DOC. NO | SUFFIX | CLIN IDENTIFYING EXHIBIT

DESCRIPTIVE DATA:
SHIP TO:
TBD

| ITEM NO. | ACRN | SHIP TO | MARK FOR | DEL SCHED DATE | ENDING DATE (WHEN APPLICABLE) | DEL SCHEDULE QTY * |
|---|---|---|---|---|---|---|
| 0001AC | AA | Y00000 | | 98FEB28 | | 8,640 |

CONTROL ITEM SERIAL NO. | ENDING SERIAL NO (WHEN APPLICABLE) | TSP PRIORITY | MILSTRIP DOC. NO | SUFFIX | CLIN IDENTIFYING EXHIBIT

DESCRIPTIVE DATA:
SHIP TO:
TBD

*REPRESENTS NET AMOUNT OF INCREASE/DECREASE WHEN MODIFYING EXISTING ITEM NOS.
E = ESTIMATED
- (IN QTY) = DECREASE
+ OR - (IN ITEM NO.) = ADDITION OR DELETION

69H-E

| FORM 69H (REV 10-83) | CONTINUATION SHEET | PROC INSTR IDENT NO | MOD/ORDER NO | PAGE | OF |
|---|---|---|---|---|---|
| | | DAAE30-96-C-0013 | PZ0001 | 8 | 81 |

## PART I SECTION F
## SUPPLIES SCHEDULE DATA

| ITEM NO. | ACRN | SHIP TO | MARK FOR | DEL SCHED DATE | ENDING DATE (WHEN APPLICABLE) | DEL SCHEDULE QTY * |
|---|---|---|---|---|---|---|
| 0001AC | AA | Y00000 | | 98MAR31 | | 9,720 |

| CONTROL ITEM SERIAL NO. | ENDING SERIAL NO (WHEN APPLICABLE) | TSP PRIORITY | MILSTRIP DOC. NO | SUFFIX | CLIN IDENTIFYING EXHIBIT |
|---|---|---|---|---|---|
| | | | | | |

DESCRIPTIVE DATA:
SHIP TO:
TBD

| ITEM NO. | ACRN | SHIP TO | MARK FOR | DEL SCHED DATE | ENDING DATE (WHEN APPLICABLE) | DEL SCHEDULE QTY * |
|---|---|---|---|---|---|---|
| 0001AC | AA | Y00000 | | 98APR30 | | 9,720 |

| CONTROL ITEM SERIAL NO. | ENDING SERIAL NO (WHEN APPLICABLE) | TSP PRIORITY | MILSTRIP DOC. NO | SUFFIX | CLIN IDENTIFYING EXHIBIT |
|---|---|---|---|---|---|
| | | | | | |

DESCRIPTIVE DATA:
SHIP TO:
TBD

| ITEM NO. | ACRN | SHIP TO | MARK FOR | DEL SCHED DATE | ENDING DATE (WHEN APPLICABLE) | DEL SCHEDULE QTY * |
|---|---|---|---|---|---|---|
| 0001AC | AA | Y00000 | | 98MAY29 | | 8,100 |

| CONTROL ITEM SERIAL NO. | ENDING SERIAL NO (WHEN APPLICABLE) | TSP PRIORITY | MILSTRIP DOC. NO | SUFFIX | CLIN IDENTIFYING EXHIBIT |
|---|---|---|---|---|---|
| | | | | | |

DESCRIPTIVE DATA:
SHIP TO:
TBD

| ITEM NO. | ACRN | SHIP TO | MARK FOR | DEL SCHED DATE | ENDING DATE (WHEN APPLICABLE) | DEL SCHEDULE QTY * |
|---|---|---|---|---|---|---|
| 0001AC | AA | Y00000 | | 98JUN30 | | 9,720 |

| CONTROL ITEM SERIAL NO. | ENDING SERIAL NO (WHEN APPLICABLE) | TSP PRIORITY | MILSTRIP DOC. NO | SUFFIX | CLIN IDENTIFYING EXHIBIT |
|---|---|---|---|---|---|
| | | | | | |

DESCRIPTIVE DATA:
SHIP TO:
TBD

| ITEM NO. | ACRN | SHIP TO | MARK FOR | DEL SCHED DATE | ENDING DATE (WHEN APPLICABLE) | DEL SCHEDULE QTY * |
|---|---|---|---|---|---|---|
| 0001AC | AA | Y00000 | | 98JUL31 | | 9,720 |

| CONTROL ITEM SERIAL NO. | ENDING SERIAL NO (WHEN APPLICABLE) | TSP PRIORITY | MILSTRIP DOC. NO | SUFFIX | CLIN IDENTIFYING EXHIBIT |
|---|---|---|---|---|---|
| | | | | | |

DESCRIPTIVE DATA:
SHIP TO:
TBD

*REPRESENTS NET AMOUNT OF INCREASE/DECREASE WHEN MODIFYING EXISTING ITEM NOS.
E = ESTIMATED
- (IN QTY, = DECREASE
+ OR - (IN ITEM NO.) = ADDITION OR DELETION

69H-E

| FORM 69H (REV 10-83) | CONTINUATION SHEET | PROC INSTR IDENT NO | MOD/ORDER NO | PAGE | OF |
|---|---|---|---|---|---|
| | | DAAE30-96-C-0013 | PZ0001 | 9 | 81 |

PART I SECTION F

SUPPLIES SCHEDULE DATA

| ITEM NO. | ACRN | SHIP TO | MARK FOR | DEL SCHED DATE | ENDING DATE (WHEN APPLICABLE) | DEL SCHEDULE QTY * |
|---|---|---|---|---|---|---|
| 0001AC | AA | Y00000 | | 98AUG31 | | 9,180 |

| CONTROL ITEM SERIAL NO. | ENDING SERIAL NO (WHEN APPLICABLE) | TSP PRIORITY | MILSTRIP DOC. NO | SUFFIX | CLIN IDENTIFYING EXHIBIT |
|---|---|---|---|---|---|
| | | | | | |

DESCRIPTIVE DATA:
SHIP TO:
TBD

| ITEM NO. | ACRN | SHIP TO | MARK FOR | DEL SCHED DATE | ENDING DATE (WHEN APPLICABLE) | DEL SCHEDULE QTY * |
|---|---|---|---|---|---|---|
| 0001AC | AA | Y00000 | | 98SEP30 | | 1,528 |

| CONTROL ITEM SERIAL NO. | ENDING SERIAL NO (WHEN APPLICABLE) | TSP PRIORITY | MILSTRIP DOC. NO | SUFFIX | CLIN IDENTIFYING EXHIBIT |
|---|---|---|---|---|---|
| | | | | | |

DESCRIPTIVE DATA:
SHIP TO:
TBD

| ITEM NO. | ACRN | SHIP TO | MARK FOR | DEL SCHED DATE | ENDING DATE (WHEN APPLICABLE) | DEL SCHEDULE QTY * |
|---|---|---|---|---|---|---|
| | | | | | | |

| CONTROL ITEM SERIAL NO. | ENDING SERIAL NO (WHEN APPLICABLE) | TSP PRIORITY | MILSTRIP DOC. NO | SUFFIX | CLIN IDENTIFYING EXHIBIT |
|---|---|---|---|---|---|
| | | | | | |

DESCRIPTIVE DATA:

| ITEM NO. | ACRN | SHIP TO | MARK FOR | DEL SCHED DATE | ENDING DATE (WHEN APPLICABLE) | DEL SCHEDULE QTY * |
|---|---|---|---|---|---|---|
| | | | | | | |

| CONTROL ITEM SERIAL NO. | ENDING SERIAL NO (WHEN APPLICABLE) | TSP PRIORITY | MILSTRIP DOC. NO | SUFFIX | CLIN IDENTIFYING EXHIBIT |
|---|---|---|---|---|---|
| | | | | | |

DESCRIPTIVE DATA:

| ITEM NO. | ACRN | SHIP TO | MARK FOR | DEL SCHED DATE | ENDING DATE (WHEN APPLICABLE) | DEL SCHEDULE QTY * |
|---|---|---|---|---|---|---|
| | | | | | | |

| CONTROL ITEM SERIAL NO. | ENDING SERIAL NO (WHEN APPLICABLE) | TSP PRIORITY | MILSTRIP DOC. NO | SUFFIX | CLIN IDENTIFYING EXHIBIT |
|---|---|---|---|---|---|
| | | | | | |

DESCRIPTIVE DATA

*REPRESENTS NET AMOUNT OF INCREASE/DECREASE WHEN MODIFYING EXISTING ITEM NOS.
E = ESTIMATED
- (IN QTY) = DECREASE
+ OR - (IN ITEM NO.) = ADDITION OR DELETION

| FORM 69K (REV 10-83) | CONTINUATION SHEET | PROC INSTR IDENT NO DAAE30-96-C-0013 | MOD/ORDER NO PZ0001 | PAGE 10 | OF 81 |
|---|---|---|---|---|---|

## PART I SECTION G
## ACCOUNTING CLASSIFICATION DATA

| ACCTG CLASS REF | APPROPRIATION | LIMIT SUBHEAD | SUPPLEMENTAL ACCOUNTING CLASSIFICATION |
|---|---|---|---|
| AA | 2152034 | | 55H5H03P413026EBS28017 |

| NON-CLIN/ELIN PAYMENT PROV | CPN RECIPIENT DOAAD | OBLIGATED AMOUNT * | SVC/AGENCY USE ONLY |
|---|---|---|---|
| | | -5,002,190.00 | 41300000000 |

DESCRIPTIVE DATA:
PRON: IW5AE0201ANG
CON: A15P40202PIW

| ACCTG CLASS REF | APPROPRIATION | LIMIT SUBHEAD | SUPPLEMENTAL ACCOUNTING CLASSIFICATION |
|---|---|---|---|
| AA | 2152034 | | 55H5H04P413026EB S28017 |

| NON-CLIN/ELIN PAYMENT PROV | CPN RECIPIENT DOAAD | OBLIGATED AMOUNT * | SVC/AGENCY USE ONLY |
|---|---|---|---|
| | | 23,513,530.00 | 41300000000 |

DESCRIPTIVE DATA:
PRON: IW5AE0201ANG
CON: A15P40202PIW

| ACCTG CLASS REF | APPROPRIATION | LIMIT SUBHEAD | SUPPLEMENTAL ACCOUNTING CLASSIFICATION |
|---|---|---|---|
| | | | |

| NON-CLIN/ELIN PAYMENT PROV | CPN RECIPIENT DOAAD | OBLIGATED AMOUNT * | SVC/AGENCY USE ONLY |
|---|---|---|---|
| | | | |

