**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

AMERICAN ORDNANCE LLC,
Plaintiff,
vs.
UNITED STATES,
Defendant.

Case No. 07-867C
Judge Wheeler

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 31

# CONTINUED

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

52.232-10, Payments Under Fixed-Price Architect-Engineer Contracts, and interim payments on cost type contracts.

(2) For contracts that provide for contract financing, requests for payment shall be submitted to the designated billing office as specified in this contract or as directed by the Contracting Officer. Contract financing payments shall be made on the [insert day as prescribed by Agency head; if not prescribed, insert 30th day] day after receipt of a proper contract financing request by the designated billing office. In the event that an audit or other review of a specific financing request is required to ensure compliance with the terms and conditions of the contract, the designated payment office is not compelled to make payment by the due date specified.

(3) For advance payments, loans, or other arrangements that do not involve recurrent submissions of contract financing requests, payment shall be made in accordance with the corresponding contract terms or as directed by the Contracting Officer.

(4) Contract financing payments shall not be assessed an interest penalty for payment delays.

(c) If this contract contains the clause at 5.213-1, Fast Payment Procedure, payments will be made within 15 days after the date of receipt of the invoice.

I.5 52.248-1 VALUE ENGINEERING. (MAR 1989)

(a) General. The Contractor is encouraged to develop, prepare, and submit value engineering change proposals (VECP's) voluntarily. The Contractor shall share in any net acquisition savings realized from accepted VECP's, in accordance with the incentive sharing rates in paragraph (f) below.

(b) Definitions. "Acquisition savings," as used in this clause, means savings resulting from the application of a VECP to contracts awarded by the same contracting office or its successor for essentially the same unit. Acquisition savings include -

(1) Instant contract savings, which are the net cost reductions on this, the instant contract, and which are equal to the instant unit cost reduction multiplied by the number of instant contract units affected by the VECP, less the Contractor's allowable development and implementation costs; (2) Concurrent

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

contract savings, which are net reductions in the prices of other contracts that are definitized and ongoing at the time the VECP is accepted; and

(3) Future contract savings, which are the product of the future unit cost reduction multiplied by the number of future contract units scheduled for delivery during the sharing period. If this contract is a multiyear contract, future contract savings include savings on quantities funded after VECP acceptance.

"Collateral costs," as used in this clause, means agency cost of operation, maintenance, logistic support, or Government-furnished property.

"Collateral savings," as used in this clause, means those measurable net reductions resulting from a VECP in the agency's overall projected collateral costs, exclusive of acquisition savings, whether or not the acquisition cost changes.

"Contracting office" includes any contracting office that the acquisition is transferred to, such as another branch of the agency or another agency's office that is performing a joint acquisition action.

"Contractor's development and implementation costs," as used in this clause, means those costs the Contractor incurs on a VECP specifically in developing, testing, preparing, and submitting the VECP, as well as those costs the Contractor incurs to make the contractual changes required by Government acceptance of a VECP.

"Future unit cost reduction," as used in this clause, means the instant unit cost reduction adjusted as the Contracting Officer considers necessary for projected learning or changes in quantity during the sharing period. It is calculated at the time the VECP is accepted and applies either (1) throughout the sharing period, unless the Contracting Officer decides that recalculation is necessary because conditions are significantly different from those previously anticipated or (2) to the calculation of a lump-sum payment, which cannot later be revised.

"Government costs," as used in this clause, means those agency costs that result directly from developing and implementing the VECP, such as any net increases in the cost of testing, operations, maintenance, and logistics support. The term does not include the normal administrative costs of processing the

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

VECP or any increase in this contract's cost or price resulting from negative instant contract savings.

"Instant contract," as used in this clause, means this contract, under which the VECP is submitted. It does not include increases in quantities after acceptance of the VECP that are due to contract modifications, exercise of options, or additional orders. If this is a multiyear contract, the term does not include quantities funded after VECP acceptance. If this contract is a fixed-price contract with prospective price redetermination, the term refers to the period for which firm prices have been established.

"Instant unit cost reduction" means the amount of the decrease in unit cost of performance (without deducting any Contractor's development or implementation costs) resulting from using the VECP on this, the instant contract. If this is a service contract, the instant unit cost reduction is normally equal to the number of hours per line-item task saved by using the VECP on this contract, multiplied by the appropriate contract labor rate.

"Negative instant contract savings" means the increase in the cost or price of this contract when the acceptance of a VECP results in an excess of the Contractor's allowable development and implementation costs over the product of the instant unit cost reduction multiplied by the number of instant contract units affected.

"Net acquisition savings" means total acquisition savings, including instant, concurrent, and future contract savings, less Government costs.

"Sharing base," as used in this clause, means the number of affected end items on contracts of the contracting office accepting the VECP.

"Sharing period," as used in this clause, means the period beginning with acceptance of the first unit incorporating the VECP and ending at the later of (1) 3 years after the first unit affected by the VECP is accepted or (2) the last scheduled delivery date of an item affected by the VECP under this contract's delivery schedule in effect at the time the VECP is accepted.

"Unit," as used in this clause, means the item or task to which the Contracting Officer and the Contractor agree the VECP applies.

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

"Value engineering change proposal (VECP)" means a proposal that -

(1) Requires a change to this, the instant contract, to implement; and

(2) Results in reducing the overall projected cost to the agency without impairing essential functions or characteristics; provided, that it does not involve a change -

(i) In deliverable end item quantities only;

(ii) In research and development (R&D) end items or R&D test quantities that is due solely to results of previous testing under this contract; or

(iii) To the contract type only.

(c) VECP preparation. As a minimum, the Contractor shall include in each VECP the information described in subparagraphs (1) through (8) below. If the proposed change is affected by contractually required configuration management or similar procedures, the instructions in those procedures relating to format, identification, and priority assignment shall govern VECP preparation. The VECP shall include the following:

(1) A description of the difference between the existing contract requirement and the proposed requirement, the comparative advantages and disadvantages of each, a justification when an item's function or characteristics are being altered, the effect of the change on the end item's performance, and any pertinent objective test data.

(2) A list and analysis of the contract requirements that must be changed if the VECP is accepted, including any suggested specification revisions.

(3) Identification of the unit to which the VECP applies.

(4) A separate, detailed cost estimate for (i) the affected portions of the existing contract requirement and (ii) the VECP. The cost reduction associated with the VECP shall take into account the Contractor's allowable development and implementation costs, including any amount attributable to subcontracts under the Subcontracts paragraph of this clause, below.

(5) A description and estimate of costs the Government may

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

incur in implementing the VECP, such as test and evaluation and operating and support costs.

(6) A prediction of any effects the proposed change would have on collateral costs to the agency.

(7) A statement of the time by which a contract modification accepting the VECP must be issued in order to achieve the maximum cost reduction, noting any effect on the contract completion time or delivery schedule.

(8) Identification of any previous submissions of the VECP, including the dates submitted, the agencies and contract numbers involved, and previous Government actions, if known.

(d) Submission. The Contractor shall submit VECP's to the Contracting Officer, unless this contract states otherwise. If this contract is administered by other than the contracting office, the Contractor shall submit a copy of the VECP simultaneously to the Contracting Officer and to the Administrative Contracting Officer.

(e) Government action. (1) The Contracting Officer shall notify the Contractor of the status of the VECP within 45 calendar days after the contracting office receives it. If additional time is required, the Contracting Officer shall notify the Contractor within the 45-day period and provide the reason for the delay and the expected date of the decision. The Government will process VECP's expeditiously; however, it shall not be liable for any delay in acting upon a VECP.

(2) If the VECP is not accepted, the Contracting Officer shall notify the Contractor in writing, explaining the reasons for rejection. The Contractor may withdraw any VECP, in whole or in part, at any time before it is accepted by the Government. The Contracting Officer may require that the Contractor provide written notification before undertaking significant expenditures for VECP effort.

(3) Any VECP may be accepted, in whole or in part, by the Contracting Officer's award of a modification to this contract citing this clause and made either before or within a reasonable time after contract performance is completed. Until such a contract modification applies a VECP to this contract, the Contractor shall perform in accordance with the existing contract. The Contracting Officer's decision to accept or reject all or part of any VECP and the decision as to which of the sharing rates applies shall be final and not subject to the

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

Disputes clause or otherwise subject to litigation under the Contract Disputes Act of 1978 (41 U.S.C. 601-613).

(f) Sharing rates. If a VECP is accepted, the Contractor shall share in net acquisition savings according to the percentages shown in the table below. The percentage paid the Contractor depends upon (1) this contract's type (fixed-price, incentive, or cost-reimbursement), (2) the sharing arrangement specified in paragraph (a) above (incentive, program requirement, or a combination as delineated in the Schedule), and (3) the source of the savings (the instant contract, or concurrent and future contracts), as follows:

CONTRACTOR'S SHARE OF NET ACQUISITION SAVINGS
(figures in percent)

| | Sharing Arrangement | | | |
|---|---|---|---|---|
| | Incentive (voluntary) | | Program requirement (mandatory) | |
| Contract Type | Instant contract rate | Concurrent and future contract rate | Instant contract rate | Concurrent and future contract rate |
| Fixed-price (other than incentive) | 50 | 50 | 25 | 25 |
| Incentive (fixed-price or cost) | * | 50 | * | 25 |
| Cost-reimbursement (other than incentive)** | 25 | 25 | 15 | 15 |

*Same sharing arrangement as the contract's profit or fee adjustment formula. **Includes cost-plus-award-fee contracts.

(g) Calculating net acquisition savings. (1) Acquisition savings are realized when (i) the cost or price is reduced on the instant contract, (ii) reductions are negotiated in concurrent contracts, (iii) future contracts are awarded, or

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

(iv) agreement is reached on a lump-sum payment for future contract savings (see subparagraph (i)(4) below). Net acquisition savings are first realized, and the Contractor shall be paid a share, when Government costs and any negative instant contract savings have been fully offset against acquisition savings.

(2) Except in incentive contracts, Government costs and any price or cost increases resulting from negative instant contract savings shall be offset against acquisition savings each time such savings are realized until they are fully offset. Then, the Contractor's share is calculated by multiplying net acquisition savings by the appropriate Contractor's percentage sharing rate (see paragraph (f) above). Additional Contractor shares of net acquisition savings shall be paid to the Contractor at the time realized.

(3) If this is an incentive contract, recovery of Government costs on the instant contract shall be deferred and offset against concurrent and future contract savings. The Contractor shall share through the contract incentive structure in savings on the instant contract items affected. Any negative instant contract savings shall be added to the target cost or to the target price and ceiling price, and the amount shall be offset against concurrent and future contract savings.

(4) If the Government does not receive and accept all items on which it paid the Contractor's share, the Contractor shall reimburse the Government for the proportionate share of these payments.

(h) Contract adjustment. The modification accepting the VECP (or a subsequent modification issued as soon as possible after any negotiations are completed) shall -

(1) Reduce the contract price or estimated cost by the amount of instant contract savings, unless this is an incentive contract;

(2) When the amount of instant contract savings is negative, increase the contract price, target price and ceiling price, target cost, or estimated cost by that amount;

(3) Specify the Contractor's dollar share per unit on future contracts, or provide the lump-sum payment;

(4) Specify the amount of any Government costs or negative instant contract savings to be offset in determining net

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

acquisition savings realized from concurrent or future contract savings; and

(5) Provide the Contractor's share of any net acquisition savings under the instant contract in accordance with the following:

(i) Fixed-price contracts - add to contract price.

(ii) Cost-reimbursement contracts - add to contract fee.

(i) Concurrent and future contract savings. (1) Payments of the Contractor's share of concurrent and future contract savings shall be made by a modification to the instant contract in accordance with subparagraph (h)(5) above. For incentive contracts, shares shall be added as a separate firm-fixed-price line item on the instant contract. The Contractor shall maintain records adequate to identify the first delivered unit for 3 years after final payment under this contract.

(2) The Contracting Officer shall calculate the Contractor's share of concurrent contract savings by (i) subtracting from the reduction in price negotiated on the concurrent contract any Government costs or negative instant contract savings not yet offset and (ii) multiplying the result by the Contractor's sharing rate.

(3) The Contracting Officer shall calculate the Contractor's share of future contract savings by (i) multiplying the future unit cost reduction by the number of future contract units scheduled for delivery during the sharing period, (ii) subtracting any Government costs or negative instant contract savings not yet offset, and (iii) multiplying the result by the Contractor's sharing rate.

(4) When the Government wishes and the Contractor agrees, the Contractor's share of future contract savings may be paid in a single lump sum rather than in a series of payments over time as future contracts are awarded. Under this alternate procedure, the future contract savings may be calculated when the VECP is accepted, on the basis of the Contracting Officer's forecast of the number of units that will be delivered during the sharing period. The Contractor's share shall be included in a modification to this contract (see subparagraph (h)(3) above) and shall not be subject to subsequent adjustment.

