**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 50

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMERICAN ORDNANCE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 07-867C |
| | ) | (Judge Wheeler) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, FIRST REQUEST FOR PRODUCTION OF DOCUMENTS AND FIRST REQUESTS FOR ADMISSIONS**

Request For Production No. 1: Produce all documents relating to the Line 3A Property, including, but not limited to, all PCO files for the M795 Contract or any other AO contract, all ACO files, all DCAA files, all IAAAP government property records, and all correspondence concerning the Line 3A Property.

Defendant's Response: Defendant has produced all non-privileged, responsive documents to plaintiff.

Request for Production No. 2: Produce all documents relating to the M795 Contract, including, but not limited to, pre- and post-negotiation memoranda, correspondence, the supporting PCO and ACO records for the undefinitized letter contract and Modification Nos. PZ0001 and P0003, invoice and delivery records, and any documents evidencing the government's intent concerning the title to the Line 3A Property.

Defendant's Response: Defendant has produced all non-privileged, responsive documents to plaintiff.

Request for Production No. 3: Produce all documents relating to government policy, procedure, instruction, and/or guidance relating to the government's acquisition of

property, contractor acquired property, or facilities at the Army's ammunition plants, including, but not limited to IAAAP, from 1990 to the present.

Defendant's Response: Defendant has produced all non-privileged, responsive documents to plaintiff.

Request for Production No. 4: Produce all government policy, procedure, instruction, and/or guidance documents relating to contractor investment in Army ammunition plants or similar facilities, including but not limited to IAAAP, from 1990 to the present.

Defendant's Response: Defendant has produced all non-privileged, responsive documents to plaintiff.

Request for Production No. 5: Produce all documents relating to the government contract administration of the M795 Contract, including, but not limited to, all IAAAP ACO records, correspondence, work papers and documents relating to the delivery of supplies or services and/or the acquisition of property.

Defendant's Response: Defendant has produced all non-privileged, responsive documents to plaintiff.

Request for Production No. 6: Produce all documents relating to DCAA reviews and/or audits of the Line 3A Property or the M795 Contract, including, but not limited to, documents relating to DCAA Letter 03541, 99JH067 dated August 12, 1999, and DCAA reports, audits, work papers, and correspondence.

Defendant's Response: Defendant has produced all non-privileged, responsive documents to plaintiff.

Request for Production No. 7: Produce all documents relating to government

property reviews and/or audits at IAAAP from 1994 to 2007, including, but not limited to, reports, work papers, and correspondence.

Defendant's Response: Defendant has produced all non-privileged, responsive documents to plaintiff.

Request for Production No. 8: Produce all documents relating to Contract No. DAAA09-94-E-0005, including, but not limited to, all contract file records, Army justification and approval documents concerning the award of the contract, government property records and negotiation memoranda.

Defendant's Response: Defendant has produced all non-privileged, responsive documents to plaintiff.

Request for Production No. 9: Produce all documents relating to Contract No. DAAA09-98--E-0003, including, but not limited to all contact file records, Army justification and/or approval documents concerning the award of the contract, government furnished property records and negotiation memoranda.

Defendant's Response: Defendant has produced all non-privileged, responsive documents to plaintiff. All such documents have been previously produced to plaintiff.

Request for Production No. 10: Produce all documents provided to or reviewed by PCO Charles M. Smith when compiling the September 26, 2007 Final Decision.

Defendant's Response: Defendant has produced all non-privileged, responsive documents to plaintiff.

Request for Production No. 11: Produce all documents regarding the Army's

consideration of its ownership rights in the Line 3A Property in connection with its offering of the Line 3A Property as government furnished material in its request for proposal ("RFP") for new facilities use and production contracts at IAAAP, including RFP No. W52P1J-06-R-0201, RFP No. W52P1J-07-R-0124, and basic ordering agreement ("BOA") W52P1J-07-G-0004.

Defendant's Response: Defendant has produced all non-privileged, responsive documents to plaintiff.

Request for Production No. 12: Produce all Army documents that provide guidance to Army property administrators regarding relevant government contract property requirements (e.g. FAR Part 45) effective at any time during the period of 1994 to present.

Defendant's Response: Defendant has produced all non-privileged, responsive documents to plaintiff.

Request for Production No. 13: Produce all documents relating to the government's administration, audit, or review of AO's compliance with the government contract property requirements at IAAAP.

Defendant's Response: Defendant has produced all non-privileged, responsive documents to plaintiff. All such documents have been previously produced to plaintiff.

Request for Production No. 14: Produce all documents relating to any response to a Request for Admission not admitted, without qualification, in its entirety, identifying which documents relate to which Request for Admission.

Defendant's Response: Defendant has produced all non-privileged, responsive documents to plaintiff.

Request for Production No. 15: Produce all documents considered or relied upon to develop a response to any Interrogatory.

Defendant's Response: Defendant has produced all non-privileged, responsive documents to plaintiff.

