DEPARTMENT OF THE ARMY
HEADQUARTERS, U.S. ARMY SUSTAINMENT COMMAND
1 ROCK ISLAND ARSENAL
ROCK ISLAND, ILLINOIS 61299-6000

REPLY TO ATTENTION OF AMSAS-ACA-L September 26, 2007

Ms. Kristen Barnard
Corporate Director
Contract Administration
American Ordnance LLC
Corporate Headquarters
207 East 29th Street
Pittsburg, Kansas 66762

Dear Ms. Barnard:

1. Reference:
   A. PCO letter to American Ordnance (AO); 6SEP07.
   B. AO letter to PCO; 13SEP07.
   C. Contract DAAA09-94-E-0005; 20DEC93.
   D. Letter Contract DAAE30-96-C-0013; 14DEC95.
   E. Definitized Contract DAAE30-96-C-0013, i.e. PZ001; 15AUG96.
   F. Mod 3 to DAAE30-96-C-0013, i.e. P0003; 13MAR97.
   G. Contract DAAA09-98-E-003; effective 28SEP98.
   H. Banashefski negotiation letter #1; 16MAY96.
   I. Banashefski negotiation letter #2; 16MAY96.
   J. Colello negotiation letter 30MAY96.
   K. Unterseher negotiation letter; 5JUN96.
   L. Heffelbower negotiation letter; 18JUN96.
   M. Hibler negotiation letter; 16JUL96.
   N. ACO letter to PCO; 20AUG96.
   O. DD250; 22OCT97.
   P. Mason & Hanger invoice; 24OCT97.
   Q. Undated Hallgren PPT presentation.

DESCRIPTION OF DISPUTE

2. AO and the Army dispute ownership of Line 3A at Iowa Army Ammunition Plant (IAAAP). On September 6, 2007 AO was given notice that the Army owns the equipment and processes that are collectively known as Line 3A at IAAAP (Reference A). AO was also instructed to make the necessary changes to the property books.

3. AO responded that Line 3A is the property of AO, and that the property is correctly recorded in the property books (Reference B).



EXHIBIT 1
to
Motion for Status
Conference

**PERTINENT CONTRACT TERMS**

4. Prior to 1998, IAAAP and Milan AAP (Milan) were managed under separated facility use contracts. IAAAP was operated by Mason & Hanger (MH), and Milan was operated by Martin Marietta. In 1998, GD-OTS and DZI partnered to create American Ordnance. Also in 1998, American Ordnance was non-competitively awarded the facility use contract for Milan and IAAAP. Three government contracts define the relevant relationship between the Army and AO. (1) DAAA09-94-E-0005 (Reference C), the IAAAP facility use contract between Army and MH. (2) DAAA09-98-E-003 (Reference D), the subsequent facility use contract between Army and AO for both IAAAP and Milan AAP. (3) DAAE30-96-C-0013 (Reference E), the M795 production and Line 3A installation contract.

5. Reference C, paragraph H-7 EXCLUSION OF FACILITIES COST IN OTHER CONTRACTS states, "The contractor agrees that it will not include in the cost or price of any goods produced or services performed under government prime contracts or subcontracts, any provision, allowance or charge (1) for the cost (other than the costs borne by the contractor) of acquisition of the facilities, or (2) for the amortization or depreciation of government furnished facilities."

6. Reference C, paragraph I-23 incorporates by reference GOVERNMENT PROPERTY (FACILITIES USE) 52.245-11 (APR 1984).

7. Reference D, CLIN 1AA and Attachment A page 5, indicates a line item in the contract for "Design, Fabricate and Install [the] Slow Cool Equipment."

8. Reference E, pages 5 to 6 lists CLINs 0001AA-, 0001AB-, 0001AC-, 0001AA, 0001AB, AND 0001AC. These CLINs describe facilitization, PQT, FAT, production and CDRL requirements to be delivered.

9. Reference E, page 5 CLIN 0001AA- description of services reads "DESIGN/FABRICATE/SUPPORT" and goes on to describe "THE ABOVE AMOUNT REPRESENTS 50% OF $10,004,379.00 TO DESIGN, FABRICATE AND INSTALL THE SLOW COOL EQUIPMENT. THE MAXIMUM NOT-TO-EXCEED CEILING PRICE IS $24,423,866.00"

10. Reference E, page 12 CLIN 0001AB states, "*=This subclin includes the costs for 1,000 ea M795 Projectiles (1,000 units X $173.92 = $173,920) as well as $9,310,071 in costs associated with special tooling, equipment, and facilitization efforts required by the contractor to perform the M795 LAP contract."

