IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMERICAN ORDNANCE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 07-867C |
| | ) | (Judge Wheeler) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S OPPOSITION TO**
**PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT**

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

REGINALD T. BLADES, JR.
Assistant Director

JOAN M. STENTIFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 616-0341
Fax: (202) 514-8624

Attorneys for Defendant

**TABLE OF CONTENTS**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. The Government Is Entitled To Summary Judgment Because The Terms Of The Contract Are Clear And Unambiguous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. Plaintiff's Reliance On The Parties' Actions During Negotiations Of The M795 Contract Is Misplaced . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

B. The Plain Language Of The Contract Required The Government To Pay AO For Delivery Of The Line 3A Equipment . . . . . . . . . . . . . . . . . . . . . . 5

C. Government Can Acquire Equipment In Contracts Other Than Facilities Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II. AO's Interpretation Of The Contract Improperly Renders Provisions Of The Contract Meaningless . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III. The Government Is Not Making A Claim In This Case, . . . . . . . . . . . . . . . . . . 12

A. Even If the Government Were Making a Claim In This Case, It Could Not Be Barred By Any Statute of Limitations . . . . . . . . . . . . . . . . . . . . . 14

B. The Government Cannot Transfer Title To Government Property Through Inadvertence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# TABLE OF AUTHORITIES

## CASES

Barron Bancshares, Inc. v. United States,
366 F.3d 1360 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Beta Sys. v. United States,
838 F.2d 1179 (Fed.Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

City of El Centro v. United States,
922 F.2d 816 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

City of Tacoma v. United States, ,
31 F.3d 1130 (Fed.Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Cmty. Heating & Plumbing Co. v. Kelso,
987 F.2d 1575 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Davidson v. Federal Deposit Ins. Corp.,
44 F.3d 246 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Hunt Constr. Group, Inc. v. United States,
281 F. 3d 1369 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

J & E Salvage Co. v. United States,
37 Fed. Cl. 256 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

J & E Salvage Co. v. United States,
152 F.3d 945 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Jowett, Inc. v. United States,
234 F.3d 1365 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Julius Goldman's Egg City v. United States,
697 F.2d 1051 (Fed. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Keeter Trading Co., Inc. v. United States,
79 Fed. Cl. 243 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Martin v. United States,
20 Cl. Ct. 738 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

McAbee Constr., Inc. v. United States,

97 F.3d 1431 (Fed. Cir.) (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Metric Constructors, Inc. v. NASA,
169 F.3d 747 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Mil-Spec Contractors, Inc. v. United States,
835 F.2d 865 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Montefiore Hospital Assoc. v. United States,
5 Cl. Ct. 471 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Trauma Servie Group v. United States,
104 F.3d 1321 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

United States v. Ford Motor Co.,
463 F.3d 1267 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**STATUTES**

48 C.F.R. § 45.302-6(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

48 C.F.R. § 45.603(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

48 C.F.R. § 52.232-16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

28 U.S.C. § 2415(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMERICAN ORDNANCE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 07-867C |
| | ) | (Judge Wheeler) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S OPPOSITION TO**
**PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of this Court ("RCFC"), defendant, the United States, opposes plaintiff, American Ordnance, LLC ("AO")'s cross-motion for summary judgment. We respectfully request that the Court grant summary judgment in defendant's favor upon all of the claims asserted in plaintiff's complaint. There are no genuine issues of material fact that would preclude judgment as a matter of law in defendant's favor.

AO's cross-motion offers only, at best, an implausible interpretation of the contract. At the outset, we note that AO has not, and cannot, explain why the Government, as AO contends, would pay $9,310,071 for 1000 production units of ammunition with a unit price of $173. This is the import of the interpretation of the contract that AO posits to the Court. In order to reach AO's proposed interpretation that the Government paid $9,310,071 for $173,000 worth of ammunition, AO asks the Court to ignore important principles of contract interpretation and disregard the Government property clause and ignore specific language contained in the Contract Line Items ("CLINs"). The Court should reject AO's meretricious argument. As demonstrated below, AO's proposed interpretation of the contract is wholly unsupported by the language of the contract and does not identify any ambiguity that would allow the Court to consider parol or

extrinsic evidence.

