IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AMERICAN ORDNANCE LLC, )
)
Plaintiff, ) No. 07-867C
) (Judge Wheeler)
v. )
)
THE UNITED STATES, )
)
Defendant. )

**SUPPLEMENTAL APPENDIX TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

REGINALD T. BLADES, JR.
Assistant Director

JOAN M. STENTIFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 616-0341
Fax: (202) 514-8624

Attorneys for Defendant

# TABLE OF CONTENTS

Excerpt from Deposition of David Banishefski [pages 11-12] . . . . . . . . . . . . . . . . . . . . . . . . . 121

Excerpt from Deposition of Steven Talmadge [pages 91-92] . . . . . . . . . . . . . . . . . . . . . . . . . . 122

Plaintiff American Ordnance's Response to Request For Admission . . . . . . . . . . . . . . . . . . . 123

Excerpt from Deposition of Steven Talmadge [pages 79-81] . . . . . . . . . . . . . . . . . . . . . . . . . . 124

Excerpt from Deposition of David Banishefski [page 97] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

Excerpts from Deposition of Valerie Colello [pages 20-21 and 185] . . . . . . . . . . . . . . . . 126-127

**the PZ modification, it appears clear to me that the government would retain title to the equipment.**

Q. Was it your intent in signing the PZ mod that the government was going to take equipment title?

A. **Yes.**

Q. How was that intent expressed in the contract modification?

A. **I think there was a government property clause that indicated that. I think there was also CLINs that showed that the government -- that there was a facilitization effort and the government was paying for that facilitization effort on their firm fixed price contract in the CLIN structure. I think it was a sub-CLIN or a CLIN, but it was broken out as such.**

Q. Anything else that you communicated your intent?

A. **I think if we weren't going to take title to the equipment, I think we would have stated that.**

Q. Is there a list of equipment that





you intended to take title to in the contract?

A. **I can't recall. I think originally there was something in the solicitation, but that we did not incorporate that because we basically said it's up to the contractor to determine what equipment he needs in order to provide the production units.**

Q. So there is no specific piece of equipment that the contractor was supposed to deliver for the government in the contract?

A. **I know there was a call out of facilitization equipment, but I don't believe it was broken out in the contract to say what pieces of equipment that was.**

Q. So there was no particular piece of equipment that the government was requiring to be delivered for the government; correct?

A. **There was a sub-CLIN that talked about the facilitization of equipment that was going to be provided for a certain amount.**

Q. I'm sorry, can you answer my question?





MR. MASIELLO: Let's --

Q. There was no particular piece of equipment that the government was requiring to be delivered for the government; correct?

A. **Specific equipment, no. We talked about the facilitization of all the equipment, whatever that was.**

Q. So whatever the contractor decided to acquire, that's what the government was acquiring?

A. **Well, that was negotiated as far as what the equipment was. I'm sure during the time of negotiations, but at the time -- at the time of putting it on the contract, I believe it was just facilitization equipment.**

Q. So the contractor could acquire anything it wanted to under the contract from your point of view?

A. **I'm not saying that. I'm not saying that at all. I'm saying they proposed some equipment, the equipment was looked at the time of negotiations and then we simply came to terms on what the price would be for that equipment. So at the time of**





**negotiations I'm sure our technical people understood what equipment they were going to be putting on the line.**

Q. I'm sorry I need to get an answer to this question: Could the contractor acquire whatever equipment it needed to perform the production units under the contract?

A. **Well, obviously, there was a discussion on what that equipment was going to be.**

Q. I'm sorry, can you answer my question, please? Could the contractor perform, acquire whatever equipment was necessary to perform the delivery of the production units under the contract?

A. **If we thought it was reasonable, I guess yes.**

Q. Was there any recourse that the government could complain about the equipment that the contractor required to perform production under the contract?

A. **They had to be able to meet the requirements under the contract, whatever the**

Talmadge

Q. Do you recall either of these offers, offer A and offer B, being conveyed to the government?

**A. I do recall offers going back and forth, so there was many offers, counteroffers going back and forth.**

Q. Okay.

**A. So this could have been one of the multiple offers.**

Q. Do you remember whether the government accepted any offers for price that are laid out here, offer A or offer B?

**A. Did the government accept? What we finally accepted is in the PZ mod, okay.**

Q. Okay. Do you recall any discussions or communications relating to Exhibit 14, with the contractor?

**A. Do I recall, I don't recall each, each one of the specific offers, you know, responding back with the contractor.**

Q. Do you recall any discussions concerning any change in position to the government's, to the government's position that the contractor would retain title to the



Talmadge

equipment, relating to this Exhibit 14?

**A. No.**

Q. Do you recall incorporating any list of equipment that the government was intending to be acquired for them by the contractor, other than Exhibit 14, into the contract?

