**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

AMERICAN ORDNANCE LLC,
Plaintiff,
vs.
UNITED STATES,
Defendant.

Case No. 07-867C
Judge Wheeler

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Of Counsel:

Timothy R. Odil
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
Telephone: (303) 634-4000
Facsimile: (303) 634-4400
E-mail: todil@mckennalong.com

Steven M. Masiello
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
Telephone: (303) 634-4000
Facsimile: (303) 634-4400
E-mail: smasiello@mckennalong.com

ATTORNEY FOR PLAINTIFF, AMERICAN ORDNANCE LLC

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 57

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AMERICAN ORDNANCE LLC,

Plaintiff,

vs.

UNITED STATES,

Defendant.

Case No. 07-867C
Judge Wheeler

DECLARATION OF JOHN R. LOHMANN, JR.

I, John R. Lohmann, Jr., make the following declaration under penalty of perjury that the following is true and correct:

1. I have personal knowledge of all facts set forth in this declaration.

2. I was employed by Mason & Hanger Corporation ("MHC") from 1964 until 1998. I became an American Ordnance LLC ("AO") employee in 1998 when AO began as a joint venture of MHC and General Dynamics Ordnance Systems, Inc.

3. Between 1997 and 1998, I was a Contract Administrator for MHC. I continued as a Contract Administrator at AO until my retirement from AO in 2008.

4. As one of my duties as a Contract Administrator, I was responsible for day-to-day administration and management of the contract for production of M795 Projectiles at the Iowa Army Ammunition Plaint ("IAAAP"), Contract No. DAAE30-96-C-0013, Modification No. PZ0001, dated August 15, 1996 (the "M795 Contract"). From my

work as Contract Administrator, I am generally familiar with the equipment located on Production Line 3A (the "Line 3A Equipment").

5. From the beginning of the time that I was Contract Administrator for the M795 Contract, based upon my review of the M795 Contract itself and from speaking with my colleagues at MHC who negotiated or performed the M795 Contract, I understood that MHC owned the Line 3A Equipment.

6. In February 1997, the government's informed MHC that the government would be unable to meet the M795 Contract's schedule for the government's delivery to MHC of metal parts, TNT, and metal pallets (the government furnished material ("GFM") needed to manufacture M795 Projectiles). Contracting Officer ("CO") David Banashefski ("Banashefski") informed MHC of the GFM delivery schedule "slippage" by letter dated February 18, 1997.

7. The government requested that MHC agree to a "no-cost modification" to the M795 Contract, *i.e.*, an amendment to the contract that did not increase the total contract price, that would allow the government to deliver GFM at a date later than the M795 Contract required.

8. Without timely delivery of GFM, MHC was placed in the unfavorable position of incurring increased costs from the government's delay as well as expending costs associated with the production of M795 Projectiles, but being unable to complete production of the projectiles and to receive payment for the price of such projectiles.

9. On February 27, 1997, I discussed with Steven Talmadge ("Talmadge"), government Contract Specialist for the M795 Contract, the government's proposed

"no-cost modification" to the M795 Contract that would allow later delivery of GFM. I and other MHC representatives informed Talmadge that MHC would be financially impacted by the proposed GFM delivery schedule slippage as a result of the fixed-price nature of the M795 Contract. MHC proposed to Talmadge that MHC could agree to the "no-cost modification" to the M795 Contract's GFM delivery schedule if the government would pay MHC in a manner that would not delay MHC's receipt of the M795 Contract's fixed price as a result of the government's failure to meet the GFE schedule requirements. Specifically, MHC proposed that the parties shift a portion of MHC's price for the delivery of 1,000 each, M795 Projectiles (SubCLIN 0001AB), described to relate to facilitization, to the earlier First Article Test ("FAT") quantity of M795 Projectiles (SubCLIN 0001AA). Talmadge did not immediately agree to MHC's proposal.

10. I spoke to Talmadge again later in the day on February 27, 1997. Talmadge requested that MHC send a separate letter regarding MHC's proposed request for earlier payment.

11. I spoke to Talmadge again on the morning of February 28, 1997. Talmadge informed me that he had spoken to other government representatives, Mr. Pritchard and Mr. Vogt, regarding MHC's proposed request for earlier payment. Talmadge informed me that Mr. Pritchard and Mr. Vogt did not have any problem with MHC's proposal. Talmadge also informed me that he would address MHC's proposal in a modification to the M795 Contract, and that the modification would modify the dates for delivery of GFM and for the timing of final liquidation payment of the relevant portion of MHC's

fixed price. Talmadge advised me that he would use words such as "final facility payment would be made upon final in-plant inspection and approval of the FAT quantities."

12. In my conversations with Talmadge related to modification of the M795 Contract, there was no discussion of any agreement to grant title in the Line 3A Equipment to the government, nor any request from the government that MHC transfer title in the Line 3A Equipment to the government.

13. In my conversations with Talmadge related to modification of the M795 Contract, Talmadge did not assert that the government owned, or would own, the Line 3A Equipment.

14. On March 3, 1997, I drafted a letter to the government regarding MHC's proposal for earlier payment (the "March 3, 1997 Request"). In the letter, MHC requested a contract modification that would shift a portion of its price for the delivery of 1,000 each, M795 Projectiles (SubCLIN 0001AB) to be paid at the time of delivery of this first production lot of M795 Projectiles, to the earlier FAT quantity of M795 Projectiles (SubCLIN 0001AA).

15. On March 13, 1997, the parties executed Modification P00003 ("P00003") to the M795 Contract to address the government's GFM schedule slippage and MHC's March 3, 1997 Request.

16. P00003 modified the dates for delivery of GFM, adjusted the schedule for MHC's delivery of M795 projectiles, and moved the portion of the M795 Projectiles'

price from SubCLIN 0001AB to SubCLIN 0001AA. P00003 confirmed that "all other terms and conditions of [the M795 Contract] remain unchanged."

17. On October 21, 1997, the government directed MHC to submit an invoice to the government for payment of the price for FAT quantity, including the portion of its price moved to SubCLIN 0001AA from SubCLIN 0001AB. Talmadge, who had now replaced Banashefski as MHC's primary government contact for the M795 Contract, directed MHC to submit an invoice and form DD250. Based upon my discussions with Talmadge, it was understood by the government that MHC was submitting the form DD250 solely in support of MHC's invoice for SubCLIN 0001AA, not to modify the terms of the M795 Contract or to deliver any facilities to the government.

