IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMERICAN ORDNANCE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 07-867C |
| | ) | (Judge Wheeler) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S OPENING POST-TRIAL BRIEF

Pursuant to the Court's order dated August 15, 2008, defendant, the United States, respectfully submits this opening brief concerning the trial in this matter that the Court heard from August 12 through 15, 2008.

STATEMENT OF ISSUES ADDRESSED

1. Whether the structure of the contract line items contained in the contract required American Ordnance to deliver the Line 3A equipment to the Government and required the Government to pay American Ordnance ("AO") for the equipment as a separate deliverable such that the Government took title to the equipment.

2. Whether title to the Line 3A equipment vested in American Ordnance, when the equipment was provided as a separate contract line item in the contract and the Government paid over $9 million associated with that contract line item.

3. Whether American Ordnance established at trial that the parties to the definitized letter contract intended title to the Line 3A equipment to vest in American Ordnance.

4. Whether AO can take title to Government property by adverse possession.

PRELIMINARY STATEMENT AND SUMMARY OF THE ARGUMENT

We stated in our opening statement that the evidence would show that the terms of the definitized contract executed between the parties required the Government to pay a lump sum of $9,310,071 to American Ordnance for the Line 3A equipment. Tr. 32:21-33:6. By structuring the contract to require payment of a segregated amount specifically for equipment contained in a contract line item, the parties evidenced their intent that the Government would pay for and take title to the Line 3A equipment. AO was informed on several occasions that in order for AO to take title to the equipment, the costs of the equipment would have to be amortized and included in the unit price for the entire production quantity. Tr. Ex. 16; Banishefski Tr. 575:6-577:1; 578:2-15. AO refused to agree to this treatment, insisting that the Government pay for the equipment separately. Hibler Tr. 273:20-274:7; Banishefski Tr. 579:20-580:10. Therefore, AO failed to prove entitlement to a declaratory judgment that it holds title to the Line 3A equipment. The plain meaning of the terms of the contract preclude a finding that the partise intended AO to own the equipment.

AO presented testimony concerning correspondence exchanged between the parties during the negotiations of the definitized letter contract, but these cannot serve to contradict the meaning of the terms contained in the contract.

Additionally, AO presented testimony concerning the parties' post contract signing behavior, specifically that it placed tags on the equipment indicating that the equipment belonged to AO, and that because 10 years elapsed without the Government instructing AO to remove the AO tags and replace them with Government tags, that AO can now claim ownership. This amounts to a claim from AO that it has taken ownership of Government-owned property by

adverse possession. Such claims are barred by statute.

PROPOSED FINDINGS OF FACT

1. American Ordnance LLC ("AO"), is the current operating contractor at IAAAP. It is a joint venture of Day and Zimmerman, Inc. and General Dynamics Ordnance Systems. Testimony of Marilyn Daniels, Transcript ("Tr.") 55:24-56:2.

2. The current facilities contract, DAAA09-98-E0003, permits AO to utilize the facilities for work other than work directly awarded or workloaded to AO, subject to approval by the Contracting Officer for its facilities contract. Testimony of Charles Smith ("Smith") Tr. 726:8-18; Defendant's Appendix To Motion for Summary Judgment at 9-24.

3. Under the current facilities use contract, AO is responsible for maintaining all equipment whether the equipment is owned by AO or the Government. Smith: Tr. 727:13-19.

4. On December 14, 1995, the Government entered into Letter Contract DAAE30-96-C-0013 with Mason and Hanger for certain production efforts at IAAAP. Line item1AA and page five of attachment A to the letter contract refer to a line item to "Design, Fabricate and Install the Slow Cool Equipment." Plaintiff's Trial Exhibit ("Tr. Ex.") 5.

5. Letter Contract DAAE30-96-C-0013 was definitized by modification number PZ0001 on August 15, 1996. Tr. Ex. 36; Testimony of Steven Talmadge ("Talmadge") Tr. 455:15-23.

6. The definitized contract contained the following pertinent provisions: Contract Line Item Numbers ("CLINs") 0001AA-, 0001AB-, 0001AC-, 0001AA, 0001AB, and 0001AC. These CLINs described facilitization, Production Qualification Testing ("PQT"), First Article Testing ("FAT") production, and Contract Data Requirements List ("CDRL")

requirements to be delivered. Id., at p. 6. Talmadge Tr. 543:9-546:12.

7. The definitized CLIN structure is set out at page 12 of the definitized contract. Tr. Ex. 36, p. 12.

8. In the definitized contract, CLIN 0001AA provided for First Article Test Quantities of 1,500 units each at a total cost of $643,264.00, including PQT quantities. Id.