DESCRIPTIVE DATA:

| ACCTG CLASS REF | APPROPRIATION | LIMIT SUBHEAD | SUPPLEMENTAL ACCOUNTING CLASSIFICATION |
|---|---|---|---|
| | | | |

| NON-CLIN/ELIN PAYMENT PROV | CPN RECIPIENT DOAAD | OBLIGATED AMOUNT * | SVC/AGENCY USE ONLY |
|---|---|---|---|
| | | | |

DESCRIPTIVE DATA:

| ACCTG CLASS REF | APPROPRIATION | LIMIT SUBHEAD | SUPPLEMENTAL ACCOUNTING CLASSIFICATION |
|---|---|---|---|
| | | | |

| NON-CLIN/ELIN PAYMENT PROV | CPN RECIPIENT DOAAD | OBLIGATED AMOUNT * | SVC/AGENCY USE ONLY |
|---|---|---|---|
| | | | |

DESCRIPTIVE DATA:

| ACCTG CLASS REF | APPROPRIATION | LIMIT SUBHEAD | SUPPLEMENTAL ACCOUNTING CLASSIFICATION |
|---|---|---|---|
| | | | |

| NON-CLIN/ELIN PAYMENT PROV | CPN RECIPIENT DOAAD | OBLIGATED AMOUNT * | SVC/AGENCY USE ONLY |
|---|---|---|---|
| | | | |

DESCRIPTIVE DATA:

*REPRESENTS NET AMOUNT OF INCREASE/DECREASE WHEN MODIFYING AN EXISTING ACRN.

**Part I - The Schedule**

A.1 **NOTICE TO OFFERORS - USE OF CLASS I OZONE-DEPLETING SUBSTANCES**

(a) In accordance with Section 326 of P.L. 102-484, the Government is prohibited from awarding any contract which includes a specification or standard that requires the use of Class I Ozone-Depleting substance (ODS) identified in Section 602(a) of the Clean Air Act, (42 U.S.C. 7671a(a), or that can be met only through the use of such a substance unless such use has been approved, on an individual basis, by a senior acquisition official who determines that there is no suitable substitute available.

(b) To comply with this statute the Government has conducted a best efforts screening of the specifications and standards associated with this acquisition to determine whether they contain any ODS requirements. To the extent that ODS requirements were revealed by this review, they are identified below with the disposition determined in each case.

(c) If offerors possess any special knowledge about other ODSs required directly or indirectly at any level of contract performance, the U.S. Army would appreciate if such information was surfaced to the Contracting Officer for appropriate action. To preclude delay to the procurement, offerors should provide any information as soon as possible after release of the solicitation and prior to the submission of offers to the extent practicable. If the Statement of Work contains use of Ozone-Depleting Substances, contractors are required to comply with FAR 52.223-11 Ozone-Depleting Substances and FAR 52.223-12 Refrigeration Equipment and Air Conditioners.

| ODS Identified | Specification/Standard | Disposition |
|---|---|---|
| (See Section C, Statement of Work - Ozone-Depleting Substances Paragraph 3.7) | | |

STANDARD FORM 36, JULY 1966
GENERAL SERVICES ADMINISTRATION
FED. PROC. REG. (41 CFR) 1-16.101
EXCEPTION TO SF 36 APPROVED
BY NARS, MAR 1977

# CONTINUATION SHEET

REF. NO. OF DOC. BEING CONT'D. DAAE30-96-C-0013

PAGE 12 OF 81

NAME OF OFFEROR OR CONTRACTOR
Mason & Hanger - Silas Mason Co., Inc.

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| B1 | | | | | |
| CLIN 0001 | | | | | |
| 0001AA | First Article Test in accordance with the Statement of Work under Section C. (Includes PQT quantities). | 1 (consisting of 1,500) | LOT | | $ 643,264 |
| 0001AB | Load, Assemble, and Package M795 Projectiles in accordance with TDP and Statement of Work Section C. | 1,000 | ea | N/A | $9,483,991* |
| 0001AC | Load, Assemble, and Package M795 Projectiles in accordance with TDP and Statement of Work Section C. | 76,968 | ea | $173.92 | $13,386,275 |
| | *=This subclin includes the costs for 1,000 ea M795 Projectiles (1,000 units X $173.92 = $173,920) as well as $9,310,071 in costs associated with special tooling, equipment, and facilitization efforts required by the contractor to perform the M795 LAP contract. | | | | |
| 0002 | Data in accordance with CDRL, DD 1423, Exhibit A, of Section J of the contract. | 1 | LOT | | NSP |
| | NSP = Not Separately priced. | | | | |

PART I- THE SCHEDULE
SECTION B-SUPPLIES OR SERVICES AND PRICES/COSTS

B.2 252.225-7008 SUPPLIES TO BE ACCORDED DUTY-FREE ENTRY. (DEC 1991)

In accordance with paragraph (a) of the Duty-Free Entry clause and/or paragraph (b) of the Duty-Free Entry - Qualifying Country End Products and Supplies clause of this contract, the following supplies are accorded duty-free entry:

None

**PART I- THE SCHEDULE**
**SECTION C-DESCRIPTION/SPECIFICATIONS/WORK STATEMENT**

STATEMENT OF WORK
155mm, HE, M795 LAP

C.1.0 Scope - This statement of work encompasses the Load, Assemble, and Pack (LAP) for 155mm, HE, M795 projectiles. The contractor shall LAP 155mm, HE, M795 projectiles to completely meet designated requirements.

C.2.0 Applicable Documents

MIL-STD-1167C (5 Aug 1985) Notice 1, Ammunition Data Card
12 March 1986
Notice 2, 17 March 1993
MIL-STD-1168A (28 Feb 1975) Notice 1, Ammunition Lot Numbering
31 March 1988

C. 2.1 Advisory/Reference Military Specification

MIL-STD-973 (17 Apr 1992) Configuration Management,
Notice 3, 13 Jan 1995

C.2.2 Other Publications

Technical Data Package Listing - TDPL # 9312769 dated 28 Aug 95, as updated via page 2, paragraph 3 of the contract.

C.3.0 Requirements

C.3.1 Production

C.3.1.1 Basic Contract Requirement - The contractor shall Load, Assemble, and Pack (LAP) a quantity of 79,468 each M795 projectiles (includes FAT Qty) in accordance with TDPL number 9312769. The contractor shall deliver M795 projectiles as delineated in Section F of this contract. The deliverable items include; 155mm, HE, M795 Projectiles (9312769), Obturator (10542907), Supplemental Charge (8797090), Liner Cup (9331677), Spacers (8797088).

The Government shall provide as Government Furnished Material (GFM), Trinitrotoluene (TNT), Metal Parts,( to include Lift Plugs, Gaskets, Flexible Rotating Band Covers, and Projectile Body), Metal Pallets, and an Ammunition Data Card Software Program, in accordance with Section H.

C.3.1.2 Ammo Data Cards - Ammunition Data Cards (DI-MISC-

**PART I- THE SCHEDULE**
**SECTION C-DESCRIPTION/SPECIFICATIONS/WORK STATEMENT**

80043 tailored) shall be prepared IAW MIL-STD-1167C (tailored in attachment to DSL) and submitted for projectiles in Section F. Lot numbering shall be provided IAW MIL-STD-1168A.

C.3.2 Test and Evaluation

C.3.2.1. First Article Test (FAT)

C.3.2.1.1 The contractor shall be responsible for procuring all materials and equipment required to conduct the First Article Test (FAT) under the contract. FAT shall be performed within fifteen (15) months after contract award and shall be witnessed and accepted or rejected by the Government.

C.3.2.1.2 The First Article shall be submitted in accordance with TDPL 9312769 and this contract.

C.3.2.2 Ballistic Testing - Ballistic testing shall be performed in accordance with TDPL 9312769 and this contract. The contractor shall send one (1) representative to attend up to a maximum of four (4) ballistic tests at Yuma Proving Ground at the Government's discretion. Each trip will be for a duration of five(5) days including travel time.

C.3.3 Quality Program Plan - The contractor shall implement and maintain the 155mm, HE, M795 Quality Program as submitted with M&H's proposal dated November 29, 1995.

C.3.3.1 Statistical Process Control (SPC) - The contractor shall implement and maintain an SPC plan. (OT-90-12138)

C.3.3.2 Acceptance Inspection Equipment (AIE) Approval - Standard (commercial) inspection and test equipment designs which are used to perform examinations and tests IAW the item specification shall be submitted (DI-RELI-80322 tailored). Special Acceptance Inspection Equipment (equipment that is specially designed for a given characteristic) designs which are used to perform examinations and tests shall be submitted IAW the item specification (DI-QCIC-81006 tailored).

C.3.3.3 Inspection of Critical Safety Items

C.3.3.3.1 Critical Safety Definition - The following definition applies:

Critical Safety Item (CSI) - A part, assembly, installation, or production system with one or more critical

**PART I- THE SCHEDULE**
**SECTION C-DESCRIPTION/SPECIFICATIONS/WORK STATEMENT**

characteristics as defined by item specification.

C.3.3.3.2 Traceability of Manufactured Items and Material - All technical and quality requirements relating to critical safety characteristics must be traceable to the time and place that they were produced. The contractor's records on file should provide the degree of traceability required to enable after the fact verification of all aspects of material, manufacture, special processing, assembly and inspection of critical safety characteristics.

C.3.3.3.3 Vendor Control of Critical Safety - The contractor's vendor quality program shall address controls for critical safety item characteristics produced by vendors and contain a requirement for the periodic audit of the implementation of these controls. Purchase orders to subcontractors producing CSIs shall contain a requirement for 100 percent inspection of all critical safety characteristics.

C.3.3.3.4 Nonconformance - Nonconformances to critical safety characteristics shall not be accepted through contractor Material Review Board actions. In instances where engineering analysis of the nonconformances determines that the existing tolerances or requirements can be changed without degrading product safety, an engineering change action may be submitted for Government approval.