(5) Alternate no-cost settlement method. When, in accordance with subsection 48.104-3 of the Federal Acquisition Regulation,

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

the Government and the Contractor mutually agree to use the no-cost settlement method, the following applies:

(i) The Contractor will keep all the savings on the instant contract and on its concurrent contracts only.

(ii) The Government will keep all the savings resulting from concurrent contracts placed on other sources, savings from all future contracts, and all collateral savings.

(j) Collateral savings. If a VECP is accepted, the instant contract amount shall be increased, as specified in subparagraph (h)(5) above, by 20 percent of any projected collateral savings determined to be realized in a typical year of use after subtracting any Government costs not previously offset. However, the Contractor's share of collateral savings shall not exceed (1) the contract's firm-fixed-price, target price, target cost, or estimated cost, at the time the VECP is accepted, or (2) $100,000, whichever is greater. The Contracting Officer shall be the sole determiner of the amount of collateral savings, and that amount shall not be subject to the Disputes clause or otherwise subject to litigation under 41 U.S.C. 601-613.

(k) Relationship to other incentives. Only those benefits of an accepted VECP not rewardable under performance, design-to-cost (production unit cost, operating and support costs, reliability and maintainability), or similar incentives shall be rewarded under this clause. However, the targets of such incentives affected by the VECP shall not be adjusted because of VECP acceptance. If this contract specifies targets but provides no incentive to surpass them, the value engineering sharing shall apply only to the amount of achievement better than target.

(l) Subcontracts. The Contractor shall include an appropriate value engineering clause in any subcontract of $100,000 or more and may include one in subcontracts of lesser value. In calculating any adjustment in this contract's price for instant contract savings (or negative instant contract savings), the Contractor's allowable development and implementation costs shall include any subcontractor's allowable development and implementation costs, and any value engineering incentive payments to a subcontractor, clearly resulting from a VECP accepted by the Government under this contract. The Contractor may choose any arrangement for subcontractor value engineering incentive payments; provided, that the payments shall not reduce the Government's share of concurrent or future contract

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

savings or collateral savings.

(m) Data. The Contractor may restrict the Government's right to use any part of a VECP or the supporting data by marking the following legend on the affected parts:

"These data, furnished under the Value Engineering clause of contract [ ], shall not be disclosed outside the Government or duplicated, used, or disclosed, in whole or in part, for any purpose other than to evaluate a value engineering change proposal submitted under the clause. This restriction does not limit the Goverment's right to use information contained in these data if it has been obtained or is otherwise available from the Contractor or from another source without limitations."

If a VECP is accepted, the Contractor hereby grants the Government unlimited rights in the VECP and supporting data, except that, with respect to data qualifying and submitted as limited rights technical data, the Government shall have the rights specified in the contract modification implementing the VECP and shall appropriately mark the data. (The terms "unlimited rights" and "limited rights" are defined in part 27 of the Federal Acquisition Regulation.)

I.6 252.209-7004 REPORTING OF COMMERCIAL TRANSACTIONS WITH THE GOVERNMENT OF A TERRORIST COUNTRY. (SEP 1994)

(a) "Definitions."

As used in this clause --

(1) "Government of a terrorist country" includes the state and the government of a terrorist country, as well as any political subdivision, agency, or instrumentality thereof.

(2) "Terrorist country" means a country determined by the Secretary of State, under section 6(j)(1)(A) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)(1)(A), as of 60 days before the contract award date, to be a country the government of which as repeatedly provided support for acts of international terrorism. As of the date of this clause terrorist countries include: Cuba, Iran, Iraq, Libya, North Korea, Sudan, and Syria.

(b) "Reporting."

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

(1) In accordance with section 843 of the National Defense Authorization Act of Fiscal Year 1994 (Pub. L. 103-160), if this contract exceeds $5,000,000, the Contractor shall report each commercial transaction that it conducts with the government of a terrorist country during the period of performance of this contract (but not beyond September 30, 1996).

(2) This reporting requirement does not apply to --

(i) Transactions conducted by affiliates or subsidiaries of the Contractor; or

(ii) Payment or receipt of payment of a judgment or award ordered by a court or arbitral tribunal or competent jurisdiction.

(3) The Contractor shall submit reports in the following format:

Title of Report: Report of Commercial Transactions with the Government of a Terrorist Country

Date of Report:

Contract Number:

Contractor's Name and Address:

Name and Telephone Number of Individual Submitting Report:

Commercial Transactions with the Government of a Terrorist Country:

Country:

________________________________________

________________________________________

Nature of Commercial Transaction:

________________________________________

________________________________________

(4) The Contractor shall submit reports annually by September 30, but not beyond September 30, 1996. Each report shall

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

include transactions conducted during the preceding one-year period of contract performance.

(5) The Contractor shall submit reports to: Deputy Director of Defense Procurement (Foreign Contracting), OUSD(A&T)DP(FC), Washington, DC 20301-3060.

I.7 252.242-7001 CERTIFICATION OF INDIRECT COSTS. (DEC 1991)

(a) The Contractor shall -

(1) Certify any proposal to establish or modify billing rates or to establish final indirect cost rates;

(2) Use the format in paragraph (c) of this clause to certify; and

(3) Have the certificate signed by an individual of the Contractor's organization at a level no lower than a vice president or chief financial officer of the business segment of the Contractor that submits the proposal.

(b) Failure by the Contractor to submit a signed certificate, as described in this clause, shall result in payment of indirect costs at rates unilaterally established by the Government.

(c) The certificate of indirect costs shall read as follows:

Certificate of Indirect Costs

This is to certify that to the best of my knowledge and belief:

1. I have reviewed this indirect cost proposal;

2. All costs included in this proposal (identify proposal and date) to establish billing or final indirect cost rates for (identify period covered by rate) are allowable in accordance with the requirements of contracts to which they apply and with the cost principles of the Department of Defense applicable to those contracts;

3. This proposal does not include any costs which are unallowable under applicable cost principles of the Department of Defense, such as (without limitation): advertising and public relations costs, contributions and donations,

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

entertainment costs, fines and penalties, lobbying costs, defense of fraud proceedings, and goodwill; and

4. All costs included in this proposal are properly allocable to Defense contracts on the basis of a beneficial or causal relationship between the expenses incurred and the contracts to which they are allocated in accordance with applicable acquisition regulations.

I declare under penalty of perjury that the foregoing is true and correct.

Firm:

_______________________________________________

Signature Name of Corporation Official:

____________________

Title:

_______________________________________________

Date of Execution:

_____________________________________

I.8 **52.245-2 GOVERNMENT PROPERTY (FIXED-PRICE CONTRACTS). -- ALTERNATE I (DEVIATION)(JUL 1995)(AS1501)**

(a) Government-furnished property. (1) The Government shall deliver to the Contractor, for use in connection with and under the terms of this contract, the Government-furnished property described in the Schedule or specifications together with any related data and information that the Contractor may request and is reasonably required for the intended use of the property (hereinafter referred to as "Government-furnished property").

(2) The delivery or performance dates for this contract are based upon the expectation that Government-furnished property suitable for use (except for property furnished "as-is") will be delivered to the Contractor at the times stated in the Schedule or, if not so stated, in sufficient time to enable the Contractor to meet the contract's delivery or performance dates.

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

(3) If Government-furnished property is received by the Contractor in a condition not suitable for the intended use, the Contractor shall, upon receipt of it, notify the Contracting Officer, detailing the facts, and, as directed by the Contracting Officer and at Government expense, either repair, modify, return, or otherwise dispose of the property. After completing the directed action and upon written request of the Contractor, the Contracting Officer shall make an equitable adjustment as provided in paragraph (h) of this clause.

(4) If Government-furnished property is not delivered to the Contractor by the required time, the Contracting Officer shall, upon the Contractor's timely written request, make a determination of the delay, if any, caused the Contractor and shall make an equitable adjustment in accordance with paragraph (h) of this clause.

(b) Changes in Government-furnished property. (1) The Contracting Officer may, by written notice, (i) decrease the Government-furnished property provided or to be provided under this contract, or (ii) substitute other Government-furnished property for the property to be provided by the Government, or to be acquired by the Contractor for the Government, under this contract. The Contractor shall promptly take such action as the Contracting Officer may direct regarding the removal, shipment, or disposal of the property covered by such notice.

(2) Upon the Contractor's written request, the Contracting Officer shall make an equitable adjustment to the contract in accordance with paragraph (h) of this clause, if the Government has agreed in the Schedule to make the property available for performing this contract and there is any -

(i) Decrease or substitution in this property pursuant to subparagraph (b)(1) above; or

(ii) Withdrawal of authority to use this property, if provided under any other contract or lease.

(c) Title in Government property. (1) The Government shall retain title to all Government-furnished property.

(2) All Government-furnished property and all property acquired by the Contractor, title to which vests in the Government under this paragraph (collectively referred to as "Government property"), are subject to the provisions of this clause. However, special tooling accountable to this contract is

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

subject to the provisions of the Special Tooling clause and is not subject to the provisions of this clause. Title to Government property shall not be affected by its incorporation into or attachment to any property not owned by the Government, nor shall Government property become a fixture or lose its identity as personal property by being attached to any real property.

(3) Title to each item of facilities and special test equipment acquired by the Contractor for the Government under this contract shall pass to and vest in the Government when its use in performing this contract commences or when the Government has paid for it, whichever is earlier, whether or not title previously vested in the Government.

(4) If this contract contains a provision directing the Contractor to purchase material for which the Government will reimburse the Contractor as a direct item of cost under this contract -

(i) Title to material purchased from a vendor shall pass to and vest in the Government upon the vendor's delivery of such material; and

(ii) Title to all other material shall pass to and vest in the Government upon -

(A) Issuance of the material for use in contract performance;

(B) Commencement of processing of the material or its use in contract performance; or

(C) Reimbursement of the cost of the material by the Government, whichever occurs first.

(d) Use of Government property. The Government property shall be used only for performing this contract, unless otherwise provided in this contract or approved by the Contracting Officer.

(e) Property administration. (1) The Contractor shall be responsible and accountable for all Government property provided under this contract and shall comply with Federal Acquisition Regulation (FAR) subpart 45.5, as in effect on the date of this contract.
(2) The Contractor shall establish and maintain a program for the use, maintenance, repair, protection, and preservation of Government property in accordance with sound industrial

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

practice and the applicable provisions of subpart 45.5 of the FAR.

(3) If damage occurs to Government property, the risk of which has been assumed by the Government under this contract, the Government shall replace the items or the Contractor shall make such repairs as the Government directs. However, if the Contractor cannot effect such repairs within the time required, the Contractor shall dispose of the property as directed by the Contracting Officer. When any property for which the Government is responsible is replaced or repaired, the Contracting Officer shall make an equitable adjustment in accordance with paragraph (h) of this clause.

(4) The Contractor represents that the contract price does not include any amount for repairs or replacement for which the Government is responsible. Repair or replacement of property for which the Contractor is responsible shall be accomplished by the Contractor at its own expense.

(f) Access. The Government and all its designees shall have access at all reasonable times to the premises in which any Government property is located for the purpose of inspecting the Government property.

(g) Limited risk of loss. (1) The term "Contractor's managerial personnel," as used in this paragraph (g), means the Contractor's directors, officers, and any of the Contractor's managers, superintendents, or equivalent representatives who have supervision or direction of -

(i) All or substantially all of the Contractor's business;

(ii) All or substantially all of the Contractor's operation at any one plant or separate location at which the contract is being performed; or

(iii) A separate and complete major industrial operation connected with performing this contract.

(2) The Contractor shall not be liable for loss or destruction of, or damage to, the Government property provided under this contract (or, if an educational or nonprofit organization, for expenses incidental to such loss, destruction, or damage), except as provided in subparagraphs (3) and (4) below.

(3) The Contractor shall be responsible for loss or destruction of, or damage to, the Government property provided under this

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

contract (including expenses incidental to such loss, destruction, or damage) -

(i) That results from a risk expressly required to be insured under this contract, but only to the extent of the insurance required to be purchased and maintained, or to the extent of insurance actually purchased and maintained, whichever is greater;

(ii) That results from a risk that is in fact covered by insurance or for which the Contractor is otherwise reimbursed, but only to the extent of such insurance or reimbursement;

(iii) For which the Contractor is otherwise responsible under the express terms of this contract;

(iv) That results from willful misconduct or lack of good faith on the part of the Contractor's managerial personnel; or

(v) That results from a failure on the part of the Contractor, due to willful misconduct or lack of good faith on the part of the Contractor's managerial personnel, to establish and administer a program or system for the control, use, protection, preservation, maintenance, and repair of Government property as required by paragraph (e) of this clause.

(4) (i) If the Contractor fails to act as provided in subdivision (g)(3)(v) above, after being notified (by certified mail addressed to one of the Contractor's managerial personnel) of the Government's disapproval, withdrawal of approval, or nonacceptance of the system or program, it shall be conclusively presumed that such failure was due to willful misconduct or lack of good faith on the part of the Contractor's managerial personnel.