**DEFENDANT'S RESPONSE TO**
**PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS**

Request for Admission No. 1: Admit that the intent of Armament Research, Development and Engineering Center ("ARDEC") PCO, Mr. Banashefski, was to structure the M795 Contract as definitized under Modification PX0001 [sic], such that the government would not take title to the Line 3A property.

Defendant's Response: Denied. There no such document at Modification PX0001. At the time the contract was signed, the intent of the parties is evidenced by the M795 contract, specifically in Modifications PZ0001 and Amendment P00003.

Request for Admission No. 2: Admit that prior to May 3, 2007, the government did not advise American Ordnance that it claimed ownership in the Line 3A Property.

Defendant's Response: Denied. The Government's ownership of the Line 3A property is established by the unambiguous terms of the M795 contract, including Modifications PZ0001 and Amendment P00003. AO is bound by the terms of the M795 contract as it was negotiated and amended by its predecessor-in-interest, Mason & Hanger Corporation.

Request for Admission No. 3: Admit that an Army contracting officer possesses sufficient authority to waive government title interest in the Line 3A Property.

Defendant's Response: Denied. No contracting officer has the authority to repudiate an express term of the contract. See Federal Acquisition Regulation ("FAR") 48 C.F.R. §§ 45.603 and 45.604-1 through 45.604-4 and Defense Federal Acquisition Regulation Supplement (DFARS) subpart 245.70 and Army Federal Acquisition Regulation Supplement (AFARS) 5145.602. Copies of these regulations are attached to these responses.

Request for Admission No. 4: Admit that an Army contracting officer possesses sufficient authority to abandon the Line 3A Property in place.

Defendant's Response: Deny that a Government contracting officer possesses sufficient authority to abandon the Line 3A property in place without any prior review, staffing, or approvals.

Request for Admission No. 5: Admit that the government understood AO will take title to the Line 3A Property upon AO's acquisition of the property under the M795 Contract not later than August 20, 1996.

Defendant's Response: Denied. The intent of the parties is reflected in the terms of the M795 Contract including Modifications PZ0001 and P0003 which provided that the Government pay American Ordnance costs of $9,310,071, associated with special tooling, equipment, and facilitization efforts required by the contractor to perform the M795 LAP contract, as provided in Modification 0003 to contract DAAE30-96-C-0013.

Request for Admission No. 6: Admit that the government was aware prior to 2001 that the Line 3A Property was tagged as AO-owned property.

Defendant's Response: Admit that certain personnel at IAAAP were aware of the tagging, but deny that tagging equipment is dispositive of ownership, particularly where the

Government has paid facilitization costs for the Line 3A equipment and accepted delivery of the Line 3A equipment from AO.

Request for Admission No. 7: Admit that the government was aware prior to 2001 that Line 3A Property was not recorded as government-owned property in IAAAP government records.

Defendant's Response: Admit that certain personnel at IAAAP were aware of the recording in the AO-maintained property books, but deny that AO's internal recordkeeping system is dispositive of ownership, particularly where the Government has paid facilitization costs for the Line 3A equipment and accepted delivery of the Line 3A equipment from AO.

**DEFENDANT'S RESPONSE TO**
**PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Interrogatory No. 1: Identify each person who provided input regarding any government response to any Request for Admission that is not admitted unconditionally in its entirety, indentifying the specific Request for Admission for which the person provided input and the individual's input.

Defendant's Response: The Final Decision issued by Mr. Charles Smith on September 26, 2007, was relied upon to assist for the responses to Requests No. 1, 2, and 5. Information available on the website, www.globalsecurity.org/military/facility/aap-iowa.htm, was relied upon to assist for the response to Request No. 2. The Federal Acquisition Regulations (FAR), Defense FAR Supplement (DFARS), and the Army FAR Supplement (AFARS) were relied upon for responses to Requests No. 3 and 4. Valerie Colello and James Nelson were relied upon for the responses to Requests No. 6 and 7. Julie Solinski provided input for the responses to Requests No. 6 and 7.

Interrogatory No. 2: Identify each person with knowledge of the assertions set forth in the Final Decision.

Defendant's Response: Mr. Charles Smith, PCO, Retired, ASC; Mr. David Banashefski, PCO, ARDEC-Picatinny; Ms. Valerie Colello, ARDEC-Picatinny; Mr. William Vogt, ARDEC-Picatinny.

Interrogatory No. 3: Identify each person with knowledge of the parties' negotiation of the M795 Contract, including, but not limited to, the undefinitized letter contract, and/or Modification Nos. P0001 and P0003.

Defendant's Response: David Banashefski, PCO, ARDEC-Picatinny; Valerie Colello, ARDEC-Picatinny; Steve Talmadge, ARDEC-Picatinny.

Interrogatory No. 4: Identify each person with knowledge of the government's alleged ownership of the Line 3A Property.

Defendant's Response: Persons with knowledge of the Government's ownership of Line 3A, in addition to the persons referenced in the Answers to Interrogatories 3 and 4, based upon the M795 contract and/or the Final Decision are: ASC: Patrick Lootens, PCO; Susan Phares, PCO; Melanie Johnson, PCO; Gene Harrison, PCO; Trudy Hallgren, PCO; Cynthia Peterman, PCO; Janice Clark, Contract Specialist; Sara Vickroy, Contract Specialist; Donna Ponce, Contract Specialist; Sarah Sims, Contract Specialist.