11. Reference E, paragraph I-8 52.245-2 GOVERNMENT PROPERTY

(FIXED PRICE CONTRACTS), - ALTERNATE I (DEVIATION) (JUL 1995) (AS1501) and specifically paragraph (b)(3) states, "Title to each item of facilities and special test equipment acquired by the Contractor for the Government under this contract shall pass to and vest in the Government when its use in performing this contract commences or when the Government has paid for it, whichever is earlier, whether or not title previously vested in the Government."

12. Reference F, page 2, paragraph 4 states, "On contract page 12, paragraph B.1, change the final payment of Facilitization costs under Subclin 0001AB to reflect Subclin 0001AA. It should be understood that the Final facilitization Payment under Subclin 0001AA will be at time of Final Inplant Inspection of the FAT quantities. See attached continuation sheet SF36."

13. Reference F, attached SF36, CLIN0001AA states, "*= This subclin includes the cost for 1,500 ea FAT/PQT M795 Projectiles ($643,264) as well as $9,310,071 in costs associated with special tooling, equipment, and facilitization efforts required by the contractor to perform the M795 LAP contract."

14. Reference G, paragraph H-8 EXCLUSION OF FACILITIES COST IN OTHER CONTRACTS states, "The contractor agrees that it will not include in the cost or price of any goods produced or services performed under government prime contracts or subcontracts, any provision, allowance or charge (1) for the cost (other than the costs borne by the contractor) of acquisition of the facilities, or (2) for the amortization or depreciation of government furnished facilities."

**FINDINGS OF FACT**

15. Reference H, a negotiation memo from Mr. Banashefski, states, "Note: It is important that the parties fully understand that this requirement is a production contract for the LAP of the M795 projectiles and is not a facilities contract. Any facilities being procured are being done solely to meet the required LAP capacity for the M795 projectile. As such, the Government will not have title to the equipment and therefore, will not be responsible for maintenance of the same."

16. Reference I, setting the definitization schedule for the undefinitized contract, states, "It should be understood that all other terms and conditions of the Letter Contract remain unchanged at this time."

17. Reference J, a letter from Ms. Colello, states her position on the negotiation of the M795 contract. The relevant portions of her letter are:

"2. After thoroughly reviewing M&H's draft SOW for the facilitization efforts needed to meet the required LAP

production delivery schedules, the Government has determined that such language is not necessary for this contract. As previously mentioned in ARDEC's letter dated 16 May 96, Subject: M795 Projectile LAP Negotiations, this is a production requirement for the LAP of the M795 projectile, and is not in any way a facilitization contract. In the RFP, the Government had asked the contractor to separately break out the costs for any necessary facilitization efforts for evaluation purposes only. Although the parties may end up negotiating the cost associated with the equipment/facilities separately from the production deliverables, in order to better understand the price of the facilitization efforts vs. the unit price of the end item; understand that the contractor will solely be responsible for performing whatever facilitization efforts are necessary to meet the required delivery schedules within the final negotiated overall price of the basic contract. In fact, it has been determined that in order to alleviate any further misunderstanding regarding the facilitization efforts, the resultant contract **will not** have a separate CLIN for the facilitization costs, but rather such costs will be included with the LAP production CLIN for the basic quantity…

12. Progress payments will be made in accordance with FAR 52.232-16, and in accordance with the modified paragraph H.8 "First Article - Progress Payments" as delineated above. In addition to receiving 75% of costs incurred via the progress payments procedures, the contractor will also be able to invoice (via the DD250) and be paid for the 25% of the unliquidated costs incurred for the LAP of the projectiles once they are provisionally accepted, pending successful lot acceptance.

As delineated above, in order to alleviate any misunderstanding by the parties that this requirement is a production effort, and is not a facilities contract, the resultant definitized contract will be constructed in such a manner that their [sic] will be **no separate line item** for any facilitization efforts which M&H would have to accomplish in order to meet the required basic/option delivery requirements of the contract. Rather, the costs of the facilitization efforts will be evenly distributed over the 79,468 projectiles being delivered as part of the basic contract deliverables. Therefore, the payment of the 25% unliquidated costs incurred for facilitization efforts not covered under progress payments will be paid out in increments over the projectile quantities delivered and provisionally accepted pending lot acceptance."

18. Reference K is a letter from the M795 Program Manager to Mr. Heffelbower, Plant Manager and Vice President, MH. In this letter, COL Unterseher expressed his desire to "discuss methods to resolve the differences [leading to schedule slippage and cost growth], satisfactorily complete negotiations, and achieve a timely contract award."

19. Reference L, a response letter from Mr. Heffelbower to COL Unterseher, explains MH's negotiation positions regarding: 16% increase for design, fabricate, and install equipment; 63% increase for production qualification of 1000 projectiles; Quotes and supporting data; and Other issues not specifically addressed in your letter. Under the category "Other issues not specifically addressed in your letter," Mr. Heffelbower also comments, "We have also agreed to take title to equipment acquired as a part of our facilitization efforts under this proposed contract…Since we have agreed to take title to the facilitization equipment, the abnormal maintenance and the demilitarization/decontamination of the facilities equipment (which was not included in our proposal) is no longer an issue."