## I. The Government Is Entitled To Summary Judgment Because The Terms Of The Contract Are Clear And Unambiguous

This is a case of contract interpretation. As such it is appropriately decided on summary judgment. Construction of an unambiguous contract is a matter of law and appropriate for summary judgment. Martin v. United States, 20 Cl. Ct. 738, 745 (1990). A written agreement is ambiguous when a plain reading of the contract could result in more than one reasonable interpretation. Metric Constructors, Inc. v. NASA, 169 F.3d 747, 751 (Fed. Cir. 1999). When the Court is called upon to interpret a contract, it should look first to the plain language of the agreement. Jowett, Inc. v. United States, 234 F.3d 1365, 1368 (Fed. Cir. 2000). The contract should be read and considered as a whole and interpreted to effectuate its spirit and purpose. Hunt Constr. Group, Inc. v. United States, 281 F. 3d 1369, 1372 (Fed. Cir. 2002). Furthermore, the court may not look to extrinsic evidence in determining whether a contract is ambiguous. McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir.) reh'g denied, en banc suggestion declined (1996).

A contract will be found to be ambiguous if there are two different reasonable interpretations that are consistent with the contract language. Keeter Trading Co., Inc. v. United States, 79 Fed. Cl. 243, 257 (2007) (citing Cmty. Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1579 (Fed. Cir. 1993). The mere fact that the parties disagree as to the meaning of the contract does not, by itself, render the contract ambiguous. Id.

Here AO is asserting the contract is ambiguous merely because it disagrees with the contracting officer. AO does not identify any ambiguous term in the contract. It does not provide an interpretation of the existing CLIN structure of the definitized contract. Nor does AO

identify any provision that states that AO was intended to take title to the Line 3A equipment. AO does not state what the contract language means, but only what it does not mean. For example, AO contends that the Government property clause does not mean what it says, and the CLIN structure would be different if the parties intended it to mean that the Government would take title to the Line 3A equipment that it was required to pay for. At no time, however, does AO affirmatively state what it believes the CLIN structure was intended to mean, or how the Descriptive Data provided with the CLINs should be interpreted. Pl. Br. 11, 18. Nor, most importantly, does AO provide a reasonable explanation for why the contract, as amended by Contract Modification 0003, required the Government to pay $643,264 for the First Article Test Items and $9,310,071 for facilitization and equipment, if it was intended that AO would take title to the equipment. App. 118. AO's explanation, that the Government was paying for the first 1,000 production units is directly contradicted by the terms of the contract. Id. The contract provided a unit price for the projectiles of $173.92. Id. Indeed, the contract clearly stated that the Government was to pay $173,920 for 1,000 production units of the M795 projectiles. Id. The only other item besides first article, the 1,000 production units, and the $9,310,071 for facilitization and equipment, charged to the Government in the definitized contract, as amended, was $13,386,275 for the remainder of the contract requirement quantity of 76,968 projectiles with a unit price of $173.92. AO's position that the contract required the Government to pay over nine million dollars for $173,920 worth of ammunition is simply unreasonable and contrary to the express terms of the contract.

Given AO's failure to offer a reasonable alternative interpretation, or to identify an ambiguity in the contract language, it has failed to provide any basis for this Court to examine

parol or extrinsic evidence. The law in this Circuit is clear that only after identifying an ambiguity in a contract provision, may the Court look to extrinsic evidence to assist in interpreting the contract terms. City of Tacoma v. United States, 31 F.3d 1130, 1134 (Fed.Cir.1994) ("Outside evidence may not be brought in to create an ambiguity where the language is clear."); Beta Sys. v. United States, 838 F.2d 1179, 1183 (Fed.Cir.1988) ("[E]xtrinsic evidence will not be received to change the terms of a contract that is clear on its face.").