**A. I didn't put the list of equipment in the contract. It was only for evaluation purposes, to determine fairness cost.**

Q. Why didn't you put the list of equipment in the contract?

**A. Why wouldn't I put the list in the contract? Because we just had the CLIN in there to deliver the units and the facilitization in that CLIN. The final CLIN structure included the price and what they had to do to complete the line to make the delivery schedule, to -- so they could perform to the delivery schedule. So we didn't have to include this equipment. It was evaluated separately on its own.**

Q. Okay. You didn't put it in the contract to identify what equipment, what the



Talmadge

government was --

**A. No, because they had to make sure that the equipment that we all agreed to would meet the delivery schedule rate per month, and that was the, that was a requirement.**

Q. So there is no list as to what equipment was to be acquired by the contractor?

**A. In the contract, no.**

Q. Is there a way that the government could object or modify or change what the contractor was to acquire, with respect to equipment?

**A. If the contractor failed to deliver the firm fixed price item at the time of delivery --**

Q. I'm sorry, what firm fixed price item?

**A. The first article testings, the CLINs, the first article testing the 1000 units and then the production schedule. If they failed to meet that schedule, and the contractor had to make sure he did whatever**



Talmadge

**he could to get that schedule met.**

Q. Okay. So the contractor was free to acquire whatever equipment he needed to produce the end items in the contract for M795s?

**A. Once the contract was agreed to, yes.**

**(Exhibit 15, July 17, 1996 letter from Jeff Hibler to Mr Banashefski, subject, confirmation of price agreement on M795 LAP contract, Bates No. AO004915, marked for identification, this date.)**

Q. The court reporter has handed you what's been marked as Exhibit 15, for identification purposes.

(Discussion off the record.)

Q. It appears to be a letter from Jeff Hibler to David Banashefski dated July 17, 1996, confirming price agreement for the M795 contract.

Do you see that letter?

**A. Yes.**

Q. It references a telephone

## REQUESTS FOR ADMISSIONS

**REQUEST FOR ADMISSION NO. 1:**

Admit that AO executed Modification 0003 to Contract No. DAAE30-96-C-0013, on or about March 13, 1997.

**RESPONSE:**

AO admits that it executed modification P00003 to Contract No. DAAE30-96-C-0013 on or about March 13, 1997.

**REQUEST FOR ADMISSION NO. 2:**

Admit that AO received a payment of $9,310,071, or payments totaling $9,310,071, in costs associated with special tooling, equipment, and facilitization efforts required by the contractor to perform the M795 LAP contract, as provided in Modification P0003 to Contract No. DAAE30-96-C-0013.

**RESPONSE:**

AO denies that it received a payment of $9,310,071, or payments totaling $9,310,071, in costs associated with special tooling, equipment, and facilitization efforts required by the contractor to perform the M795 LAP contract. AO admits that it received payments totaling $9,310,071 for the price of 1 Lot of First Article Test M795 projectiles.

Talmadge

A. No.

Q. Do you recall having any discussions with Colonel Unterseher with respect to Exhibit 10, during the M795 negotiations?

A. I don't recall, no.

That -- well, never mind.

(Exhibit 11, June 18, 1996 letter to Colonel Unterseher from Mr. Heffelbower, Bates Nos. AO002307 through AO002309, marked for identification, this date.)

Q. The court reporter has handed you what's been marked Exhibit 11, for identification purposes. It's a letter dated June 18, 1996 from Darl Heffelbower to Colonel Unterseher.

Do you see that letter, sir?

A. Uh-huh.

Q. Do you recall this letter, Exhibit 11?

A. Yeah, last week, when I saw the e-mails from Joan in regard to some of the paperwork, yes, I did see it last week.



Talmadge

Q. Do you recall this letter being provided to you during M795 negotiations?

A. I don't recall. It's been 12 years. I don't recall this letter.

Q. Based upon communications internally, would you expect Colonel Unterseher to share a letter with you a letter from the contractor dealing with the negotiations you were in the midst of?

A. I would -- you would -- I would assume, yes.

Q. Would you assume also that Mr. Banashefski would have received a copy of this from Colonel Unterseher, Exhibit 11?

A. I would -- I would assume.

Q. Do you have any reason to believe that you and Mr. Banashefski didn't receive a copy of this letter?

A. No.

Q. I would like to turn your attention to the second page of this letter. It's AO002308 of Exhibit 11. And at the bottom of the page it states, "We have also" --

A. I'm sorry, Steve, 11, you said?



Talmadge

Q. Exhibit 11. I would like to turn your attention to the second page of Exhibit 11.

A. Got it.

Q. Page AO002308.

A. Got it.

Q. At the bottom of that page it states, "We have also agreed to take title to the equipment acquired as part of our facilitization effort under this contract."