18. I directed MHC staff to prepare the Invoice and DD250 so that MHC could receive payment for the portion of the projectile price related to SubCLIN 0001AA. MHC had no intent to change any terms of the M795 Contract regarding title to the Line 3A Equipment by submitting an Invoice and form DD250.

19. On October 24, 1997, MHC submitted its Invoice and form DD250 for payment and liquidation of SubCLIN 0001AA.

20. In my experience at MHC and at AO, both the government's actions and communications to me concerning the M795 Contract were at all times consistent with AO's ownership of the Line 3A Equipment.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED this 26th day of July, 2008.

John R. Lohmann, Jr.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

AMERICAN ORDNANCE LLC,
Plaintiff,
vs.
UNITED STATES,
Defendant.

Case No. 07-867C
Judge Wheeler

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 58

DoD 4161.2-M

# DoD Manual for the Performance of Contract Property Administration

December 1991

Assistant Secretary of Defense
(Production and Logistics)

C1.3. DUTIES AND RESPONSIBILITIES OF THE PROPERTY ADMINISTRATOR

The PA shall be responsible for:

C1.3.1. Administering contract provisions, requirements, and obligations relating to Government property in the possession of contractors. General clauses include the FAR 52.245 clauses.

C1.3.2. Participating in pre-award surveys and post-award reviews.

C1.3.3. Reviewing contracts assigned for property administration to assure that property is identified in the contract and that general and special contract provisions dealing with property are included, when applicable.

C1.3.4. Ensuring that contractor property organizations are aware of and understand applicable provisions of Government contracts dealing with property including FAR 45.5.

C1.3.5. Establishing contract property control data files.

C1.3.6. Providing the contractor officer with recommendations concerning liability for loss, damage, or destruction (LDD) of property on the basis of contract terms and conditions.

C1.3.7. Granting relief of responsibility for LDD of Government property on the basis of contract terms and conditions when authorized through the PA's certificate of appointment.

C1.3.8. Performing functions as prescribed by FAR 45.5.

C1.3.9. Developing and applying a property systems analysis program to assess the effectiveness of contractor Government property management systems.

C1.3.10. Evaluating the contractor's property management system; approving the system or recommending disapproval where systems create an unacceptable risk of loss, damage, or destruction of property.

C1.3.11. Advising the Contracting Officer (CO) and other affected Government managers regarding the contractor's noncompliance with approved procedures, contractual requirements, and other significant problem areas.

C1.3.12. Notifying the CO in the event of excessive acquisition by the contractor and recommending cost disallowance, or other appropriate remedy.

C1.3.13. Performing program or Agency-oriented reviews of property acquisition, control, management, use, and disposition as dictated by contracting conditions where applicable.

C1.3.14. Supporting and assisting contractor's management, contracting officers, program managers, and other functions in resolution of property administration matters.

C1.3.15. Reviewing Government-furnished material for receipt and reconciliation in accordance with FAR 45.5 and the reports provided by the Management Control Activity (MCA) in accordance with DoD Instruction 4140.48.

C1.3.16. Providing guidance, counsel, and direction to Government and contractor managers and technicians related to regulatory and contractual requirements for management of Government property.

C1.3.17. Ensuring that the contractor promptly reports excess Government property for disposition in accordance with contract provisions.

C1.3.18. Supporting the assigned Plant Clearance Officer to ensure prompt and proper disposition of contractor inventory.

C1.3.19. Obtaining and reviewing contractually required reports of property for all assigned contracts.

C1.3.20. Preparing and submitting other reports prescribed by higher headquarters.

C1.3.21. Requesting supporting property administration.

C1.3.22. Performing supporting property administration.

C1.3.23. Recognizing the functions of other Government personnel having cognizance of property, and obtaining their assistance when required. (These functions include, but are not limited to, contract administration, plant clearance, contract audit, quality assurance, engineering, pricing, subcontracting, production, transportation, and other technical areas. Assistance and advice on matters involving analyses of the contractor's accounting records, financial aspects of contractor property reports, and on any other appropriate financial audit matters shall be obtained from the Defense Contract Audit Agency auditor, through the CO.)

## C1.4. PROPERTY ADMINISTRATOR ROLE IN THE CONTRACT ADMINISTRATION MISSION

The role of the PA is to support the contract administration function. The PA is an authorized representative of the CO regarding the contractual and technical aspects of Government property. The PA is part of the contract administration team that includes the CO, Price Analyst, Industrial Specialist, Transportation Specialist and Quality Assurance Representative (QAR). As a team member, the PA must establish effective communications with these other functional elements.

## C1.5. APPOINTMENT OF PROPERTY ADMINISTRATORS

The PA acts on behalf of the CO and is appointed in writing by a "Certificate of Appointment" in accordance with Agency directions. Direction for appointment of PAs is provided in DFARS 245.7001. Specific procedures for appointment and the issuance of a certificate of appointment shall be established by the individual Agencies.

# C2. CHAPTER 2

## CONTRACTUAL ELEMENTS OF THE PROPERTY ADMINISTRATION PROCESS

### C2.1. INTRODUCTION

C2.1.1. PAs have a variety of responsibilities to ensure that Government property in the possession of Government contractors is properly managed. The most critical and basic of these responsibilities is the administration of specific contract provisions relating to Government property. Most other responsibilities, including property system analyses, are intended to support this primary responsibility.

C2.1.2. PAs are responsible for having a thorough understanding of all contract provisions pertaining to Government property. These include:

C2.1.2.1. The contract clauses in FAR 52.245 and DFARS 252.245, and other applicable clauses, as well as any special contract provisions.

C2.1.2.2. The requirements of FAR Part 45, DFARS 245, and as supplemented by agency-unique regulations.

C2.1.2.3. The PA is responsible for the enforcement of those provisions in the FAR, DFARS, and Agency supplements that are binding upon the contractor either through incorporation by reference of an appropriate Government property clause, or by direct incorporation in the contract.