9. In the definitized contract, CLIN 0001AB provided:

> This subclin includes the costs for 1,000 ea M795 projectiles (1,000 units x $173.92 = $173,920) as well as $9,310,071 in costs associated with special tooling, equipment, and facilitization efforts required by the contractor to perform the M795 LAP contract.

Id. Talmadge Tr. 456:6-25; Testimony of David Banishefski ("Banishefski") 570:5-21.

10. In the definitized contract, CLIN 0001AC provided for the production of 76,968 projectiles at a unit price of $173.92, for a total item amount of $13,386,274.56. Talmadge Tr. 545:23-546:12.

11. The definitized contract also provided a scheduled delivery date of November 28, 1997, for the CLIN0001AB items, i.e., the first 1,000 projectiles and the facilitization equipment. Tr. Ex. 36, p. 7; Talmadge Tr. 547:9-13

12. The definitized contract also contained Federal Acquisition Regulation ("FAR") clause 52.245-2, Government Property (Fixed Price Contracts), - Alternate I (Deviation)(Jul 1995)(AS1501). Paragraph (b)(3) of that clause provides:

> Title to each item of facilities and special test equipment acquired by the Contractor for the Government under this contract shall pass to and vest in the Government when its use in performing this contract commences or when the Government has paid for it, whichever is earlier, whether or not title previously vested in the Government.

Tr. Ex. 36, p. 66; Talmadge Tr. 458:20-459:8.

13. The definitized contract also provided:

> C.3.2.1 First Article Test (FAT) – The contractor shall be responsible for procuring all materials and equipment required to conduct the First Article Test (FAT) under the contract. FAT shall be performed within fifteen (15) months after contract award and shall be witnessed and accepted or rejected by the Government.

Tr. Ex. 36, p. 48.

* * *

> H.8 First Article Test - Progress Payments (Written in Plain English) Before first article approval, only costs incurred for first article and the required facilitization efforts to meet the required LAP capacity of a maximum of 10,300 each M795 Projectiles per month for any out-year production quantities are allowable for progress payments. Payments shall not exceed 50% percent of the contract award value.

Tr. Ex. 36, p. 15.

* * *

> I.8 52.245-2 Government Property (Fixed-Price Contracts). – Alternate I (Deviation)(Jul 1995)(AS1501)
>
> (c) Title in Government property.
>
> * * *
>
> (3) Title to each item of facilities and special test equipment acquired by the Contractor for the Government under this contract shall pass to and vest in the Government when its use in performing this contract commences or when the Government has paid for it, whichever is earlier, whether or not title previously vested in the Government.

Tr. Ex. 36, p. 66.

14. On March 13, 1997, AO and the Army executed Modification P0003 ("Mod 0003") to the definitized contract DAAE30-96-C-0013. Mod 0003 contained the following pertinent provisions:

a. Paragraph 4: On contract page 12, paragraph B.1, change the final payment of Facilitization costs under Subclin 0001 AB to reflect Subclin 0001AA. It should be understood that the Final Facilitization Payment under Subclin 0001AA will be at time of Final Inplant Inspection of the FAT quantities. See attached continuation sheet SF36.

b. Attachment SF36, paragraph H-8, Exclusion of Facilities Cost in Other Contracts states: This subclin includes the cost for 1,500 ea FAT/PQT M795 Projectiles ($643,264) as well as $9,310,071 in costs associated with special tooling, equipment, and facilitization efforts required by the contractor to perform the M795 LAP contract.

Tr. Ex. 45; Talmadge 461:3-462:3.

15. The purpose of signing Modification 0003 was to put the tooling and equipment costs under the first article testing as a separate payable cost. Talmadge Tr. 464:3-16.

16. The parties negotiated the facilitization costs in the contract based on Mason and Hanger's estimate of what equipment was necessary to produce the M795 projectiles. Tr. Exs. 13 and 15; Banishefski Tr. 566:21-567:22; 569:10-570:2.

17. The Government informed Mason and Hanger that the only way that Mason and Hanger could take title to the Line 3A equipment was to treat the costs as overhead and include them in the unit price of each projectile. Tr. Ex. 16; Banishefski Tr. 575:6-577:1; 578:2-15.

18. Mason and Hanger refused to amortize the facilitization costs over the entire production quantity of M795 projectiles, instead insisting that the facilitization costs be paid as a direct cost to the contract. Banishefski 579:20-580:10.

19. When a contract provides a separate line item for equipment, and requires the Government to pay the contractor a lump sum for that line item, the Government property clause states that the Government takes title to the property upon payment to the contractor. Smith Tr. 746:7-747:9; Banishefski Tr. 662:5-663:1.

20. By agreeing to treat the facilitization costs as a direct charge to the contract, the parties evidenced their respective intentions that title to the equipment would vest with the Government as required by the Government property clause contained in the contract. Talmdage Tr. 549:19-550:6.