C.3.3.3.5 Actions Required Upon Observance of Critical Defects Whereas the emphasis of the contractor's quality program procedures pertaining to CSIs is to assure that nonconforming critical safety characteristics do not occur, in the event that a critical defect is found whether by the contractor, a subcontractor, or the Government, the following specific actions shall be taken:

a. Production of the affected component, subassembly, or assembly, shall cease immediately; operations involved in the creation of the defect must stop, including "feeder" operations, and the Government Quality Assurance Representative (QAR) notified at once with concurrent notification to the Procurement Contracting Officer (PCO) and the Administrative Contracting Officer (ACO). The contractor shall determine which operations to stop, document the rationale for this determination and provide preliminary findings pertinent to the defect to the contracting officer within 48 hours of the occurrence. Copies of this notification should be furnished to the Government QAR and ACO. (OT-93-12069)

**PART I- THE SCHEDULE**
**SECTION C-DESCRIPTION/SPECIFICATIONS/WORK STATEMENT**

b. All suspect material must be segregated and shall not be used for further production. Suspect product must be "fenced", both ahead and behind the point of detection. The contractor shall conduct a detailed investigation and analysis to assess the extent of product affected and take all actions necessary to assure the conformance of all suspect material. A request for the use of any fenced material associated with the critical defect, along with the analysis supporting the request, shall be forwarded to the contracting officer for approval, with copies furnished to the Government QAR and ACO. (OT-93-12069)

c. A detailed investigation and analysis with Government participation shall be conducted of the process, equipment, handling, quality control, etc. to determine the cause of the defect. Corrective action to prevent future manufacture of the critical defect shall be instituted. Positive corrective action is required; screening of the affected product alone is insufficient to meet this requirement without other appropriate action intended to eliminate the cause of the defect.

d. A request to restart production/operations along with supporting documentation (i.e., investigation results, screening information, corrective action, etc.) shall be submitted to the contracting officer for approval with copies furnished to the Government QAR and ACO. Restart shall begin only after approval to restart has been issued by the contracting officer and any conditions or restrictions associated with the approval are satisfied. Contracting officer response to restart requests will be provided within five (5) working days from the time of receipt. Confirmation of receipt of the request to restart is the contractor's responsibility. (OT-93-12069)

C.3.3.4 Accident/Incident Report - The contractor shall immediately report any major accident/incident (including fire) resulting in any of the following: causing one or more fatalities, or one or more disabling injuries; damaging Government property exceeding $10,000; affecting program planning or production schedules; degrading the safety of the equipment under contract, such that personnel injury or property damage may be involved; identifying a potential hazard requiring corrective action. The contractor shall prepare and submit the report (DI-H-1329A) for each accident/incident.

C.3.4 Change Actions - The contractor shall submit ECPs, RFW/RFDs, and NORs and may utilize MIL-STD-973 and Notice 3, as

guidance. (DI-CMAN-80639B, DI-CMAN-80640B, DI-CMAN-80641B, DI-CMAN-80642B)

C.3.5 Program Reviews - The contractor shall conduct quarterly integrated reviews at the contractor facility with the first review 45 days after contract award.

C.3.5.1 Government Reviews - The contractor shall be required to send one(1) representative to attend up to three (3) government reviews at the U.S. Army ARDEC Armaments, Research, Development, and Engineering Center (ARDEC), Picatinny Arsenal, New Jersey. Each trip shall be for a duration of three (3) days including travel time.

C.3.6. Hazardous Waste Report - The contractor shall identify the specific types and amounts of hazardous waste being generated during the conduct of efforts performed under this contract (DI-MGMT-80899).

C.3.7 Ozone Depleting Substances - Regardless of whether the use of Ozone Depleting Substances has been approved for this Statement of Work (SOW), ODS specifications or requirements shall not be incorporated into data or software delivered under this action, including any changes, updates, or modifications to the technical data package (TDP), drawings or manuals unless specifically authorized and approved in writing by the Contracting Officer in advance of delivery.

C.3.8 Deficiency Reports - The contractor shall submit a deficiency report if any 3government furnished material is found defective. (DI-QCIC-80736)

C.4 **PHYSICAL SECURITY STANDARDS FOR SENSITIVE ITEMS**

1. The Contractor will protect all Arms, Ammunition and Explosives (AA&E) manufactured for the Government or provided by the Government as Government Furnished Equipment/Material (GFE/M). Standards are in the Department of Defense (DOD) 5100.76-M dated September 1992 entitled "Physical Security of Sensitive Conventional Arms, Ammunition, and Explosives." To get a copy send to:

National Technical Information Service
3285 Port Royal Road
Springfield, VA 22181
(AC 703-487-4600)

**PART I- THE SCHEDULE**
**SECTION C-DESCRIPTION/SPECIFICATIONS/WORK STATEMENT**

2. The Contractor will allow Government officials access to prime and subcontractor facilities so that regulatory surveys, inspections and investigations may be conducted.

3. This clause applies to the items listed below:

| ITEM | SENSITIVITY/CATEGORY |
|---|---|
| Trinitrotoluene (TNT) | Category III |

NOTE:

This clause applies to all contracts and subcontracts at any tier.

C.5 STATEMENT OF WORK--TRANSPORTATION SECURITY REQUIREMENTS

Supplies under this contract are Category III and require Transportation Protective Services (TPS) according to DOD 5100.76M (Physical Security of Sensitive Conventional Arms, Ammunition, and Explosives) and AR 55-355/DLAR 4500.3 (Defense Traffic Management Regulation). Military services policies can add to or amend these requirements under guidance provided by Defense Logistics Agency (DLA)/Defense Contract Management Command (DCMC) or other components assigned to provide contract administration services (CAS) within a specified geographic area. DLAH 4105.4, DOD Directory of Contract Administration Service Components, dated July 1992 identifies the areas. It also includes information for offshore/OCONUS procurements.

C.6 STATEMENT OF WORK -- TRANSPORTATION SECURITY REQUIREMENTS FOR CONTRACTOR-TO-CONTRACTOR SHIPMENTS

Supplies that qualify as sensitive under DOD 5100.76-M (Physical Security of Sensitive Conventional Arms, Ammunition and Explosives), which the contractor will ship between two and more contracts, require special Transportation Protective Services (TPS). TPS is the same as the DOD security standard if the item is sensitive or shipped as DOT Class A, B or C Explosives. Military services policy and Defense Logistics Agency/Defense Contract Management Command (DCMC) may add to or amend the explosive class, as named in AR 55-355, Defense Traffic Management Regulation.

**PART I- THE SCHEDULE**
**SECTION C-DESCRIPTION/SPECIFICATIONS/WORK STATEMENT**

Shipper's Defense Contract Management District/Area Operations (DCMD/DCMAO) transportation officers will supply the sensitive category, decide the TPS required and get the TPS from commercial carriers.

Include this clause in all contracts/subcontracts.

## Part I - The Schedule
## SECTION D - PACKAGING AND MARKING

D.1 PRESERVATION, PACKAGING, PACKING AND MARKING

The contractor shall prepare all items for shipment as delineated in TDPL No. 9312769 drawing number 12914619.

D.2 BAR CODE MARKING (WITTEN IN PLAIN ENGLISH)

The contractor shall mark all items for shipment as delineated in TDPL No. 9312769 drawing number 12914619.

D.3 UNITIZATION

Unitization shall be in accordance with TDPL No. 9312769 drawing number 12914619.

**Part I - The Schedule**
**SECTION E - INSPECTION ANDACCEPTANCE**

E.1 52.252-2 CLAUSES INCORPORATED BY REFERENCE. (JUN 1988)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available.

| | | |
|---|---|---|
| 52.246-2 | INSPECTION OF SUPPLIES - FIXED-PRICE | JUL 1985 |
| 52.246-16 | RESPONSIBILITY FOR SUPPLIES | APR 1984 |

E.2 **Quality Program Plan**

This contract will be performed under the Quality Program Plan delineated under the occntractor's proposal dated November 29, 1995. It is understood that the contractor's Quality Program Plan meets the equivalent of the Government's MIL-Q-9858 quality provision.

E.3 ACCEPTANCE

[X ] Acceptance will be at the Contractor's plant.

[ ] Acceptance will be at destination.

E.4 GOVERNMENT PROCUREMENT QUALITY ASSURANCE ACTIONS

Government Procurement Quality Assurance (PQA) actions will be accomplished by the Governments authorized Quality Assurance Representative (QAR) at:

[X] Contractors Plant

[ ] Destination

[ ] Other: The Contractor's plant except for tests conducted at a Government Facility or Proving Ground

E.5 STATISTICAL PROCESS CONTROL

a. In addition to the quality requirements of the technical data package, the Contractor shall implement Statistical Process Control (SPC) in accordance with a government accepted

**Part I - The Schedule**
**SECTION E - INSPECTION ANDACCEPTANCE**

SPC Program Plan. Control chart techniques shall be in accordance with the American National Standards Institute (ANSI) Z1.1, Z1.2 and Z1.3. Alternate SPC charting methods may be proposed and submitted to the Government for review.

b. The SPC Program Plan developed by the contractor shall consist of a general plan and a detailed plan. The plans shall be structured as delineated on the Data Item Description referenced in the DD Form 1423. The general and the detailed plans shall be submitted to the government for review per DD Form 1423 requirements. Notification by the Government of acceptance or nonacceptance of the plans shall be provided in accordance with the time frames specified on the DD Form 1423. Once a general plan for a facility has been approved by this Command, the approval remains in effect for subsequent contracts as long as the contractual requirements remain substantially unchanged from contract to contract. Therefore, resubmission of a previously accepted general SPC plan is not required if current SPC contract clause and Data Item Description (DID) requirements are fulfilled. If this Command has previously accepted the general SPC plan under essentially the same SPC contractual requirements, so indicate by providing the Contracting Officer with the following information:

Date of Acceptance: 12/16/96

Contract Number(s): DAAA09-91-Z-0006

c. The contractor is responsible for updating the general plan to current SPC contractual requirements. If errors or omissions are encountered in a previously accepted SPC general plan, opportunities for improvement will be identified by the Government, and corrective action shall be accomplished by the contractor.

d. A milestone schedule will be submitted for those facilities who do not have, or have never had, a fully implemented SPC program and will not have a fully operational SPC program once production is initiated. The milestones shall provide a time-phased schedule of all efforts planned relative to implementation of an SPC program acceptable to the Government. A milestone schedule shall include implementation start and complete dates for those SPC subjects addressed under the paragraph entitled Format and Content on the applicable SPC DID. The milestone schedule shall only include those actions that can not be accomplished prior to first article or the initiation of production, if a first article is not required. Milestones shall be developed for each commodity identified for