(ii) In such event, any loss or destruction of, or damage to, the Government property shall be presumed to have resulted from such failure unless the Contractor can establish by clear and convincing evidence that such loss, destruction, or damage -

(A) Did not result from the Contractor's failure to maintain an approved program or system; or

(B) Occurred while an approved program or system was maintained by the Contractor.

(5) If the Contractor transfers Government property to the possession and control of a subcontractor, the transfer shall

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

not affect the liability of the Contractor for loss or destruction of, or damage to, the property as set forth above. However, the Contractor shall require the subcontractor to assume the risk of, and be responsible for, any loss or destruction of, or damage to, the property while in the subcontractor's possession or control, except to the extent that the subcontract, with the advance approval of the Contracting Officer, relieves the subcontractor from such liability. In the absence of such approval, the subcontract shall contain appropriate provisions requiring the return of all Government property in as good condition as when received, except for reasonable wear and tear or for its use in accordance with the provisions of the prime contract.

(6) The contractor shall notify the contracting officer upon loss or destruction of, or damage to, Government property provided under this contract, with the exception of low value property for which loss, damage or destruction is reported at contract termination, completion or when needed for continued contract performance. The Contractor shall so notify the Contracting Officer and shall communicate with the loss and salvage organization, if any, designated by the Contracting Officer. With the assistance of any such organization, The Contractor shall take all reasonable action to protect the Government property from further damage, separate the damaged and undamaged Government property, put all the affected Government property in the best possible order, and furnish to the Contracting Officer a statement of --

(i) The lost, destroyed, or damaged Government property;

(ii) The time and origin of the loss, destruction, or damage;

(iii) All known interests in commingled property of which the Government property is a part; and

(iv) The insurance, if any, covering any part of or interest in such commingled property.

(7) The Contractor shall repair, renovate, and take such other action with respect to damaged Government property as the Contracting Officer directs. If the Government property is destroyed or damaged beyond practical repair, or is damaged and so commingled or combined with property of others (including the Contractor's) that separation is impractical, the Contractor may, with the approval of and subject to any conditions imposed by the Contracting Officer, sell such property for the account of the Government. Such sales may be

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

made in order to minimize the loss to the Government, to permit the resumption of business, or to accomplish a similar purpose. The Contractor shall be entitled to an equitable adjustment in the contract price for the expenditures made in performing the obligations under this subparagraph (g)(7) in accordance with paragraph (h) of this clause. However, the Government may directly reimburse the loss and salvage organization for any of their charges. The Contracting Officer shall give due regard to the Contractor's liability under this paragraph (g) when making any such equitable adjustment.

(8) The Contractor represents that it is not including in the price and agrees it will not hereafter include in any price to the Government any charge or reserve for insurance (including any self- insurance fund or reserve) covering loss or destruction of, or damage to, Government property, except to the extent that the Government may have expressly required the Contractor to carry such insurance under another provision of this contract.

(9) In the event the Contractor is reimbursed or otherwise compensated for any loss or destruction of, or damage to, Government property, the Contractor shall use the proceeds to repair, renovate, or replace the lost, destroyed, or damaged Government property or shall otherwise credit the proceeds to or equitably reimburse the Government, as directed by the Contracting Officer.

(10) The Contractor shall do nothing to prejudice the Government's rights to recover against third parties for any loss or destruction of, or damage to, Government property. Upon the request of the Contracting Officer, the Contractor shall, at the Government's expense, furnish to the Government all reasonable assistance and cooperation (including the prosecution of suit and the execution of instruments of assignment in favor of the Government) in obtaining recovery. In addition, where a subcontractor has not been relieved from liability for any loss or destruction of, or damage to, Government property, the Contractor shall enforce for the benefit of the Government the liability of the subcontractor for such loss, destruction, or damage.

(h) Equitable adjustment. When this clause specifies an equitable adjustment, it shall be made to any affected contract provision in accordance with the procedures of the Changes clause. When appropriate, the Contracting Officer may initiate an equitable adjustment in favor of the Government. The right to an equitable adjustment shall be the Contractor's exclusive

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

remedy. The Government shall not be liable to suit for breach of contract for -

(1) Any delay in delivery of Government-furnished property;

(2) Delivery of Government-furnished property in a condition not suitable for its intended use;

(3) A decrease in or substitution of Government-furnished property; or

(4) Failure to repair or replace Government property for which the Government is responsible.

(i) Final accounting and disposition of Government property. Upon completing this contract, or at such earlier dates as may be fixed by the Contracting Officer, the Contractor shall submit, in a form acceptable to the Contracting Officer, inventory schedules covering all items of Government property (including any resulting scrap) not consumed in performing this contract or delivered to the Government. The Contractor shall prepare for shipment, deliver f.o.b. origin, or dispose of the Government property as may be directed or authorized by the Contracting Officer. The net proceeds of any such disposal shall be credited to the contract price or shall be paid to the Government as the Contracting Officer directs.

(j) Abandonment and restoration of Contractor's premises. Unless otherwise provided herein, the Government -

(1) May abandon any Government property in place, at which time all obligations of the Government regarding such abandoned property shall cease; and

(2) Has no obligation to restore or rehabilitate the Contractor's premises under any circumstances (e.g., abandonment, disposition upon completion of need, or upon contract completion). However, if the Government-furnished property (listed in the Schedule or specifications) is withdrawn or is unsuitable for the intended use, or if other Government property is substituted, then the equitable adjustment under paragraph (h) of this clause may properly include restoration or rehabilitation costs.

(k) Communications. All communications under this clause shall be in writing.

(l) Overseas contracts. If this contract is to be performed

outside of the United States of America, its territories, or possessions, the words "Government" and "Government-furnished" (wherever they appear in this clause) shall be construed as "United States Government" and "United States Government-furnished", respectively.

I.9 **252.247-7023 TRANSPORTATION OF SUPPLIES BY SEA. (DEC 1991)**

(a) Definitions. As used in this clause --

(1) "Components" means articles, materials, and supplies incorporated directly into end products at any level of manufacture, fabrication, or assembly by the Contractor or any subcontractor.

(2) "Department of Defense" (DoD) means the Army, Navy, Air Force, Marine Corps, and defense agencies.

(3) "Foreign flag vessel" means any vessel that is not a U.S.-flag vessel.

(4) "Ocean transportation" means any transportation aboard a ship, vessel, boat, barge, or ferry through international waters.

(5) "Subcontractor" means a supplier, materialman, distributor, or vendor at any level below the prime contractor whose contractual obligation to perform results from, or is conditioned upon, award of the prime contract and who is performing any part of the work or other requirement of the prime contract.

(6) "Supplies" means all property, except land and interests in land, that is clearly identifiable for eventual use by or owned by the DoD at the time of transportation by sea.

(i) An item is clearly identifiable for eventual use by the DoD if, for example, the contract documentation contains a reference to a DoD contract number or a military destination.

(ii) "Supplies" includes (but is not limited to) public works; buildings and facilities; ships; floating equipment and vessels of every character, type, and description, with parts, subassemblies, accessories, and equipment; machine tools; material; equipment; stores of all kinds; end items; construction materials; and components of the foregoing.

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

(7) "U.S.-flag vessel" means a vessel of the United States or belonging to the United States, including any vessel registered or having national status under the laws of the United States.

(b) The Contractor shall employ U.S.-flag vessels in the transportation by sea of any supplies to be furnished in the performance of this contract. The Contractor and its subcontractors may request that the Contracting Officer authorize shipment in foreign-flag vessels, or designate available U.S.-flag vessels, if the Contractor or a subcontractor believes that --

(1) U.S.-flag vessels are not available for timely shipment;

(2) The freight charges are inordinately excessive or unreasonable; or

(3) Freight charges are higher than charges to private persons for transportation of like goods.

(c) The Contractor must submit any request for use of other than U.S.-flag vessels in writing to the Contracting Officer at least 45 days prior to the sailing date necessary to meet its delivery schedules. The Contracting Officer will process requests submitted after such date(s) as expeditiously as possible, but the Contracting Officer's failure to grant approvals to meet the shipper's sailing date will not of itself constitute a compensable delay under this or any other clause of this contract. Requests shall contain at a minimum --

(1) Type, weight, and cube of cargo;

(2) Required shipping date;

(3) Special handling and discharge requirements;

(4) Loading and discharge points;

(5) Name of shipper and consignee;

(6) Prime contract number; and

(7) A documented description of efforts made to secure U.S.-flag vessels, including points of contact (with names and telephone numbers) with at least two U.S.-flag carriers contacted. Copies of telephone notes, telegraphic and facsimile message or letters will be sufficient for this purpose.

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

(d) The Contractor shall, within 30 days after each shipment covered by this clause, provide the Contracting Officer and the Division of National Cargo, Office of Market Development, Maritime Administration, U.S. Department of Transportation, Washington, DC 20590, one copy of the rated on board vessel operating carrier's ocean bill of lading, which shall contain the following information --

(1) Prime contract number;

(2) Name of vessel;

(3) Vessel flag of registry;

(4) Date of loading;

(5) Port of loading;

(6) Port of final discharge;

(7) Description of commodity;

(8) Gross weight in pounds and cubic feet if available;

(9) Total ocean freight in U.S. dollars; and

(10) Name of the steamship company.

(e) The Contractor agrees to provide with its final invoice under this contract a representation that to the best of its knowledge and belief --

(1) No ocean transportation was used in the performance of this contract;

(2) Ocean transportation was used and only U.S.-flag vessels were used for all ocean shipments under the contract;

(3) Ocean transportation was used, and the Contractor had the written consent of the Contracting Officer for all non-U.S.-flag ocean transportation; or

(4) Ocean transportation was used and some or all of the shipments were made on non-U.S.-flag vessels without the written consent of the Contracting Officer. The Contractor shall describe these shipments in the following format:

| ITEM | CONTRACT | QUANTITY |
|---|---|---|

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

| DESCRIPTION | LINE ITEMS |
| --- | --- |
| | |
| | |
| | |
| | |
| TOTAL | |

(f) If the final invoice does not include the required representation, the Government will reject and return it to the Contractor as an improper invoice for the purposes of the Prompt Payment clause of this contract. In the event there has been unauthorized use of non-U.S.-flag vessels in the performance of this contract, the Contracting Officer is entitled to equitably adjust the contract, based on the unauthorized use.

(g) The Contractor shall include this clause, including this paragraph (g) in all subcontracts under this contract, which exceed the small purchase limitation of section 13.000 of the Federal Acquisition Regulation.

I.10 **52.210-1000 DEMILITARIZATION CLAUSE. (MAR 1963)**

(a) The items called for by this contract being military items, the following provision as to the disposal of completed or partially completed parts, components, subassemblies, and end items will apply. Property (whether title to the property is in the Government or not, and including parts, components, subassemblies, and assemblies to the extent indicated below) of the type covered by this contract for which the contractor does not claim or is refused payment (including, but not limited to, rejects or overruns) under the provisions of this contract, but which is manufactured, fabricated, assembled, or produced in connection with the manufacture, fabrication, assembly or production of the items covered by this contract, and which is manufactured, fabricated, assembled, or produced on the basis of or with the aid of drawings, specifications, facilities, equipment or material furnished or specified by the Government pursuant to this contract, will be completely destroyed or mutilated (whichever is prescribed) prior to final payment in the manner and to the extent herein below set forth in order that such property will be unusable or nonreclaimable for its original purpose, and to preclude the possibility or reconditioning such property to make it saleable as implements of war:

***The following shall be accomplished in accordance with DOD***

**Part II - Contract Clauses**
**SECTION I - CONTRACT CLAUSES**

***4160-21M-1, fig 56:***

*1. Remove all explosive fills and dispose through sales, as scrap to authorized commercial explosive dealers and/or destruction through environmentally approved burning or detonation.*

*2. The fuze well liner and metal container for the supplementary charge shall be cut in half, or split vertically approximately two inches, or crushed and disposed of as scrap.*

*3. The contractor has the option in demilitarizing the projectile body by removing or mutilating the rotating band or mutilating the projectile such that it can no longer be used for its intended purpose (crushing or cutting the projectile lengthwise or cross wise). All other metal parts do not require specific demilitarization procedures, however, all Metal parts which are to be scrapped shall be certified to be free of explosives and or explosives residue prior to removal from plant.*

(b) The contractor agrees that no items demilitarized, as stated above, will be disposed of by the contractor other than as scrap.

© Upon completion of production under this contract, the contractor shall certify to the administrative Contracting Officer that demilitarization, as prescribed above, has been accomplished.

(d) The contractor further agrees that it will include the aforesaid provision in any subcontracts for the aforesaid items.