Joint Munitions Command/Iowa AAP/ARDEC-Picatinny; Larry Niebuhr, Production Manager; Natalie Swegle, Production Manager; Ann Weeks, Production Manager; Angelo Almeida, Product Quality Manager (now at Picatinny); Howard Miller, Iowa AAP Plant Advocate; Randy Ommen, Property; Kathryn Doyle, Property; Jackie Skiles, Facility Command

Assessment; Al Beuster, Industrial Preparedness Division; James Scott, Industrial Preparedness Division; Chad Rhodes, Industrial Preparedness Division; Fred Wortham, Industrial Preparedness Division; James Nelson, Iowa AAP ACO; Julie Solinski, Iowa AAP; Mark Ruzzek, DCAA auditor– Iowa AAP; Mike Walker, DCAA-Minneapolis.

Interrogatory No. 5: Identify each person with knowledge of the government's administration of AO's compliance with the government property requirements at IAAAP.

Defendant's Response: Julie Solinski, Iowa AAP; Jim Nelson ACO, Iowa AAP.

Interrogatory No. 6: Identify each witness that the government intends to present at trial in this matter.

Defendant's Response: Defendant has not finally determined which individuals it will call if this case proceeds to trial. Subject to change, defendant identifies the following individuals who are likely to be called by the Government as witnesses Charles Smith, PCO, Retired; James Nelson, ACO, Iowa AAP; David Banashefski, PCO, ARDEC-Picatinny; William Vogt, ARDEC-Picatinny; Julie Solinski, Iowa AAP, Mike Walker, DCAA0 Minneapolis; Mickey Burkett, American Ordnance. Defendant reserves the right to amend this answer in accordance with the rules of this Court.

Interrogatory No. 7: Identify each document that the government intends to present at trial in this matter.

Defendant's Response: Defendant has not finally determined which documents it will present if this case proceeds to trial. Subject to change, however, defendant identifies the following documents likely to be presented by the Government at trial: all documents contained in its Administrative Report, plus any documents necessary to rebut or address evidence and/or

testimony presented by AO in discovery or at trial.

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

REGINALD T. BLADES, JR.
Assistant Director

Joan M. Stentiford

JOAN M. STENTIFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 616-0341

Attorneys for Respondent

June 4, 2008

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on the 4th day of June, 2008 I caused copies of "DEFENDANT'S FIRST SET OF INTERROGATORIES AND DEFENDANT'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS AND DEFENDANT'S REQUEST FOR ADMISSIONS, to be sent by electronic transmission with a copy to the United States Mail, (First Class/Postage Prepaid), to:

Steven M. Masiello, Esq.
Timothy R. Odil, Esq.
McKenna Long & Aldridge, LLP
1875 Lawrence Street, Suite 200
Denver, Colorado 80202

[signature]

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 51

99 NOV 15 AM 8:42

— RECORD COPY —
To Be Retained

From: Judith Morgan
To: Vicki Dreckmeier
Date: 11/12/99 9:26AM
Subject: Annual System Analysis

Attached is the formal letter and system analysis report for FY1999.

Judith E. Morgan
Property Administrator

| DOC CONTROL [illegible] | FILE: 11/15 | | | |
|---|---|---|---|---|
| ROUTED TO: | Action | Reply | Coord. | Info. |
| PLT. MGR. | | | | |
| Rc [illegible] | | | | ✓ |
| CONTRACTS | | | | |
| ENV. S & H | | | | |
| MECH OPS | | | | |
| NETH ENG | | | | |
| OPERATIONS | | | | |
| PROG. MGMT. | | | | |
| H. RESOURCES | | | | |
| JTB | | | | |
| LEXINGTON | | | | |

November 10, 1999

Property Administrator

Mr. Jeff Hibler
Vice President & Plant Manager
American Ordnance LLC
17575 State Highway 79
Middletown, IA 52638-9701

Dear Mr. Hibler:

References:

a. Federal Acquisition Regulation, Part 45, Subpart 45.5, Government Property.

b. Department of Defense Manual 4161.2-M, December 1991, DoD Manual for the Performance of Contract Property Administration.

c. Property Administrator's letter dated October 23, 1998, transmitting the Fiscal Year 1999 Annual Government Property System Analysis Plan.