20. Reference M, a letter from Mason& Hanger Division Manager, Mr. J.B. Hibler states, "On contingency no. 3, delete the sentence which states 'Mason & Hanger's prior proposals are of no effect.' And replace it with '*M&H's proposal submitted on 29 November 1995, as revised during the negotiation process*, is further updated for facilitization costs as delineated under Attachment 1 dated 12 July 1996 and other cost and pricing data provided.' Other sentences within this contingency remain unchanged. Add the following contingency: 'M&H's proposed facilitization costs are based on meeting a maximum monthly LAP capability rate of 10,300 each M795 projectiles for any out-year production quantities. *This does not preclude M&H from including equipment items in out-year production proposals.*'"

21. Reference M's Attachment 1 includes an itemized description and corresponding spreadsheet of equipment to be installed for the M795 facilitization.

22. Reference N is a letter from Mr. Taylor, the ACO at IAAAP, to Mr. Banashefski, the PCO for contract DAAE30-96-C-0013. Mr. Taylor states, "We understand that… the Government does not intend to take title to the facilities even though they are to be direct costed. We believe it is our responsibility to bring to your attention several potential administrative problems under these conditions." Mr. Taylor continues, "The first issue is a potential Cost Accounting Standards (CAS) violation… Second, equipment deliverable per the customer's specifications are costed directly to the contract which required the equipment. Normally, the Government takes title to equipment that is direct costed… Even though the contractor owns the equipment, costs of maintenance of equipment is an allocable

line overhead cost… We consider it essential to discuss these issues to avoid potential conflicts between the two contracts [M795 contract and IAAAP facility use contract]."

23. Reference O is a DD250, properly executed and signed on 22OCT97, for CLIN 0001AA of contract number DAAE30-96-C-0013. CLIN 0001AA is listed twice. The first entry is for "Special Tooling, equipment, and Facilitization," and there is a corresponding payment amount for $9,310,071. The second entry is for "First Article Sample of 24 units," and there is a corresponding payment amount for $10,292.22."

24. Reference P is inaccurately referred to by AO as an AO invoice, but it is in fact a MH invoice. It is dated 2 days subsequent to the issuance of the DD250. It itemizes CLIN 0001AA of contract DAAE30-96-C-0013 with 3 line items. The first line item is "First Article Test," and it has a corresponding value of $9,310,071. The second line item states, "Less: Amounts Previously Invoiced on Progress Payments," and it has a corresponding value of $5,641,391. The third line item is "First Article Sample of 24 units," and it has a corresponding value of $10,292.22. There is a subsequent GRAND TOTAL with a corresponding value of $3,678,972.22. Finally there is a signature from the IAAAP ACO which certifies payment of $3,678,972.22.

25. Reference Q is the slides from a Power Point Presentation that was presented by Trudy Hallgren. Ms. Hallgren was the PCO for contract DAAA09-98-E-003, the Iowa/Milan AAPs facility use contract. The apparent reference by AO to this presentation is on slide 9:

| Equipment Piece | Use | Replacement Value | Purpose |
|---|---|---|---|
| Various | 155MM M795 | $10,000,000 | M795 Production |

**AREAS OF AGREEMENT AND DISAGREEMNT**

26. The Army and AO appear to agree that all of the above References are authentic, with the following exceptions. AO, via its attorney, questions the authenticity of Reference O as well as the "legitimate documentation concerning the items of Line 3A Equipment that were allegedly 'offered' by AO to the government under the DD250," (Reference B, page 6). I disagree with AO's attorney, and I believe the DD250 is authentic, correctly executed and supported by relevant documents that do provide an itemized accounting. I believe that Reference M's Attachment 1, a MH memo and spreadsheet, support the dollar value indicated on the subsequent DD250. One other area of confusion is that AO, via its attorney in Reference B, states that Reference P is an AO invoice, although Reference P is drafted on MH letterhead. I

find that this confusion was an editorial mistake by AO, and it does not alter the party's positions in any relevant manner.

27. Regarding reference J: This letter obviously does not state the final negotiated agreement between the parties as the costs for the facilitization project were not evenly spread over the deliverable projectiles, but were billed separately.

28. Regarding Reference L: It appears that, as of the date of this letter, the contractor was including maintenance costs of the facilitization equipment in their proposal, which recognizes Government ownership of the equipment. While the letter also references an agreement to take title to the equipment, this letter is dated two months prior to definitization and may not reflect the final negotiated agreement.