A. Plaintiff's Reliance On The Parties' Actions During Negotiations Of The M795 Contract Is Misplaced

The parol evidence rule, which is a substantive rule rather than a procedural rule of law, provides that "a binding integrated agreement discharges prior agreements to the extent that it is inconsistent with them" and precludes the admission of prior or contemporaneous evidence to vary the terms of a final written agreement. Restatement (Second) of Contracts § 213 (1979). Montefiore Hospital Assoc. v. United States, 5 Cl. Ct. 471 (1984).

In this case, AO relies on statements made by the parties during negotiations, rather than merely looking to the four corners of the contract. This is improper as evidence. The parties' course of conduct prior to signing a contract is inadmissible where the contract executed between the parties is not ambiguous. United States v. Ford Motor Co., 463 F.3d 1267, 1278 (Fed. Cir. 2006) (citing Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375-76). In Ford Motor, the Federal Circuit explicitly held that the parties' course of performance is insufficient to read out an explicit term of a contract. Id.

Thus, AO's extensive reliance on the parties' behavior during negotiations is misplaced. In its proposed findings of fact AO relies on deposition testimony provided by Valerie Colello,

While Valerie Colello was the program supervisor at ARDEC, Picatinny Aresenal, she clearly stated at her deposition that she had no part in negotiating the M795 contract, and signed the letter only in the absence of the Contracting Officer, David Banishefsky. Colello Depo. at 19:22-21-15. Thus, she has no personal knowledge of how the negotiations were conducted, what statements were made, or why the contract contains the specific terms that it does.

Similarly, AO relies on correspondence between Darl Heffelbower, president of AO, to Colonel Unterseher to support its position. PPFUF ¶ 29. As both Steve Talmadge, Contract Specialist at Picatinny Arsenal, and David Banishefsky, Contracting Officer testified, Colonel Unterseher had no authority to bind the Government in negotiations. Therefore any reference to statements or representations made by him would offer no insight into the parties' contracting intent. Talmadge Depo. at 80:2-81:11; Banishefsky Depo. at 97:14-21. Negotiations conducted with an individual without contracting authority are not binding on the Government. Trauma Servie Group v. United States, 104 F.3d 1321, 1325 (1997) (citing City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990) (other citations omitted); Mil-Spec Contractors, Inc. v. United States, 835 F.2d 865, 867 (1987) (holding that a purported agreement with the United States is not binding unless the other party can show that the individual making the agreement had authority to bind the Government).

B. The Plain Language Of The Contract Required The Government To Pay AO For Delivery Of The Line 3A Equipment

As we established in our opening brief, the express terms of the contract require that the Government pay $9,310,071 in "costs associated with special tooling, equipment, and facilitization efforts required by the contractor to perform the M795 LAP contract." DPFUF ¶ 15. It is undisputed that the Line 3A equipment is the equipment identified in the

quoted contract language and is the equipment assembled by AO to produce the M795 projectiles as required by the contract. It is further undisputed that the Government paid AO $9,310,071. DPFUF ¶ 25. It is undisputed that the Government paid AO for the ammunition it produced. If AO did not earn the payment of $9,310,071 for facilitization costs for the Line 3A equipment, then the Government paid AO that money for nothing. According to AO's interpretation of the contract, the Government paid $9,310,071 for 1000 production units of the M795 projectile, without any explanation of the Government's other payments, which also were for that ammunition. Plaintiff's Brief ("Pl. Br.") at 19-20.

AO's interpretation of the contract ignores the fact that the Line 3A equipment was deliverable under CLIN 0001AB with the first production quantity of 1000 units. App. 116. That it was separately deliverable from the first production units was demonstrated by the fact that Modification 00003 moved the payment and delivery of the equipment to CLIN AA, where it was payable at the time that the First Article Test units were delivered. Id. AO additionally ignores the fact that it received payment for the value of the Line 3A equipment at the time the First Article Test items were approved. DPFUF ¶ 23.