Do you see that line?

A. This was dated, this was dated June, so this was before the -- okay. I see it here, yes, I do see it.

Q. Do you recall this agreement occurring, with the contractor agreeing with the government that it would take title to the equipment, under the M795 contract?

A. No, I don't agree with -- I'm sorry, I don't -- I'm sorry, rephrase that. What was the question again?

(A portion of the record was read.)

A. See, the Colonel doesn't have the authority to enter into an agreement, so it's



Talmadge

the contracting officer who does.

So I don't know if the -- when we got down to the final product, the final PZ mod, what we, what we finally agreed to was in that document. So things leading up to that point could have gone back and forth, meaning we take title to it, we don't take title to it. All I know is at the final negotiation of the signatures, that's what we agreed to.

Q. You just indicated to me that it's likely, that Colonel Unterseher likely shared this letter with you and Mr. Banashefski.

Did you do anything to explain to the contractor that that agreement was no longer valid, that the contractor would take title to the equipment under the M795 contract?

A. I don't recall.

Q. I would like to turn your attention to the third page of Exhibit 11. You see the second paragraph down it says, "Since we have agreed to take title to the facilitization equipment, the abnormal maintenance and

Banashefski

in Exhibit 9, the draft facilitization scope of work?

A. **Again, this issue on who owned the equipment obviously came up during the negotiation of the definitization modification. This is so early in the process though. This looks like it happened in May, if indeed these are the dates. That's real early in the process, so I don't know.**

Q. Do you know why this -- the language to the effect in draft facilitization scope of work did not -- was or was not incorporated into the definitive modification?

A. **No, I can't recall why it wasn't.**

Q. I would like you to take a look at Exhibit 10, please.

A. **Exhibit 10. Okay. Okay.**

Q. Exhibit 10 appears to be a letter from Colonel Unterseher to Darl Heffelbower dated June 5, 1996. Do you see that letter, sir?

A. **Yes.**



**Banashefski**

Q. Do you recall this letter, sir?

A. **No.**

Q. Have you ever seen this letter before?

A. **I can't recall.**

Q. Exhibit 10.

A. **Yeah, I can't recall.**

Q. Do you recall any discussions with Colonel Unterseher concerning the issues raised in Exhibit 10?

A. **No.**

Q. I would like to turn your attention to Exhibit 11, please.

A. **Okay. Okay.**

Q. Exhibit 11 appears to be a letter dated June 18, 1996?

A. **Uh-huh.**

Q. From Darl Heffelbower to Colonel Unterseher. Do you see that letter, sir?

A. **Uh-huh.**

Q. Do you recognize the letter, Exhibit 11?

A. **No, I do not.**

Q. Did you ever receive this letter,



Banashefski

Exhibit 11?

A. **I can't recall, but this -- I do not see anything on here that shows that it came to our office as the contracting office negotiating the contract, so I don't see anything coming into our office.**

Q. Would the program manager ordinarily provide you copies of correspondence relating to the negotiation of a contract you were involved in?

A. **I would believe they would, but I would think that the -- that the contractor would also send us copy furnished of whatever they're talking about to the program manager to us, especially during the negotiation process.**

Q. Who is Mike Divine?

A. **Mike Divine? At the time, Mike divine was probably -- again, I'm just -- he was high up in the -- in the program manager's office at -- at Picatinny I think at this time. What his exact title was at that time, I'm not sure. I'm not sure, but he was a person who at Picatinny had a**



**Banashefski**

**leadership position in the program manager's side, the technical side of the house.**

Q. I would like to turn your attention to the second page of Exhibit 11.

A. **Okay.**

Q. You see the last sentence on that letter, it says, "We have also agreed to take title to the equipment acquired as a part of our facilitization efforts under this proposed contract."

Do you see that?

A. **Yes, I do.**

Q. Did Colonel Unterseher or the contractor communicate this agreement to you that you recall?

A. **Again, not that I'm aware of, no.**

**And let me just state for the record, that Colonel Unterseher cannot negotiate and cannot bind the government. He did not have the authority to do that.**

Q. So you are telling me then that you did not receive Exhibit 11 from Colonel Unterseher, he did not communicate that the agreement of the contractor to take title of

18

Colello
end-item deliverable in the contract?
A. **Yes.**
Q. And what is the basis for that point of view?
A. **I believe there was a narrative in the PZ mod that discussed the facilitization costs, and I believe the facilitization costs were separate from the costs of the M795s.**
Q. Is there anything else?
A. **I think the government property clause was included in the definitization of the letter contract.**
Q. Is there anything else that led you to believe that the equipment was a deliverable under the PZ0001?
A. **Contained in the contract?**
Q. Yes, ma'am.
A. **No, I don't think so -- not that I can recall.**
Q. Anything outside of the contract that would lead you to believe it was a deliverable? The equipment?
A. **I don't think so.**
Q. Is there anything else, going back