C2.1.2.4. The Government property clauses at FAR 52.245-2, 52.245-5, and other clauses in FAR 52.245, are the most important for PAs to understand and properly administer. They establish the title, property control, risk of loss, and disposition provisions that generally apply to all Government property. Clauses, such as FAR 52.232-16, 52.249-2, 52.249-6, 52.252-1, etc., may impact the control of other property accountable to Government contracts at various times. The PA shall be familiar with the implications of these clauses and their application where appropriate.

C2.1.2.5. PAs must be similarly familiar with special contract requirements relating to Government property. These include the amount of authorized Government-furnished property (GFP), contractor-acquired property (CAP) specified as a line item, authorized use of Military Standard Requisitioning and Issue Procedures (MILSTRIP) for ordering Government property, warranty provisions, and other special provisions.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

AMERICAN ORDNANCE LLC,
Plaintiff,
vs.
UNITED STATES,
Defendant.

Case No. 07-867C
Judge Wheeler

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 59

**From:** Julie Solinski
**To:** Beverly Atkins (beverly.atkins@us.army.mil); R...
**Date:** 7/10/2006 11:37 am
**Subject:** Re: Contracting

**CC:** Celia M Ms JMC Hadden; Cynthia L Ms AFSC Peterman
Randy

Attached is first of three listings or summary of listings that will answer you questions as best as can be given the short time frame. Below is the spreadsheet of government owned equipment purchased under service BOA 12 that needs to be moved to Facilities contract. AO is in process of submitting to PCO for the transfer. Note on Delivery Order 294 the items listed in Bldg. 1-12 were destroyed in the recent incident. Note this is in workbook format and the "+" contain information for each order.

Julie K. Solinski
Property Administrator
Iowa AAP
DSN 585-7908
(319) 753-7908
jsolinsk@aollc.biz

>>> "Ommen, Randy R Mr JMC" <randy.ommen@us.army.mil> 6/28/2006 10:48 am >>>

They want to know how soon we can expect the following:

1. Production line of equipment GFE/GFM to the contractor, but owned by the Government.

2. Production line of equipment modified by the contractor.

3. Production line of equipment after modification can not be removed and now is Government property.

4. Production line equipment after modification can be returned to its original condition less fair wear.

5. Production line equipment that is being used and makes the products for the Government that is owned by the contractor and if removed would make the line inoperational to produce the item for the Government.

Please response to what date we can expect this information.

Thank You

Randy Ommen

2561

Equipment Breakdown at Iowa AAP

All Data as of the September 30, 2005 DD1662 Report

American Ordnance has approximately 6500 separately numbered line items at Iowa with acquisition of $13,151,000. There are also an unspecified number of items not numbered that are under $500 value. All government hand tools were sold to AO in 2004. After a review, there appears to be approximately 3200 items that are directly related to production items. The large dollar value items that could directly impact production are:

Line 3A - 510 Line Items are located on the line that directly support production. The ARDEC contract that facilitized Line 3A in the mid 90s was vague about ownership of equipment. It was ARDEC contract but some key items have AO ownership. Major Items include:

1. Qty of 36 conditioning ovens for M107/M795 at $10,000 per oven.
2. Qty of 32 line items of computer equipment that support the Phoenix digital X-Ray.
3... Qty of 2 MH50174G Thermometers, Infrared $26,142.50 3A- 20-01.
4. Approx 70 pouring carts used for transport of shells. They racks are mounted on government owned carts. There actual ownership could be disputed.
5. 3A-05-01 Controls for pouring include CPUs, pumps, control panels, display panel integral to the pouring.

Line 3 - 191 Items to support production.

1. Bldg 3-16 contains the High Shear Mixer and three companion pieces of equipment.
2. 80 Pouring racks for 155MM, M107

Line 2 – 453 Items to support production.

1. MH50300G Epoxy Paint System Acquisition $1,000,000
2. Line of the Future Equipment with acquisition cost over $1,000,000 purchased by AO includes:
   a. Primer Inspection Station
   b. Primer Processing Stations
   c. Conveyor systems
   d. Pick and Place Bonding stations
3. X-ray fixtures approx 25 in 2-10 for M830A1 and 4 Fuze X-ray fixtures
4. MH235 CNC Lathe to support M830A1
5. Qty of 15 Leak detector heads for 120MM cans, each costs minimum of $3,000 current replacement value more like $6,000.
6. Various process fixtures such as the M831 Disassembly tool, fin tracer tool, adhesive dispenser fixtures.
7. Qty of 15 Binks Paint gun heads for various painting systems.
8. Fixtures for ADBAT pull testing
9. 2-05-2 Fire Detection System approx 44K. MH50030G
10. Bonding Fixtures at least 42 that were refurbished for Line of the Future.

11. XM 1002 Equipment

Line 1

Demil 1-85-2 Bldg. 45 Total Items most are general purpose except plasma torch and pull apart jaws.

MACS 1-13 Bldg. 163 Total Items Most of production related items are AO owned.
1. 2 MACS Assembly Machines approx. $100,000 each
2. Conveyor Equipment
3. Loading Manifolds
4. 2 Powder Weighing Systems approx $65,000 each
5. Numerous Powder Bag sewing stations
6. 2 powder dispensing stations/barricade approx. $20,000 each
7. Inkjet marking machine.

Reactive Armor – 1-61 Bldg 94 Total Items most are general purpose tables, racks, rivet guns and material handling equipment.

Miscellaneous
1. Qty of 174, 50 hole pouring racks in storage that support motar production.
2. Qty of 23, 4 way stacking racks in storage that support production
3. Calibration Lab Listing of 39 pages of gages at 1-84 to support all production items and tooling.

AMERICAN ORDNANCE
Total 3200 Items
DAAA09-98-E-0003
DAAA09-98-G-0012
DAAA09-99-C-0020
DAAA21-87-C-0071
DAAA21-90-C-0016
DAAB15-01-C-0015
DAAE30-00-C-1033
DAAE30-01-9-0800
DAAE30-01-C-1054
DAAE30-03-C-1084
DAAE30-03-C-1108
DAAE30-96-C-0013
DAAE30-96-C-0015
DAAE30-97-D-1005
DAAE30-99-C-1012
DAAE30-99-C-1049
DAAH01-00-C-0108
DAAH01-84-C-A182
DAAH01-90-C-0323
N00019-94-C-0088
N00019-95-C-0084

Above is listing of all Iowa contracts that reported government equipment on record for last DD 1662 on September 30, 2005. Below is summary of contracts with significant production equipment. American Ordnance owned items under separate report.