21. On October 22, 1997, a DD 250 was signed as accepted by William Vogt, Production Manager of the M795 line, accepting two listed items. The second listed item was the First Article Sample of 24 units at a total price of $10,292.22. The first listed item was "Special Tooling, Equipment, and Facilitization," and the amount listed was $9,310,071.00. Tr. Ex.47; Talmadge 466:21-467:16.

22. The parties understood that when the Government signed the Form DD250, the Government was paying AO for the items listed on the form, including the Line 3A equipment, and that AO was delivering the equipment to the Government as required by the contract. Tr. Ex. 47; Banishefski Tr. 589:16-17.

23. The Government paid AO facilitization payments under the M795 contract totaling $9,310,071. Tr. Ex. 47; Banishefski Tr. 589:8:15.

ARGUMENT

I. The Contract Terms Require That The Government Take Title To The Line 3A Equipment

The express terms of the contract require that the Government pay $9,310,071 in "costs associated with special tooling, equipment, and facilitization efforts required by the contractor to perform the M795 LAP contract." Tr. Ex. 36, p. 12. It is undisputed that the Line 3A equipment is the equipment identified in the quoted contract language and is the equipment assembled by AO to produce the M795 projectiles as required by the contract.

In cases requiring interpretation of a contract, the Court is required to begin with the language of the contract. "In construing a contract, a court must begin with the plain language." M.A. Mortensen Co. v. Brownlee, 363 F.3d 1203, 1206 (Fed. Cir. 2004). The starting place for interpreting a contract is the text of the contract itself. Jowett, Inc. v. United States, 234 F.3d 1365, 1368 (Fed. Cir. 2000). The words of the contract are given "their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." Id. If the words of the contract are clear, the plain meaning must be enforced. McAbee Construction, Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996); accord Hol-Gar Manufacturing Corp. v. United States, 169 Ct. Cl. 384, 395, 351 F.2d 972, 979 (1965) ("[A]n interpretation which gives a reasonable meaning to all parts of an instrument will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous.").

The relevant provisions of the contract are clear. The definitized contract provided:

C.3.1.1 Production

Basic Contract Requirement – The contractor shall
Load, Assemble, and Pack (LAP) a quantity of
79,468 each M795 projectiles (includes FAT Qty)

in accordance with TDPL number 9312769. The contractor shall deliver M795 projectiles as delineated in Section F of this contract. The deliverable items include; 155mm, HE, M795 Projectiles (9312769), Obturator (10542907), Supplemental Charge (8797090), Liner Cup (9331677), Spacers (8797088).

* * *

C.3.2.1 First Article Test (FAT) – The contractor shall be responsible for procuring all materials and equipment required to conduct the First Article Test (FAT) under the contract. FAT shall be performed within fifteen (15) months after contract award and shall be witnessed and accepted or rejected by the Government.

* * *

H.8 First Article Test - Progress Payments (Written in Plain English)
Before first article approval, only costs incurred for first article and the required facilitization efforts to meet the required LAP capacity of a maximum of 10,300 each M795 Projectiles per month for any out-year production quantities are allowable for progress payments. Payments shall not exceed 50% percent of the contract award value.

* * *

I.8 52.245-2 Government Property (Fixed-Price Contracts). – Alternate I (Deviation)(Jul 1995)(AS1501)

(c) Title in Government property.

* * *

(3) Title to each item of facilities and special test equipment acquired by the Contractor for the Government under this contract shall pass to and vest in the Government when its use in performing this contract commences or when the Government has paid for it, whichever is earlier, whether or not title previously vested in the Government.

DPFUF ¶21.

Thus, AO's responsibilities under the contract were clear: to procure all necessary materials and equipment to produce the FAT, and then produce acceptable FAT to the Army . If the FAT were acceptable, AO was responsible for, then, producing the remainder of the quantity called for in the contract. The government property clause makes it clear that any equipment used in performing this contract, such as in producing the FAT, becomes property of the Government as of the earlier time when it is either put to use or the Government pays for it. Under the CLIN structure provided in Mod 0003, upon acceptance of the FAT, the Army would be obligated to pay AO $9,310,071 in facilitization costs, and $643,264 for the FAT.

The documents relied upon by AO at trial are documents from the parties' negotiations, and contain discussions of various positions of the parties that did not ultimately make it into the terms of the definitized contract. For example, trial exhibit 11, a letter from contracting officer David Banishefski, stated that the Government's negotiation position as of May 16, 1996, was that the Government did not intend to take title to the Line 3A equipment. As Mr. Banishefski explained at trial, this was the Government's position in the negotiations as of May 16, 1996. Mr. Banishefski testified that in a letter dated May 30, 1996, trial exhibit 16, the Government explained to Mason and Hanger that in order for it to take title to the Line 3A equipment the cost of the equipment would have to be amortized over the unit price of the entire production quantity. Banishefski Tr. 610:16-611:3. This term did not make it into the contract, however, because Mason and Hanger was unwilling to agree to this and insisted that they be paid for the equipment as a direct cost to the contract. Hibler Tr. 273:20-274:7.