**Part I - The Schedule**
**SECTION E - INSPECTION ANDACCEPTANCE**

SPC application. Milestones shall be submitted through the Government Quality Assurance Representative to the Contracting Officer for review and acceptance. Any deviations from the accepted milestones, to include justification for such deviations, shall be resubmitted through the same channels for review. The government reserves the right to disapprove any changes to the previously accepted milestones. Notification by the Government of the acceptance or nonacceptance of the milestones shall be furnished to the Contractor by the Contracting Officer.

e. The Contractor shall review all process and operation parameters for possible application of SPC techniques. This review shall include processes and operations under the control of the prime contractor and those under the control of subcontractor or vendor facilities. A written justification shall be included in the detailed plan for each process and operation parameter that controls or influences characteristics identified as critical, special, or major which have been deemed impractical for the application of SPC techniques. A pamphlet on application of SPC for short production runs is available through the Contracting Officer.

f. Statistical evidence in the form of control charts shall be prepared and maintained for each process or operation parameter identified in the detailed plan. These charts shall identify all corrective actions taken on statistical signal. At the conclusion of the production run, a collection of charts traceable to the product, shall be maintained for a minimum of 3 years. The control charts shall be provided to the Government for review at any time upon request.

g. When the process or operation parameter under control has demonstrated both stability and capability, the Contractor [ ] request, in writing, through Administrative Contracting Officer (ACO) and Contracting Officer (CO) channels to the Product Assurance and Test Directorate, that acceptance inspection or testing performed in accordance with contract requirements be reduced or eliminated. Upon approval by the CO, acceptance shall then be based upon the accepted SPC plan, procedures, practices and the control charts.

h. The Government will not consider requests for reduction or elimination of 100% acceptance inspection and testing of parameters or characteristics identified as critical in the technical data package, specifications or drawings of this contract if any one of the following conditions exist:

**Part I - The Schedule**
**SECTION E - INSPECTION ANDACCEPTANCE**

(1) The existing process currently utilizes a fully automated, cost effective, and sufficiently reliable method of 100% acceptance inspection or testing for an attribute-type critical parameter or characteristic.

(2) The Contractor utilizes attribute SPC control chart methods for the critical parameter or characteristic.

(3) The critical parameter or characteristic is a first order, single point safety failure mode (nonconformance of the critical parameter or characteristic in and of itself would cause a catastrophic failure).

i. The Government will only consider reduction or elimination of the 100% acceptance inspection or test requirement for other critical parameters or characteristics if either of the following conditions are met:

(1) The process is in a state of statistical control utilizing variable control chart methods for the critical parameter or characteristic under control and the process performance index (Cpk) is at least 2.0. The Contractor shall maintain objective quality evidence through periodic audits that the process performance index is being maintained for each production delivery.

(2) The critical parameter or characteristic is conclusively shown to be completely controlled by one or more process or operation parameters earlier in the process, and those parameters are in a state of statistical control utilizing variable data, and the product of the probability of the conformance for each earlier parameter associated to the critical characteristic is better than or equal to a value equivalent to that provided by a Cpk of at least 2.0. The Contractor shall maintain objective quality evidence through periodic audits that the process performance indexes are being maintained for each production delivery.

j. For characteristics other than critical, requests for reduction or elimination of acceptance inspection and testing shall be considered when the process performance index is greater than or equal to a Cpk of 1.33 for variables data. Requests shall be considered for attributes data when the percent beyond the specification limits is less than or equal to .003 (Cpk=1.33).

k. Process or operation parameters under reduced or eliminated inspection or testing that undergo a break in

**Part I - The Schedule**
**SECTION E - INSPECTION ANDACCEPTANCE**

production less than 6 months in length, may continue to operate under reduced or eliminated inspection or testing provided there has been no degradation below a Cpk of 1.33 (2.0 for criticals). Any break in production greater than 6 months shall require resubmission of the request for reduction or elimination of inspection or testing through the same channels cited in paragraph g above.

l. Not used.

m. Immediately following a change to a process or operation parameter under reduced or eliminated inspection, the process capability (Cp) or process performance indexes (Cpk) shall be recalculated and documented for variable data; the grand average fraction defective shall be recalculated for attribute data. If any of these values have deteriorated, immediate notification shall be made to the Government along with the associated documentation. Return to original inspection and test requirements may be imposed as stipulated in paragraph n below.

n. The Government reserves the right to withdraw authorization to reduce or eliminate final acceptance inspection or testing and direct the Contractor to return to original contract inspection or test procedures at any indication of loss of process control or deterioration of quality.

E.6 REWORK AND REPAIR OF NONCONFORMING MATERIAL

a. Rework and Repair are defined as follows:

(1) Rework - The reprocessing of nonconforming material to make it conform completely to the drawings, specifications or contract requirements.

(2) Repair - The reprocessing of nonconforming material in accordance with approved written procedures and operations to reduce, but not completely eliminate, the nonconformance. The purpose of repair is to bring nonconforming material into a usable condition. Repair is distinguished from rework in that the item after repair still does not completely conform to all of the applicable drawings, specifications or contract requirements.

b. Rework procedures along with the associated inspection procedures shall be documented by the Contractor and submitted

**Part I - The Schedule**
**SECTION E - INSPECTION ANDACCEPTANCE**

to the Government Quality Assurance Representative (QAR) for review prior to implementation. Rework procedures are subject to the QAR's disapproval.

c. Repair procedures shall be documented by the Contractor and submitted on a Request for Deviation/Waiver form, to the Contracting Officer for review and written approval prior to implementation.

d. Whenever the Contractor submits a repair or rework procedure for Government review, the submission shall also include a description of the cause for the nonconformances and a description of the action taken or to be taken to prevent recurrence.

e. The rework or repair procedure shall also contain a provision for reinspection which will take precedence over the Technical Data Package requirements and shall in addition, provide the Government assurance that the reworked or repaired items have met reprocessing requirements.

E.7 **DESTRUCTIVE TESTING**

a. All costs of destructive testing by the Contractor and items destroyed by the Government are considered as being included in the contract unit price.

b. Where destructive testing of items or components thereof is required by contract or specification, the number of items or components required to be destructively tested, whether destructively tested or not, shall be in addition to the quantity to be delivered to the Government as set forth in the Contract Schedule.

c. All pieces of the complete First Article shall be considered as destructively tested items unless specifically exempted by other provisions of this contract.

d. The Contractor shall not reuse any components from items used in a destructive test during First Article, lot acceptance or inprocess testing, unless specifically authorized by the Contracting Officer.

e. The Government reserves the right to take title to all or any items or components described above. The Government may take title to all or any items or components upon notice to the Contractor. The items or components of items to which the Government takes title shall be shipped in accordance with the

**Part I - The Schedule**
**SECTION E - INSPECTION ANDACCEPTANCE**

Contracting Officer's instructions. Those items and components to which the Government does not obtain title shall be rendered inoperable and disposed of as scrap by the Contractor.

E.8 **ACCEPTANCE INSPECTION EQUIPMENT (AIE)**

a. The contractor shall manage his acceptance inspection equipment in accordance with ANSI/NCSL Z540.1.

b. The Contractor shall provide all acceptance inspection equipment (AIE) (except for any equipment listed as available in Section H and/or in Appendix I of this contract) necessary to assure conformance of components and end items to contract requirements. Equipment listed as available shall be furnished by the Government in accordance with the Government Property clause of this contract. Government furnished acceptance inspection equipment shall not be used by the contractor or his subcontractors in lieu of work gages.

c. All AIE shall be available for use prior to First Article submission, if First Article is required, or prior to initiation of production under this contract.

d. Contractor furnished AIE shall be made (i) in accordance with the equipment drawings specified in Section C (Description/Specifications section), or (ii) in accordance with any other design, provided that the design documentation is first approved by the Government. AIE designs utilized for inspection of characteristics that are classified as "Minor" require approval by the Government Quality Assurance Representative (QAR). AIE design documentation for inspection of characteristics listed as "Critical, Special, or Major" shall be submitted to the Government for review and approval in accordance with the Contract Data Requirements List, DD Form 1423.

e. Resubmission of AIE design documentation for approval on a follow-on contract is not required provided inspection characteristic parameter(s) specified in the current technical data package and the previously approved AIE design documentation remain unchanged. The contractor shall provide the contract number and identify previously approved AIE documentation that meets the above prerequisites.

f. The Government reserves the right to disapprove at any time during performance of this contract, use of any AIE not meeting the requirements of the approved design documentation.

**Part I - The Schedule**
**SECTION E - INSPECTION ANDACCEPTANCE**

E.9 FIRST ARTICLE TEST (GOVERNMENT TESTING)

a. The first article shall consist of, See quantities as specified in paragraph 4.3.1 and Table II of MIL-P-63252, which shall be examined and tested in accordance with contract requirements, the item specification(s), the Quality Assurance Provisions (QAPs) and drawings listed in the Technical Data Package.

b. The first article shall be delivered to, the contractors plant. The first article shall be delivered by the Contractor Free on Board (FOB) destination except when transportation protective service or transportation security is required by other provision of this contract. If such is the case, the first article shall be delivered FOB origin and shipped on Government Bill of Lading.

c. The first article shall be representative of items to be manufactured using the same processes and procedures as contract production. All parts and materials, including packaging and packing, shall be obtained from the same source of supply as will be used during regular production. All components, subassemblies, and assemblies in the first article sample shall have been produced by the Contractor (including subcontractors) using the technical data package provided by the Government.

d. Prior to delivery, each of the first article assemblies, subassemblies, and components shall be inspected by the Contractor for all contract, drawing, QAP and specification requirements except for any environmental or destructive tests indicated below:

[ None ]

The Contractor shall provide to the Contracting Officer at least 15 calendar days advance notice of the schedule date for final inspection of the first article. Those inspections which are of a destructive nature shall be performed upon additional sample parts selected from the same lot(s) or batch(es) from which the first article was selected. Results of contractor inspections (including supplier's and vendor's inspection records when applicable) shall be verified by the Government Quality Assurance Representative (QAR). The QAR shall attach to the contractor's inspection report a completed DD Form 1222. One copy of the contractor's inspection report with the DD Form 1222 shall be forwarded with the first article; two copies

**Part I - The Schedule**
**SECTION E - INSPECTION ANDACCEPTANCE**

shall be provided to the Contracting Officer. Upon delivery to the Government, the first article may be subjected to inspection for all contract, drawing, specification, and QAP requirements.

e. Notwithstanding the provisions for waiver of first article, an additional first article sample or portion thereof, may be ordered by the Contracting Officer in writing when (I) a major change is made to the technical data, (ii) whenever there is a lapse in production for a period in excess of 90 days, or (iii) whenever a change occurs in the place of performance, manufacturing process, material used, drawing, specification or source of supply. When conditions (I), (ii), or (iii) above occurs, the Contractor shall notify the Contracting Officer so that a determination can be made concerning the need for an additional first article sample or portion thereof, and instructions provided concerning the submission, inspection and notification of results. Costs of the first article testing resulting from production process change, change in the place of performance, or material substitution shall be borne by the Contractor.

f. Rejected first articles or portions thereof not destroyed during inspection and testing will be held at the government first article test site for a period of 30 days following the date of notification of rejection, pending receipt of instructions from the Contractor for the disposition of the rejected material. The Contractor agrees that failure to furnish such instructions within said 30 day period shall constitute abandonment of said material by the Contractor and shall confer upon the Government the right to destroy or otherwise dispose of the rejected items at the discretion of the Government without liability to the Contractor by reason of such destruction or disposition.