**Part III - List of Documents, Exhibits, and other Attachments**
**SECTION J - LIST OF ATTACHMENTS**

J.1 LIST OF DOCUMENTS, EXHIBITS, AND OTHER ATTACHMENTS

| TITLE | | DATE | NO. OF PAGES |
|---|---|---|---|
| 68X | Contract and Continuation Sheets, Section A through J | | 81 |
| Exhibit A | Contract Data Requirements DD Form 1423, including Instructions to complete DD 1423s and Address Codes | | 7 |
| Attachment I | Hazardous Component Safety Data Statements (HCSDS) for M795 projectile, TNT, and TNT Charge. | | 14 |
| Attachment II | Clearance of Technical Evaluation for Public Release | | 2 |
| Attachment III | Disclosure of Lobbying Activities, Standards Form LLL | | 2 |
| Attachment IV | Guidance Sheet for the Document Summary List (DSL); and Document Summary List | | 5 |
| Attachment V | TDPL 9312769, including ECP'S and drawings delineated under page 2, Paragraph 3 of the contract. | | |

J.2 GUIDANCE ON DOCUMENTATION OF DATA REQUIREMENTS

The following information is furnished to provide guidance with respect to the abbreviations and codes utilized in various blocks of DD Form 1423, Contract Data Requirements List.

**Part III - List of Documents, Exhibits, and other Attachments**
**SECTION J - LIST OF ATTACHMENTS**

1. Block 7, DD Form 250 Requirement. This block designates the location (Contractor's facility or destination) for performance of Government inspection and acceptance. The applicable codes for inspection and acceptance are cited below. The Government activity to perform the destination acceptance task is entered in Block 14 as the first addressee.

| Code | Inspection | Acceptance |
|---|---|---|
| SS | *Source (DD Form 250) | *Source (DD Form 250) |
| DD | Destination (DD Form 250) | Destination (DD Form 250) |
| SD | *Source (DD Form 250) | Destination (DD Form 250) |
| DS | Destination (DD Form 250) | *Source (DD Form 250) |
| LT** | Letter of Transmittal only | |
| NO | No inspection or acceptance required | |
| XX | Inspection/Acceptance requirements specified elsewhere in contract | |

*Source indicates Contractor's facility.
**Use of these symbols is not authorized for engineering data such as drawings and specifications.

2. Block 8, Approval Code. Item of critical data requiring specific advanced written approval, such as test plans, are identified by an "A" in this field. Most of these data require submission of a preliminary draft prior to publication of a final document. When advanced approval is not required, this field is a blank.

3. Block 10, Frequency. The codes used in this block are cited below:

| | | | |
|---|---|---|---|
| DAILY | Daily | SEMIA | Each 6 months |
| WEEKLY | Weekly | 2TIME | 2 separate submittals |
| BI-WE | Each 2 weeks | OTIME | One time MTHLY |
| Monthly | | ONE/R | One time & revision |
| ASREQ | As required (see Notes A/B) | R/ASR | Revision as required |
| BI-MO | Each 2 months | DFDEL | Deferred delivery |
| QRTLY | Quarterly | ONE/P | One time preliminary draft |
| ANNLY | Annually | | |
| CHG P AS REQ | Change pages as required | | |

NOTE A: Block 13 is used for further explanation.
NOTE B: When data is of recurring type, it will be submitted at end of reporting period established in field unless otherwise indicated in Data Preparation Instruction or in Blocks 12 or 13 of DD Form 1423.

**Part III - List of Documents, Exhibits, and other Attachments**
**SECTION J - LIST OF ATTACHMENTS**

4. Block 11, As of Date (AOD). When data is submitted only once, this block indicates the number of days the data is to be submitted prior to the end of the reporting period; e.g., "15" would place the AOD for this report at 15 days before the end of each month, quarter, or year depending on the frequency established in Block 10; "0" places the AOD at the end of the month, quarter, or year. Further guidance is shown in Block 13 or 16, as required.

5. Block 12, Date of First Submission. This block indicates the initial data submission date (Year/Month/Day). When data has already been submitted and will be resubmitted, the date of the next submission is entered. When the contract start date has not been established, this block indicates the number of days after the contract start date that the data is due; e.g., 30 DAC. Further information, if required, is contained in Block 13. Classified dates are cited in this form. "DFDEL" indicates deferred delivery.

6. Block 13, Date of Subsequent Submission/Event Identification. When data is submitted more than once, the date(s) of subsequent submission(s) is indicated in this block. When submission of data is based on the initiation of a specific event or milestone, this information is cited in this block (when such information classifies the form, this block is left blank). Example: "NLT 15 days before start of production"; "45 days before first article"; etc.

7. Block 14, Distribution and Addresses. Addresses and number of copies (regular/reproducible) to be forwarded to each addressee that is cited in this block; e.g., DTIC-20/0. Addressees are indicated by office symbol (i.e., SMCAR-XYZ), Contractor initials, DOD Handbook H-4 codes, and Command initials. A list explaining these symbols, etc., is attached to the form. When reproducible copies are required (second number), the type of copies required will be cited in this block or Block 16.

NOTE: Unless otherwise cited in Block 10, entries in Blocks 3 through 9 on DD Form 1664, Data Item Descriptions, are for informational purposes only and are not contractually binding.

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 32

19 August 1996 JBH 96-0119/L

Commander
U.S. Army Tank Automotive and
Armaments Command, ARDEC
ATTN AMSTA-AR-PCW-A/Dave Banashefski/B.10
Picatinny Arsenal, NJ 07806-5000

Dear Mr. Banashefski:

Subject: Contract DAAE-96-C-0013 Liquidation of Line Items 0001AA and 0001AB

Reference: 1) Telecon between David Banashefski and Jeff Hibler dated 14 August 1996
2) Telecon between Steve Talmadge and Jeff Hibler dated 14 August 1996

In confirmation of referenced telecons, full liquidation of CLIN 0001AA on Contract DAAE-96-C-0013 will occur at acceptance of M795 First Article, and full liquidation of CLIN 0001AB on Contract DAAE-96-C-0013 will occur at the time of completion of a provisionally accepted ammunition data card for the first M795 production lot.

Point of contact for this letter is the undersigned at DSN 585-7724.

Sincerely,

MASON & HANGER CORPORATION

Original Signed By

J. B. Hibler
Division Manager,
Administration

JBH/lm

cc: Document Control
J. B. Hibler/D. L. Schleif (1)
K. R. Barker/F. H. Jones (1)
P. A. Schulte
D. W. Reed, Corporate

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 33

**DEPARTMENT OF THE ARMY**
IOWA ARMY AMMUNITION PLANT
17571 STATE HIGHWAY 79
MIDDLETOWN, IOWA 52638-5000

REPLY TO ATTENTION OF:

RECEIVED AUG 26 1996 PCN-A

SIOIA-MAC (5-20b) 20 August 1996

MEMORANDUM FOR Commander, U.S. Army ARDEC, ATTN: Mr. David M. Banashefski, Picatinny Arsenal, NJ 07806-5000

SUBJECT: Contract No. DAAE30-96-C-0013

1. The ACO staff at this installation has been delegated Contract Administration for subject contract. The following is provided for your consideration.

2. Mason & Hanger-Silas Mason Co., Inc. was granted authorization on 21 December 1995 to use the facilities on Contract No. DAAA09-94-E-0005 to LAP the 155MM, M795. Some of the effort involved in preparing the facilities for the LAP of the 155MM, M795 appears to involve construction work that might fall under the Davis-Bacon Act. To preclude possible future labor questions, please advise on the application of the Davis-Bacon Act to the facilities preparation work under the subject contract.

3. We understand that all new facilities (equipment and buildings) acquired by Mason & Hanger under the facilitization phase of the M795 program will not be called out as deliverables under the contract even though they are being direct costed versus being depreciated. The Government does not intend to take title to the facilities even though they are to be direct costed. We believe it is our responsiblity to bring to your attention several potential administrative problems under these conditions.

a. The first issue is a potential Cost Accounting Standards (CAS) violation. Mason & Hanger's Cost Accounting Standards Disclosure Statement establishes that capital assets acquired with a minimum cost of $1500 or more and two year useful life, will be capitalized. These assets are then depreciatd over their useful life and the cost is allocated through the benefitting indirect cost pool. These assets are contractor owned assets.

b. Second, equipment deliverable per the customer's specifications are costed directly to the contract which required the equipment. Normally, the Government takes title to equipment that is direct costed.

c. There is no criteria which permits the direct costing of a building as a direct cost to the contract.

SIOIA-MAC (5-20b)
SUBJECT: Contract No. DAAB30-96-C-0013

d. Even though the contractor owns the equipment, costs of maintenance of equipment is an allocable line overhead cost.

e. Article H-8 of the installation's facilities Contract No. DAAA09-94-E-0005 specifies that any new construction will be recorded in the real property records and is therefore Government property. Ownership of the building by the operating contractor would not be in accordance with the terms of the facilities contract.

4. We consider it essential to discuss and clarify these issues to avoid potential conflicts between the two contracts.

5. Request you coordinate issues regarding subject contract with the PCO for Contract No. DAAA09-94-E-0005, Mr. John Kaddatz, at Industrial Operations Command, AMSIO-ACG-A, Team B, Rock Island, IL 61299-6000, DSN 793-3414.

6. Reply is requested on or before 5 September 1996.

7. The POC is Ms. Roberta Amenell, SMCIO-MAC, DSN 585-7706, e-mail ramenell @ria-emh2.army.mil.

FRED W. TAYLOR, JR.
Administrative Contracting
Officer

CF:
HQ, IOC, AMSIO-ACG-A, Team B, ATTN: Mr. John Kaddatz

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 34

From: ACOJDN --IAAP Date and time 09/05/96 06:48:47
To: ACOJEM --IAAP

From:
Subject: (U)In brief summary-M795 Action:

*** Forwarding note from ACOFWT --IAAP 09/04/96 13:35 ***
To: ACOJEM --IAAP ACOJDN --IAAP

From: fred
Subject: (U)In brief summary-M795 Action:
I talked to Dave Banashefski and Steve Talmage later in the morning.
Per Dave Banashefski:
1.On progress payments he would like to have them processed. He has written a letter on the issue. According to DFAS, DFAS will make payment if the copies are sent in marked Duplicate Original. No disbursements have been made on the accounting classification.

2. GFM. On the equipment from Louisiana AAP the PCO says he wants an equitable adjustment from M&H before they can have it. I have a copy of the equipment list for the M795 contract. The equipment M&H wants is on the list. So the PCO want the contract adjusted or they don't get the equipment.

3. Dave Banashefski said he will try to keep up in the loop on every thing.

4. On our letter brining some issues to his attention.
He said he considered the building incidental to equipment installation.
We talked about the CAS issue and he agreed this is a problem. He may approach M&H and ask them to turn the title on the equipment over to the Government on the facilities contract.

5. He said negotiating the Term and Conditions(standard contract FAR language) with M&H was a long drawn out affair that shouldn't have happened. It left a lot of people at ARDEC wondering about M&H. I told Dave Banashefski in my opinion Marilyn Daniels, Jeff Hibbler, and Doug Reed know just as much about the FAR clauses as any one on the Government side. Evidently M&H questioned the need for many standard clauses in the contract, and couldn't understand why clauses were included.

6. Sam Fry owes Steve Talmage an updated Small Business Plan. Steve asked Sam for some changes to correct some serious defect. Steve is still waiting for the changes which were promised for the visit this week.

7. Option quantity for FY 96.This amounts to 130,000 rounds which the PM took off the table after they had so many problems dealing with M&H. One plan they have is to combine this quantity with the FY 97 buy of 130,000 rounds ( a total of 260,000) and do a market survey and see if any one else is interested. The problem is M&H wanted more money per round for the greater option quantity than they wanted for the basic quantity of 76,000 rounds. Another plan the the PM is looking at is off shore LAP of the M795. There are 20 plus firms around the world that might be interested. Plus there is pressure for off shore procurement from customers who have bought things from us in the past.

8. Jim Pritchard will be here through Thursday. He said he will stop in and talk to us.

Fred

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 35

JAN-20-1998 15:11 PURCHASING, MASON-HANGER 1 319 753 7924 P.02/02

DEPARTMENT OF THE ARMY
UNITED STATES ARMY TANK-AUTOMOTIVE AND ARMAMENTS COMMAND
ARMAMENT RESEARCH, DEVELOPMENT AND ENGINEERING CENTER
PICATINNY ARSENAL, NEW JERSEY 07806-5000

AMSTA-AR-PCW-A October 7, 1996

MEMORANDUM FOR Commander, U.S. Army Iowa Ammunition Plant, ATTN: Mr. Fred W. Taylor, JR, Middletown, IA, 52638-5000

SUBJECT: 155MM, M795 Load, Assemble and Package (LAP) Contract DAAE30-96-C-0013

1. References:

a. Administrative Contracting Officer's letter dated August 20, 1996, identifying several areas of the M795 LAP contract that need further clarification and may have possible administrative problem.

b. Telephone conversation on September 17, 1996, between ARDEC Acquisition Center, Administrative Contracting Office and Mason & Hanger, regarding same above.