Enclosed is the Fiscal Year 1999 Annual System analysis of your property control system covering the following Government contracts:

| CONTRACT NO. | TYPE OF CONTRACT |
|---|---|
| DAAA09-98-E-0003 | Facility Use |
| DAAA09-98-G-0012 | FFP/CR Services Basic Ordering Agreement |
| DAAA09-98-G-0011 | FFP/CR Supply Basic Ordering Agreement |
| DAAA09-91-Z-0006 | Cost Plus Fixed Fee |
| DAAA09-94-E-0005 | Facility Use |
| DAAA09-94-G-0001 | FFP/CR Services Basic Ordering Agreement |
| DAAA09-95-G-0009 | FFP/CR Supply Basic Ordering Agreement |
| DAAH01-93-C-0156 | Cost Plus Incentive Fee |
| DAAE30-96-C-0013 | Firm Fixed Price |

Additionally, the following third party contracts for which supporting property administration was performed were also evaluated:

| CONTRACT NO. | TYPE OF CONTRACT | PRIME CONTRACTOR |
|---|---|---|
| DAAA09-93-C-0263 | FFP | Primex |
| DAAA09-92-C-0105 | FFP | Primex |
| DAAH01-92-C-R344 | CPFF | Titan |
| N00174-93-C-0072 | CPFF | Titan |

The overall system analysis findings were satisfactory and your property control system has continuing approval.

The cooperation of all contractor personnel contacted during the course of the biennial system analysis is appreciated.

Sincerely,

Judith E. Morgan
Property Administrator

Enclosure

Copies Furnished:

HQ, IOC, ATTN: AMSIO-IBL
ACO, Iowa Army Ammunition Plant

FINAL SUMMARY REPORT

FISCAL YEAR 1999

ANNUAL SYSTEM ANALYIS

OF

GOVERNMENT PROPERTY

AMERICAN ORDNANCE, LLC

IOWA ARMY AMMUNITION PLANT

PERIOD OF SURVEY - FY1999

REPORT PREPARED BY:

JUDITH E. MORGAN
GOVERNMENT PROPERTY ADMINISTRATOR

DATE: 26 October 1999

4. FUNCTION 4 - IDENTIFICATION

1. Introduction and Background. Evaluation of the contractor's process of properly identifying Government property. Functional segments were reviewed for compliance with criteria prescribed by Appendix A, Department of Defense Manual 4161.2-M.

a. Month Function Scheduled for Evaluation: Nov - Dec 98

b. Actual Start Date: Nov 98

c. Actual Completion Date: Dec 98

2. Evaluation Method Used: All criterion were subject to Class I Statistical sampling. The same populations and samples used to evaluate Function 3 - Receiving, Functional Segment Receiving Process was used to evaluate Identification.

3. Findings:

a. Functional Segment: Identification Process.

(1) General Stores and Production Stores Receipts (Lot #1)

| Lot Size | Sample Size | Continue with Sample 2 if Defects are | Reject if Defects are | Actual Defects |
|---|---|---|---|---|
| 3033 | 34 | 1, 2, or 3 | 4 | 0 |

4. Conclusions: No deficiencies were found during the review of the process for identifying property. Minor or isolated defects identified during the review were corrected during the performance of the review. Identification functions are being performed in accordance with the contractor's Property Control procedures. The samples reviewed were in compliance with the criterion of DOD 4161.2-M for this function. Review of the samples indicated that assets are labeled, tagged or otherwise identified according to the approved property control procedures upon fabrication or receipt. General purpose components of special test equipment are identified to facilitate removal and reutilization.

5. Recommendations. Up date property control procedures.

6. Action Required. None.

7. This function is rated satisfactory.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

AMERICAN ORDNANCE LLC,
Plaintiff,
vs.
UNITED STATES,
Defendant.

Case No. 07-867C
Judge Wheeler

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 52

ORIGINAL



UNITED STATES COURT OF FEDERAL CLAIMS
CIVIL DOCKET: 1:07-cv-00867-TCW

-------------------------------x

AMERICAN ORDNANCE, LLC,

Appellant,

vs.

UNITED STATES OF AMERICA,

Respondent.

-------------------------------x

DEPOSITION OF STEVEN TALMADGE

New York, New York

Monday, June 2, 2008

Reported by:
Jennifer Ocampo-Guzman
JOB NO. 15078B

David Feldman
Worldwide

From File to Trial™

California | New York | Texas
www.david-feldman.com

Talmadge

-- no, I don't recall this document.

Q. Do you recall discussing with Mr. Hibler the contents of the document and the action items?

A. There were -- yeah, I do recall now that we did correspond like this with action items. I do recall that.

Q. Do you recall satisfying any action items on behalf of the government?

A. Yeah, satisfied them all, and we put everything into the final document.

Q. I would like to draw your attention to what's been marked Exhibit 13 for identification purposes.

(Exhibit 13, Fax to Jeff Hibler from Steven Talmadge, Bates Nos. AO003942 and AO003943, marked for identification, this date.)

Q. Exhibit 13 appears to be a fax from you to Mr. Hibler, dated June 20, 1996. It's a two-page fax, and it includes a new CLIN structure.

Do you see that?

A. Yes.

Talmadge

Q. Do you see in the Remarks section that this facsimile states "Response to action item number 2"?

A. Okay.

Q. Would you go back, please, to Exhibit 12 and take a look at the second page of Exhibit 12 and tell me what action item number 2 states.

I'll state it. Action item 2 on the second page of Exhibit 12 states, "ARDEC to determine how to present facilitization clause language so M&H cash flow is not negatively impacted, yet M&H ultimately owns the equipment."