29. Regarding Reference N: Mr. Taylor recognizes the possible intent of some government and AO agents to vest ownership of property with AO. However, he suggests that the terms of the contract state otherwise. He specifically states that issues such as direct costing and Cost Accounting Standards, which are incorporated into the contract, do not support ceding title to the contractor.

30. Regarding Reference P: This invoice is consistent with all other contractual documents in establishing a price of $9,310,071 for the facilitization of Line 3A.

31. Regarding Reference Q: This Reference does not appear to shed any light on the dispute. The slide appears to have been developed by the contractor and refers to Line 3A as an example of contractor investment. Since it is agreed by all parties that the Government paid $9,310,071 for the facilitization of Line 3A, the slide is obviously in error.

32. Referring to the DD250 discussed in Reference A, dated 22 October 1997: Mr. William Vogt, Project Manager for the M795 signed and checked the box for acceptance of listed items. Two items are listed separately in block 16; 1) Special tooling, Equipment and facilitization and 2) First Article Sample of 24 units which is separately priced. This DD250 indicates that the Government accepted the Facilitization of Line 3A and that it was separately priced. The facilitization of Line 3A was neither amortized in the First Article price, nor amortized in the price of production items.

33. The plain reading of the contract clearly indicates that Line 3A is a deliverable item under contract DAAE30-96-C-0013. CLIN 0001AA- and CLIN 0001AB (subsequently changed to CLIN 0001AA via formal contract modification) calls for the design, fabrication and installation of the slow cool equipment and

facilitization costs are priced at $9,310,071. This price is referenced in the definitized contract by Modification PZ0001, CLIN 0001AB. In the definitized agreement, the cost of this facilitization is not spread over the first article quantity price or the product price. The slow cool equipment was the name of the project that later is called Line 3A. The subsequent DD250 reads "Special Tooling, equipment, and Facilitization," with a corresponding value of $9,310,071. Any ambiguity that AO might see in this plain reading of the delivery schedule is ultimately resolved by the subsequent terms of the contract. Contract paragraph I-8 clearly states that ownership of each item of facilities and special test equipment purchased by the contractor, for use under the contract and at government expense, vests with the government. The contract terms are clear and unambiguous. The government paid for the creation and installation of Line 3A. No contractual agreement exists for subsequent transfer of ownership to MH (now AO). Therefore the government must still own Line 3A.

34. AO, via its attorney, asserts that several documents outside of the contract should be used to alter the otherwise unambiguous understanding of the parties. I disagree with this assertion. However, my analysis of those documents presented by AO does not lead me to believe that they prove that the Army and MH intended that Line 3A should be owned by MH. Most notably, References H through M are all written prior to the definitizion of the contract. The final meeting of the minds between the Army and MH is not reflected in these documents. Reference M, a MH letter, specifically notes that negotiations were ongoing at that time. Reference H indicates that the Army will not be responsible for maintenance of the facilization (Line 3A). Reference J indicates that in May of 1996, the facilitization would not be reflected as a CLIN, and that any costs of facilitization would be spread out over the production of the M795 rounds. Clearly this is an intermediate negotiating point, as the definitized contract does have a line item for facilitization, and the definitized contract does not spread the cost of the facilitization over the M795 production requirement. Additionally, I have discussed Reference P with Mr. Nelson. Mr. Nelson recalls signing the MH invoice. He informs me that his understanding of the MH invoice description of "0001AA First Article Test $9,310,071.00" was consistent with the more precise contract language of CLIN 0001AA on page 12 of Reference E (the M795 production contract).

35. Finally, even if I am mistaken and those refenced documents that exist outside the contract should indicate that the Army and MH intended that MH would take title to Line 3A, it is clear to me that the PCO, had neither apparent nor actual authority to do so under References D and E. Certainly the Program Manager did not have the authority to transfer title to MH.

**DETERMINATION**

I determine that the Army does have title to the equipment and processes collectively known as Line 3A. As stated in Reference A, you are directed to take immediate action to correct the property record books; amending any existing discrepancies such that those items listed in Attachment B to Reference A are recorded as government owned personal property in the property record books. Provide affirmation that the property record books have been amended no later than 5 business days from receipt of this letter. Additionally, please inform the ACO staff as to the length of time required to reflect the property record book changes via subsequent retagging of the equipment in place on Line 3A.

**NOTICE OF RIGHT TO APPEAL**

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C.603, regarding Maritime Contracts) within 12 months of the date you receive this decision. The government reserves all other rights under the contract, federal statute and common law.

CHARLES M. SMITH
Procuring Contracting Officer
Chief, 40mm, Mortars & LAP Branch

Copies Furnished:
Iowa AAP ACO/Mr. Nelson
Iowa AAP Commander/LTC Nutt
Steven M. Masiello