Steve Talmadge, Contract Specialist testified at his deposition that the structure of the Contract Line Items ("CLINs") established, beyond question, that the contract required the Government to pay AO for the Line 3A equipment and that AO was required to deliver it to the Government. DPFUF ¶ 26. Mr. Talmadge also explained that the CLIN structure of the contract indicated that the Government was contracting with AO for AO to produce a production line for the Line 3A projectiles to meet certain standards at a certain quantity, which would be evaluated upon submission of the First Article Test items for inspection and approval. Id. The contract did

not, therefore, need to contain a list of equipment to be provided, nor a scope of work for the construction of the production line, because the Government was relying on AO's expertise to assemble the necessary items to meet the production schedule and performance requirements of the contract. Indeed, it was that expertise, among other things, that the Government purchased from AO.

Additionally, the contract contained the following provisions which unequivocally demonstrate that the production line was procured for the Government's ultimate possession and ownership.

> C.3.1.1 <u>Production</u>
> Basic Contract Requirement – The contractor shall Load, Assemble, and Pack (LAP) a quantity of 79,468 each M795 projectiles (includes FAT Qty) in accordance with TDPL number 9312769. The contractor shall deliver M795 projectiles as delineated in Section F of this contract. The deliverable items include; 155mm, HE, M795 Projectiles (9312769), Obturator (10542907), Supplemental Charge (8797090), Liner Cup (9331677), Spacers (8797088).
>
> * * *
>
> C.3.2.1 <u>First Article Test (FAT)</u> – The contractor shall be responsible for procuring all materials and equipment required to conduct the First Article Test (FAT) under the contract. FAT shall be performed within fifteen (15) months after contract award and shall be witnessed and accepted or rejected by the Government.
>
> * * *
>
> H.8 <u>First Article Test - Progress Payments (Written in Plain English)</u>
> Before first article approval, only costs incurred for first article and the required facilitization efforts to meet the required LAP capacity of a maximum of 10,300 each M795 Projectiles per month for any out-year production quantities are allowable for

> progress payments. Payments shall not exceed 50% percent of the contract award value.
>
> * * *

I.8 52.245-2 Government Property (Fixed-Price Contracts). – Alternate I (Deviation)(Jul 1995)(AS1501)

> (c) Title in Government property.
>
> * * *
>
> (3) Title to each item of facilities and special test equipment acquired by the Contractor for the Government under this contract shall pass to and vest in the Government when its use in performing this contract commences or when the Government has paid for it, whichever is earlier, whether or not title previously vested in the Government.

DPFUF ¶21.

C. Government Can Acquire Equipment In Contracts Other Than Facilities Contracts

AO contends that the Government could not have intended to take title to the Line 3A equipment because in a firm-fixed price production contract the Government may not purchase facilities. Pl. Br. 21. AO is incorrect. Indeed the section of the Department of Defense Manual for the Performance of Contract Property Administration that AO cites clearly contradicts plaintiff's contention:

> facilities may also be acquired on contract other than facilities contracts. In this instance, the title provisions in the Government property clause included in that instant contract will prevail.

DoD 4161.2-M, quoted at Pl. Br. 21.

This provision is consistent with the testimony of Valerie Collello, Branch Chief, ARDEC, Picatinny Aresenal, New Jersey, who stated that it is permissible for the Army to

procure equipment under a production contract. Colello Depo. 185:2-9.

Thus, AO's claim that the M795 contract would have been structured differently if the Government were to take title to the Line 3A equipment is meritless, and provides no support for AO's position.

II. AO's Interpretation Of The Contract Improperly Renders Provisions Of The Contract Meaningless

It is well established, and is conceded by AO in this case, that contract interpretation must give effect to all provisions of a contract; an interpretation that renders a clause void or without effect is improper as a matter of law. AO's argument flouts that principle. In this case, AO contends that the Government property clause does not apply to the Line 3A equipment because the clause applies only to "property obtained for the Government," and AO contends that it did not acquire the Line 3A equipment for the Government. This circular reasoning ignores the provision contained in paragraph 4 of the statement of work, which provides a performance standard for the facilitization costs:

> It is understood that the facilitization costs delineated in the contract are based on meeting a maximum monthly LAP [Load, Assemble, and Pack] capability rate of 10,300 each M795 projectiles for any out-year production quantities.