19

Colello
to earlier, is there anything else that leads you to believe that the government changed its position from your May 30, 1996 letter, other than the PZ0001 contract that we just discussed?
A. **I don't think so. Just signature of the contract of the parties.**
Q. Do you recall any discussions relating -- with government individuals relating to PZ0001 and the property title?
A. **No. I do not remember any discussions on that.**
Q. Was there any discussions about including equipment as an end item in PZ0001?
A. **I don't remember any discussions regarding that.**
Q. Any discussions with other government employees concerning the title and the equipment at any time?
A. **No.**
Q. Let me just also follow up on, you mentioned that there's nothing else that -- other than PZ0001, that leads you to believe that the government changed its position.

20

Colello
Is that because you had any -- no involvement in the negotiations leading to PZ0001?
A. **No, I had no involvement, so I had no privity to conversations or positions on the part of the government or Mason & Hanger.**
Q. Can you describe, now that you've had a chance to review your letter, what your role, what you believe your role was in the M795 contract negotiations?
A. **In the actual negotiations?**
Q. Yes, ma'am.
A. **I had no role in the negotiations.**
Q. Do you have any understanding as to why you were the signature authority under the May 30, 1996 letter?
A. **I believe I was the signatory to that letter in the absence of the assigned PCO to the M795 contract.**
Q. Who was the assigned PCO?
A. **David Banashefski.**
Q. Do you recall who prepared the letter for you to sign?
A. **No, I don't recall who prepared the**

21

**Colello**
**letter.**
Q. Do you recall who had input or assisted you in issuing the letter of May 30, 1996?
A. **Do I recall who -- I'm sorry.**
MR. MASIELLO: Could you repeat the question, please.
(A portion of the record was read.)
A. **No, I don't remember.**
Q. Do you remember anything concerning the M795 negotiations, other than what we've already discussed this morning?
A. **I had no part in the negotiations, so I have no recollection of any issues.**
Q. I would like to talk to you about some definitional terms as a contracting officer.
What is a contract line item number, or CLIN?
A. **A contract line item number is, well, there is a number, a CLIN number, and against the CLIN number is a description of the end -- the deliverable under the contract. And for purposes of a contract, it**

182

Colello

**contract specialist who was working on the FOIA request, and I was told there was approximately 13 to 15 contract files for the M795 program.**

Q. When you say 13 to 15 files, how much is a file, what is the volume of a file?

**A. An official contract file has six sections to it, and I would say each section could probably hold 100 documents, maybe. I really don't know, but it would be a lot of paper.**

Q. And do you know what a banker box is?

**A. No.**

Q. Okay. Is it a box full of documents?

**A. One file?**

Q. How many inches, I guess, of documents?

**A. Yeah, inches. One file?**

Q. 13 to 15 files, how much?

**A. Well, one file probably could hold about that much paperwork.**

Q. Okay.

183

Colello

**A. So there were was -- I was told 13 to 15 for the M795 program.**

**I do not know how many files relate to -- and I don't know if there is other contracts after the 96-C that would constitute 795 program. I do not know how many files the 96-C contract was comprised of.**

Q. Just for the record, you indicated with your fingers about six inches per file?

**A. I would say so, yes.**

MR. MASIELLO: Okay. Ms. Colello, I don't have any further questions.

Do you have anything you wanted to say or clarifying anything, before we let you go?

THE WITNESS: I don't think so.

MR. MASIELLO: Ms. Stentiford?

MS. STENTIFORD: I have just two questions to ask you, Ms. Colello.

EXAMINATION BY

MS. STENTIFORD:

Q. Towards the end of your direct testimony, Mr. Masiello asked you a series of

184

Colello

questions about where the -- I just want to clarify something -- whether there were any documents that reflected the government's intent, with respect to this contract, the M795 contract, and the definitization of the letter contract. And you said that there weren't any other letters or e-mails or what have you.

But prior to that I believe you said that it was your opinion or your understanding that the contract terms itself were the expression of the government's interest.

Am I correct in that?

**A. Yes.**

Q. And the only other question I have for you, you were asked very many questions about the fact that there can be contracts that are called production contracts, and there can be contracts that are called facilities contracts.

Do you recall answering those questions?

**A. Yes.**

185

**Colello**

Q. My question is, if something is identified as a production contract, is it possible for the government to procure equipment under that contract?

**A. If it's called a production contract?**

Q. Yes.

**A. Yes.**

MS. STENTIFORD: Thank you. I have nothing else.

MR. MASIELLO: That's all I have. Thank you very much for your time.

THE WITNESS: You're welcome.

(Time noted: 4:04 p.m.)