DAAA09-98-E-0003 Equipment Summary Represents bulk of equipment on GOCO contract. Acquisition cost $53,288,877.

| | |
|---|---|
| Special Tooling | 3691 Items |
| Special Test Equipment | 118 Items |
| IPE (Lathes, Mills) | 70 Items |
| OPE | 23701 Items |
| Military Property | 143 Items |

DAAA09-98-E-0012 See separate spreadsheet for breakout by Delivery Order.

DAAE30-96-C-0013 ARDEC Managed Contract covered original facilitization of Line 3A. Acquisition costs on record of $3,154,205

| | |
|---|---|
| Special Tooling | 40 Items |
| OPE | 83 Items |

Includes slurry analyzer with probe for pour kettle acq cost $116,000
2 feather feeders for the kettles acq cost $103,000 each
35 Flow switches
35 Brass flow meters
Portions of Digital X-ray totaling approx acq cost $2,700,000
40 X-ray fixtures for M107/M795 approx acq cost $100,000

2564

DAAE30-03-C-1108 Alliant Contract for XM 1040 Government Ownership
Special Tooling 12 Items
OPE 21 Items

DAAE30-03-C-1084 Alliant M830A1 120MM Contract ARDEC Ownership
Acquisition cost $388,760
Special Tooling 72 Items
Special Test Equipment 5 Items
OPE 67 Items

DAAH01-00-C-0108 Javelin TI/Martin Joint Venture Government ownership
Special Tooling 33 Items
OPE 4 Items

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

AMERICAN ORDNANCE LLC,
Plaintiff,
vs.
UNITED STATES,
Defendant.

Case No. 07-867C
Judge Wheeler

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 60

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMERICAN ORDNANCE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | No. 07-867C |
| | ) | |
| UNITED STATES, | ) | DEPOSITION OF |
| | ) | **CHARLES SMITH** |
| Defendant. | ) | |

ORIGINAL

**DEPOSITION OF CHARLES SMITH**, taken in the Conference Room at the Rock Island Arsenal, Building 90, Rock Island, Illinois, on **June 6, 2008**, commencing at **8:40 AM**, before Donna M. Kelly, a Certified Shorthand Reporter, licensed in the States of Illinois and Iowa, pursuant to notice of the parties in the above-entitled action.

contractual documents?

A. Clear on the contractual documents, the contract and the clauses and the DD250.

Q. Is the DD250 part of a government contract?

A. It's part of the government's contract file. It's the official acceptance of the items delivered under the contract, whether they be services or equipment or production units, so I could ask my lawyer if that's a part of the contract.

Q. No, you're a contracting officer. In your experience, is a DD250 signed by the contractor incorporated into the contract, to your knowledge?

A. It's not incorporated into the contract by modification. It's required by the contract, executed, and becomes a part of the contract file and the contract documentation.

Q. Does negotiation correspondence become part of the contract file?

A. It becomes part of the contract file.

Q. Yes?

A. Yes.

Q. What else becomes part of the contract file?
A. Any --
Q. Does an invoice become part of the contract file?
A. Invoices, DCMA documentation.
Q. DCAA audit reports?
A. Yes.
Q. Anything else?
A. There can be other things that become part of the contract file.
Q. So did you find the DD250 within the contract file to be important to your final decision?
A. Yes.
Q. So this document was not incorporated into the contract, correct, this DD250?
MR. IVES: Objection.
A. There is no modification that says that this is incorporated into the contract.
Q. Okay. How do you put -- in your experience as a contracting officer, how does language become incorporated into a contract?
A. As part of the basic contract or by modification.

all I know of.

Q. Do you know of any other instance where it was verbally or otherwise stated by the contractor that some agreement existed?

A. No.

Q. Going back to the evenly distributing costs of facilitization over projectiles, you mentioned that helped resolve the intent of the parties. Why, in your experience?

MR. IVES: Objection.

A. My experience in contracting is if your contract consists of deliverable items at a unit price, and that unit price includes the acquisition by the contractor of some bit of equipment to perform the contract, then your agreement under the firm fixed price is -- does not include taking title to that equipment.

If you separately price equipment under the government property clause, then you take the -- the government takes title to that equipment.

Under a firm fixed price for production units we don't officially know what the contractor has used the money to do. Maybe he has used it to buy equipment; fine. Maybe

he had just used it to buy equipment, labor; fine. We don't take title to anything that he has purchased with that firm fixed price.

If it was a separately priced line for equipment, delivered with its own DD250, then not amortized in the price of the product, then under the property clause we take title to it.

Q. I think I asked this before, but do you know why the parties did not amortize the facilitization?

A. Insofar as I do not know what their intents were at the time, why decisions were made, no. I don't know that, no.

Q. Looking at numbered paragraph 32 on page A000572 of Exhibit 18, it states in the second sentence, "This DD250 indicates that the government accepted the Facilitization of Line 3-A and that it was separately priced."

Do you see that, separately priced, excuse me?

A. Yes.

Q. I think we went over this, but is it fair to say that the DD250 was important to your final decision?

A. Yes.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 61

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMERICAN ORDNANCE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | No. 07-867C |
| | ) | |
| UNITED STATES, | ) | DEPOSITION OF |
| | ) | **JAMES NELSON** |
| Defendant. | ) | |

COPY

**DEPOSITION OF JAMES NELSON**, taken in the Conference Room at the Rock Island Arsenal, Building 90, Rock Island, Illinois, on **June 4, 2008**, commencing at **9 AM**, before Donna M. Kelly, a Certified Shorthand Reporter, licensed in the States of Illinois and Iowa, pursuant to notice of the parties in the above-entitled action.

contractor's failure to list the Line 3-A equipment as government property?

A. I do not.

Q. Do you believe that any deficiency was ever found with respect to the ownership of the Line 3-A equipment in the audit?

A. I don't know if it was found through audit. I know that it was made an issue. That's why the Charles Smith memorandum and the decision was issued.

Q. When, approximately, was -- well, when was this -- let's talk about Mr. Smith's final decision.

When, to your understanding, did the government decide to take action to require the contractor to list the Line 3-A equipment as government property?