Contracting Officer Charles Smith, explained that when facilities are charged to a

specific line item in a contract, and the Government is required to pay for the facilities upfront as a lump sum payment, and the contract contains the Government property clause, 48 C.F.R. § 52-245-2, then the Government takes title to the property when payment is made for the property. There is no dispute that the Government paid a lump sum of $9,310,071 for the Line 3A equipment as required by CLIN 0001AA, as modified by contract modification 0003. Tr. Ex. 45. As a matter of law, therefore, the structure of the contract required that the Government pay for the Line 3A equipment and also take title to it.

II. <u>AO Cannot Acquire Title To Government Property By Adverse Possession</u>

AO presented evidence at trial concerning the color and size of the identification tags that it placed on the Line 3A equipment. Specifically, Dan Darley, the materiel director for American Ordnance, testified that AO applies a color coded tag to each piece of property. Darley Tr. 289:1-7. Mr. Darley explained AO's current property recordkeeping system in detail, but he also testified that he was working as a master production scheduler in 1995 and 1996, when the Line 3A equipment was delivered and had never read the M795 contract except to prepare for trial. Darley Tr. 363:14-364:6.

AO relies on the fact that it tagged the Line 3A equipment as AO's property for its position that the Government somehow acquiesced in AO's claim of title, but this is not supported by the evidence. It is not clear that the Government was aware that AO had incorrectly marked the equipment. Charles Smith testified that because AO operated the IAAAP plant under a facilities use contract, it was responsible for maintaining all equipment housed there.

Smith Tr. 726:1-18. Therefore, after the equipment was installed, there would have been no

reason for any Government employee to review AO's property records, or to make an issue of title to the Line 3A equipment. Smith Tr. 727:7-22.

Additionally, Julie Solinski, the Government's property administrator, testified that she performed annual audits of AO's records of Government property, she did not review AO's records of its own property. Solinski Tr. 409:20-24; 410:11-15. Additionally, Ms. Solinski testified that the purpose of the annual audit is to verify the reliability and completeness of AO's property record system, not to review title to any particular equipment. Solinski Tr. 384:6-9. Ms. Solinski further testified that the annual property audit focuses on issues of title only for equipment acquired since the last acceptable audit. Solinski Tr. 388:8-14.

Even assuming, however, that the Government did notice the tags but failed to alert AO of any problems, this does not provide a basis for converting title to AO. As we established in our motion for summary judgment, there are specific requirements and procedures that must be followed in order to transfer title to Government property; the Government cannot merely acquiesce in a contractor's claim of title to Government property. See 48 FAR §§ 45.603; 45.604, and DFARS Subpart 245.70, and AFARS 5145.602. None of the procedures described in those regulations was undertaken by the Government with respect to the Line 3A equipment, nor does AO allege to the contrary.

Moreover, the issue of property tags is relevant only to AO's claim that it acquired title to the Line 3A equipment by adverse possession. AO claims that it placed conspicuous, color-coded tags on the Line 3A equipment and by failing to object for a long period of time, the Government has did not assert its rights in time to prevent title from being transferred to AO. As we have established in our briefs on summary judgment, AO's claim is prohibited by 28 U.S.C

§ 2415(c), which provides that there is no time limit on the Government's ability to bring an action to establish the title to, or right of possession of, real or personal property. See also S.Rep. No. 1328, 89th Cong., 2d Sess.3 (1966), reprinted in 1966 U.S.C.C.A.N. 2502, 2505.

## CONCLUSION

Accordingly, plaintiff did not establish at trial that it has title to the Line 3A equipment; instead, the terms of the contract are not modified by positions taken by the parties during negotiations. The terms of the contract clearly establish that the Government paid AO for the Line 3A equipment as a separate contract line item, and therefore, under the terms of the Government property clause title to the equipment vested in the Government.

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:

James Mackey Ives
Litigation Attorney
General Litigation Branch
Army Litigation Center
901 N. Stuart Street, Suite 400
Arlington, Virginia 22203

Larry Manecke
U.S. Army Sustainment Command
Office of Counsel
AMSAS-GC
Bldg. 390
1 Rock Island Arsenal
Rock Island, Illinois 61299-6000

August 29, 2008

s/ Joan M. Stentiford
JOAN M. STENTIFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Telephone: (202) 616-0341
Fax: (202) 514-8624

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify under penalty of perjury that on this 29th day of August, 2008, the foregoing "DEFENDANT'S POST TRIAL BRIEF", was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Joan M. Stentiford
JOAN M. STENTIFORD