**Part I - The Schedule**
**SECTION F- DELIVERIES OR PERFORMANCE**

F.1 **52.252-2 CLAUSES INCORPORATED BY REFERENCE. (JUN 1988)**

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available.

| | | |
|---|---|---|
| 52.211-17 | DELIVERY OF EXCESS QUANTITIES | SEP 1989 |
| 52.212-15 | GOVERNMENT DELAY OF WORK | APR 1984 |
| 52.247-29 | F.O.B. ORIGIN | JUN 1988 |

F.2 **52.212-1 TIME OF DELIVERY. (JUL 1995)**

(a) The Government requires delivery of the FAT/PQT lot and 77,968 ea Production quantities in accordance with the following schedule:

| Delivery Item | Delivery Date | Quantity | Destination |
|---|---|---|---|
| FAT | 31 MAR 1997 | 24 ea | Yuma |
| PQT/Firing Table Test | 31 MAR 1997 | 1,476 ea | Yuma |
| LAP M795 | 28 NOV 1997 | 1,000 ea* | TBD |
| LAP M795 | 31 DEC 1997 | 2,000 ea* | TBD |
| LAP M795 | 31 JAN 1998 | 8,640 ea* | TBD |
| LAP M795 | 28 FEB 1998 | 8,640 ea* | TBD |
| LAP M795 | 31 MAR 1998 | 9,720 ea* | TBD |
| LAP M795 | 30 APR 1998 | 9,720 ea* | TBD |
| LAP M795 | 29 MAY 1998 | 8,100 ea* | TBD |
| LAP M795 | 30 JUN 1998 | 9,720 ea* | TBD |
| LAP M795 | 31 JUL 1998 | 9,720 ea* | TBD |
| LAP M795 | 31 AUG 1998 | 9,180 ea* | TBD |
| LAP M795 | 30 SEP 1998 | 1,528 ea* | TBD |

TBD= To be Determined

*= Note: For each monthly LAP quantity identified above, a total of 24 ea projectiles per month shall be marked for the Yuma Proving Ground for ballistic testing.

**Part I - The Schedule**
**SECTION F- DELIVERIES OR PERFORMANCE**

The Government will evaluate equally, as regards time of delivery, offers that propose delivery of each quantity within the applicable delivery period specified above. Offers that propose delivery that will not clearly fall within the applicable required delivery period specified above, will be considered nonresponsive and rejected. The Government reserves the right to award under either the required delivery schedule or the proposed delivery schedule, when an offeror offers an earlier delivery schedule than required above. If the offeror proposes no other delivery schedule, the required delivery schedule above will apply.

OFFEROR'S PROPOSED DELIVERY SCHEDULE

| ITEM NO. | QUANTITY | WITHIN DAYS AFTER DATE OF CONTRACT |
|---|---|---|
| ________ | ________ | ________________ |
| ________ | ________ | ________________ |
| ________ | ________ | ________________ |

(b) Attention is directed to the Contract Award provision of the solicitation that provides that a written award or acceptance of offer mailed, or otherwise furnished to the successful offeror, results in a binding contract. The Government will mail or otherwise furnish to the offeror an award or notice of award not later than the day award is dated. Therefore, the offeror should compute the time available for performance beginning with the actual date of award, rather than the date the written notice of award is received from the Contracting Officer through the ordinary mails. However, the Government will evaluate an offer that proposes delivery based on the Contractor's date of receipt of the contract or notice of award by adding (i) five calendar days for delivery of the award through the ordinary mails, or (ii) one working day if the solicitation states that the contract or notice of award will be transmitted electronically. (The term "working day" excludes weekends and U.S. Federal holidays.) If, as so computed, the offered delivery date is later than the required delivery date, the offer will be considered nonresponsive and rejected.

F.3 **52.211-16 VARIATION IN QUANTITY. (APR 1984)**

(a) A variation in the quantity of any item called for by this contract will not be accepted unless the variation has been caused by conditions of loading, shipping, or packing, or

allowances in manufacturing processes, and then only to the extent, if any, specified in paragraph (b) below.

(b) The permissible variation shall be limited to:

[0% ] Percent increase
[0% ] Percent decrease

This increase or decrease shall apply to [3]

*Contracting Officer shall insert in the blank the designation(s) to which the percentages apply, such as (1) the total contract quantity, (2) item 1 only, (3) each quantity specified in the delivery schedule, (4) the total item quantity for each destination, or (5) the total quantity of each item without regard to destination.

F.4 52.242-15 STOP-WORK ORDER. (Aug 1989)

(a) The Contracting Officer may, at any time, by written order to the Contractor, require the Contractor to stop all, or any part, of the work called for by this contract for a period of 90 days after the order is delivered to the Contractor, and for any further period to which the parties may agree. The order shall be specifically identified as a stop-work order issued under this clause. Upon receipt of the order, the Contractor shall immediately comply with its terms and take all reasonable steps to minimize the incurrence of costs allocable to the work covered by the order during the period of work stoppage. Within a period of 90 days after a stop-work order is delivered to the Contractor, or within any extension of that period to which the parties shall have agreed, the Contracting Officer shall either -

(1) Cancel the stop-work order; or

(2) Terminate the work covered by the order as provided in the Default, or the Termination for Convenience of the Government, clause of this contract.

(b) If a stop-work order issued under this clause is canceled or the period of the order or any extension thereof expires, the Contractor shall resume work. The Contracting Officer shall make an equitable adjustment in the delivery schedule or contract price, or both, and the contract shall be modified, in writing, accordingly, if -

**Part I - The Schedule**
**SECTION F- DELIVERIES OR PERFORMANCE**

(1) The stop-work order results in an increase in the time required for, or in the Contractor's cost properly allocable to, the performance of any part of this contract; and

(2) The Contractor asserts its right to the adjustment within 30 days after the end of the period of work stoppage; provided, that, if the Contracting Officer decides the facts justify the action, the Contracting Officer may receive and act upon a proposal submitted at any time before final payment under this contract.

(c) If a stop-work order is not canceled and the work covered by the order is terminated for the convenience of the Government, the Contracting Officer shall allow reasonable costs resulting from the stop-work order in arriving at the termination settlement.

(d) If a stop-work order is not canceled and the work covered by the order is terminated for default, the Contracting Officer shall allow, by equitable adjustment or otherwise, reasonable costs resulting from the stop-work order.

F.5 HOLIDAY BASE CLOSURE

Picatinny Arsenal will close the day after Thanksgiving and the period between Christmas and New Year's Day, (observed). Therefore, contractors must plan and price their work and deliveries to ARDEC.

**Part I - The Schedule**
**SECTION G - CONTRACT ADMINISTRATION DATA**

G.1 The primary points of contract responsibilities for management of this solicitation/contract are as follows:

Contract Specialist: Mr. Steve Talmadge
(201) 724-5663
DSN 880-5663

Contracting Officer: Mr. David Banashefski
(201) 724-4113
DSN 724-4113

US Army ARDEC
AMSTA-AR-PCW-A, Building 10
Picatinny Arsenal, NJ 07806-5000

Facsimile # (201) 724-4043

G.2 REMIT-TO ADDRESS

Payment shall be made to the remit-to address shown on the invoice as authorized by the contractor.

**Part I - The Schedule**
**SECTION H - SPECIAL CONTRACT REQUIREMENTS**

H.1 **252.201-7000 CONTRACTING OFFICER'S REPRESENTATIVE. (DEC 1991)**

(a) "Definition. Contracting officer's representative" means an individual designated in accordance with subsection 201.602-2 of the Defense Federal Acquisition Regulation Supplement and authorized in writing by the contracting officer to perform specific technical or administrative functions.

(b) If the Contracting Officer designates a contracting officer's representative (COR), the Contractor will receive a copy of the written designation. It will specify the extent of the COR's authority to act on behalf of the contracting officer. The COR is not authorized to make any commitments or changes that will affect price, quality, quantity, delivery, or any other term or condition of the contract.

H.2 **252.223-7003 CHANGE IN PLACE OF PERFORMANCE - AMMUNITION AND EXPLOSIVES. (DEC 1991)**

(a) The Offeror shall identify, in the "Place of Performance" provision of this solicitation, the place of performance of all ammunition and explosives work covered by the Safety Precautions for Ammunition and Explosives clause of this solicitation. Failure to furnish this information with the offer may result in rejection of the offer.

(b) The Offeror agrees not to change the place of performance of any portion of the offer covered by the Safety Precautions for Ammunition and Explosives clause contained in this solicitation after the date set for receipt of offers without the written approval of the Contracting Officer. The Contracting Officer shall grant approval only if there is enough time for the Government to perform the necessary safety reviews on the new proposed place of performance.

(c) If a contract results from this offer, the Contractor agrees not to change any place of performance previously cited without the advance written approval of the Contracting Officer.

H.3 **SCHEDULE OF GOVERNMENT FURNISHED PROPERTY (GFP)**

(a) The Government will furnish and deliver (FOB Contractor's place of performance) the property listed below.

(b) If the delivery schedule is not met, the Contractor will notify the Contracting Officer in writing.