2. As a follow-up to reference (a) & (b), in accordance with FAR 22.402 (b)(2)(i) (Davis-Bacon Act), if construction work is incidental to the furnishing of the end-item, the clause is not applicable to the contract. This office has determined that the construction of the equipment room under the M795 LAP contract is incidental to the overall LAP effort, therefore, clause 52.222-6 is not applicable.

3. If you should have any further questions regarding this matter, the point of contact in this office is Mr. Steve Talmadge on (DSN) 880-5663.

David M. Banashefski
Contracting Officer

| RC: DOC CONTROL M & H-SM CO. INC. | FILE: M795 | DATE: 11/19 | |
|---|---|---|---|
| ROUTED TO: | Action | Reply | Coord. | Info. |
| P. MGR. | | | | |
| ADMINISTRATION | | | | ✓ |
| CONTROLLER | | | | ✓ |
| ENGINEERING | | | | ✓ |
| ENV. S & H | | | | |
| MATERIEL | | | | |
| MECHANICAL | | | | |
| OPERATIONS | | | | |
| PROG. MGMT. | | | | ✓ |
| CUSTOMER SERV. | | | | |
| IS&S DEPT. | | | | |
| LEXINGTON | | | | |

RDS/LJShaw
RRB
DAF
PAS
DC (2)

343

TOTAL P.02

AO001916

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 36

From: AUDJRL --IAAP
To: CNDKRB --IAAP
ENMJDC --IAAP
cc: AUDJRL --IAAP

Date and time 02/28/97 11:46:50
PRDPAS --IAAP

From:
From:
Subject: (U) S. Talmadge, ARDEC, Telecon: Schedule Slippage / Cost Impact

Summary of telephone conversations between K. Barker, J. Lohmann and Steve Talmadge, ARDEC at 9:30 am and K. Barker, P. Schulte, J. Cortum, J. Lohmann andS. Talmadge at 1:30pm, 27 Feb. 1997.

9:30 Conversation:

Subject of conversation was D. Banashefski's letter dated 18 February 1997 notifying M&H of schedule slippage on delivery of GFM metal parts, TNT and metal pallets out to 31 May 1997 and slippage of FAT delivery to 15 June 1997. Letter requested M&H respond in writting whether this would result in any production schedule slippage or any cost impact.

Steve was told that del. of mtps. the end of May, should not affect the Production del. sched., but there would be a cost impact. The amount had not been determined yet. Ken brought up at this time that the although the contract calls for final payment of the facilitization portion of the contract upon completion of the first production lot, M&H would consider foregoing the charging of any cost impact back against the contract if ARDEC would consider moving up final payment of the fac. portion of the contract. This request was being made since the facilitization work was nearing completion and we would be able to close up the line after we finished the FAT until we were ready to start production, resulting in reduced line o/h. Steve balked at the logic, saying he wasn't convinced what we were saying was correct. After much discussion, we said we would put together some detail and get back with him.

1:30 pm conversation:

Called Steve back and told him we were prepared to give him the info. he had requested, with the exception of the amount of the cost impact. I told Steve that the earliest we could complete the FAT units, based on the projected schedule slippage, would be 31 July 1997. Also, Production start-up date should not be affected if there is no further slippage, but we would have to have FAT results and the go-ahead to start production no later than 15 September 1997. He said he would take this info. to the Program Mgr. and then get back with us.

Jon C. then discussed how there would be a cost impact resulting from the schedule slippage due to a smaller window to complete the pink water system which was forcing the use of overtime. Steve said this made sense and asked what kind of $$ were we talking about. Jon said the amt. probably would not exceed $25, 000, but a detailed estmate had not been worked up.

After further discussion, it was decided that Steve would present the 31 July FAT date and the 15 Sep. production turn-on date to the Program Manager for his approval and then get back with us. He also stated that if we wanted to move up the final pymnt. date on the facilitization portion of the contract, to address this issue under a separate letter to him. The cost impact issue was not clearly resolved at this time, but I was of the impression that Steve thought we would forego any cost impact resulting from the pink water system si nce we were wanting to move up the facilitization final liquidation payment.

From: AUDJRL --IAAP
To: CNDKRB --IAAP
PRDPAS --IAAP
cc: AUDJRL --IAAP

Date and time 02/28/97 12:12:11
ENMJDC --IAAP

From: J. Lohmann
From:
Subject: (U) 155MM, M795 FAT Scedule Slippage

Steve Talmadge called this morning. He had discussed the 31 July FAT date and the 15 Sep. 1997 production turn-on date with J. Pritchard and B. Vogt and they had no problem with those dates. He asked that I send him a letter formalizing this info. in response to his letter, stating there would not be any cost impact.

He also discussed the early liquidation of the facilitization cost on this contract with Mr. Pritchard and Mr. Vogt. He said they didn't have a problem with this, also, but he still wanted this issue addressed in a separate letter to him.

He said he would handle both issue on one Mod.; the new dates and the changing of final liquidation payment. He said he would use words like "final facility payment would be made upon final in-plant inspection and approval of the FAT quantities".

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 37

Faxed 3/3

| | INITIALS | X | SIGN OFF | DATE | COPY OF LETTER? | COPY OF ATTACH? | | INITIALS | X | SIGN OFF | DATE | COPY OF LETTER? | COPY OF ATTACH? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (RC) (2) DC/CA | JRL | x | R | 3/3/97 | ✓ | | ENG | | | | | | |
| | | | R for | | | | OPER | | | | | | |
| PM: | PAS | x | PAS | 3/3/97 | ✓ | | | | | | | | |
| | | | | | | | CONT'R | KRB | | | | ✓ | |
| | | | | | | | ENVIRO | | | | | | |
| PLANT MGR | | | | | | | | | | | | | |

JRL 97-0535

3 March 1997

Department of the Army
U.S. Army ARDEC
Picatinny Arsenal, NJ 07806-5000

Attn: AMSTA-AR-PCW-A, Bldg. No. 10
Mr. Steve Talmadge

Dear Sir:

Subcontract: ARDEC LAP M795 HE Projectile; Contract No. DAAE30-96-C-0013

Subject: Projectile 155MM HE, M795, Slippage of FAT Delivery

Reference:
1) Telephone Conversation on 28 February 1997 Between Steve Talmadge (ARDEC) and John Lohmann (Mason and Hanger Corporation)
2) Telephone Conversation on 27 February 1997 Between Steve Talmadge (ARDEC) Ken Barker, Pete Schulte, Jon Cortum and John Lohmann (Mason and Hanger Corporation)

As discussed during reference telephone conversations, Mason & Hanger Corporation (M&H) would like to request final payment of the Facilitization cost be included under Sub CLIN 0001AA, First Article Test quantities, instead of Sub CLIN 0001AB, which is for delivery of the first production lot of 1,000 units. M&H is requesting this consideration since Facilitization has been accelerated and is expected to be completed by the time the FAT units are complete which should be in July 1997. Production is not scheduled to begin until November which places M&H in the unfavorable position of having incurred Facilitization costs four (4) to five (5) months prior to full reimbursement for these costs. Approximately $2.3 million of cost is at stake which has a major impact on M&H's cash flow position.

Please direct questions to Mr. Pete Schulte at (319) 753-7120 or the undersigned at (319) 753-7044.

Sincerely,

MASON & HANGER CORPORATION

**Original Signed by**

J. R. Lohmann, Jr.
Contract Administrator

JRL/cap

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 38

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE | PAGE 1 OF PAGES 4

2. AMENDMENT/MODIFICATION NO. P00003

3. EFFECTIVE DATE

4. REQUISITION/PURCHASE REQ. NO.

5. PROJECT NO. *(If applicable)*

6. ISSUED BY CODE W15QKN

Department of Army
U.S. Army TACOM-ARDEC
Picatinny Arsenal N.J. 07806-5000

S. Talmadge

7. ADMINISTERED BY (If other than Item 6) CODE W52P1J

Finance & Accntg Office
Attn: SMCARI-RMF-PV
Rock Island, IL 61299-5000

97 MAR 17 ... 57

M & H - ...

8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and ZIP Code)*

Mason & Hanger
Silas Mason Co., Inc.
17575 State Highway 79
Middletown, IA 52638

CODE 14912 | FACILITY CODE

(X) 9A. AMENDMENT OF SOLICITATION NO.

9B. DATED *(SEE ITEM 11)*

10A. MODIFICATION OF CONTRACT/ORDER NO.

10B. DATED *(SEE ITEM 13)*

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and ☐ is ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, ________ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. Accounting and Appropriation Data *(If required)*

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES *(such as changes in paying office, appropriation date, etc.)* SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b).

X C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:

D. OTHER *(Specify type of modification and authority)*

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return 2 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

See Continuation page(s).

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print)
Ronald D. Steele
Contract Administratin Manager

16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)
David M. Banashefski

15B. CONTRACTOR/OFFEROR [signature] *(Signature of person authorized to sign)*

15C. DATE SIGNED 13 MAR 97

16B. UNITED STATES OF AMERICA BY [signature] *(Signature of Contracting Officer)*

16C. DATE SIGNED 13 MAR 97

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE

30-105

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243



AO002544

CONTINUATION SHEET DAAE30-96-C-0013 PAGE OF

P00003

The subject contract is hereby modified as follows:

1. The following delineates the changes to the contract Line ITEMS/CLINS and incorporates the revised delivery schedule for M795 LAP First Article Test/PQT lots quantities. See attached delivery schedule.

| CLIN | ACRN | Item | Date | Quantity | Amount |
|---|---|---|---|---|---|
| 0001AA- | AA | FAT | 31 MAR 1997 | 1 lot | $ 643,264 |
| 0001AA+ | AA | FAT | 31 JUL 1997 | 1 lot | $9,953,335 |
| PRON# IW5AE0201ANG | | | | | |
| 0001AB- | AA | M795 LAP | 28 NOV 1997 | 1,000 | $9,483,991 |
| 0001AB+ | AA | M795 LAP | 28 NOV 1997 | 1,000 | $ 173,920 |
| PRON# IW5AE0201ANG | | | | | |

2. As a result of this modification, delivery of the Nov 28, 1997 Production lot (1,000 ea) is predicated on the approved FAT as delineated under the contract clauses. In addition, written approval to proceed with production must be issued by the Contracting Officer not later than September 15, 1997.

3. Under contract clause H.3, change the delivery date of the Government Furnished Material for Metal Parts, TNT and Metal pallets from Jan 97 to 31 May 1997. All other GFM dates and quantities remain unchanged.

4. On contract page 12, Paragraph B.1, change the final payment of Facilitization costs under Subclin 0001AB to reflect Subclin 0001AA. It should be understood that the Final Facilitization Payment under Subclin 0001AA will be at time of Final Inplant Inspection of the FAT quantities. See attached continuation sheet SF36.

5. It should be understood that there is no change to the contract amount.

6. In consideration of this modification as equitable adjustment for the above mentioned changes, the Contractor hereby releases the Government from any and all liability under this contract relating to this modification, including claims for future equitable adjustments attributable to such facts or circumstances giving rise to the aforesaid changes.