Do you see that, sir?

A. Yes, I do see it.

Q. Okay. Would you now look at Exhibit 13.

A. Okay.

Q. Does Exhibit 13, the fax from you to Mr. Hibler, does that satisfy action item number 2 on Exhibit 12, the second page, to your recollection?

A. At that time, yes.

Talmadge

Q. Would you expect to see, in the PZ0001, a CLIN structure similar to the CLIN structure stated on Exhibit 3?

A. Not necessarily. It could change again.

Q. If this CLIN structure on Exhibit 13, second page, were to be included in the PZ0001, would that provide the contractor title to the equipment?

A.. If it was that way?

Q. Yes, sir.

(Witness reading to himself.)

A. Would it mean he's taken title to the equipment. To be -- you would have to read what's in section C as well.

Q. Okay. Is there anything else you would have to look at to determine whether the contractor, whether the government and contractor agreed that the contractor would take title to the equipment?

A. That would be the first place I would go.

Q. Would you please look at the language after the asterisk on the second

Talmadge

page of Exhibit 13. It states, "The FAT sub-CLIN price includes the cost associated with any special tooling, equipment and/or facilitization efforts required by the contractor to perform the M795 projectile LAP contract."

Do you see that, sir?

A. Uh-huh.

Q. Is that language that you developed?

A. Yeah. Yes.

Q. So just again, looking at Exhibit 12 and Exhibit 13, do you recall that this response to action item 2 in Exhibit 13, along with the language that we just discussed, was intended to provide the contractor with title to the equipment and facilitization?

A. At that time, I don't know. I really don't know. I don't know.

Q. Do you recall developing this new CLIN structure on the second page of Exhibit 13?

A. Working as a team, it could have

Talmadge

been generated with me and the PCO at the same time. So, yeah, I could have been part of the preparing of this, yeah.

Q. What was this new CLIN structure intended to do for -- once incorporated into the contract, to your recollection?

A. What's the time frame on this, this is June.

At that time it described where we were at, in the negotiation process of the whole requirement.

Q. Okay. So at that time the second page of Exhibit 13 described how to present facilitization costs language so M&H cash flow is not negatively impacted, yet M&H ultimately owns the equipment; is that correct?

A. I wouldn't phrase it that way, because I really don't know if they owned it or not, at that time.

Q. But Exhibit 13 is your response to action item 2 from Exhibit 12; correct?

A. Yes.

(Exhibit 14, July 10, 1996 letter

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

AMERICAN ORDNANCE LLC,
Plaintiff,
vs.
UNITED STATES,
Defendant.

Case No. 07-867C
Judge Wheeler

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 53

ORIGINAL



UNITED STATES COURT OF FEDERAL CLAIMS
CIVIL DOCKET: 1:07-cv-00867-TCW

------------------------------x

AMERICAN ORDNANCE, LLC,

Appellant,

vs.

UNITED STATES OF AMERICA,

Respondent.

------------------------------x

DEPOSITION OF VALERIE COLELLO

New York, New York

Monday, June 2, 2008

Reported by:
Jennifer Ocampo-Guzman
JOB NO. 15078A

David Feldman
Worldwide

From File to Trial™

California | New York | Texas
www.david-feldman.com

Colello

would include the price agreed to for that deliverable.

Q. Is there -- is a CLIN or a contract line item number, is that the method that the government uses to indicate what is deliverable under a contract?

A. It's the method to indicate what is being acquired under the contract, it's the method to indicate what prices the government will pay for what's being acquired under the contract, and it's a method to indicate what will be delivered under the contract.

Q. Is there ordinarily a delivery schedule relating to a CLIN, in an army contract?

A. Yes.

Q. And how does a delivery schedule work within an army contract, generally?

A. How does it work?

Q. Yes, ma'am, in relationship to a CLIN.

A. The delivery schedule would identify the required schedule for delivery of the deliverable.

Colello

Q. Would you expect that the delivery schedule, in the case of the army acquiring facilities or equipment, would indicate a date that the facilities or equipment would be delivered, in an army contract?

A. Yes.

Q. What is a statement of work, or a SOW, S-O-W?

A. Statement of work is a portion of a solicitation in a resultant contract that basically defines the government's requirements governing a specific acquisition.

Q. How does a statement of work or a SOW relate to a CLIN, in an army contract?

A. It may -- there would be discussion in the statement of work, within the requirements, that may track to the CLIN structure.

Q. When you say "may track to the CLIN structure," is there times when it doesn't track to the CLIN structure?

A. Scope of work may say "services to support," and the services may or may not be

listed in the CLIN structure.

Q. Would you expect -- if the army were requiring the delivery of or facilitization of equipment, would you expect that the list of equipment that is to be delivered would be contained in the statement of work?

A. Well, I would expect to see a discussion of or a statement that the contractor shall provide the equipment. I don't know whether there would be a list of it or not.

Q. Do you know whether PZ0001 modification included a delivery schedule for the delivery of the line 3A equipment or a statement of work paragraph requiring the contractor to provide the equipment?