Appendix ("App.") 35.

The facilitzation costs were provided in sub-contract line item number ("sub-CLIN") 0001AB, which reflected $9,310,071 in facilitization costs, that were to be paid, at that time, with the first 1,000 production units. App. 39. Additionally, paragraph C.3.2.1.1 provided that:

> The contractor shall be responsible for procuring all materials and equipment required to conduct the First Article Test ("FAT") under the contract. FAT shall be performed within fifteen (15)

months after contract award and shall be witnessed and accepted or rejected by the Government.

Thus, the contract terms made AO responsible for assembling a production line for the M795 projectiles that would produce acceptable FAT, and would also meet the required monthly production quantity. Therefore, rather than provide a specific list of equipment that AO was responsible for delivering to the Government, the contract provided that AO was required to procure equipment that would meet the FAT and quality, production, and delivery requirements of the contract. At their depositions, the Government employees responsible for negotiating the M795 contract with AO were unanimous in explaining the absence of a list of deliverable equipment. For example, Steve Talmadge, a Contract Specialist employed by the Army at Picatinny Arsenal, New Jersey stated:

Q. Why didn't you put the list of equipment in the contract?
A. Why wouldn't I put the list in the contract? Because we just had the CLIN in there to deliver the units and the facilitization in that CLIN. The final CLIN structure included the price and what they [AO] had to do to complete the line and make the delivery schedule, to – so they could perform to the delivery schedule. So we didn't have to include this equipment. It was evaluated separately on its own.
Q. Okay. You didn't put it in the contract to identify what equipment, what the government was –
A. No, because they had to make sure that the equipment that we all agreed to would meet the delivery schedule rate per month, and that was the, that was a requirement.

App. 121-123. DPFUF ¶ 23 [Talmadge deposition 91:12-92:7]

Similarly, David Banishefsky, the contracting officer, testified:

Q. Is there a list of equipment that you intended to take title to in the contract?
A. I can't recall. I think originally there was something in the solicitation, but that we did not incorporate that because we

> basically said it's up to the contractor to determine what equipment he needs in order to provide the production units.

App. 124-125. DPFUF ¶ 24

Thus, the contract clearly required AO to assemble a production line that would meet the quality, production, and delivery requirements of the contract. The contract further required the Government to pay AO for whatever equipment it purchased to meet the production requirements because the CLIN 0001AB required the Government to pay $9,310,071 in facilitization costs. Thus, under the plain meaning of the Government property clause contained in the contract, AO acquired the Line 3A equipment for the Government and title to the equipment vested in the Government when AO began using the equipment to produce the first article test units.

AO's interpretation of the contract amounts to interpreting the contract as a supply contract, rather than a firm-fixed price production contract. This proposed interpretation of the contract is incorrect as a matter of law because it renders the descriptive data included with CLIN 0001AB meaningless. CLIN 0001AB states "This subclin includes 1,000 each M795 projectiles at a total price of $173,920 and $9,310,071 in facilitization costs." If the contract required only that AO supply a certain quantity of M795 projectiles, this language is mere surplusage. There would be no need to provide for facilitization costs, if all AO was to deliver to the Government were the specified quantity of projectiles. This is an unacceptable interpretation of the contract because it does not "give meaning to all of its provisions," as is required by the law of this circuit. See, e.g., Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1057-58 (Fed. Cir. 1983).