A. Well, I believe that the issue ever since the property was acquired was always an open issue. The final determination to have it in order to change the property was the Charles Smith final determination sometime in 2007.

Q. All right. Well, let me try to clarify, then.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

AMERICAN ORDNANCE LLC,
Plaintiff,
vs.
UNITED STATES,
Defendant.

Case No. 07-867C
Judge Wheeler

**APPENDIX IN SUPPORT OF PLAINTIFF AMERICAN ORDNANCE LLC'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# APPENDIX EXHIBIT NO. 62

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AMERICAN ORDNANCE LLC,

Plaintiff,

vs.

UNITED STATES,

Defendant.

Case No. 07-867C
Judge Wheeler

# PLAINTIFF AMERICAN ORDNANCE LLC'S MOTION FOR SUMMARY JUDGMENT

Of Counsel:

Timothy R. Odil
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
Telephone: (303) 634-4000
Facsimile: (303) 634-4400
E-mail: todil@mckennalong.com

Steven M. Masiello
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
Telephone: (303) 634-4000
Facsimile: (303) 634-4400
E-mail: smasiello@mckennalong.com

ATTORNEY FOR PLAINTIFF, AMERICAN ORDNANCE LLC

## A. Summary of the Facts[1]

AO, or its predecessors-in-interest, have operated IAAAP for the United States Army (the "government" or the "Army") since 1951.[2] Pl. Facts, ¶ 1. IAAAP is operated as a government-owned contractor-operated ("GOCO") facility for production of ammunition items such as warheads and large-caliber ammunition. *Id.*, ¶ 3. Prior to the early 1990s, AO operated IAAAP under cost-plus-fixed-fee contract arrangements. *Id.*, ¶ 5. In the early 1990s, however, the government began to replace its prior contracting arrangements with "facilities use" contract arrangements, under which it is anticipated that contractors may make private investments and improvements in the facility and related personal property. *Id.*, ¶ 6. Under facilities use contracts, the government and other third-parties enter into separate contracts for the production of supplies at GOCO facilities such as IAAAP. *Id.*, ¶ 7. The government entered into two facilities use contracts with AO, one in 1993 (Contract No. DAAH09-94-E-0005), and another in 1998 (Contract No. DAAA09-98-E-0003). *Id.* (Together, AO and the government are referred to as the "parties.") AO currently operates and maintains IAAAP and another production facility, the Milan Army Ammunition Plant ("MLAAP"), pursuant to such facilities use contracts. *Id.*

As contemplated under facilities use arrangements, the government entered into separate contracts with AO for the production of ammunition. On December 12, 1995, the government

---

[1] AO sets forth the uncontroverted facts relevant to this matter in its Proposed Findings of Uncontroverted Fact ("Pl. Facts") filed herewith. R.C.F.C. 56(h)(1). AO relies upon the Plaintiff's Facts as the basis of its Motion. AO additionally references herein the Exhibits Contained in its Appendix in Support of its Motion ("Pl. App.").

[2] AO was formed in 1998 as a joint venture of its predecessors in interest, Mason & Hanger Corporation ("MHC") and General Dynamics Ordnance Systems, Inc. ("GDOS"). Pl. Facts, ¶ 1. References in this Brief to "AO" include its predecessors-in-interest.

issued "Letter Contract" No. DAAE30-96-C-0013 to AO for the production of supplies; specifically, production of 155mm M795 Projectiles (the "Letter Contract"). *Id.*, ¶ 11. On August 15, 1996, the parties reached agreement regarding the terms and final price and executed (*i.e.*, "definitized") the firm, fixed-price ("FFP") contract for production of M795 Projectiles in Modification No. PZ0001 (the "M795 Contract"). *Id.*, ¶ 34. During the negotiation period of the M795 Contract, AO informed the government that it would "facilitize," or procure, whatever equipment was necessary to create a production line to produce M795 Projectiles, *i.e.*, the Line 3A Equipment. *Id.*, ¶¶ 26-27. Also during the negotiation period, the government told AO that the government would not take title to, or be responsible for, the equipment AO procured to manufacture M795 Projectiles, including Line 3A Equipment. *Id.*, ¶¶ 18, 19, 21, 23.

The government Contracting Officer ("CO") responsible for negotiating the M795 Contract, David Banashefski ("Banashefski"), specifically directed AO that:

> It is important that the parties fully understand that this requirement is a production contract for the LAP [Load, Assemble, and Pack] of M795 projectiles and is not a facilities contract. Any facilities being procured are being done solely to meet the required LAP capacity for the M795 projectile. As such, the Government will not have title to the equipment and therefore, will not be responsible for maintenance of the same.

*Id.*, ¶ 19; Ex. 10, p. 199, May 16, 1996 Letter from Banashefski (emphasis in original).

CO Valerie Colello ("Colello") further confirmed that:

> This is a production requirement . . . and is not in any way a facilitization contract . . . . [I]n order to alleviate any further misunderstandings regarding the facilitization efforts, the resultant contract *will not* have a separate CLIN for the facilitization costs, but rather such costs will be included with the LAP production CLIN for the basic quantity. . . . [T]here will be no separate line item for any facilitization efforts which [AO] would have to accomplish in order to meet the required basic/option delivery requirements of the contract.

Pl. Facts, ¶ 23; Ex. p. 215, 218, May 30, 1996 Letter from Colello (emphasis in original). Collello further confirmed that the government was examining AO's price for facilitization for evaluation purposes only:

> In the [M795] RFP, the Government had asked the contractor to separately break out the costs for any necessary facilitization efforts for evaluation purposes only.

*Id.*

Based upon the government's direction, the parties agreed that AO would not be required to acquire the Line 3A Equipment for the government as a deliverable under the M795 Contract, and, thus, the government would not take title to the Line 3A Equipment. Pl. Facts, ¶ 29. Specifically, the parties included the standard FAR government property clause for FFP contracts (the "FFP Property Clause"), which provides that title to property acquired under a FFP-type contract only vests in the government for property acquired by the contractor for the government. *Id.*, ¶ 35. The FFP Property Clause provides:

> Title to each item of facilities...acquired by the Contractor for the Government under this contract shall pass to and vest in the Government when its use in performing this contract commences or when the Government has paid for it, whichever is earlier, whether or not title previously vested in the Government.