**Part I - The Schedule**
**SECTION H - SPECIAL CONTRACT REQUIREMENTS**

(c) Government Furnished Material/Property Delivery Schedule:

**1. TRINITROTOLUENE (TNT)**

| DATE | QTY/Unit | DESTINATION |
|---|---|---|
| Jan 97 | 64,380/lbs | IAAAP |
| Sep 97 | 28,280/lbs | IAAAP |
| Oct 97 | 56,560/lbs | IAAAP |
| Nov 97 | 244,339/lbs | IAAAP |
| Dec 97 | 244,339/lbs | IAAAP |
| Jan 98 | 274,882/lbs | IAAAP |
| Feb 98 | 274,882/lbs | IAAAP |
| Mar 98 | 229,068/lbs | IAAAP |
| Apr 98 | 274,882/lbs | IAAAP |
| May 98 | 274,882/lbs | IAAAP |
| Jun 98 | 259,610/lbs | IAAAP |
| Jul 98 | 43,212/lbs | IAAAP |

**2. METAL PARTS**

| DATE | QTY/UNIT | DESTINATION |
|---|---|---|
| Jan 97 | 1,521/each | IAAAP |
| Sep 97 | 1,016/each | IAAAP |
| Oct 97 | 2,026/each | IAAAP |
| Nov 97 | 8,732/each | IAAAP |
| Dec 97 | 8,732/each | IAAAP |
| Jan 98 | 9,823/each | IAAAP |
| Feb 98 | 9,823/each | IAAAP |
| Mar 98 | 8,187/each | IAAAP |
| Apr 98 | 9,823/each | IAAAP |
| May 98 | 9,823/each | IAAAP |
| Jun 98 | 9,278/each | IAAAP |
| Jul 98 | 1,549/each | IAAAP |

**3. Metal Pallets**

| DATE | QTY/UNIT | DESTINATION |
|---|---|---|
| Jan 97 | 191/each | IAAAP |
| Sep 97 | 127/each | IAAAP |
| Oct 97 | 254/each | IAAAP |
| Nov 97 | 1,092/each | IAAAP |

**Part I - The Schedule**
**SECTION H - SPECIAL CONTRACT REQUIREMENTS**

| | | |
|---|---|---|
| Dec 97 | 1,092/each | IAAAP |
| Jan 98 | 1,228/each | IAAAP |
| Feb 98 | 1,228/each | IAAAP |
| Mar 98 | 1,024/each | IAAAP |
| Apr 98 | 1,228/each | IAAAP |
| May 98 | 1,228/each | IAAAP |
| Jun 98 | 1,160/each | IAAAP |
| Jul 98 | 194/each | IAAAP |

**4. Ammunition Data Card Software Program**

| DATE | QTY/UNIT | DESTINATION |
|---|---|---|
| Oct 96 | 1/each | IAAAP |

H.4 SAFETY REQUIREMENTS FOR HAZARDOUS ITEMS

a. The contractor shall use the safety data provided in the Hazardous Component Safety Data Sheets (HCSDS) to insure the safe handling of the energetic material. The HCSDS are in Section J of the contract.

b. The contractor shall comply with Paragraph F, Chapter 1 of DOD 4146.26M, DOD Contractor's Safety Manual for Ammunition and Explosives. This requires the contractor to submit all site and construction plans through the local Defense Contract Management District Safety Office to the Contracting Officer for approval. The contractor must also submit changes for approval. Contractors will assure that their subcontractors follow the same procedures.

c. Whenever the contractor uses a government facility, he shall comply with the local safety requirements of that facility.

d. The contractor must obtain written approval from the Contracting Officer before the award of a subcontract involving explosives, propellants or pyrotechnic materials. When the contractor requests the Contracting Officer's approval, the Contracting Officer will arrange a Defense Logistics Agency preaward safety survey for each subcontractor.

e. The contractor is responsible for decontaminating all facilities/equipment at the end of the contract unless they intend to continue using the facilities/equipment for similar purposes. You must include these costs original contract. The contractor must provide the Contracting Officer with a

certification that you decontaminated all contaminated facilities/equipment.

f. The contractor is responsible for properly disposing of hazardous materials during this contract. If disposal is done on the subcontractor's site, the contractor must note this in his site plan per paragraph b. The Contracting Officer must approve a subcontractor prior to him performing disposal per paragraph d.

g. The contractor will provide reports of accidents/incidents as required by Data Item DI-H- 1329A. The government reserves the right to investigate any accident/incident under Chapter 2, Paragraphs F and G of DOD 4145.26M, DOD Contractor's Safety Manual for Ammunition and Explosives.

H.5 **RELEASE OF INFORMATION**

1. Unclassified Contracts - Obtain the Contracting Officer's approval before releasing information received during this contract or generated for this contract.

2. Classified Contracts - The DOD Security Agreement (DD Form 441) and DOD Contract Security Classification Specification (DD Form 254) apply.

NOTE: Section J provides instructions for clearing technical material for release to the public and a sample clearance form (SMCAR Form 3002).

H.6 **CALIFORNIA SALES AND USE TAX (AMCCOM # 52.229-4500)(AL 92-1)**

If this contract contains either the clause FAR 52.245-2, Government Property (Fixed Price Contracts), or 52.245-5, Government Property (Cost-Reimbursement, Time and Material, or Labor Hour Contracts), California sales tax on the purchase of any tangible personal property for the performance of this contract is not an allowable cost. Such purchases can be made tax-free by giving California vendors resale certificates, the form for which is prescribed by California tax authorities. This California sales tax exemption does not apply to the purchase of any property to be incorporated into real property located in California.

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

H.7 **MATERIAL INSPECTION AND RECEIVING REPORT**

Distribute DD Form 250 to the following:

U.S. Army ARDEC
ATTN: AMSTA-AR-PCM; Mr. G. Cervino
Picatinny Arsenal, NJ 07806-5000

U.S. Army ARDEC
ATTN: SFAE-AR-SD; D. Booker
Picatinny Arsenal, NJ 07806-5000

U.S. Army ARDEC
ATTN: AMSTA-AR-FSA-M; W. Smith
Picatinny Arsenal, NJ 07806-5000

H.8 **FIRST ARTICLE - PROGRESS PAYMENTS (WRITTEN IN PLAIN ENGLISH)**

Before first article approval, only costs incurred for first article and the required facilitization efforts to meet the required LAP capacity of a maximum of 10,300 each M795 Projectiles per month for any out-year production quantities are allowable for progress payments. Payments shall not exceed 50% percent of the contract award value.

I.1 **52.252-2 CLAUSES INCORPORATED BY REFERENCE. (JUN 1988)**

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available.

| | | |
|---|---|---|
| 52.202-1 | DEFINITIONS | SEP 1991 |
| 52.203-3 | GRATUITIES | APR 1984 |
| 52.203-5 | COVENANT AGAINST CONTINGENT FEES | APR 1984 |
| 52.203-6 | RESTRICTIONS ON SUBCONTRACTOR SALES TO THE GOVERNMENT | JUL 1995 |
| 52.203-7 | ANTI-KICKBACK PROCEDURES | JUL 1995 |
| 52.203-9 | REQUIREMENT FOR CERTIFICATE OF PROCUREMENT INTEGRITY-MODIFICATION | SEP 1995 |

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

| | | |
|---|---|---|
| 52.203-10 | PRICE OR FEE ADJUSTMENT FOR ILLEGAL OR IMPROPER ACTIVITY | SEP 1990 |
| 52.203-12 | LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS | JAN 1990 |
| 52.204-4 | PRINTING/COPYING DOUBLE-SIDED ON RECYCLED PAPER | MAY 1995 |
| 52.209-6 | PROTECTING THE GOVERNMENT'S INTEREST WHEN SUBCONTRACTING WITH CONTRACTORS DEBARRED, SUSPENDED, OR PROPOSED FOR DEBARMENT | AUG 1995 |
| 52.210-5 | NEW MATERIAL | MAY 1995 |
| 52.210-7 | OTHER THAN NEW MATERIAL, RESIDUAL INVENTORY, AND FORMER GOVERNMENT SURPLUS PROPERTY | MAY 1995 |
| 52.212-8 | DEFENSE PRIORITY AND ALLOCATION REQUIREMENTS | SEP 1990 |
| 52.215-2 | AUDIT AND RECORDS--NEGOTIATION | OCT 1995 |
| 52.215-21 | CHANGES OR ADDITIONS TO MAKE-OR-BUY PROGRAM | APR 1984 |
| 52.215-22 | PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA | JAN 1991 |
| 52.215-24 | SUBCONTRACTOR COST OR PRICING DATA | DEC 1994 |
| 52.215-26 | INTEGRITY OF UNIT PRICES -- ALTERNATE I (APR 1991) | APR 1991 |
| 52.215-27 | TERMINATION OF DEFINED BENEFIT PENSION PLANS | SEP 1989 |
| 52.215-33 | ORDER OF PRECEDENCE | JAN 1986 |
| 52.215-39 | REVERSION OR ADJUSTMENT OF PLANS FOR POST-RETIREMENT BENEFITS OTHER THAN PENSIONS (PRB) | FEB 1995 |
| 52.215-40 | NOTIFICATION OF OWNERSHIP CHANGES | FEB 1995 |

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

| | | |
|---|---|---|
| 52.219-8 | UTILIZATION OF SMALL, SMALL DIS-ADVANTAGED AND WOMAN OWNED SMALL BUSINESS CONCERNS | OCT 1995 |
| 52.219-9 | SMALL, SMALL DISADVANTAGED AND WOMEN OWNED SMALL BUSINESS SUBCONTRACTING PLAN | OCT 1995 |
| 52.219-13 | UTILIZATION OF WOMEN-OWNED SMALL BUSINESSES | AUG 1986 |
| 52.219-16 | LIQUIDATED DAMAGES-SMALL BUSINESS SUBCONTRACTING PLAN | AUG 1989 |
| 52.220-3 | UTILIZATION OF LABOR SURPLUS AREA CONCERNS | JUL 1995 |
| 52.220-4 | LABOR SURPLUS AREA SUBCONTRACTING PROGRAM | APR 1984 |
| 52.222-20 | WALSH-HEALEY PUBLIC CONTRACTS ACT | APR 1984 |
| 52.222-26 | EQUAL OPPORTUNITY | APR 1984 |
| 52.222-28 | EQUAL OPPORTUNITY PREAWARD CLEARANCE OF SUBCONTRACTS | APR 1984 |
| 52.222-35 | AFFIRMATIVE ACTION FOR SPECIAL DISABLED AND VIETNAM ERA VETERANS | APR 1984 |
| 52.222-36 | AFFIRMATIVE ACTION FOR HANDICAPPED WORKERS | APR 1984 |
| 52.222-37 | EMPLOYMENT REPORTS ON SPECIAL DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA | JAN 1988 |
| 52.223-2 | CLEAN AIR AND WATER | APR 1984 |
| 52.223-6 | DRUG-FREE WORKPLACE | JUL 1990 |
| 52.225-11 | RESTRICTIONS ON CERTAIN FOREIGN PURCHASES | MAY 1992 |
| 52.226-1 | UTILIZATION OF INDIAN ORGANIZATIONS AND INDIAN-OWNED ECONOMIC ENTERPRISES | AUG 1991 |