7. All other terms and conditions of this contract remain unchanged.

CONTINUATION SHEET DAAE30-96-C-0013 PAGE OF

P00003

**F.2 52.212-1 Time of Delivery. (JUL 1995)**

(a) The Government requires delivery of the FAT/PQT lot and 77,968 ea Production quantities in accordance with the following schedule:

| Delivery Item | Delivery Date | Quantity | Destination |
|---|---|---|---|
| FAT | 31 JUL 1997 | 24 ea | Yuma |
| PQT/Firing Table Test | 31 JUL 1997 | 1,476 ea | Yuma |
| LAP M795 | 28 NOV 1997 | 1,000 ea* | TBD |
| LAP M795 | 31 DEC 1997 | 2,000 ea* | TBD |
| LAP M795 | 31 JAN 1998 | 8,640 ea* | TBD |
| LAP M795 | 28 FEB 1998 | 8,640 ea* | TBD |
| LAP M795 | 31 MAR 1998 | 9,720 ea* | TBD |
| LAP M795 | 30 APR 1998 | 9,720 ea* | TBD |
| LAP M795 | 29 MAY 1998 | 8,100 ea* | TBD |
| LAP M795 | 30 JUN 1998 | 9,720 ea* | TBD |
| LAP M795 | 31 JUL 1998 | 9,720 ea* | TBD |
| LAP M795 | 31 AUG 1998 | 9,180 ea* | TBD |
| LAP M795 | 30 SEP 1998 | 1,528 ea* | TBD |

TBD= To be Determined

*=Note: For each monthly LAP quantity identified above, a total of 24 ea projectiles per month shall be marked for the Yuma Proving Ground for Ballistic Testing.

| STANDARD FORM 36, JULY 1966<br>GENERAL SERVICES ADMINISTRATION<br>FED. PROC. REG. (41 CFR) 1-16.101 | CONTINUATION SHEET | REF. NO. OF DOC. BEING CONT'D.<br>DAAE30-96-C-0013 | PAGE 12 OF 81 |
|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR
Mason & Hanger-Silas Mason Co., Inc.

| ITEM NO. | SUPPLIES / SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| B.1 | | | | | |
| CLIN 0001 | | | | | |
| 0001AA | First Article Test in accordance with the Statement of Work under Section C. (Includes PQT quantities). Consisting of 1,500 ea. | 1 | LOT | . | $9,953,335* |
| 0001AB | Load, Assemble, and Package M795 Projectiles in accordance with TDP and Statement of Work Section C. | 1,000 | ea | $173.92 | $173,920 |
| 0001AC | Load, Assemble, and Package M795 Projectiles | 76,968 | ea | $173.92 | $13,386,275 |
| | *= This subclin includes the cost for 1,500 ea PAT/PQT M795 Projectiles ($643,264) as well as $9,310,071 in costs associated with special tooling, equipment, and facilitization efforts required by the contractor to perform the M795 LAP contract. | | | | |
| 0002 | Data in accorance with CDRL, DD1423, Exhibit A, of Section J of the contract. | 1 | lot | NSP | NSP |
| | NSP= Not Separately Priced. | | | | |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 39

DEPARTMENT OF THE ARMY
UNITED STATES ARMY TANK - AUTOMOTIVE AND ARMAMENTS COMMAND
ARMAMENT RESEARCH, DEVELOPMENT AND ENGINEERING CENTER
PICATINNY ARSENAL, NEW JERSEY 07806-5000

October 21, 1997

Precision Munitions
& Demolition Group (A)

SUBJECT: Contract DAAA21-96-C-0013; First Article Test

Mason & Hanger-Silas Mason Co., Inc.
Attn: Mr. John Lohmann, Jr.
17575 State Highway 79
Middletown, Iowa 53638

Dear Mr. Lohmann:

Reference is made to your letter dated September 17, 1997, regarding liquidation of special tooling and equipment cost.

This office has been informed by the ARDEC technical community that M&H has successfully completed the necessary special tooling, equipment and facilitization efforts under CLIN 0001AA of the contract.

As a result of the above, M&H should officially submit an invoice to the ACO's office (Mr. Jim Nelson) for approval.

In addition, the First Article Sample/Evaluation submitted under subject contract is hereby approved. You are hereby authorized to proceed with the production of M795 projectiles.

If you should have any further questions regarding the above, contact the undersigned on (973) 724-5663.

Sincerely,

Steven M. Talmadge
Contracting Officer

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 40

DN:32144839.1

since 1827
MASON & HANGER CORPORATION
IOWA ARMY AMMUNITION PLANT

Sold To: Defense Finance & Accounting Service
Rock Island Operating Location
ATTN: DFAS-RI-FPV, Building 68
Rock Island, IL 61299-8301

Invoice No. 97-0493

Invoice Date 10/24/97
Terms Net 30
Remit By 11/23/97

Order No. DAAE30-96-C-0013

| Item | Quantity | Description | Unit Price | Total |
|---|---|---|---|---|
| 0001AA | | First Article Test | | $9,310,071.00 |
| | | Less: Amounts Previously Invoiced on Progress Payments | | ($5,641,391.00) |
| | 24 | First Article Sample of 24 units | $428.84 | $10,292.22 |

If questions please contact Angi Campbell (319)753-7216

GRAND TOTAL $3,678,972.22

Certified For Payment In the Amount of: $ 3,678,972.22

James D. Nelson
Administrative Contracting Officer
Iowa Army Ammunition Plant
Middletown, IA 52638-5000
DSN 585-7041, Commercial 319 753-7041

Please Make Wire Fund Transfer To:

Firstar Bank
Burlington, Iowa 52601
Account #621021744

OR

Please Make Check Payable To:

Mason & Hanger-Silas Mason Co., Inc.

17575 State Highway 79 • Middletown, Iowa 52638-9701 • 1-800-488-9719 • Fax 319-753-7774 • info@teamiowa.com

# MATERIAL IN ECTION AND RECEIVING REPOR

Form Approved
OMB No. 0704-0248

Public reporting burden for this collection of information is estimated to average 35 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0248), Washington, DC 20503.

PLEASE DO NOT RETURN YOUR COMPLETED FORM TO EITHER OF THESE ADDRESSES.

1. PROC. INSTRUMENT IDEN. CONTRACT: DAAE30-96-C-0013
(ORDER) NO.:
6. INVOICE NO./DATE: 97-0493 /
7. PAGE: 1 OF 1
8. ACCEPTANCE POINT: ORIGIN

2. SHIPMENT NO.: IAAAP 001
3. DATE SHIPPED: 10/21/97
4. B/L
TCN
5. DISCOUNT TERMS: NET 30 DAYS

9. PRIME CONTRACTOR CODE 14913
MASON & HANGER CORPORATION
LEXINGTON, KENTUCKY 40504-3363

10. ADMINISTERED BY CODE W52P1J
IOC
ROCK ISLAND, ILLINOIS

11. SHIPPED FROM (IF OTHER THAN 9) CODE 4A924 FOB:
MASON & HANGER CORPORATION
17575 STATE HWY 79
MIDDLETOWN, IOWA 52638

12. PAYMENT WILL BE MADE BY CODE W52H1C
DEFENSE FINANCE & ACCOUNTING SERVICE
R I OPERATING LOCATION
ATTN: DFAS-RI-FPV BLDG 68
ROCK ISLAND, ILLINOIS 61299-8301

13. SHIPPED TO CODE 4A924
MASON & HANGER CORPORATION
17575 STATE HWY 79
MIDDLETOWN, IOWA 52638

14. MARKED FOR CODE

| 15. ITEM NO. | 16. STOCK/PART NO. DESCRIPTION (Indicate number of shipping containers - type of container - container number.) | 17. QUANTITY SHIP/REC'D* | 18. UNIT | 19. UNIT PRICE | 20. AMOUNT |
|---|---|---|---|---|---|
| 0001AA | Special Tooling, Equipment, and Facilitization | | | | $9,310,071.00 |
| .001AA | First Article Sample of 24 units | 24 | ea | $428.84 | $10,292.22 |

21. CONTRACT QUALITY ASSURANCE

A. ORIGIN
☐ CQA ☐ ACCEPTANCE of listed items has been made by me or under my supervision and they conform to contract, except as noted herein or on supporting documents.
DATE — SIGNATURE OF AUTH GOVT REP
TYPED NAME AND OFFICE

B. DESTINATION
☒ CQA ☒ ACCEPTANCE of listed items has been made by me or under my supervision and they conform to contract, except as noted herein or on supporting documents.
DATE: 97 Oct 22 — SIGNATURE OF AUTH GOVT REP: William Voigt
TYPED NAME AND TITLE: SFAE-GCSS-SD
Product Manager, M795

22. RECEIVER'S USE
Quantities shown in column 17 were received in apparent good condition except as noted.
DATE RECEIVED — SIGNATURE OF AUTH GOVT REP
TYPED NAME AND OFFICE

*If quantity received by the Government is the same as quantity shipped, indicate by (X) mark, if different, enter actual quantity received below quantity shipped and encircle.

23. CONTRACTOR USE ONLY

DD Form 250, DEC 91 — Previous editions are obsolete. — *U.S. Government Printing Office: 1992 - 311-830/60242

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

AMERICAN ORDNANCE LLC,
Plaintiff,
vs.
UNITED STATES,
Defendant.

Case No. 07-867C
Judge Wheeler

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 41

SARD-PC (AMSIO-AC/21 Jan 98) 1st End W.A.Kley/DSN 761-1035
SUBJECT: Justification and Approval (J&A) for the Facility Use and Management of Iowa and Milan Army Ammunition Plants, FY 99-03, Control #980028 - REVISED

Office of the Assistant Secretary of the Army, Research, Development and Acquisition, 103 Army Pentagon, Washington, DC 20310-0103 2 MAR 1998

FOR Commander, U.S. Army Industrial Operations Command, ATTN: AMSIO-AC, Rock Island, Illinois 61299-6000

I have approved the enclosed Justification and Approval (J&A), and I am returning it for implementation up to the point of award. Prior to the award of any contracts for the Facility Use and Management of the Iowa and Milan Army Ammunition Plants, specific approval to make those awards must be obtained from this office. The request for approval to award should be accompanied by information sufficient to permit a thorough evaluation of the negotiated agreements to be included in the contracts.

I'm aware of the trend to phase out "workloaded" items and the competitive advantage emanating from sole source use of these plants. Benefits derived from the negotiated agreement should be substantive and have a high probability of being realized. American Ordnance should identify their management and capital investment plan. This plan should reflect an acceptable reduction in service contract costs and revised capital investments that would be substituted for the current investments which were based on separate management of the plants.

Kenneth J. Oscar
Acting Assistant Secretary of the Army
(Research, Development and Acquisition)

Enclosure

CONTROL NUMBER: 980028
PROGRAM: Facility Use and Management of Iowa and Milan AAPs
EST. DOLLAR VALUE: $400,000,000

# JUSTIFICATION REVIEW DOCUMENT FOR OTHER THAN FULL AND OPEN COMPETITION

Program: Facility Use and Management of Iowa and Milan Army Ammunition Plants (AAPs)

Authority:

Prepared by: Trudy A. Hallgren
Procurement Analyst

Procuring Contracting Officer: Mark E. Haldeman

Technical Representative: Richard Janik
Deputy Chief of Staff for Industrial Readiness

Requirements Representative: Roger A. Biehl
Acting Chief, Ammo Production and Logistics Division

REVIEWS: I have reviewed this justification and find it adequate to support other than full and open competition.

Legal Counsel: Anthony B. Sconyers, Chief Counsel — Signature: [signature]

Principal Assistant Responsible for Contracting: William E. Turnis — Signature: [signature] 2-13-98

Competition Advocate: Craig J. Colledge — Signature: [signature] 2-13-98

Head of the Contracting Activity: James W. Monroe, Major General, USA, Commanding — Signature: [signature]

CONTROL NUMBER: 980028
PROGRAM: Facility Use and Management of Iowa and Milan AAPs
EST. DOLLAR VALUE: $400,000,000

# JUSTIFICATION REVIEW DOCUMENT FOR OTHER THAN FULL AND OPEN COMPETITION

Program: Facility Use and Management of Iowa and Milan Army Ammunition Plants (AAPs)

Authority:

Prepared by: Trudy A. Hallgren
Procurement Analyst

Procuring Contracting Officer: Mark E. Haldeman

Technical Representative: Richard Janik
Deputy Chief of Staff for Industrial Readiness

Requirements Representative: Roger A. Biehl
Acting Chief, Ammo Production and Logistics Division

REVIEWS: I have reviewed this justification and find it adequate to support other than full and open competition.

Legal Counsel: Anthony B. Sconyers, Chief Counsel — Signature: //signed//

Principal Assistant Responsible for Contracting: William E. Turnis — Signature: //signed// 2-13-98

Competition Advocate: Craig J. Colledge — Signature: //signed// 2-13-98

Head of the Contracting Activity: James W. Monroe, Major General, USA, Commanding — Signature: //signed//

CONTROL NUMBER: 980028
PROGRAM: Facility Use and Management of Iowa and Milan AAPs
EST. DOLLAR VALUE: $400,000,000

FY 1999-2003
CLASS JUSTIFICATION AND APPROVAL
FOR OTHER THAN FULL AND OPEN COMPETITION
JUSTIFICATION

1. Contracting Activity:

U.S. Army Industrial Operations Command, Rock Island, IL 61299-6000.

2. Description of Action:

a. This command seeks the authority to restrict the (1) Operation, Facility Use and Management of Iowa and Milan Army Ammunition Plants (AAPs) (to include specialized services to be acquired by the Army at these facilities) and (2) select ammunition supply requirements to be acquired by the Army for FY 1999-2003, including that remaining under FY 98 beginning 1 July 1998, to American Ordnance LLC. The command plans to exercise that authority by issuing sole source contracts to American Ordnance for services and potentially ammunition supply requirements. Using appropriate make or buy procedures, the IOC will determine within the scope of that authority which ammunition supply requirements will be direct workloaded (make) and which ammunition supply requirements will be obtained through competitive procurements (buy). Ammunition supply items include, but are not limited to, those ammunition supply items which have been direct workloaded to the facilities in the past. NOTE: In January 1998, Mason & Hanger Corporation (M&H), the current Facility Use Contractor at Iowa AAP, and General Dynamics Ordnance Systems (GDOS), the current Operating Contractor at Milan AAP, formed a jointly owned company, American Ordnance, for the express purpose of having American Ordnance assume all M&H operations at Iowa AAP and all GDOS operations at Milan AAP. The novation of existing contracts is in process; the goal is to have all existing contracts novated by 31 May 1998.

b. The type of funds to be used are CAWCF, PA, OMA, & RDT&E.

c. American Ordnance will be awarded a Five-Year Facility Use Contract (DAAA09-98-E-0003) covering the Facility Use and Management of both Iowa and Milan AAPs. It is anticipated the no cost, five-year Facility Use Contract will be awarded on 1 July 1998. In addition, FY 99-03 requirements for specialized services and ammunition supply requirements, including any remaining FY 98 requirements after 1 July 1998, will be placed on companion delivery orders against Basic Ordering Agreements (DAAA09-98-G-0011/supplies and DAAA09-98-G-0012/services). NOTE: This J&A authority will

also be used to place carryover and prior year requirements for the plants with American Ordnance. These carryover and prior year requirements are requirements which had been expected to be placed on contract in prior fiscal years but, due to late receipt or instability of the prior year program, execution has been delayed necessitating inclusion under the authority of this Class J&A.

d. Generally, firm fixed price actions will result. In some instances, cost plus fixed fee price actions may be used, as appropriate.

e. As this is a class document, a statement of applicability will be processed for each funding action executed under this authority.

f. An Acquisition Plan which includes these requirements is in process for approval by the Principal Assistant Responsible for Contracting.