MS. STENTIFORD: She's already told you she doesn't know anything about the M795 contract.

You can answer the question.

A. I don't know what the line 3A is.

Q. Do you know whether PZ0001 included any delivery schedule for any equipment or

called facilities acquisition, in the FAR?

A. No, I don't.

Q. In these contracts where you would acquire equipment necessary, would you have a CLIN indicating the delivery of the equipment to the government?

A. A CLIN indicating delivery?

Q. Yes.

A. There would be a CLIN for the equipment.

Q. Would there be a delivery schedule associated with the delivery of that equipment in your contracts?

A. Yes.

Q. Would there be a statement of work relating to what it was, what kind of equipment you were seeking to have delivered under that CLIN?

A. There may be a name for the equipment, yes.

Q. Would there be a requirement or some other description of the equipment that the contractor was to deliver under that CLIN?

Colello

A. Well, there would be a description at least as to what the equipment would be required to do. The government, at that point in time of developing the statement of work, may not know the specific types of equipment that would be required, so it may not be that definitive. We would ask the contractor to propose the types of equipment in their proposal for evaluation on the part of the government.

Q. Okay. Would these contracts that required delivery of equipment to produce the item also include production of the item, or production CLINs as well?

A. Yes. You would have CLINs associated with whatever we were buying, that the equipment was associated to.

Q. What types of other CLINs would you expect to see in that type of a contract?

A. In a production-type contract, I would expect to see a CLIN for the items that the contractor was required to produce under the contract.

Q. Would you expect to see a CLIN for

Colello

to separately break out the costs for any necessary facilitization efforts for evaluation purposes only."

Do you see that sentence, ma'am?

A. Yes, I do.

Q. Do you have any knowledge of why the government asked Mason & Hanger to separately break out the cost for facilitization in the RFP?

A. I would have to answer that that it is common practice that when we have solicited a contractor for a proposal, that we would require a breakout of all the costs associated with, whether it be equipment, services, a complete detail cost breakdown of the costs that the item is comprised, of in order to properly have our supporting people evaluate those costs, from a technical and a pricing standpoint.

So I believe what the letter is attempting to communicate is that we ask the contractor to break out those costs for evaluation purposes.

Q. Okay. What would you have expected

Colello

contract, the definitization. I don't know why, But it doesn't -- in the RFP, it probably should have been a complete list, anyway. So I don't know how C.3.9 did not end up in the definitization mod.

Q. Do you know whether there is a complete list of equipment and facilitization that was required to be delivered with the M795 contract, incorporated into modification PZ0001, Exhibit 5?

A. I have no knowledge of a complete list.

Q. Do you know whether a complete list exists in PZ0001, Exhibit 5, now having reviewed it in preparation for this deposition?

A. I did not see a complete list.

Q. To your understanding, why is there no list of equipment to be delivered to the government in modification PZ0001, Exhibit 5?

A. I don't know.

Q. Would you have expected to see a list of equipment that was to be delivered under PZ0001, Exhibit 5, if it were a

Colello

deliverable?

A. And if there were multiple pieces of equipment. I would assume that there should be a list in either the specifications, the section C, because there is probably also specifications that are cited in here that may call out what types of equipment. I would expect that somewhere in the contract document it would describe the equipment that was required under the contract.

And having not written the contract, and I'm speculating, it could have been a case of where we asked for a list of the equipment in the proposal to evaluate it and, under a firm fixed price contract, we listed it as equipment and incorporated it into the contract as equipment and did not provide a list.

The contractor's ultimately responsible to meet all the specifications in the contract, and while we negotiated the price of the equipment, if a specification change -- if everything remains the same, if

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 54

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMERICAN ORDNANCE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | No. 07-867C |
| | ) | |
| UNITED STATES, | ) | DEPOSITION OF |
| | ) | JAMES NELSON |
| Defendant. | ) | |

DEPOSITION OF JAMES NELSON, taken in the Conference Room at the Rock Island Arsenal, Building 90, Rock Island, Illinois, on June 4, 2008, commencing at 9 AM, before Donna M. Kelly, a Certified Shorthand Reporter, licensed in the States of Illinois and Iowa, pursuant to notice of the parties in the above-entitled action.

Charles Smith, issued a decision, which, as I referred to earlier, that was back in 2007.

Q. Is that the September 26, 2007, final decision from Mr. Smith that you're referring to?

A. I don't know the exact date.

Q. Does that sound right, in that time frame?

A. I would say --

MR. IVES: Objection. You've asked for speculation. He says that he doesn't know the date.

MR. MASIELLO: Can you answer the question, please, sir?