As demonstrated above, because the contract required AO to deliver the Line 3A equipment to the Government, and required the Government to pay AO for that equipment, AO's proposed interpretation is implausible. Moreover, the parties acted in accordance with the terms of the contract. As evidenced by the Form DD 250, on October 22, 1997, the Government took delivery of the special tooling, equipment and facilitization, at the stated amount of $9,310,071, and the First Article Sample of 24 units at a unit price of $428.84. App. 119. On October 24, 1997, Mason and Hanger (AO's predecessor) submitted an invoice for CLIN0001AA, the First Article Test in the amount of $9,310,071.00, and 24 First Article Test units at a unit price of of $428,84, and a total price of $10,292.22. App. 120. AO now attempts to cast this delivery and payment as the mere liquidation of progress payments that vested title to the Line 3A equipment in it rather than the Government. AO relies on 48 C.F.R. § 52.232-16 for this conclusion, but that regulation does not support AO's interpretation of the contract. The predicate for AO's position here is that the Line 3A equipment was not required to be delivered to the Government under the contract. As demonstrated in our opening brief, and above in our current brief, the terms of the contract required AO to deliver the equipment, and required the Government to pay for it. Both of these events occurred. The progress payment clause contained in the contract states that "when the Contractor completes all of the obligations under this contract, including liquidation of all progress payments, title shall vest in the Contractor for all property (or the proceeds thereof) not – (1) Delivered to, and accepted by, the Government under this contract; . . ." Therefore, far from rendering the progress payments clause meaningless, as argued by AO, the Government's interpretation is totally consistent with both the terms of the contract and the applicable FAR clauses. AO's attempt to analogize the Government's claim to

title to a temporary lien fails because it is based on the false premise that the Line 3A equipment was not delivered by AO and paid for by the Government.

III. The Government Is Not Making A Claim In This Case,

The Government did not make an affirmative claim for a final decision from the Contracting Officer, and is not making an affirmative claim in this case because the Government has always had title to the Line 3A equipment. The dispute as to ownership of the Line 3A equipment arose when AO informed the Army that it considered that equipment to be property of AO, not the Government.

The Government holds title to the Line 3A equipment by virtue of the contract terms agreed to by the parties, including Modification PZ0001, which definitized the letter contract, and Modification 00003, which made it clear that the Government was paying $9,310,071 in facilitization costs for the Line 3A equipment. Modification 0003 was signed on March 13, 1997. It is undisputed that the Government paid AO a total of $9,310,071 for the Line 3A equipment as of October 24, 1997. App. 119-120. It is undisputed that AO completed delivery of the remaining LAP quantities of M795 projectiles in accordance with the delivery schedule provided in the contract, which concluded on September 30, 1998. App. 117.

As of September 30, 1998, therefore, both parties had met their respective obligations under the contract. AO had delivered, and the Government had accepted, the FAT units and the Line 3A equipment from AO, and the Government paid to AO the FAT costs and the facilitization costs as set out in CLIN 0001AB. At that point, the Government had received everything to which it was entitled under the terms of the M795 contract. The Government, therefore, had no reason to submit a claim to assert title to property of which it had taken

delivery, and for which it had paid. J & E Salvage Co. v. United States, 37 Fed. Cl. 256, 262 (1997) aff'd J & E Salvage Co. v. United States, 152 F.3d 945 (Fed. Cir. 1998).

Subsequently, it came to the attention of the Government that AO was claiming that the Line 3A equipment was titled to it, and had placed tags on the property identifying it as belonging to AO. Therefore, on September 6, 2007, the Contracting Officer instructed AO to correct the property record and to state whatever grounds AO relied on for its claim of ownership. DPFUF ¶ 23. On September 13, 2007, AO, through counsel, responded and served "notice that it disputes the government's claim. . . ." Despite counsel's characterization of the letter as responding to a claim from the Government, the contracting officer recognized this as AO's claim, and responded to it in writing the final decision. DPFUF ¶ 24.