Ex. 31, p. 325; *see also* 48 C.F.R. § 52.245-2(c)(3) (1996) (emphasis added).[3] The parties purposely structured the M795 Contract to conform to the parties' intent and the terms of the FFP Property Clause, removing any requirement from the M795 Contract that AO acquire property for the government and deleting specific contract clauses that would have conveyed title to the government of the Line 3A Equipment. Pl. Facts, ¶¶ 37, 39, 40. Indeed, the parties

[3] Cited non-current provisions of the FAR are provided in the Appendix at Ex. 49, p. 408-451.

deleted all provisions of the Letter Contract that would have required AO to acquire the Line 3A Equipment for the government, including a separate Contract Line Item Number ("CLIN") for facilitization, and its associated Statement of Work ("SOW") paragraph. *Id.*

The parties' conduct following execution of the M795 Contract confirmed the contractual intent and AO's ownership of the Line 3A Equipment. Five days after the execution of the M795 Contract, the Administrative Contracting Officer ("ACO") at IAAAP, Fred W. Taylor ("Taylor"), one of the ACOs responsible for the administration of the M795 Contract, issued a memorandum confirming that AO was not required to acquire the Line 3A Equipment for the government, that the Line 3A Equipment would not be deliverable under the M795 Contract, and that the government would not take title to the equipment. *Id.*, ¶ 59. A month later, CO Banashefski confirmed ACO Taylor's understanding of the parties' agreement, discussing with Taylor the possibility of approaching AO at some future time to ask AO to consider returning title to the Line 3A Equipment to the government the next time a facilities contract was negotiated. *Id.*, ¶ 60.

On March 3, 1997, AO requested a contract modification that would shift a portion of its price for delivery of 1000 each, M795 Projectiles (SubCLIN 0001AB), described to relate to facilitization, and amortized over and meant to be paid at the time of delivery of this first production lot of M795 Projectiles, to the earlier First Article Test ("FAT") quantity of M795 Projectiles (SubCLIN 0001AA). This request was made to permit AO to receive timely payment from the government, despite the slippage of the government's schedule for the provisioning of certain government furnished materials needed to produce the M795 Projectiles (the "March 3, 1997 Request"). *Id.*, ¶ 67. The parties executed Modification P00003 ("P00003") to the M795 Contract on March 13, 1997, to address MHC's March 3, 1997 Request. *Id.*, ¶ 68. P00003

moved the portion of the M795 Projectiles' price from SubCLIN 0001AB to SubCLIN 0001AA, but had no other effect on the M795 Contract. *Id.*, ¶ 69. On October 21, 1997, the government directed AO to submit an invoice to the government for payment of the FAT quantity price for SubCLIN 0001AA, and AO submitted its Invoice and form DD250 for payment and liquidation of SubCLIN 0001AA. *Id.*, ¶¶ 70-71.

In 1998, an IAAAP CO recognized AO's ownership of Line 3A Equipment in describing AO's ownership of property at IAAAP. *Id.*, ¶ 73. In 1999, a Defense Contract Audit Agency ("DCAA") audit of AO's cost accounting practices regarding the M795 Contract concluded that AO owned the Line 3A Equipment, and that DCAA would not pursue any further investigation of AO's accounting for the Line 3A Equipment. *Id.*, ¶¶ 74-76. In addition, following execution of the M795 Contract, and continuing without interruption through September 2007, AO conspicuously tagged the Line 3A Equipment as AO-owned property (rather than government-owned property), and AO recorded the Line 3A Equipment as AO-owned property. *Id.*, ¶¶ 79-83. Indeed, AO's exercise of possession, ownership, and control of the Line 3A Equipment since the inception of the M795 Contract was "obvious" to the government ACO responsible for the administration of the M795 Contract at IAAAP. *Id.*, ¶ 86. Prior to May 2007, no government review or annual audit of AO's recording and tagging of Line 3A Equipment as AO-owned property ever identified such recording or tagging as erroneous. *Id.*, ¶¶ 87-88.

In August 2007, the Army initiated a competitive procurement for a follow-on contract for operation and maintenance ("O&M") of IAAAP and MLAAP. *Id.*, ¶ 92. On February 21, 2008, the Army issued Request for Proposal ("RFP") No. W52P1J-06-R-0201. *Id.*, ¶ 93. The Army contemplates in the current RFP, and thereby compels offerors to assume as part of their proposals, that the Line 3A Equipment will be government-furnished property that any new

contractor could use for its own production activities. *Id.* The estimated date of award of the new O&M contract is September 2008.

Only in its written final decision issued September 26, 2007 (the "Final Decision"), after eleven uninterrupted years of AO's possession, ownership, and control of the Line 3A Equipment, did the Army ever assert its claim of ownership. The Army ordered AO to re-tag the Line 3A Equipment as government-owned property, and to change its records to reflect government ownership, in preparation for the Army's competitive procurement for a follow-on O&M contract for IAAAP. *Id.*, ¶ 94.

On October 30, 2007, AO complied with the Army's directive to re-tag the Line 3A Equipment and to change its records to reflect government ownership of the Line 3A Equipment. *Id.*, ¶ 95. AO did not agree with the Army's directive, however, and thus, AO reserved its right to dispute the government's ownership claim. On December 10, 2007, AO filed its Complaint in this matter seeking a declaratory judgment that AO holds title to the Line 3A Equipment, and that the government's claim is barred by the applicable statute of limitations.

### B. <u>The Uncontroverted Facts Require Entry of Summary Judgment for AO</u>

As shown below, AO is entitled to summary judgment because the uncontroverted facts establish that, as a matter of law, AO owns the Line 3A Equipment. The plain language of the M795 Contract confirms that the contract is deliberately structured to require that AO take title to the Line 3A Equipment. The government purposely tailored the M795 Contract's existing CLIN structure to remove the Line 3A Equipment as a deliverable, eliminated the pre-established provision of the SOW that would have required AO's acquisition of the Line 3A Equipment <u>for the government</u> as part of the contract work requirement, and included or excluded other clauses based upon the understanding of AO's ownership of the Line 3A Equipment. The M795

ownership of contractor-acquired property at IAAAP and MLAAP in compliance with contract requirements. *See* 48 C.F.R. § 45.104 (1996). Such audits did not identify any issue with AO's tagging and recording the Line 3A Equipment as AO-owned property. Pl. Facts, ¶ 87.