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

| | | |
|---|---|---|
| 52.227-1 | AUTHORIZATION AND CONSENT | JUL 1995 |
| 52.227-2 | NOTICE AND ASSISTANCE REGARDING PATENT AND COPYRIGHT INFRINGEMENT | APR 1984 |
| 52.227-3 | PATENT INDEMNITY | APR 1984 |
| 52.228-5 | INSURANCE - WORK ON A GOVERNMENT INSTALLATION | SEP 1989 |
| 52.229-4 | FEDERAL, STATE, AND LOCAL TAXES (NONCOMPETITIVE CONTRACT) | JAN 1991 |
| 52.229-5 | TAXES - CONTRACTS PERFORMED IN U.S. POSSESSIONS OR PUERTO RICO | APR 1984 |
| 52.230-2 | COST ACCOUNTING STANDARDS | AUG 1992 |
| 52.230-5 | ADMINISTRATION OF COST ACCOUNTING STANDARDS | FEB 1995 |
| 52.232-1 | PAYMENTS | APR 1984 |
| 52.232-8 | DISCOUNTS FOR PROMPT PAYMENT | APR 1989 |
| 52.232-9 | LIMITATION ON WITHHOLDING OF PAYMENTS | APR 1984 |
| 52.232-11 | EXTRAS | APR 1984 |
| 52.232-16 | PROGRESS PAYMENTS | JUL 1991 |
| 52.232-16 | PROGRESS PAYMENTS -- ALTERNATE II (AUG 1987) | JUL 1991 |
| 52.232-17 | INTEREST | JAN 1991 |
| 52.232-23 | ASSIGNMENT OF CLAIMS | JAN 1986 |
| 52.232-28 | ELECTRONIC FUNDS TRANSFER PAYMENT METHODS | APR 1989 |
| 52.233-1 | DISPUTES | MAR 1994 |
| 52.233-3 | PROTEST AFTER AWARD | AUG 1989 |
| 52.242-10 | F.O.B. ORIGIN - GOVERNMENT BILLS OF LADING OR PREPAID POSTAGE | APR 1984 |

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

| | | |
|---|---|---|
| 52.242-13 | BANKRUPTCY | JUL 1995 |
| 52.243-1 | CHANGES - FIXED-PRICE | AUG 1987 |
| 52.244-1 | SUBCONTRACTS (FIXED-PRICE CONTRACTS) | FEB 1995 |
| 52.244-5 | COMPETITION IN SUBCONTRACTING | APR 1984 |
| 52.245-17 | SPECIAL TOOLING | DEC 1989 |
| 52.246-23 | LIMITATION OF LIABILITY | APR 1984 |
| 52.249-2 | TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE). | APR 1984 |
| 52.249-8 | DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) | APR 1984 |
| 52.253-1 | COMPUTER GENERATED FORMS | JAN 1991 |
| 252.203-7000 | STATUTORY PROHIBITIONS ON COMPENSATION TO FORMER DEPARTMENT OF DEFENSE EMPLOYEES | DEC 1991 |
| 252.203-7001 | SPECIAL PROHIBITION ON EMPLOYMENT | APR 1993 |
| 252.203-7002 | DISPLAY OF DOD HOTLINE POSTER | DEC 1991 |
| 252.203-7003 | PROHIBITION AGAINST RETALIATORY PERSONNEL ACTIONS | APR 1992 |
| 252.204-7002 | PAYMENT FOR SUBLINE ITEMS NOT SEPARATELY PRICED | DEC 1991 |
| 252.204-7003 | CONTROL OF GOVERNMENT PERSONNEL WORK PRODUCT | APR 1992 |
| 252.205-7000 | PROVISION OF INFORMATION TO COOPERATIVE AGREEMENT HOLDERS | DEC 1991 |
| 252.209-7000 | ACQUISITION FROM SUBCONTRACTORS SUBJECT TO ONSITE INSPECTION UNDER THE INTERMEDIATE-RANGE NUCLEAR FORCES (INF) TREATY | DEC 1991 |
| 252.215-7000 | PRICING ADJUSTMENTS | DEC 1991 |

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

| | | |
|---|---|---|
| 252.215-7002 | COST ESTIMATING SYSTEM REQUIREMENTS | DEC 1991 |
| 252.219-7003 | SMALL, SMALL DISADVANTAGED, AND WOMEN OWNED SMALL BUSINESS SUBCONTRACTING PLAN (DOD CONTRACTS) | NOV 1995 |
| 252.223-7002 | SAFETY PRECAUTIONS FOR AMMUNITION AND EXPLOSIVES | MAY 1994 |
| 252.225-7001 | BUY AMERICAN ACT AND BALANCE OF PAYMENTS PROGRAM | JAN 1994 |
| 252.225-7002 | QUALIFYING COUNTRY SOURCES AS SUBCONTRACTORS | DEC 1991 |
| 252.225-7009 | DUTY-FREE ENTRY - QUALIFYING COUNTRY END PRODUCTS AND SUPPLIES | DEC 1991 |
| 252.225-7012 | PREFERENCE FOR CERTAIN DOMESTIC COMMODITIES | MAY 1994 |
| 252.225-7026 | REPORTING OF CONTRACT PERFORMANCE OUTSIDE THE UNITED STATES | MAY 1995 |
| 252.225-7031 | SECONDARY ARAB BOYCOTT OF ISRAEL | JUN 1992 |
| 252.227-7013 | RIGHTS IN TECHNICAL DATA--NONCOMMERCIAL ITEMS | JUN 1995 |
| 252.227-7030 | TECHNICAL DATA - WITHHOLDING OF PAYMENT | OCT 1988 |
| 252.227-7036 | CERTIFICATION OF TECHNICAL DATA CONFORMITY | MAY 1987 |
| 252.227-7037 | VALIDATION OF RESTRICTIVE MARKINGS ON TECHNICAL DATA | JUN 1995 |
| 252.231-7000 | SUPPLEMENTAL COST PRINCIPLES | DEC 1991 |
| 252.232-7004 | DOD PROGRESS PAYMENT RATES | NOV 1993 |
| 252.232-7006 | REDUCTION OR SUSPENSION OF CONTRACT PAYMENTS UPON FINDING OF FRAUD | AUG 1992 |

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

| | | |
|---|---|---|
| 252.233-7000 | CERTIFICATION OF CLAIMS AND REQUESTS FOR ADJUSTMENT OR RELIEF | MAY 1994 |
| 252.242-7000 | POSTAWARD CONFERENCE | DEC 1991 |
| 252.242-7003 | APPLICATION FOR U.S. GOVERNMENT SHIPPING DOCUMENTATION/INSTRUCTIONS | DEC 1991 |
| 252.242-7004 | MATERIAL MANAGEMENT AND ACCOUNTING SYSTEM | DEC 1991 |
| 252.243-7001 | PRICING OF CONTRACT MODIFICATIONS | DEC 1991 |
| 252.245-7001 | REPORTS OF GOVERNMENT PROPERTY | MAY 1994 |
| 252.246-7000 | MATERIAL INSPECTION AND RECEIVING REPORT | DEC 1991 |
| 252.247-7023 | TRANSPORTATION OF SUPPLIES BY SEA | DEC 1991 |
| 252.246-7001 | WARRANTY OF DATA | DEC 1991 |
| 252.249-7001 | NOTIFICATION OF SUBSTANTIAL IMPACT ON EMPLOYMENT | DEC 1991 |

I.2 <u>52.209-4 FIRST ARTICLE APPROVAL - GOVERNMENT TESTING. (SEP 1989) -- ALTERNATE I (SEP 1989)</u>

(a) The Contractor shall deliver IAW Table II of MIL-P-63252, units(s) of Lot/Item IAW Table II of MIL-P-63252, within 30 calendar days from the date of this contract to the Government at the contractors facility (Iowa Army Ammunition Plant, Middletown, Iowa) for first article tests. The shipping documentation shall contain this contract number and the Lot/Item identification. The characteristics that the first article must meet and the testing requirements are specified elsewhere in this contract.

(b) Within 30 calendar days after the Government receives the first article, the Contracting Officer shall notify the Contractor, in writing, of the conditional approval, approval, or disapproval of the first article. The notice of conditional approval or approval shall not relieve the Contractor from complying with all requirements of the specifications and all other terms and conditions of this contract. A notice of conditional approval shall state any further action required of

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

the Contractor. A notice of disapproval shall cite reasons for the disapproval.

(c) If the first article is disapproved, the Contractor, upon Government request, shall submit an additional first article for testing. After each request, the Contractor shall make any necessary changes, modifications, or repairs to the first article or select another first article for testing. All costs related to these tests are to be borne by the Contractor, including any and all costs for additional tests following a disapproval. The Contractor shall furnish any additional first article to the Government under the terms and conditions and within the time specified by the Government. The Government shall act on this first article within the time limit specified in paragraph (b) above. The Government reserves the right to require an equitable adjustment of the contract price for any extension of the delivery schedule or for any additional costs to the Government related to these tests.

(d) If the Contractor fails to deliver any first article on time, or the Contracting Officer disapproves any first article, the Contractor shall be deemed to have failed to make delivery within the meaning of the Default clause of this contract.

(e) Unless otherwise provided in the contract, the Contractor -

(1) May deliver the approved first article as a part of the contract quantity, provided it meets all contract requirements for acceptance and was not consumed or destroyed in testing; and

(2) Shall remove and dispose of any first article from the Government test facility at the Contractor's expense.

(f) If the Government does not act within the time specified in paragraph (b) or (c) above, the Contracting Officer shall, upon timely written request from the Contractor, equitably adjust under the Changes clause of this contract the delivery or performance dates and/or the contract price, and any other contractual term affected by the delay.

(g) The Contractor is responsible for providing operating and maintenance instructions, spare parts support, and repair of the first article during any first article test.