3. Description of Supplies/Services:

a. Ammunition Supply Requirements. The Operation, Facility Use and Management of the Iowa and Milan sites includes, but is not limited to the load, assemble, and pack (LAP) of ammunition end items and components (metal parts and propellants and explosives) critical to the military defense for training and combat mission replenishment purposes. Supporting efforts include services for safety; fire protection; security; utilities; grounds maintenance; property management; compliance with environmental programs (both Federal and state mandated); care, maintenance, and surveillance of ammunition stock; and specialized testing.

b. Services to be performed by the contractor which may be direct funded include, but are not limited to: ACO/COR support; COR ADP support; maintenance of inactive industrial facilities (MIIF), or laid away portions of the facilities retained for replenishment purposes; ~~layaway projects~~; the execution of special programs for forestry, agriculture, fish, and wildlife programs; commercial reuse efforts; environmental restoration projects; installation restoration projects; historical preservation efforts; energy conservation; maintenance of military family housing; supply depot operations; demilitarization of ammunition requirements; modernization and production support & equipment replacement of industrial facilities (IF) projects; omnibus engineering projects; disposal of industrial stock; etc.

c. The total estimated dollar value is $401,717,465 (rounded to $400,000,000). The ammunition supply requirements (ammunition items to be loaded, assembled, and packed at the two sites) which may be directly workloaded within the terms of this J&A are estimated at $237,487,000. These ammunition supply requirements will be evaluated by the IOC Make or Buy Committee for subsequent competition or workloading. (As a funded program is received, adjustments in quantity or dollars may

CONTROL NUMBER: 980028
PROGRAM: Facility Use and Management of Iowa and Milan AAPs
EST. DOLLAR VALUE: $400,000,000

result; however, the authority of this J&A will be used unless significant changes occur which affect the basis of this justification.) The dollar values for the ammunition supply requirements were either directly excerpted or derived from the FY 99 Budget Estimate Submission, developed by the Technical and Program Managers from Statements of Requirements and Budget Submissions from all Services for inclusion in the Eight-Year Integrated Conventional Ammunition Procurement Plan (ICAPP).

d. The direct funded service requirements, estimated at $164,230,465, are based on the FY 99 Budget Estimate Submission, or have been estimated based on FY 98 requirements for these services. A summary of requirements, by fiscal year, follows:

| $(m) | FY 99 | FY 00 | FY 01 | FY 02 | FY 03 | TOTAL |
|---|---|---|---|---|---|---|
| Supplies | 65.259 | 22.857 | 39.489 | 51.727 | 57.885 | 237.487 |
| Services | 29.218 | 37.943 | 38.347 | 25.809 | 32.915 | 164.230 |
| Total | 94.747 | 60.800 | 77.836 | 77.536 | 90.800 | 401.717 |

4. Authority Cited:

10 U.S.C. 2304(c)(1), Only one responsible source and no other supplies or services will satisfy agency requirements, as authorized by FAR 6.302-1.

5. Basis for Use of the Authority Cited:

a. This acquisition meets the criteria of FAR 6.302-1(a)(2)(iii)(A) and (B) in that the services are deemed to be available only from the original source in the case of follow-on contracts for the continued provision of highly specialized services, it is likely that award to any other source would result in substantial duplication of cost to the Government that is not expected to be recovered through competition, and unacceptable delays in fulfilling the agency's requirements.

b. M&H and GDOS have negotiated the formation and implementation of a jointly owned company, American Ordnance, to assume the operation of the two respective parent companies at Iowa and Milan AAPs. American Ordnance, as a result of the joint venture between GDOS and M&H, will operate the Iowa and Milan sites providing highly specialized services and has unique knowledge and capabilities relative to the operation and management of Iowa and Milan AAPs and the production and/or LAP of the medium and large caliber families identified at Appendix A.

CONTROL NUMBER: 980 )28
PROGRAM: Facility Use and Managem nt of Iowa and Milan . APs
EST. DOLLAR VALUE: $400,000,( )0

c. To ensure the availability and capability to produce critical ammunition items, the Gover ment has made a substantial investment in the facilities and equipment at the Iowa and Milan AAPs, ne replacement value of which is estimated to exceed $189 million. Additionally, current contract r investment in equipment at the two sites has an estimated replacement value of $19.5 million. oth plants benefit from the existence of this contractor-owned equipment. All production lines are quipped with specialized electronic equipment (controllers, computers, etc.) for both melt/pour and pre: ied explosive loading. The production lines have numerous presses that range from one half ton to 800 ton capacity. The equipment is in good operating condition, and the contractor's flexibility and exp insion capabilities have permitted adaptability to new items as they have evolved. The contractor has ised corporate management as well as on-site technical resources to effect modernization of lines as well as construction/rehabilitation of existing lines to assure optimum industrial readiness.

d. American Ordnance has acquired the management expertise and the highly specialized sk lls vital to the operation of Army ammunition plants and the production of ammunition items contained with the medium and large caliber families of conventional ammunition identified at Appendix A. These items are required to meet defense ammunition requirements for training and readiness. The medium and large caliber ammunition production facilities at Iowa and Milan AAPs are an integral part of tl e United States ammunition industrial base and have been designated as Group Technology Centers for ne load, assembly, and pack (LAP) of missile warheads (except select Navy missile warheads), 120mm 'ank Ammunition, 105mm and 155mm Artillery (HE and RAP), 40mm, Demo Charges (TNT, H6), i0mm and 81mm Mortars, the M74 Grenade for the ATACMS, and various Fuzes. In the past, prodi ction of these items has been by workload or acquired by the contractor directly (competitive contracts, subcontracts, third party efforts, etc.). For several families of medium and large caliber ammur tion, the facilities at Iowa and Milan represent the sole existing production capacity.

e. The most highly specialized services to be performed by the contractor are melt/pour an press explosive fill capabilities, two technologies required for the LAP items of conventional ammun ion for the families of items listed at Appendix A. In addition to the production of ammunition items, he contractor on-site has developed other specialized skills in renovation and reclamation process s, to include explosive washout and conversion of HE to TP, and is expanding their explosive fill ca ability to include injection molding technology. In addition, the contractor possesses concurrent engir eering expertise providing for design, development, prototype development, test, and transition to pr duction capabilities.

f. In addition, contractor personnel have performed research and development work on in ensitive explosive pressing of more than 50 different warheads from one to eleven inches in diameter. The contractor will have on-site engineering and technical staffs working in metrology, chemistry, nateriel, and physical properties laboratories, and maintains the capability to perform precision pressing precision casting, x-ray (industry's largest nondestructive test facility), flexible manufacturing, est fire,

munitions functional and static testing, production process testing, ammunition destruction (underground detonation), incineration/flashing, packaging, storage, and surveillance. No other contractor currently possesses the specialized skills and expertise developed by this contractor for the production of all the items contained within the medium and large caliber families of ammunition.

g. Presently, teaming efforts are occurring between the two sites to remedy production problems. For example, critical engineering efforts are underway by engineering and production personnel at both sites on the mortar rounds in an attempt to solve base separation problems and voids in the melt/pour process of the mortars. No other contractors have successfully manufactured these mortars; rather, only these highly skilled contractor personnel will have the capability to remedy the current production problems and deliver these items within the timeframe needed by the field/customer.

h. The asset posture for many other rounds of ammunition reflect items in extremely short supply. For example, the 40mm M918 TP, M430 HEDP, and M383 have all been identified as Committee for Ammunition Logistics Support (CALS) managed items, meaning they are in extremely short supply and are being closely monitored, are allocated items, and training is currently being restricted. Any delay in delivery of these items would severely impact training and readiness.

i. Based on the preceding facts and the highly specialized services to be provided by American Ordnance, the contractor's knowledge of the unique processes and specialized skills, as well as corporate resources, no other contractor has the capability to deliver all the ammunition items contained with the medium and large caliber ammunition families identified at Appendix A.

j. Nor could any other contractor deliver these requirements within the time frames required, that is, delays would be incurred which would severely impact training and readiness, and would jeopardize the soldier in the field. Both sites are required for national defense readiness purposes. American Ordnance will have the skilled management and personnel needed to respond in the event of a national emergency. The contractor will retain the critical skills and specialized knowledge within the organization to reactivate laidaway lines in the required time frame for contingency or emergency situations, and, has access to the corporate resources needed to respond in the event of a national emergency. Should reactivation of laidaway lines be required, such vital expertise, specialized skills, and knowledge could not be duplicated in the time frame required without this contractor and their corporate resources. Past and current involvement by the contractors at the Iowa and Milan sites demonstrates and ensures that they can meet the demands of a reactivation.

CONTROL NUMBER: 980028
PROGRAM: Facility Use and Management of Iowa and Milan AAPs
EST. DOLLAR VALUE: $400,000,000

(2) Developing a new source at this time through a competition would lengthen lead times significantly. It is estimated that if the operation, facility use and management of Iowa and Milan AAPs and all the ammunition supply requirements were presently competed, ammunition deliveries to the field could be delayed by approximately two years. This two year delay is attributable to both the procurement lead time associated with a competition and the production lead time required by a new producer, due to: (1) loss of experienced personnel including upper management during the competition period and during transition; (2) lead time to replace contractor-owned equipment or install Government-furnished equipment as replacement; (3) production lead time required by a new producer, and (d) recertification and qualification of systems and process of the new producer. Further, there is no assurance this expertise could be effectively and successfully transferred to another contractor. This delay would impact the Service's training and war reserve levels. This risk of delay is unacceptable to our Service customers.

(3) Such a change at the present time would also directly impact production for other Government agencies, commercial customers (both foreign and domestic), such as the Armament Research and Development Engineering Center and Pine Bluff Arsenal, as a result of the contractor directly competing and acquiring other contracts, subcontracts, or 3rd party work. For example, the 120mm Tank Ammunition program is currently performed at the Iowa site on a 3rd party basis. It is critical to the Project Manager for Tank Ammunition, the Army, and the Marine Corps that a stable, capable, and proven contractor operate the AAP so no impact to performance or deliveries of 120mm Tank Ammo is realized. A listing of current production at these sites is at Appendix B. Again, much of this work is obtained directly by the contractor. In fact, 70% of the work currently performed at the Iowa site is work the contractor has acquired directly. Further, the contractor has been authorized use of the facilities into the future as far as CY 01 based on current contract schedules.

k. Given these facts, this sole source effort is necessary to maintain existing production schedules and deliveries to the field. However, this five year effort will allow the IOC to analyze and assess future requirements for services, production requirements, replenishment requirements, commercial reuse efforts, etc., through FY 01 to determine appropriate competitive opportunities for the future. Bottom line, this sole source effort sets the stage for competition in five years.

6. Efforts to Obtain Competition:

a. The circumstances described in this J&A do not support competing the operation, facility use and management of these active Army ammunition plants. However, the Facility Use Contract will include a requirement for the contractor to develop and abide by a Government-approved Small Business and Small Disadvantaged Business Subcontracting Plan for any subcontracted efforts. This plan is reviewed by both the Industrial Operations Command Small Business Office and the Small Business Administration Liaison Office, who make recommendations for change and/or approval to the Contracting Officer.

CONTROL NUMBER: 980028
PROGRAM: Facility Use and Management of Iowa and Milan AAPs
EST. DOLLAR VALUE: $400,000,000

b. Upon execution of this J&A, any requirements placed under the authority of this J&A will be synopsized in the Commerce Business Daily for subcontracting purposes. All other funding actions in excess of $25,000 will also be synopsized in the Commerce Business Daily for subcontracting opportunities.