A. I don't recall. I was thinking possibly May, but that may be the action that I'm thinking of.

Q. Sometime in 2007, though?

A. Sometime in 2007, yes.

Q. Did you have any role in the negotiation or award of the definitizing modification PZ001 for the M795 contract?

A. I don't believe I did.

Q. Do you have any knowledge or information concerning the negotiation or

award of the M795 definitization Mod PZ001?
A. No.
Q. How about the negotiation and award of Modification 3 to the M795 contract?
Did you have any involvement in negotiation or award of that modification?
A. I don't recall any involvement in any negotiation with any of the basic contract or any of the modifications to that contract or functions post award.
Q. Did you have any communications with respect to the negotiation -- with respect to the definitizing Mod PZ001 or Modification 3 for the M795 contract with anyone?
A. I don't recall that I did.
Q. You mentioned earlier that you believed it was likely that Ms. Morgan communicated the issue that Mr. Taylor raised about property title under the M795 contract in the 1996 e-mail.
Do you know what Ms. Morgan communicated?
A. No, I do not.
Q. Can you describe in more detail, to the extent that you recall, what the issue was

that Mr. Taylor was raising with respect to property title under the M795 contract in 1996?

A. Well, I believe what the issue that he was raising essentially was that the property that was purchased on that particular contract was paid for by the government and should be owned by the government.

Q. Do you know why he was raising the issue with respect to ownership? Was there a question in his mind?

A. Obviously.

MR. IVES: Objection. Are you asking him to get inside the mind of Charles Smith? Obviously, this witness has no personal knowledge of what Mr. Smith was thinking at the time.

MR. MASIELLO: Sir, can you please stop coaching the witness with your long-winded objections.

MR. IVES: Objection. You can answer the question, if you can understand it.

A. Repeat the question.

Q. Let me ask it another way. Did you understand from the e-mail that you received from Mr. Taylor that he was concerned that the

normally happens at the Iowa Army Ammunition Plant?

Is there a process for listing that property and tagging that property? Can you describe that for me, please?

A. Since I'm not the property administrator, I don't know the exact steps involved in that process.

Q. What steps do you know, sir?

A. The steps that I would expect to happen would be that the property is recorded by the contractor as government-owned property when it's purchased on contract, and the records would -- the accountable records would show that the property was owned by the government.

Q. Anything else, sir?

A. That's it.

Q. Do you know whether the M795 equipment at issue in this case was recorded by the government on its property list?

A. I believe that the contractor recorded it as their property.

Q. Do you know when that occurred, when the contractor recorded it as their property?

A. I don't know the exact date.

Q. Can you give me an estimate, sir?

A. I would assume that it would have been in the 1996 time frame, shortly after it was acquired.

Q. When did you become aware of the contractor recording the M795 equipment as its own?

A. I don't know the exact date, but, once again, in the 1996 time frame.

Q. To your understanding, was Mr. Taylor, Fred Taylor, also aware that the contractor was recording the M795 equipment as their own in the 1996 time frame?

MR. IVES: Objection.

A. I don't know what Mr. Taylor knew.

Q. How did you become aware of the recording of the property in 1996?

A. I became aware of the issue through Mr. Taylor's memorandum or, actually, his e-mail.

Q. Was Ms. Morgan made aware of it by that e-mail, as well, sir, to your knowledge?

MR. IVES: Objection.

A. I don't know how Ms. Morgan was made

wait 10 years to clarify the true ownership of
the equipment?
Do you have an understanding for why
that would happen?
A. Well, there is a -- I don't know
that the government waited. I think there
was a process that had been brought to the
contracting activity's attention. It was
really in their hands, and that would have been
the contracting officer for the M795 contract.
They were notified, and it was our --
it was my understanding that the contracting
officer was going to look into that.
Q. Do you know when the M795 contracting
officer was notified of the property issue?
A. Once again, back in 1996 time frame.
Q. And you just stated to me that you
understood that the M795 contracting officer
was going to -- what was it? Take action, or I
don't recall your exact words.
Can you describe what your
understanding was after the M795 contracting
officer being notified, what was going to
happen?
A. I don't know what was going to happen,

that is used by and relied upon by you or your staff?

A. I'm not directly familiar with any specific document, although I'm sure there is policy or a handbook or guidebook that would clarify what a property administrator is to do.

Q. Are you familiar with DOD manual 4161.2-M? Have you ever heard that designation for a property manual?

A. Not that I recall.

Q. Are you familiar with any DOD manual that you or the property administrator relies on in performing administrative duties under the contract at the Iowa Army Ammunition Plant?

A. I don't recall any specifically right now.

Q. Sir, I just want to clarify one thing that we have already talked about, but did you know during the time of 1996 through 2006 that the contractor had marked and identified the M795 equipment as its own equipment?

A. Yes, I think that's pretty obvious.

Q. Did you ever raise the concern regarding the contractor's identification of that M795 equipment as its own in light of the

DD 250 allegedly delivering the property to the government?

A. Not that I recall specifically.

Q. Do you know if anybody ever raised an issue concerning the contractor's ownership -- excuse me, identifying equipment as its own in light of the DD 250 or other issues?

A. Once again, Mr. Taylor addressed that in his letter to the contracting officer. I believe the -- I'm sure that Judy Morgan discussed it with the contractor.

MR. MASIELLO: I have no further questions. Do you have any questions?

MR. IVES: No, I don't have any questions.