The final decision set forth for AO in detail the history and substance of the title to Line 3A equipment, but cannot be interpreted as a "claim" asserted by the Government. Taking AO's position to its logical conclusion would mean that ownership and title by a party to tangible or intangible assets could be defeated by any party not constantly declaring its ownership status. This would amount to subjecting Government property to constant jeopardy of conversion by a motivated contractor set on acquiring title to Government property through what amounts to adverse possession, as AO attempts to do in this case. AO contends that it gave the Government "notice" that AO intended to claim ownership of the Line 3A property, and that AO's claim must have been "conspicuous" and "obvious" to the Government. Plaintiff's Brief at 36. Such claims cannot be maintained against the Government as a matter of law, and AO's claim should be denied. As we explained in our opening brief, 28 U.S.C. § 2415(c) was expressly intended to preclude a claim based on adverse possession against the Government, as AO attempts to make

here. Defendant's Motion for Summary Judgment, p. 12 sec. III. AO's cross-motion fails to rebut this point. Moreover, AO's reliance on an adverse possession theory gives the lie to its contention that the plain language of the M795 contract gave title to the Line 3A equipment to AO. If that were the case, AO would have no need to resort to the specious claim that merely by writing its name on Government property it could convert that to contractor-owned property.

A. Even If the Government Were Making a Claim In This Case, It Could Not Be Barred By Any Statute of Limitations

As we established in our opening brief, even if the Government were asserting a claim to title of the Line 3A equipment, its claim could not be barred by any statute of limitations. As a matter of statute, there is no time limit on the Government with respect to bringing an action to establish title to, or right of possession of, real or personal property. 28 U.S.C. § 2415(c); S.Rep. No. 1328, 89th Cong., 2d Sess.3 (1966), reprinted in 1966 U.S.C.C.A.N. 2502, 2505; Davidson v. Federal Deposit Ins. Corp., 44 F.3d 246 (1995).

B. The Government Cannot Transfer Title To Government Property Through Inadvertence

As we established in our opening brief, the Government cannot inadvertently transfer title to Government property. Transfer of Government property requires, at the outset, an individual with actual authority to transfer title, and then there are specific procedures that must be followed. These procedures and requirements are set forth in the Federal Acquisitions Regulation ("FAR") as well as the Defense Federal Acquisition Regulation Supplement ("DFARS"), and Army Federal Acquisition Regulation Supplement ("AFARS"). See 48 FAR §§ 45.603; 45.604, and DFARS Subpart 245.70, and AFARS 5145.602. At a minimum, transfer of title to Government property requires specific actions by a Plant Clearance Officer. 48 C.F.R.

§ 45.603(a). The Plant Clearance Officer is a Government employee appointed by the head of the contract administration office, not an individual employed by a private contractor. DFARS 245:7001.

Not surprisingly, the controlling procedures that govern transfer of Government property do not include conversion by a contractor by means of attaching labels, even brightly colored, distinctive ones. Rather, they involve specific, affirmative actions taken by the Plant Clearance Office whose actions require, in turn, approval from other Government officials. None of the necessary procedures, as described in the regulations, was undertaken by the Government with respect to the Line 3A equipment, nor does AO allege to the contrary.

Moreover, the actions described by AO as creating doubt as to the ownership are specious and border on the fraudulent. AO claims that merely by placing AO identification tags on the equipment, stating that the property belongs to AO, it effected a conversion of the Government's property. As we established in our opening brief on summary judgment, this attempt at gaining title to Government property by adverse possession is barred by statute. AO's remaining argument, that the contract did not provide for the Government to pay for the equipment, is contradicted by the plain language of the contract line items, as well as the Government property clause.

## CONCLUSION

For the foregoing reasons, and for the reasons explained in our cross-motion for summary judgment, defendant respectfully requests that the Court grant defendant's motion for summary judgment and enter an order dismissing the complaint.

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

s/ Joan M. Stentiford
JOAN M. STENTIFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Telephone: (202) 616-0341
Fax: (202) 514-8624

OF COUNSEL:
James Mackey Ives
Litigation Attorney
General Litigation Branch
Army Litigation Center
901 N. Stuart Street, Suite 400
Arlington, Virginia 22203

Larry Manecke
U.S. Army Sustainment Command
Office of Counsel
AMSAS-GC
Bldg. 390
1 Rock Island Arsenal
Rock Island, Illinois 61299-6000

July 29, 2008

Attorneys for Defendant

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 29th day of July, 2008, the foregoing "DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT", was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Joan M. Stentiford
JOAN M. STENTIFORD