AO's treatment of the Line 3A Equipment as AO-owned property, and not as government-owned property, including AO's clearly visible marking of such as AO property and its annually-reviewed property records identifying the Line 3A Equipment as AO-owned property, demonstrates the parties' intent that title to the Line 3A Equipment remain in AO. Indeed, AO's actions of possession, ownership, and control of the Line 3A Equipment were "obvious" to the relevant government representatives who administered the M795 Contract and the other contracts at IAAAP since the inception of the M795 Contract on August 15, 1996. *Id.*, ¶ 86 (fact that contractor tagged Line 3A Equipment as AO-owned was "pretty obvious"). Following execution the M795 Contract, both AO and the government have recognized for over eleven years that AO owns the Line 3A Equipment, and they have acted accordingly.

### C. <u>All Extrinsic Evidence Supports the Parties' Intent That AO Would Own the Equipment</u>

As discussed above, the M795 Contract's plain language establishes that AO holds title to the Line 3A Equipment, and the parties' conduct confirms this result. When the plain language of an agreement is clear because there exists only one reasonable interpretation that is supported by the parties' intent, as demonstrated by the agreement's wording and the parties' conduct, the Court need not inquire any further. *See First Nationwide Bank v. United States*, 48 Fed. Cl. 248, 260-61 (2000). If an ambiguity exists, however, the Courts may examine the extrinsic evidence to determine the intent of the parties. *See McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434 (Fed. Cir. 1996); *Perry-McCall Constr., Inc. v. United States*, 46 Fed. Cl. 664 at 671 (2000). The extrinsic evidence, including the government's written and verbal directions to AO

during the negotiation of the M795 Contract and the parties' written exchanges after the M795 Contract was executed, overwhelmingly supports that the parties intended that AO take title to the Line 3A Equipment.

**1. The Parties' Negotiation Correspondence and Actions Conclusively Demonstrate That the Government Required That AO Agree to Take Title to the Line 3A Equipment as a Condition of Being Awarded the M795 Contract**

Following negotiation sessions on approximately May 13 and 14, 1996, government negotiators, including CO Banashefski and Contract Specialist Steven Talmadge ("Talmadge"), informed AO that the government would not take title to the Line 3A Equipment. Pl. Facts, ¶ 18-19. AO informed Banashefski that the language of the RFP (and by incorporation, the Letter Contract), including SubCLIN 0001AA and SOW paragraph C.3.9, would need to be changed if the government intended for AO to take title to the Line 3A Equipment. *Id.*

Banashefski confirmed the government's intent that AO would take title to the Line 3A Equipment in a letter sent May 16, 1996 (the "Banashefski Letter"). *Id.*, ¶ 19; Banashefski Letter, Ex. 10, p. 199. The Banashefski Letter confirmed that the government did not intend to take title to the Line 3A Equipment:

> It is important that the parties fully understand that this requirement is a *production contract for the LAP [Load, Assemble, and Pack] of M795 projectiles and is not a facilities contract.* Any facilities being procured are being done solely to meet the required LAP capacity for the M795 projectile. As such, the Government will not have title to the equipment and therefore, will not be responsible for maintenance of the same.

*Id.* (emphasis in original). Moreover, the Banashefski Letter was coordinated with, and authorized by, the government's legal adviser. *Id.*; Pl. Facts, ¶ 20.

Following the Banashefski Letter, AO proposed to the government alternative language to the M795 Contract scope of work for facilitization that would clarify in the M795 Contract

that the government's intent that AO would take title to the Line 3A Equipment. Pl. Facts, ¶ 22. The government rejected AO's proposed language in a letter response dated May 30, 1996 from CO Valerie E. Colello (the "Colello Letter"). *Id.*, ¶ 23. The Colello Letter states as follows:

> After thoroughly reviewing M&H's draft SOW for the facilitization efforts needed to meet the required LAP production delivery schedules, the Government has determined that such language is not necessary for this contract.

*Id.* Further, the Colello Letter states that:

> This is a production requirement . . . and is not in any way a facilitization contract . . . . In the [M795] RFP, the Government had asked the contractor to separately break out the costs for any necessary facilitization efforts <u>for evaluation purposes only</u>.

*Id.* (emphasis added). Further, the government directed that:

> in order to alleviate any further misunderstandings regarding the facilitization efforts, the resultant contract *will not* have a separate CLIN for the facilitization costs, but rather such costs will be included with the LAP production CLIN for the basic quantity.

*Id.* The government confirmed that:

> there will be no separate line item for any facilitization efforts which [AO] would have to accomplish in order to meet the required basic/option delivery requirements of the contract.

*Id.*

The government's requirement that AO take title to the Line 3A Equipment presented a significant risk to AO because AO was concerned that unforeseen consequences that might occur during production, such as the damage or destruction of a piece of Line 3A Equipment, would result in significant additional costs to AO to replace the equipment. *Id.*, ¶ 27. AO took over a month to consider the increased risk that accepting ownership of the Line 3A Equipment would inject into the M795 Contract. *Id.*, ¶ 29.

By letter dated June 18, 1996, from AO representative Darl J. Heffelbower to Army Colonel James E. Unterseher (the "Heffelbower Letter"), AO informed the government that MHC agreed to the government's requirement that AO take title to the Line 3A Equipment. *Id.* In addition to the Heffelbower Letter, AO negotiators expressed to government negotiators, including Banashefski and Talmadge, that AO agreed to take title to the Line 3A Equipment. *Id.*, ¶ 30. Banashefski and Talmadge acknowledged AO's agreement to take title to the Line 3A Equipment. *Id.*, ¶ 30.