(h) Before first article approval, the acquisition of materials

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

or components for, or the commencement of production of, the balance of the contract quantity is at the sole risk of the Contractor. Before first article approval, the costs thereof shall not be allocable to this contract for (1) progress payments, or (2) termination settlements if the contract is terminated for the convenience of the Government.

(i) The Government may waive the requirement for first article approval test where supplies identical or similar to those called for in the schedule have been previously furnished by the Offeror/Contractor and have been accepted by the Government. The Offeror/Contractor may request a waiver.

(j) The Contractor shall produce both the first article and the production quantity at the same facility and shall submit a certification to this effect with each first article.

I.3 52.234-1 INDUSTRIAL RESOURCES DEVELOPED UNDER DEFENSE PRODUCTION ACT TITLE III. (DEC 1994)

(a) Definitions --

"Title III industrial resource" means materials, services, processes, or manufacturing equipment (including the processes, technologies, and ancillary services for use of such equipment) established or maintained under the authority of Title III, Defense Production ACT (50 U.S.C. App. 2091-2093).

"Title III project contractor" means a Contractor that has received assistance for the development or manufacture of an industrial resource under 50 U.S.C. App. 2091-2093, Defense Production Act.

(b) The Contractor shall refer any request from a Title III project contractor for testing and qualification of a Title III industrial resource to the Contracting Officer.

(c) Upon the direction of the Contracting Officer, the Contractor shall test Title III industrial resources for qualification. The Contractor shall provide the test results to the Defense Production Act Office, Title III Program, located at Wright-Patterson Air Force Base, Ohio 45433-7739.

(d) When the Contracting Officer modifies the contract to direct testing to this clause, the Government will provide the Title III industrial resource to be tested and will make and equitable adjustment in the contract for the costs of testing and qualification of the Title III industrial resource.

(e) The Contractor agrees to insert the substance of this clause, including paragraph (e), in every subcontract issued in performance of this contract.

I.4 52.232-25 PROMPT PAYMENT. (MAR 1994)

Notwithstanding any other payment clause in this contract, the Government will make invoice payments and contract financing payments under the terms and conditions specified in this clause. Payment shall be considered as being made on the day a check is dated or an electronic funds transfer is made. Definitions of pertinent terms are set forth in 32.902. All days referred to in this clause are calendar days, unless otherwise specified.

(a) Invoice Payments (1) For purposes of this clause, "invoice payment" means a Government disbursement of monies to a Contractor under a contract or other authorization for supplies or services accepted by the Government. This includes payments for partial deliveries that have been accepted by the Government and final cost or fee payments where amounts owed have been settled between the Government and the Contractor.

(2) Except as indicated in subparagraph (a)(3) and paragraph (c) of this clause, the due date for making invoice payments by the designated payment office shall be the later of the following two events:

(i) The 30th day after the designated billing office has received a proper invoice from the Contractor.

(ii) The 30th day after Government acceptance of supplies delivered or services performed by the Contractor. On a final invoice where the payment amount is subject to contract settlement actions, acceptance shall be deemed to have occurred on the effective date of the contract settlement. However, if the designated billing office fails to annotate the invoice with the actual date of receipt, the invoice payment due date shall be deemed to be the 30th day after the date the Contractor's invoice is dated, provided a proper invoice is received and there is no disagreement over quantity, quality, or Contractor compliance with contract requirements.

(3) The due date on contracts for meat, meat food products, or fish; contracts for perishable agricultural commodities, contracts for dairy products, edible fats or oils, and food products prepared from edible fats or oils, and contracts not requiring submission of an invoice shall be as follows:

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

(i) The due date for meat and meat food products, as defined in section 2(a) (3) of the Packers and Stockyard Act of 1921 (7 U.S.C. 182 (3)) and further defined in Pub. L. 98-181 to include any edible fresh or frozen poultry meat, any perishable poultry meat food product, fresh eggs, and any perishable egg product, will be as close as possible to, but not later than, the 7th day after product delivery.

(ii) The due date for fresh or frozen fish, as defined in section 204(3) of the Fish and Seafood Act of 1986 (16 U.S.C. 4003(3)), will be as close as possible to, but not later than, the seventh day after product delivery.

(iii) The due date for perishable agricultural commodities, as defined in Section 1(4) of the Perishable Agricultural Commodities Act of 1930 (7 U.S.C. 499a(44)), will be as close as possible to, but not later than, the 10th day after product delivery, unless another date is specified in the contract.

(iv) The due date for dairy products, as defined in section 111(e) of the Dairy Production Stabilization Act of 1983 (7 U.S.C. 4502(e)), edible fats or oils, and food products prepared from edible fats or oils, will be as close as possible to, but not later than, the 10th day after the date on which a proper invoice has been received.

(v) If the contract does not require submission of an invoice for payment (e.g., periodic lease payments), the due date will be as specified in the contract.

(4) An invoice is the Contractor's bill or written request for payment under the contract for supplies delivered or services performed. An invoice shall be prepared and submitted to the designated billing officer specified in the contract. A proper invoice must include the items listed in subdivisions (a)(4)(i) through (a)(4)(viii) of this clause. If the invoice does not comply with these requirements, then the contractor will be notified of the defect within 7 days after receipt of the invoice at the designated billing office (3 days for meat, meat food products, or fish, and 5 days for perishable agricultural commodities, edible fats or oils, and food products prepared from edible fats or oils. Untimely notification will be taken into account in the computation of any interest penalty owed the Contractor in the manner described in subparagraph (a)(6) of this clause.

(i) Name and address of the Contractor.

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

(ii) Invoice date.

(iii) Contract number or other authorization for supplies delivered or services performed (including order number and contract line item number).

(iv) Description, quantity, unit of measure, unit price, and extended price of supplies delivered or services performed.

(v) Shipping and payment terms (e.g., shipment number and date of shipment, prompt payment discount terms). Bill of lading number and weight of shipment will be shown for shipments on Government bills of lading.

(vi) Name and address of Contractor official to whom payment is to be sent (must be the same as that in the contract or in a proper notice of assignment).

(vii) Name (where practicable), title, phone number and mailing address of person to be notified in event of a defective invoice.

(viii) Any other information or documentation required by other requirements of the contract (such as evidence of shipment).

(5) An interest penalty shall be paid automatically by the Government, without request from the contractor, if payment is not made by the due date and the conditions listed in subdivisions (a)(5)(i) through (a)(5)(iii) of this clause are met, if applicable.

(I) A proper invoice was received by the designated billing office.

(ii) A receiving report or other Government documentation authorizing payment was processed and there was no disagreement over quantity, quality, or contractor compliance with any contract term or condition.

(iii) In the case of a final invoice for any balance of funds due the Contractor for supplies delivered or services performed, the amount was not subject to further contract settlement actions between the Government and the Contractor.

(6) The interest penalty shall be at the rate established by the Secretary of the Treasury under section 12 of the Contract Disputes Act of 1978 (41 U.S.C. 611) that is in effect on the

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

day after the due date, except where the interest penalty is prescribed by other government authority. This rate is referred to as the "Renegotiation Board Interest Rate," and it is published in the Federal Register semiannually on or about January 1 and July 1. The interest penalty shall accrue daily on the invoice payment amount approved by the Government and be compounded in 30-day increments inclusive from the first day after the due date through the payment date. That is, interest accrued at the end of any 30-day period will be added to the approved invoice payment amount and be subject to interest penalties if not paid in the succeeding 30-day period. If the designated billing office failed to notify the Contractor of a defective invoice within the periods prescribed in subparagraph (a)(4) of this clause, then the due date on the corrected invoice will be adjusted by subtracting the number of days taken beyond the prescribed notification of defects period. Any interest penalty owed the Contractor will be based on this adjusted due date. Adjustments will be made by the designated payment office for errors in calculating interest penalties, if requested by the Contractor.

(i) For the sole purpose of computing an interest penalty that might be due the contractor, Government acceptance shall be deemed to have occurred constructively on the 7th day (unless otherwise specified in this contract) after the contractor delivered the supplies or performed the services in accordance with the terms and conditions of the contract, unless there is a disagreement over quantity, quality, or contractor compliance with a contract provision. In the event that actual acceptance occurs within the constructive acceptance period, the determination of an interest penalty shall be based on the actual date of acceptance. The constructive acceptance requirement does not, however, compel Government officials to accept supplies or services, perform contract administration functions, or make payment prior to fulfilling their responsibilities.

(ii) The following periods of time will not be included in the determination of an interest penalty:

(A) The period taken to notify the Contractor of defects in invoices submitted to the Government, but this may not exceed 7 days (3 days for meat, meat food products, or fish, and 5 days for perishable agricultural commodities, dairy products, edible fat or oils, and food products prepared from edible fats or oils).

(B) The period between the defects notice and resubmission of

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

the corrected invoice by the Contractor.

(iii) Interest penalties will not continue to accrue after the filing of a claim for such penalties under the clause at 52.233-1, Disputes, or for more than 1 year. Interest penalties of less than $1.00 need not be paid.

(iv) Interest penalties are not required on payment delays due to disagreement between the Government and Contractor over the payment amount or other issues involving contract compliance or on amounts temporarily withheld or retained in accordance with the terms of the contract. Claims involving disputes, and any interest that may be payable, will be resolved in accordance with the clause at 52.233-1, Disputes.

(7) An interest penalty shall also be paid automatically by the designated payment office, without request from the contractor, if a discount for prompt payment is taken improperly. The interest penalty will be calculated as described in subparagraph (a) (6) of this clause on the amount of discount taken for the period beginning with the first day after the end of the discount period through the date when the contractor is paid.

(8) If this contract was awarded on or after October 1, 1989, a penalty amount, calculated in accordance with regulations issued by the Office of Management and Budget, shall be paid in addition to the interest penalty amount if the contractor -

(i) Is owed an interest penalty;

(ii) Is not paid the interest penalty within 10 days after the date the invoice amount is paid; and

(iii) Makes a written demand, not later than 40 days after the date the invoice amount is paid, that the agency pay such a penalty.

(b) Contract Financing Payments (1) For purposes of this clause, contract financing payment means a Government disbursement of monies to a Contractor under a contract clause or other authorization prior to acceptance of supplies or services by the Government. Contract financing payments include advance payments, progress payments based on cost under the clause at 52.232-16, Progress Payments, progress payments based on a percentage or stage of completion (32.102(e)(1)) other than those made under the clause at 52.232-5, Payments Under Fixed-Price Construction Contracts, or the clause at