7. Actions to Increase Competition:

a. An Economic Analysis was conducted by the IOC to assess the impact of plant competition with respect to cost and readiness, as explained in paragraph 5. It was determined that the continued sole source arrangement with the contractor for the operation, facility use and management of these sites will garner greater savings to the Government with less risk than a competition would. Further, no other contractor currently possesses the critical skills and expertise required to manufacture all the families of ammunition supply requirements currently being manufactured at these sites. To ensure the contractor maximizes competition on subcontracted efforts, the procurement systems at Iowa and Milan AAPs will be reviewed periodically. Competition at the subcontracting level is and will be continually encouraged by the Government. Therefore, no competitive awards for the operation, facility use and management of Iowa and Milan AAPs will take place before FY 03. However, the IOC will continue assessing the operation, facility use and management through FY 01, considering such factors as production quality, delivery, new Defense Planning Guidance, replenishment requirements, out year training requirements, stockpile levels, commercial reuse initiative, adequacy of technical data, etc. for potential competition opportunities in the future, as previously described in paragraph 5k, for future competition. This period will put the IOC in a position to effect a smooth transition to a new contractor if possible, without interruption or impact to other major programs (like 120mm Tank Ammo, 120mm Mortar, etc.) being produced at these sites.

b. Additionally, it is anticipated that some ammunition items will be competed rather than workloaded based on the decisions of the IOC Make or Buy Committee. The Competition Advocate is a member of this committe and consistently champions the competition of production requirements.

8. Market Research:

Market research performed by the IOC has revealed there is some interest in the facility use and management of Army ammunition plants. However, no market research was performed specifically on the operation, facility use and management of the Iowa and Milan sites since current production and readiness demands, as well as the results of the economic analysis, do not support competition. This procurement will be synopsized in order to maximize subcontractor competition.

CONTROL NUMBER: 980028
PROGRAM: Facility Use and Management of Iowa and Milan AAPs
EST. DOLLAR VALUE: $400,000,000

9. Interested Sources: To date, no other firms have expressed written interest in the operation, facility use and management of either Iowa or Milan AAPs.

10. Other Factors:

a. An economic analysis was performed at the IOC which compared the options available to the Government, i.e., continued sole source versus competition of the plants individually or competition of the plants together. The following major assumptions were made: (1) award in FY 99; (2) an annual 20% savings on LAP prices for four consecutive years (FY 00-03); and, (3) a gradual increase in savings for the sole source option (i.e., 2%, 8%, 16%, 20%, 20%) for the five year period (FY 99-03). Given the cost of competition, it was determined that net savings from all three options would be about the same *if* the incumbant contractor won the competition. However, the net savings from either competitive options would be substantially less than the sole source option if the incumbent was displaced. Most importantly, net savings will be guaranteed by American Ordnance; with competition there is a much greater risk of obtaining savings.

b. This J&A authorizes the award of a no-cost Five-Year Facility Use Contract and two accompanying Basic Ordering Agreements for supplies and services to American Ordnance. Under the authorization requested, the Government is still permitted to determine, as it does today, whether an item will be placed on contract as a direct workload item, or whether it will be acquired through a competitive procurement. The contractor has extended reduced prices for direct workloaded items into the out years, but the Government could determine at any time to obtain that item through competition.

c. Further, make or buy determinations at the plant level are pursued by the contractor with the intent of reducing costs and are reviewed by the Government staff. Requirements which can be competitively subcontracted for a cost savings are being accomplished. Examples from the Milan site include:

(1) Fire & Ambulance Department - Three year cost savings projection range is $200,000 to $300,000.

(2) Janitorial Services - First year savings for contracting out this level of effort was $90,376.

(3) Grounds Maintenance - Grass mowing, first year savings $56,715.

(4) After a make-or-buy analysis was performed for the Guard Department, the decision was made to keep security services in-house at a negotiated three-year reduction of $420,813.71 in departmental costs.

CONTROL NUMBER: 980028
PROGRAM: Facility Use and Management of Iowa and Milan AAPs
EST. DOLLAR VALUE: $400,000,000

(5) Preliminary work is underway to develop a solicitation package by the end of CY 97 for a formal Make-or-Buy for the Maintenance Department. The study should be completed in 1998. This department's FY97 budged exceeded $5.4 million.

At Iowa, the following cost reductions have been realized over the past three years:

(1) Sales of residue materials from operations and recovered demil material have reduced overhead costs by $652,116.

(2) Use of Statistical Process Control to reduce inspection requirements on the 40 lb Cratering Charge has reduced costs by $457,650.

(3) Reduction of costs of Project Management returned $585,000 to the Government.

(4) Refurbishing 120mm cans saved $1,000,000.

(5) Elimination of the booster for the 40 lb Cratering Charge reduced costs by $210,000.

Therefore, even though the prime contracts have not been competed, real savings have been realized through competitive contracting out at the subcontract level. These programs will continue under AO.

d. A Statement of Applicability will be issued with each contract action for which an obligation/deobligation of funds occurs. The Statements of Applicability are a part of the contract file.

e. Proven expertise in the safety and environmental areas is critical to the design, manufacture, and demil of conventional ammunition. Iowa AAP is the leader throughout the industrial base in safety, has been a leader in developing and operating a pink water processing system, received the Secretary of the Army Hazardous Waste Minimization Award in FY 93, and has received several awards for energy conservation. Personnel at both sites have vast expertise and knowledge relative to solid and hazardous waste management, and operates explosive waste incinerators and contaminated waste processors, monitors air and water quality (surface and underground), chemical and biological, and maintains a ready industrial and chemical emergency response capability.

f. Construction of IAAAP was completed in February 1942. M&H continued to operate the facility since that date. M&H entered into a Five-Year Facility Use Contract with the IOC in December 1994.

g. General Dynamics Ordnance Systems (formally Lockheed Martin Ordnance Systems) have operated MLAAP since 1972. Their current operation and maintenance contract expires 31 Dec 98.

CONTROL NUMBER: 980028
PROGRAM: Facility Use and Management of Iowa and Milan AAPs
EST. DOLLAR VALUE: $400,000,000

11. Technical Certification: I certify that the supporting data under my cognizance which are included in this Class Justification and Approval are accurate and complete to the best of my knowledge and belief.

Name: Richard Janik Date: 13 FEB 1998

Title: Deputy Chief of Staff for Industrial Readiness Signature: [signature]

12. Requirements Certification: I certify that the supporting data under my cognizance which are included in this Class Justification and Approval are accurate and complete to the best of my knowledge and belief.

Name: Timothy Donnelly Date: 2/13/98

Title: Acting Chief, Ammo Production and Logistics Division Signature: [signature]

13. Fair and Reasonable Cost Determination: I hereby determine that the anticipated cost for each and every contract action executed under the authority of this Class J&a will be fair and reasonable. This determination will be based on cost analysis, technical analysis by related Government proponents, DCAA audits, and price analysis.

14. Procuring Contracting Officer Certification: I certify that this Class Justification and Approval is accurate and complete to the best of my knowledge and belief.

Name: Date: 02/13/98

Title: Contracting Officer Signature: Mark E. Holdeman

CONTROL NUMBER: 980028
PROGRAM: Facility Use and Management of Iowa and Milan AAPs
EST. DOLLAR VALUE: $400,000,000

APPROVAL

Based on the foregoing justification, I hereby approve the procurement of the Facility Use and Management of Iowa and Milan AAPs on an other than full and open competition basis pursuant to the authority of 10 USC 2304(c)(1), subject to availability of funds, and provided that the supplies, services and property herein described have otherwise been authorized for acquisition.

2 Feb 98
DATE

Kenneth J. Oscar
Acting Assistant Secretary of the Army
(Research, Development and Acquisition)

CONTROL NUMBER: 980028
PROGRAM: Facility Use and Management of Iowa and Milan AAPs
EST. DOLLAR VALUE: $400,000,000

APPENDIX A
MANUFACTURING CAPABILITIES BY AMMUNITION FAMILIES

76-120MM TANK AMMUNITION
105, 155MM AND 8 INCH ROCKET-ASSISTED PROJECTILES
155MM AND 8 INCH PROJECTILES
TOW FAMILY HELLFIRE, 120MM, AND JAVELIN PRESSED WARHEADS
STINGER, CHAPARRAL, HAWK, AND PATRIOT CAST WARHEADS
FAMILY OF SCATTERABLE MINES (FASCAM), GEMSS, GATOR, VOLCANO & RAAM
M180 CRATERING CHARGE
M16A2 MINES
40 LB CRATERING KIT
120MM RETROGRADE
DETONATOR FAMILY
UP TO 2000 LB BOMBS
75-105MM BLANK AMMUNITION
1/4,1/2 AND 1 LB TNT DEMO BLOCKS
TOW AND HELLFIRE TIP CHARGES

40MM, HE AND PRACTICE (GRENADE LAUNCHER AND MACHINE GUN FIRED)
60MM, MORTARS, HE, TP AND SMOKE/WP
81MM, MORTARS, HE, PRACTICE AND SMOKE/WP
120MM MORTARS, HE, PRACTICE AND SMOKE/WP
105MM TANK CARTRIDGES, HEAT KINETIC, ENERGY W/DEPLETED URANIUM, AND TP
120MM TANK CARTRIDGES, KINETIC ENERGY W/DEPLETED URANIUM, AND TP
155MM ARTILLERY CARTRIDGES W/HE DUAL PURPOSE GRENADE, ICM
40MM BLANK SALUTE CARTRIDGES
40MM CARTRIDGE CASES
FUZES, PD, MO, MTSQ FOR 60MM MORTARS THRU 155MM ARTILLERY
IGNITION CARTRIDGES FOR 60MM, 81MM AND 120MM MORTARS
PROPELLING CHARGES FOR 60MM, 81MM AND 120MM MORTARS
BURSTERS FOR 60MM AND 81MM SMOKE/WP MORTARS
GRENADES, HEGP FOR WARHEADS
TACMS AND LANCE WARHEADS
DISPENSER AND BOMB, AIRCRAFT, CLUSTER BOMB UNIT
DEMOLITION CHARGES, HE AND PRACTICE (MICLIC)
PERCUSSION PRIMERS FOR 60MM AND 81MM MORTARS
ARMOR TILES FOR M80 TANK AND BRADLEY FIGHTING VEHICLE

# APPENDIX B

## ITEMS CURRENTLY IN PRODUCTION (WORKLOAD, DIRECT SALES, AND THIRD PARTY)

Ctg, 105mm, RAP HERA, M913
M913 Insulator Rework
Missile Warheads, including M280 HAWK and STINGER
Chg, Demo, 40 lb, Cratering XM228

Ctg, 81mm, HE M821A1 w/M734 Fuze
Ctg, 81mm, HE M889A1 w/M935 Fuze
M220 Prop Chg f/81mm M879/821/889
Ctg, Ign, M752A1 f/81mm M819/M853
LAP, Prop Chg, M218 f/81mm M819
LAP, Ctg, 81mm, M879
Ctg, Ign, M299 f/81mm
LAP, Prop Chg, M219 f/81mm M853
Fuze, M935
Fuze, MO-M734
Ctg, Ign, M701 f/60mm M721/M722
Ctg, 60mm, HE, M720
LAP, Chg, Prop, M204 f/60mm
Ctg, 60mm, HE, M888
Ctg, 40mm, HEDP M433
Ctg, 40mm, M430A1
Ctg, 40mm, TP, M918 f/MK19
40mm M383/M430
LAP, Fuze, M739A1
M767 Fuze
105mm M393A1 Demil

BFVS Armor Tile
BLU-109 Bomb, 1000 lb
120mm Mortar, Smoke
120mm Mortar, HE
Army TACAMS (loading grenades into warheads/LAP)
Demil, M483, 155mm ICM w/Grenades

Demil, APERS
MICLIC
C4 Extrusion

M207E5 Main Charge

M207E5 Tip Charge
Javelin
SIDEWINDER
M830A1
M833 DU Disassy
HAWK
XM908 Bunker Buster
M829A2
M829A2 Bandoleer
M831A1
M865
M913 Flash Reducer Bag
Recon/Fuze, 120mm Warheads
40 # Cratering Charge
105mm HERA M913
M1 High Frag
M913 Insulator Rework
M913 Infrared Scan
M795 Packout
M795 Loading
M549A1
M549A1 Washout/Reload
81mm Mortar
Demil M581
120mm Mortar
APERS Demil (M580, M581, M494)
HELLFIRE II
Long Bow
M258 Stinger
APOVS
TOW IIA Tip Charge
TOW IIA Main Charge
WAM
AIM 9mm
M830A1 Warheads
KE-W or DM43A1
M865 SUPER OPTION
M107

MAR-02-1998 09:28 AMSIO-ACG-ARMS P.01

# facsimile TRANSMITTAL

to: Marilyn Daniel
fax #: 606-223-1569
re: Approved J&A
date: March 2, 1998
pages: 17, including this cover sheet.

Marilyn,

As discussed.

Trudy

From the desk of...

Trudy A. Hallgren
ARMS Team
U.S. Army Industrial Operations Command
(IOC)
AMSIO-ACG-ARMS
Rock Island, IL 61299-6000

(309) 782-3632
Fax: (309) 782-6877