(The deposition of James Nelson was concluded at 12:02 p.m., 06-04-2008.)

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 55

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMERICAN ORDNANCE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | No. 07-867C |
| | ) | |
| UNITED STATES, | ) | DEPOSITION OF |
| | ) | MICHAEL WALKER |
| Defendant. | ) | |

DEPOSITION OF MICHAEL WALKER, taken in the Conference Room at the Rock Island Arsenal, Building 90, Rock Island, Illinois, on June 6, 2008, commencing at 12:03 PM, before Donna M. Kelly, a Certified Shorthand Reporter, licensed in the States of Illinois and Iowa, pursuant to notice of the parties in the above-entitled action.

were looking at the assertion made by the contractor that they owned the equipment, so that was our focus. The assumption was if you own the equipment, then you have to follow your disclosed practice, and I didn't believe that they were.

Q. Again, that's not exactly my question.

My question is, did you have any reason to believe that the contractor's assertion that it owned the equipment was wrong in the 1999 time frame?

MR. IVES: Objection.

A. I don't believe so.

Q. I would like to draw your attention to Exhibit 4.

A. Do you want this one back?

Q. Exhibit 4 appears to be a letter, dated November 15, 1999, from the DCAA to Mr. Burkett, signed -- well, with a signature block, Frank J. Evans.

Do you see that letter, Exhibit 4?

A. I do, yes.

Q. Do you recognize that letter, sir?

A. I do have some recall of the letter; correct.

Q. Do you recall the reasons why you decided not to pursue the noncompliance?

A. Not specifically. I probably would have a better idea if I just did a quick read through the letter, because I assume we kind of spell out why it is that we believe that was the case.

Q. Do you have any general recollection?

A. I'm not sure. I'm not a hundred percent sure. I know we lay some information out here, but I don't want to speculate why that was.

Q. Mr. Walker, did you do anything to prepare for the deposition today?

A. Really didn't do much, just took a general look at some of the files and stuff that I think we had provided through the Army folks to you guys.

Q. Did you take a look -- did you have a chance to review Exhibit 4 during that preparation?

A. I took a quick glance at it. I did not read it through entirely.

Q. Based upon the review that you did perform, albeit a quick glance, what do you

recall, if anything, about the reasons why
potential CAS noncompliance was not pursued?
A. Well, it must have had something to
do with some level of buying, I guess, some of
the arguments that the contractor was making,
but I don't -- I just -- I'm usually pretty
good at reading through something if I do a
detailed read of the document.
I just don't recall if there were
multiple things here or if it was just one
thing, but I know as is referenced in that
first page of the letter, there was an AO
response that was provided to the -- to our
potential noncompliance issue.
Q. Anything else that you remember, just
as to the reasons not to pursue a potential CAS
violation?
A. Not specifically.
Q. I would like you to turn to the second
page of Exhibit 4.
In the last paragraph of that page, it
states a conclusion. Take a glance at that
paragraph.
A. Sure.
Q. In that paragraph, as far as what the

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AMERICAN ORDNANCE LLC,
Plaintiff,
vs.
UNITED STATES,
Defendant.

Case No. 07-867C
Judge Wheeler

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 56

ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL APPEALS

-----------------------------x

AMERICAN ORDNANCE,

Appellant,

vs. No. 1:07-cv-00867-TCW

UNITED STATES OF AMERICA,

Respondent.

-----------------------------x

DEPOSITION OF DAVID BANASHEFSKI

New York, New York

Tuesday, June 3, 2008

Reported by:
Jennifer Ocampo-Guzman
JOB NO. 15079A

David Feldman
Worldwide

From file to trial℠

California | New York | Texas
www.david-feldman.com

Banashefski

A. I would think we did. Again, without going through every -- every piece of correspondence within the file, I can't say and even then, was it something that was misfiled or not filed or unfortunately not found in the contract, possibly, but would this normally be, you know, addressed and put in the contract, absolutely.

Q. Sir, do you know whether you did anything to clarify what the ACO's understanding of the M795 contract that the government does not intend to take title of facilities?

A. I would say, yes. What it was, I don't know.

Q. Do you know whether the ACO ever described to you his understanding different than what is expressed in Exhibit 6?

A. I can't recall.

Q. Do you recall any discussions with the ACO on the issue of government taking title to the facilities under the M795 contract?

A. I just indicated before I think we

Banashefski

definitely would have clarified this one way or another with him, how we did that, I can't recall how we did that, but a letter like this would not just come on my desk and sit. We would have to respond one way or another. Whether it was telephonically, whether it was written correspondence, somehow these issues would have been cleared up.

Q. Were these issues cleared up with the contractor to your recollection?

A. I can't recall.

Q. Do you understand if you did anything to clarify these issues with the contractor?

A. I can't recall.

Q. The issues in Exhibit 6.

A. I can't recall.

Q. Do you remember any discussions with the contractor whatsoever concerning the issues raised in Exhibit 6?

A. In this letter, no, I don't. Off the top of my head, no, I don't.

MR. MASIELLO: Can we go off the record for a second?