AO's decision to accept title to the Line 3A Equipment rendered moot certain other issues raised during the negotiations, such as a facilitization SOW paragraph that defined the specific equipment that would be delivered, or the terms and conditions required to be added to the M795 Contract for facilitization. *Id.*, ¶ 31. The parties continued negotiations related to the M795 Contract, and developed an action item list for completing the negotiations. *Id.*, ¶ 32. Item 2 from the Action Item List required the government to revise the contract language so that AO would be timely paid for its efforts pursuant to the M795 Contract, and would ultimately own the Line 3A Equipment. *Id.* On June 20, 1996, Talmadge provided to AO a draft of a revised CLIN structure which would accomplish Action Item 2. *Id.*, ¶ 33. The revised CLIN structure provided by the government deleted the Letter Contract's separate SubCLIN 0001AA, which previously required that MHC acquire and deliver the Line 3A Equipment to the government in accordance with SOW Section C.3.9. *See* Ex. 23, p. 244. The new CLIN structure contained deliverables of projectiles only. *Id.* The government also removed SOW paragraph C.3.9 associated with the Letter Contract's SubCLIN 0001AA from the M795 Contract entirely. Pl. Facts, ¶ 37.

By agreeing to take title to the Line 3A Equipment and to do so at a fixed price, AO bore the risk associated with correctly estimating the manhours of effort and the equipment needed to meet the required production quantities and schedule. *Id.*, ¶ 26. Had AO underestimated the effort and equipment needed to manufacture M795 Projectiles, AO would have been required to purchase and install additional equipment while still being bound by its fixed price for the delivery of M795 Projectiles. *Id.* Consistent with the direction provided in the Colello Letter, the price of facilities was negotiated only so that the government could evaluate the reasonableness of MHC's price for M795 Projectiles. *Id.*, ¶ 23-25 ("the Government had asked the contractor to separately break out the costs for any necessary facilitization efforts for evaluation purposes only," a "common practice").

The final, negotiated M795 Contract deleted the Letter Contract's SubCLIN 0001AA and any reference to any requirement that AO would acquire equipment for the government in the M795 Contract SOW. *Id.*, ¶ 39. Thus, the final, negotiated M795 Contract, consistent with the government's direction that the M795 Contract was "a production requirement . . . and is not in any way a facilitization contract," contained no separate CLIN for facilitization, no reference to any requirement in the scope of work for facilitization, and no requirement that MHC deliver the Line 3A Equipment. *See* Daniel Dec., Ex. 1, p. 8-9, ¶ 22; Pl. Facts, ¶ 38, 49, 54, 56 (CO Colello stating that she would expect the contract to have included each).

All evidence from the negotiations of the M795 Contract confirm that the parties took specific actions to draft a contract that allowed AO to be paid a price for delivering M795 Projectiles that would permit AO to recover the costs of facilitization built into its price, while conveying title to the Line 3A Equipment to AO. Indeed, all evidence from the negotiation confirms that eleven years before any controversy arose, the government unambiguously directed

AO that it must take title to the Line 3A Equipment. *See, e.g.*, Ex. 10, p. 199, May 16, 1996 Banashefski Letter; *Macke Co.*, 467 F.2d at 1325. As the *Macke* court recognized, the government's statements made eleven years ago, contemporaneous with the negotiation of the M795 Contract, reveal the government's intent in drafting the final M795 Contract.

**2. The Government Acknowledged AO's Ownership of the Line 3A Equipment After Execution of the M795 Contract**

On August 20, 1996, an authorized IAAAP Administrative Contracting Officer ("ACO") for the M795 Contract, Fred W. Taylor, Jr., stated his understanding of the terms of the M795 Contract:

> [A]ll new facilities (equipment and buildings) acquired by [AO] under the facilitization phase of the M795 program will not be called out as deliverables under the contract . . . . The Government does not intend to take title to the facilities even though they are to be direct costed.

Pl. Facts, ¶ 59; Ex. 33, p. 340 (the "August 20, 1996 Memorandum"). No government representative, including Banashefski and Talmadge, communicated to AO any disagreement with ACO Taylor's independent confirmation of AO's ownership of the Line 3A Equipment. Pl. Facts, ¶ 62. Banashefski responded to the August 20, 1996 Memorandum by letter dated October 7, 1996, but did not communicate any dispute with ACO Taylor's statements regarding AO's ownership of the Line 3A Equipment. *Id.*, ¶ 61.

Again, in 1998, the government's CO for IAAAP and MLAAP, Ms. Trudy Hallgren, acknowledged AO's ownership of property AO acquired under its FFP contracts. Hallgren Presentation. *Id.*, ¶ 73. CO Hallgren prepared a presentation in which she justified an Army sole-source contract award to AO based, in part, upon AO's ownership of over $10 million of equipment at IAAAP, including certain of the Line 3A Equipment. *Id.* The Army's relevant contracting personnel, therefore, long understood that AO owned the Line 3A Equipment.

In 1999, DCAA conducted a post-award audit of the M795 Contract relating to AO's cost accounting practices regarding the Line 3A Equipment. *Id.*, ¶ 74; Ex. 42, p. 374. After conducting an investigation, DCAA's auditor stated that:

> We have reviewed all the negotiation correspondence provided by AO and the Army concerning the M795 Basic Contract Negotiations. We can find no documents indicating that the Army ever intended for the facility and equipment to be "special purpose." In fact to the contrary, we found Army correspondence indicating clearly that the government did not want title to the facility and equipment.

*Id.* The Army provided documents and information to DCAA in connection with the 1999 audit, but provided no document that led DCAA to conclude that AO's ownership of the Line 3A Equipment was not correct. Pl. Facts, ¶ 75-76 (DCAA auditor stating that, after investigation and consultation with relevant ACOs responsible for administering the M795 Contract that he had no reason not to believe the contractor's assertion that it owned the Line 3A Equipment was erroneous). After further investigation, DCAA declined to pursue any further audit issue regarding a potential cost accounting standards noncompliance because of DCAA "buy in" with respect to AO's audit response and the "unique nature of the situation surrounding the M795 facilities." Pl. Facts, ¶ 75-76. The voluminous extrinsic evidence created contemporaneously with, and subsequent to, the execution of the M795 Contract verifies that, even if the M795 Contract is ambiguous, the parties intended that AO take title to the Line 3A Equipment.

## IV. THE GOVERNMENT'S CLAIM OF OWNERSHIP OF THE LINE 3A EQUIPMENT IS BARRED BY THE STATUTE OF LIMITATIONS

In 1996, the parties negotiated the M795 Contract. Just five days after execution of the M795 Contract, on August 20, 1996, ACO Taylor drafted a memorandum that confirmed that AO would take title to the Line 3A Equipment. To produce the M795 Projectiles required to be delivered pursuant to the M795 Contract, AO acquired the Line 3A Equipment. AO