**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES,<br><br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**PLAINTIFF AMERICAN ORDNANCE LLC'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to the Court's Post-Trial Scheduling Order entered on August 15, 2008, plaintiff, American Ordnance ("AO"), respectfully submits its Proposed Findings of Fact and Conclusions of Law.

## SUMMARY OF ARGUMENT

In 1996, the defendant, the United States (the "government" or "Army"), directed AO's predecessor-in-interest, the Mason & Hanger Corporation ("MHC"), to take title to certain equipment comprising Production Line 3A (the "Line 3A Equipment" or "Equipment") at the Iowa Army Ammunition Plant ("IAAAP") in Middletown, Iowa. Together with ownership of the Line 3A Equipment, the government assigned to MHC the associated risks of such ownership – including, among others, the risks that the Line 3A Equipment would not function as intended to produce 155 millimeter M795 Projectiles ("M795 Projectiles"), that the Line 3A Equipment would cause MHC's costs

to exceed the fixed price that MHC received for its performance of the contract, that the Line 3A Equipment would require expensive abnormal maintenance, and that any portion of the Line 3A Equipment would be lost through damage or destruction. Throughout negotiations of the resulting definitive contract (the "M795 Contract" or "Contract"), the parties worked to structure the Contract to achieve the parties' intended goals. After execution of the definitive M795 Contract, both parties confirmed through their respective conduct and performance of the Contract their understanding and agreement that MHC (and later, AO) owned the Line 3A Equipment.

In 2007, the government issued a Contracting Officer Final Decision (the "Final Decision") that attempts to completely reverse the parties' agreement reached in the M795 Contract. The government's claim directly opposes eleven years of the parties' conduct regarding the Line 3A Equipment, repudiates the parties' expressed intent in executing the Contract, and contradicts the terms of the parties' Contract. Thus, the government does not possess title in the Line 3A Equipment, and AO is entitled to Declaratory Judgment that title in the Equipment is vested in AO.

In the alternative, even if the government's claim of ownership asserted in its Final Decision were meritorious, which it is not, the government's claim was asserted eleven years after the claim accrued, and is therefore barred by the applicable six-year statute of limitations. Accordingly, AO also is entitled to Declaratory Judgment because the government's claim to title in the Line 3A Equipment is time-barred.

## STATEMENT OF ISSUES PRESENTED

The issues presented for resolution in this case are as follows:

1. Whether the government, through the definitized M795 Contract, acquired ownership of the Line 3A Equipment; and, in the alternative,

2. Whether the government's claim of ownership of the Line 3A Equipment asserted in its Final Decision is barred by the applicable Contract Disputes Act ("CDA") six-year statute of limitations.

## PROPOSED FINDINGS OF FACT

A trial was held on August 12-15, 2008 at the United States Court of Federal Claims in Washington D.C. The proposed findings of fact resulting from the evidence presented at trial are set forth below.

### A. General Background

AO, or its predecessors-in-interest, MHC, have operated the IAAAP for the Army since the 1950s. (Daniel, Tr. 72:7-72:11). IAAAP is operated as a government-owned, contractor-operated ("GOCO") facility used primarily for the production of ammunition items for the Army, such as warheads and large-caliber ammunition. (Daniel, Tr. 53:21-54:9). Before 1990, AO operated IAAAP under cost-plus, fixed-fee contracts. (Daniel, Tr. 72:20-73:11). Beginning in the early 1990s, however, the government began to replace cost-plus, fixed-fee contracts with "facilities use" contracts, requiring contractors to make capital investments in the government facility and related personal property, such as equipment, even though the government continued to own the real property and much of the personal property located at the production facility. (Daniel, Tr. 74:1-74:24).

As part of the government's conversion to facilities use contracts at its production facilities, it entered into two facilities use contracts with AO's predecessor MHC relating to the IAAAP, one in 1993 (Contract No. DAAH09-94-E-0005) (the "1993 Contract") and a second in 1998 (Contract No. DAAA09-98-E-0003) (the "1998 Contract"). (Answer, ¶¶ 19-20; Daniel, Tr. 73:12-75:19). AO currently operates and maintains IAAAP and another government production facility, the Milan Army Ammunition Plant ("MLAAP"), pursuant to the 1998 Contract. (Daniel, Tr. 53:21-54:9, 57:5-57:13; Smith, Tr. 725:16-725:22).

### B. <u>The M795 Contract Negotiation</u>

In 1995, the Army announced that it needed to produce M795 Projectiles and requested that MHC manufacture the projectiles. (Answer, ¶ 25). The M795 Projectile had previously been a research and development item that ARDEC, the Army's research and development command, would now procure in production quantities. (Daniel, Tr. 77:10-78:4). The M795 had never been mass-produced before and, therefore, had no production history permitting an assessment of the manufacturing process. *Id.*

MHC designed, built, acquired, and installed the Equipment MHC believed was necessary to permit MHC to manufacture the M795 Projectiles according to the standards and specifications required by the Army, through its research and development unit, ARDEC. (Hibler, Tr. 201:9-201:25). The Line 3A production "line" in which the Equipment is installed extends over a mile at IAAAP and the manufacturing process occurs in twenty to thirty buildings at the plant. (*Id.*; Darley, Tr. at 282:25 to 285:6).

To initiate the contracting process for production of the M795 Projectiles, the government issued Request for Proposal DAAE30-96-R-0004 (the "M795 RFP") on October 11, 1995. (Exhibit 2). The M795 RFP contained Statement of Work ("SOW") paragraph C.3.9, which stated:

> Equipment purchased/fabricated by the contractor under this procurement shall be property of the U.S. government. A partial list of equipment includes: Preheat Ovens, Grid Melter, Melt Kettles, Pour Machines, Controlled Cooling Apparatus, and Post Cyclic Conditioners.

(Exhibit 2, page 10 of 121). Further, the M795 RFP contained a specific Contract Line Item Number ("CLIN") 0001AA for delivery of the Line 3A Equipment. (Stephen Talmadge ("Talmadge"), Tr. 468:7-468:20; Exhibit 2, page AO004559).

On December 12, 1995, the government issued "Letter Contract" No. DAAE30-96-C-0013 to MHC for the production of M795 Projectiles (the "Letter Contract"), which expressly incorporated Section C, the SOW, from the M795 RFP, including Paragraph C.3.9. (Exhibit 5, page AO000585; Talmadge, Tr. 473:16-475:9). The Letter Contract also contained a specific CLIN requiring MHC to deliver specific "slow cool equipment," the Line 3A Equipment, to the government pursuant to SOW paragraph C.3.9 as follows:

> Deliveries are to be made in accordance with the following schedule:

| <u>Line Item</u> | <u>Description</u> | <u>Quantity</u> | <u>[Date]</u> |
|---|---|---|---|
| 0001AA | Design, Fabricate and Install Slow Cool Equipment | 1 lot | 21 Months [after award] |

(Exhibit 5, page 5, CLIN 0001AA; Talmadge, Tr. 469:22-471:25).

The Letter Contract contemplated that the parties would negotiate the terms of a definitized firm, fixed-price contract ("FFP") by no later than April 29, 1996. (Exhibit 5, Attachment A, ¶ 3(b); Talmadge, Tr. 473:16-475:9). With that timing in mind, the government and MHC on March 14, 1996 exchanged a list of "Action Items" to be negotiated for the terms and conditions of a definitized contract, including Action Item No. 5, which would "[d]etermine how facilitization SOW gets into the contract." (Exhibit 6, page 2, Item 5).

Based on the Action Items and its understanding of the Letter Contract, MHC drafted a proposed Facilitization Scope of Work and delivered it to government representatives in preparation for negotiations. (Exhibit 9, pages 2-3; Daniel, Tr. 110:15-110:25). During the negotiation period that began in March 1996, the MHC representatives continued to discuss internally and with government representatives the contract issues based on the assumption that the government would receive delivery of and take title to the Line 3A Equipment MHC acquired to load, assemble, and pack ("LAP") the M795 Projectiles. (Daniel, Tr. 49:5-49:13, 84:11-84:21; Talmadge, Tr. 477:23-478:8). The negotiators involved were well aware of the standard FFP Property Clause, including its terms vesting title in the government to facilities under certain circumstances. (Daniel, Tr. 105:19-106:10).

Then, on approximately May 13-14, 1996, the government completely changed its position regarding title to the Line 3A Equipment. (Talmadge, Tr. 478:22-479:1; Daniel, Tr. 89:11-90:22). During the negotiations, government representatives, including the Procurement Contracting Officer ("PCO") for the M795 Contract, David Banashefski

("Banashefski"), advised MHC in meetings held at ARDEC on approximately May 13-14, 1996 that the government would not take title to or be responsible for, the Line 3A Equipment MHC procured to manufacture the M795 Projectiles. (Daniel, Tr. 88:2-88:5, 112:11-112:17, and 118:25-119:7). To confirm the government's position regarding ownership of the Equipment, Banashefski sent MHC a letter on May 16, 1996 stating clearly:

> It is important that the parties fully understand that this requirement is a **production contract for the LAP of M795 projectiles and is not a facilities contract.** Any facilities being procured are being done solely to meet the required LAP capacity for the M795 projectile. As such, the Government will not have title to the equipment and therefore, will not be responsible for maintenance of the same.

(Exhibit 10, page 2 (emphasis in original) (the "Banashefski Letter"); Talmadge, Tr. 480:18-480:25). Denise Scott, a government attorney involved in the negotiations, reviewed the Banashefski Letter before it was sent to MHC and signed the letter, specifically identifying her action as "Legal Concurrence" with the positions expressed in the Banashefski Letter. (*Id.* at 2; Daniel, Tr. 113:16-114:13; Talmadge, Tr. 482:24-483:6; Banashefski, Tr. 657:17-658:2).

Because of the change in the government's position concerning title to the Line 3A Equipment, MHC representatives negotiating with the Army needed to reevaluate how the proposed ownership change would affect MHC. (Daniel, Tr. 90:14-93:23; Hibler, Tr. 210:21-211:8). MHC representatives informed the government that the resulting definitized contract would need to be modified from the M795 RFP and Letter

Contract to address the title issue and its consequences, including, among other items, the elimination of facilitization provisions in the final contract. (Daniel, Tr. 99:10-101:20). To acknowledge MHC's understanding that the government had changed its position on title, Jeff Hibler ("Hibler"), an MHC negotiation team member, e-mailed Banashefski on May 17, 1996 stating that "[w]ith the ARDEC position that M&H will own the equipment, . . . M&H has to discuss this internally and will get back with you." (Exhibit 11 at 7.)

Internal discussions at MHC following the Banashefski Letter addressed whether the company wanted to accept title to the Line 3A Equipment. The proposed change in ownership changed the risks that MHC confronted in performing the M795 Contract. In particular, MHC was concerned that it would not only be responsible for abnormal maintenance, but would also be exposed to unforeseen expenditures if the Line 3A Equipment were damaged or destroyed. (Daniel, Tr. 90:23-93:9; Hibler, Tr. 211:14-212:12). In addition, MHC faced the prospect of unanticipated increases in costs if its pricing did not accurately reflect the actual amount of time and expense required to manufacture the M795 Projectiles according to the standards and specifications the Army required. (Daniel, Tr. 92:3-93:4). Likewise, as owners of the Line 3A Equipment, MHC was concerned that after its performance of the M795 Contract, which was expected to be completed by 1998, MHC would be left with the responsibility for demilitarizing, demobilizing, and, ultimately, disposing of the property, a liability it needed to consider carefully before accepting title to the Equipment. (Daniel, Tr. 92:14-93:4; Hibler, Tr. 211:14-212:12 and 225:18-226:7). Banashefski confirmed that the government did not

want to bear the risks associated with government ownership, including the risk that the Equipment may not actually work to produce compliant M795 Projectiles, and the ownership risk of maintenance for the Equipment. (Banashefski, Tr. 671:9-672:19).

As MHC representatives discussed internally the risks and benefits that the government's change of position on ownership presented, government representatives acknowledged the benefits to the government that would flow from MHC ownership of the Line 3A Equipment. In fact, Banashefski recognized that MHC ownership meant that all of the risk to produce the required rounds was placed on MHC. (Banashefski, Tr. 672:16-672:19).

During the time that MHC representatives discussed internally the ramifications of the government's change in position on ownership of the Line 3A Equipment, negotiations between the parties continued. On May 30, 1996, with an explicit reference to the Banashefski Letter, government contracting officer Valerie Colello ("Colello"), Banashefski's supervisor, sent MHC a six-page letter (the "Colello Letter") specifically addressing several outstanding contract issues, including ownership of the Line 3A Equipment and the implementation of MHC ownership in the definitized contract. (Exhibit 16; Daniel, Tr. 122:15-122:20; Talmadge, Tr. 476:8-477:5). Responding to the proposed MHC SOW for facilitization, Colello wrote:

> After thoroughly reviewing M&H's draft SOW for the Facilitization efforts needed to meet the required LAP production delivery schedules, the Government has determined that such language is not necessary for this contract.

(Exhibit 16, ¶ 2). To explain the government's position, Colello continued by stating that, as described in the Banashefski Letter, "this is a production requirement for the LAP of the M795 projectile and is not in any way a facilitization contract." *Id.*

To clarify the government's request that MHC accept title to the Equipment, Colello described in detail that the government had only requested facilitization costs for the government's use in evaluating the reasonableness of the MHC pricing of the M795 Projectiles:

> In the [M795] RFP, the Government had asked the contractor to separately break out the costs for any necessary facilitization efforts for evaluation purposes only. Although the parties may end up negotiating the costs associated with the equipment/facilities separately from the production deliverables, in order to better understand the price of the facilitization efforts vs. the unit price of the end item; understand that the contractor will solely be responsible for performing whatever facilitization efforts are necessary to meet the required delivery schedules within the final negotiated overall price of the basic contract.

*Id.* To eliminate any confusion, Colello emphatically informed MHC:

> In fact, it has been determined that in order to alleviate any further misunderstanding regarding the facilitization efforts, the resultant contract **will not** have a separate CLIN for the facilitization costs, but rather such costs will be included with the LAP production CLIN for the basic quantity.

*Id.* (emphasis in original). Later in the letter Colello reemphasized the nature of the M795 Contract, advising MHC for the ongoing negotiations:

> [a]s delineated above, in order to alleviate any misunderstanding by the parties that this requirement is a production effort, and is not a facilities contract, the resultant definitized contract will be constructed in such a manner that their [sic] will be **no separate line item** for any Facilitization

> efforts which M&H would have to accomplish in order to meet the required basic/option delivery requirements of the contract.

*Id.* ¶ 12 (emphasis in original). Based on the Colello Letter, the parties understood that the government intended to remove from the final M795 Contract any CLIN for the facilitization effort, thereby providing MHC with title to the Line 3A Equipment. (Daniel, Tr. 94:21-95:12). In addition, the Colello Letter underscored the parties' intent that MHC would own the Line 3A Equipment, to be implemented in the resultant definitized M795 Contract by, among other things, removal of any reference to facilitization requirements from the SOW as confirmation that "this is only a production contract and the Government will not take title to the Equipment." (Daniel, Tr. 95:19-95:24; Hibler, Tr. 214:14-214:24).

Negotiations continued into June on the M795 Contract, and the Army's Project Manager for the Contract, Colonel James Unterseher, apparently frustrated at the lack of progress in negotiations, wrote on June 5, 1996 to Darl Heffelbower ("Heffelbower"), MHC's plant manager for the IAAAP, addressing unresolved issues and warning that "unless we can resolve this situation, I may be forced to consider other alternatives." (Exhibit 18 at 1; Daniel, Tr. 125:19-126:19). Internal discussions continued at MHC on the remaining open issues as negotiations between MHC and the Army attempted to address and resolve as many of those issues as possible. (Daniel, Tr. 93:10-93:23). To address the still unresolved question of ownership for the Line 3A Equipment, Banashefski reiterated to the MHC representatives on June 6, 1996 that "ARDEC was considering [the M795 Contract] a production contract only." (Exhibit 19 at 1).

Banashefski explained that the Army did not want facility costs to be in a separate CLIN, but instead in the production unit price, requesting a separate CLIN in the M795 RFP "only . . . so [the Army] would get visibility of what all the facility items cost." *Id.*

By June 14, 1996, several key negotiating points were still unresolved, including the question of ownership for the Line 3A Equipment. Another government representative, Mike Devine ("Devine"), a member of Colonel Unterseher's Project Management staff, faxed Heffelbower a list of negotiation issues Heffelbower had not addressed in his communications with the Project Manager's office. (Exhibit 22). Of the four items Devine addressed, the second was "the final ownership of equipment." *Id.* at 2 ¶ 2. MHC representatives interpreted the Devine communication as further government insistence that the company take title to the Line 3A Equipment (Daniel, Tr. 94:13-94:20 and 126:20-127:23).

Heffelbower responded to Unterseher and Devine in a June 18, 1996 letter to Unterseher (the "Heffelbower Letter"), addressing several of the remaining open issues, including ownership of the Line 3A Equipment: "We have also agreed to take title to the equipment acquired as a part of our facilitization efforts under this proposed contract . . . . Since we have agreed to take title to the facilitization equipment, the abnormal maintenance and the demilitarization/decontamination of the facilities equipment (which was not included in our proposal) is no longer an issue." (Exhibit 23 at 2-3; Daniel, Tr. 96:20-97:19 and 127:24-128:18; Hibler, Tr. 203:25-204:22). Government representatives Talmadge and Banashefski received the Heffelbower Letter, reviewed it, discussed it, and understood that MHC was agreeing to take title to the Line 3A Equipment. (Banashefski,

Tr. 639:4-640:20, 641:21-643:15). Moreover, at the same time MHC sent the Heffelbower Letter, the MHC negotiators told their Army counterparts, including Banashefski and government Contract Specialist Talmadge of MHC's acceptance of the government's directive that MHC take title to the Line 3A Equipment. (Daniel, Tr. 97:23-98:9 and 128:19-128:22; Hibler, Tr. 204:23-205:10).

As contract negotiations continued, and with the parties' agreement that MHC would take title to the Line 3A Equipment, the parties' negotiation attention shifted to modifying the Letter Contract's terms to reflect MHC's ownership of the Equipment. By accepting title to the Equipment, certain previous negotiation issues became moot, including the need for a facilitization SOW defining the specific equipment that would be delivered to the government or the terms and conditions that would need to be added to the definitized contract for facilitization costs. (*Id.*; Daniel, Tr. 128:23-129:7). Instead, the parties discussed how to structure the definitized M795 Contract "to determine how to present facilitization clause language so M&H cash flow is not negatively impacted yet M&H ultimately owns the equipment." (Daniel, Tr. 123:17-124:8).

The issue of MHC cash flow originally surfaced during early June discussions, triggered by Banashefski's statement proposing that MHC would receive progress payments equal to 75 percent of actual expenditures, with the remainder of the cost being liquidated over the basic quantity of M795 production units, a proposal unacceptable to MHC. (Exhibit 19 at 1; Hibler, Tr. at 218:13 to 220:17). In what the parties identified as "Action Item No. 2," negotiations centered on accelerating payments to MHC to avoid

any adverse cash flow effects arising from the manufacturing and delivery schedule for the M795 projectiles. (Daniel, Tr. 99:20-100:4 and 133:16-134:8).

Specifically addressing Action Item No. 2, on June 20, 1996, Talmadge sent MHC negotiators a draft revision to the Letter Contract's CLIN structure designed to accomplish Action Item No. 2, which would determine how to "present facilitization clause language so that MHC cash flow is not impacted, yet MHC ultimately owns the equipment." (Exhibit 25 at 2; Daniel, Tr. 134:9-134:22; Hibler, Tr. 219:9-222:22; Talmadge, Tr. 502:22-503:13, 505:21-507:4). Central to the Talmadge CLIN structure was the deletion of Letter Contract's CLIN 0001AA for facilitization, and replacement of CLIN 0001AA with a requirement only for the delivery of one lot of First Article Test ("FAT") projectiles, and the creation of additional separate CLINs involving, exclusively, the LAP of production quantities of M795 Projectiles MHC would deliver to the Army. (Daniel, Tr. 100:5-101:24 and 134:23-136:12; Hibler, Tr. 229:4-234:4).

Talmadge provided to MHC the revised CLIN structure incorporating these revisions that he had prepared with input from Banashefski, Colonel Unterseher (the government program manager), and legal counsel. (Exhibit 25; Talmadge, Tr. 507:5-508:16). The revised CLIN structure Talmadge provided to MHC included an "asterisk" attached to CLIN 0001AA, with language that stated, "The FAT subCLIN price includes the costs associated with any special tooling equipment and/or facilitization efforts required by the contractor to perform the M795 projectile LAP contract." (Exhibit 25, page 2; Talmadge, Tr. 508:17-509:18). The asterisk language was specifically developed in response to Action Item No. 2, and was inserted into the revised CLIN structure for the

express purpose of ensuring that MHC took title to the Line 3A Equipment. (Talmadge, Tr. 510:16-511:13). Indeed, the asterisk language that Talmadge drafted in response to Action Item No. 2 is substantially the same as the language contained in the definitized M795 Contract CLIN structure. (Talmadge, Tr. 511:9-513:5; Exhibit 72).[1] Talmadge explained to MHC that the asterisk language was included so that the Army could bring out the facilitization price for evaluation purposes, to determine whether the Army thought it was a fair price, and also to demonstrate the reasonableness of the prices in the Contract. (Daniel, Tr. 100:5-101:5, 135:15-137:5). Talmadge assured MHC that ARDEC had structured other contracts in this way numerous times to gain price visibility for evaluation purposes. (Daniel, Tr. 101:6-102:10).

### C. The Definitized M795 Contract

Using this revised CLIN structure as the basic framework for completing Action Item No. 2, the parties continued to negotiate the details of the CLIN framework, delivery schedule, and related terms and conditions, all premised on MHC's ownership of the Line 3A Equipment. (Daniel, Tr. 136:13-137:14). At no point during the negotiations or execution of the M795 Contract did government representatives indicate a further change of position regarding title to the Line 3A Equipment or advise MHC representatives that the government intended to own the equipment (Daniel, Tr. at 158:15 to 159:13; Hibler, Tr. 235:13-235:18, 239:16-240:3, 262:16-263:7). On August 15, 1996, all remaining

[1] Exhibit 72 is a comparison of Exhibit 25, page 2 (revised CLIN structure in response to Action Item 2), with Exhibit 36, page 12 (the definitized M795 Contract). Exhibit 72 was admitted into evidence at Tr. 811:7-812:6.

open issues were resolved and the parties signed PZ0001, a modification to the Letter Contract that became the definitized M795 Contract. (Exhibit 36 at 1). The parties included in the final agreement the standard FAR government property clause (the "FFP Property Clause") for FFP contracts:

> Title to each item of facilities . . . acquired by the Contractor for the Government under this contract shall pass to and vest in the Government when its use in performing this contract commences or when the Government has paid for it, whichever is earlier, whether or not title previously vested in the Government.

Exhibit 36 at page 68, ¶ 1.8(c)(3).

The M795 Contract included a SOW provision addressing deliverables, which provided that "[t]he Contractor shall deliver M795 projectiles as delineated in Section F of this contract. The deliverable items include; 155mm, HE, M795 Projectiles (9312769), Obturator (10542907), Supplemental Charge (8797090), Liner Cup (9331677), Spacers (8797088)." (Exhibit 36, page 14 of 81, ¶ C.3.1.1). Moreover, both the delivery schedule, Section F, and the CLIN structure "computer pages" refer only to projectiles as deliverables, provide a specific quantity of such projectiles for each delivery date, and provide a delivery destination for the first two deliveries as Yuma, indicating the Yuma, Arizona proving grounds. (Exhibit 36, page 31 of 81, § F.2; Banashefski, Tr. 712:10-714:25). Not included in the final M795 Contract, however, was any provision for facilitization in the SOW or any list of facilities that MHC was required to acquire and deliver to the government, and paragraph C.3.9 from the RFP SOW was specifically deleted from the M795 Contract. (Daniel, Tr. 139:24-140:6; Talmadge, Tr.

469:6-469:13, 472:14-473:2). Standard FAR provisions that the parties discussed during negotiations as required if the Line 3A Equipment had been government property or a required deliverable under the final M795 Contract, including 48 C.F.R. §§ 52.245-7, -10, and -11, were also excluded in the final agreement. (Daniel, Tr. 140:25-142:15)

Also deleted was the Letter Contract's CLIN 0001AA for facilitization and delivery of the Equipment, replacing that structure with the new CLIN framework Talmadge originally proposed on June 20, 1996 to include only M795 projectiles as deliverables and to achieve the objectives of Action Item No. 2. (Exhibit 36, page 12; Demonstrative Exhibit 6; Daniel, Tr. 136:20-138:10, 139:6-140:6; Talmadge, Tr. 468:7-468:20). Under this final CLIN structure, MHC was required to deliver one First Article Test ("FAT") lot quantity of M795 projectiles pursuant to CLIN 0001AA, 1,000 each M795 projectiles pursuant to CLIN 0001AB, and a final delivery of 76,968 projectiles pursuant to SubCLIN 0001AC. (Exhibit 36 at page 12). Linked to CLIN 0001AB in the M795 Contract was asterisk language stating that "this subclin includes 1,000 each M795 Projectiles at a total price of $173,920 and $9,310,071 in facilitization costs," just as Talmadge and Banashefski had proposed during the negotiations in response to Action Item No. 2. (Exhibit 36 at page 12).

Significantly, all deliverables in the final definitized M795 Contract are stated in terms of units of projectiles. (Exhibit 36, page 31; Daniel, Tr. 140:14-140:24). Nowhere does the final M795 Contract identify any of the Line 3A Equipment as a deliverable or as a requirement of the production work to be performed under the M795 Contract. (*See, e.g.*, Exhibit 36, pages 12, 31). No separate CLIN or SubCLIN number is assigned to the

Line 3A Equipment in the M795 Contract's CLIN structure. (Exhibit 36 at page 12). At the conclusion of the M795 production, the Contract did not direct MHC to perform any activities related to storage, demilitarization, decontamination, or disposal of any property, including the Line 3A Equipment. (Daniel, Tr. 140:25-141:23; *see, e.g.,* Exhibit 36, page 40). All of these provisions in the final definitized M795 Contract underscore the agreement reached between MHC and the government during negotiations where MHC conclusively accepted title to the Line 3A Equipment.

Once production of the M795 projectiles was underway, attention focused on the administration of the M795 Contract and MHC's delivery of completed projectiles. By February 1997, however, the government's scheduled delivery of certain items it had agreed to provide to MHC had become delayed. (Daniel, Tr. 143:10-143:18). Concerned that the government delay would adversely affect its delivery schedule, MHC requested, and the government agreed to, a contract modification that would shift a portion of its price for the delivery of 1,000 each, M795 projectiles (CLIN 0001AB) to be paid at the earlier delivery of FAT samples (CLIN 0001AA), rather than at the delivery of the first production lot of 1000 projectiles. (Daniel, Tr. 143:7-144:15). MHC and the government agreed that the change would allow MHC to receive timely payment from the government despite the slippage in the government's schedule for providing government-furnished materials needed to produce the M795 projectiles. *Id.*

To reflect their agreement, the parties executed on March 13, 1997 modification P00003 to the M795 Contract, adjusting the schedule for government supply of the required government-furnished materials, modifying the delivery schedule for M795

Projectiles, and shifting part of the projectile price from CLIN 0001AB to CLIN 0001AA, allowing MHC to receive a timely payment from the government despite the delay in the delivery of the government-furnished materials needed for production. (Exhibit 45). No other changes to the M795 Contract were effected by the P00003 modification. (Talmadge, Tr. 515:22-517:17). The P00003 modification changed or affected no provisions of the final M795 Contract relating in any was to MHC's ownership of the Line 3A Equipment. (Daniel, Tr. 144:16-144:19; Talmadge, Tr. 518:17-519:22). Indeed, precisely the same asterisk language contained in the M795 Contract is also contained in the P00003 modification, the only difference being the location of the asterisk itself to reflect the revised payment date and delivery schedule. (Talmadge, Tr. 516:7-516:10).

In October 1997, pursuant to the terms of the Letter Contract, MHC submitted to the government an invoice in the net amount of $3,678,972.22 for payment of CLIN 0001AA, the First Article Test units, after deducting amounts the government had previously invoiced on progress payments, all as provided in the definitized M795 Contract. (Exhibit 47). Accompanying the MHC invoice was a Form DD250 approving the invoice for payment and restating the asterisk language contained in the definitized M795 Contract providing for payment to MHC in connection with the delivery of FAT projectiles. *Id.* The DD250 does not provide acceptance of any Line 3A Equipment, but instead recognizes and restates the parties' agreement in the definitized M795 Contract regarding the timing and amount of payments to MHC, using the same CLIN provisions set forth in the Contract, as the parties intended. (*Id.*; Daniel, Tr. 151:2-151:13). No list

of equipment was attached to the Form DD250 in the contract file, as the government Property Administrator would have expected to see in order to maintain a record of equipment if any had been delivered. (Solinski, Tr. 419:24-420:9, 421:15-422:2). The Invoice and Form DD250 had no effect on the parties' agreement that MHC take title to the Line 3A Equipment.

## D. Contract Performance and the Line 3A Equipment

In August 1996, as the M795 Contract transitioned from negotiation, drafting, and execution to performance and production, government responsibility for the Contract shifted from government negotiators Banashefski and Talmadge to the government's Administrative Contract Officer ("ACO") Fred W. Taylor ("Taylor"), the government official responsible for administering the M795 production contract. Significantly, on August 20, 1996, only five days after the parties signed the final M795 Contract, Taylor sent a memorandum to Banashefski explaining his understanding of the contract provisions relating to ownership of the Line 3A Equipment:

> We understand that all new facilities (equipment and buildings) acquired by Mason & Hanger under the facilitization phase of the M795 program will not be called out as deliverables under the contract even though they are being direct costed versus being depreciated.

(Exhibit 38, ¶ 3). More explicitly, Taylor later reiterated his understanding on ownership, advising Banashefski that "[t]he Government does not intend to take title to the facilities even though they are to be direct costed." *Id.* Talmadge faxed a copy of the Taylor memorandum to MHC (Exhibit 38, page 1).

Twice Banashefski confirmed Taylor's understanding regarding facilitization and MHC ownership of the Line 3A Equipment. In a September 4, 1996 e-mail Taylor summarized his recent discussion with Banashefski concerning the M795 Contract, noting that Banashefski told him that Banashefski may approach MHC at some future time to ask that MHC consider returning title to the Line 3A Equipment to the Army. (Exhibit 39). Later, on October 7, 1996, Banashefski specifically responded to Taylor's August 20, 1996 memorandum, addressing issues Taylor had raised in his memorandum concerning provisions of the Davis-Bacon Act, but, despite the express reference to Taylor's memorandum, saying nothing that would dispute Taylor's understanding that MHC owned the Line 3A Equipment. (Exhibit 41).

Similarly, during a teleconference concerning Taylor's memorandum, with MHC representatives participating on the call, Talmadge confirmed the government position that the government would not own the Equipment. (Exhibit 40, page 1, ¶ 3). No government representative, including Banashefski, Talmadge, or Taylor, ever advised MHC that there had been a change in the government's position after May 16, 1996 regarding MHC's ownership of the Line 3A Equipment. (Daniel, Tr. 158:15-159:13). No government representative ever notified MHC that the final M795 Contract the parties signed actually conveyed title in the Line 3A Equipment to the government. *Id.* No government representative ever advised MHC that ACO Taylor's August 20, 1996 understanding of the title provisions in the final M795 Contract he would administer was incorrect. (*Id.*; Talmadge, Tr. 537:11-537:14, 541:7-541:10).

With respect to the parties' administration of the M795 Contract's property terms, MHC first began purchasing the equipment necessary for it to manufacture, load, assemble, and package the M795 projectiles after signing the Letter Contract on December 12, 1995. As it initially acquired and installed certain of the Equipment, MHC systematically tagged the individual items as government-owned property, consistent with its understanding of the Letter Contract that the government would acquire title in the Equipment. (Darley, Tr. 360:20-361:20).

Shortly after execution of the final definitized M795 Contract, however, MHC began retagging all of the Line 3A Equipment it had acquired to show the equipment as contractor-owned property. *Id.* AO personnel have maintained color-coded property tags on plant property (white and fluorescent pink for government property, blue and gold attached to AO property) in conspicuous locations on the items. (Demonstrative Exhibits 9 through 16; Darley, Tr. 288:21-290:4). Since the retagging of the Line 3A Equipment after the execution of the final M795 Contract in 1996, only AO property tags appeared on the Line 3A Equipment until issuance of the Final Decision. (Darley, Tr. 320:18-321:20).

Beginning in 1996 and continuing each year thereafter, MHC and then AO recorded the Line 3A Equipment on its property logs as contractor-owned property, and tagged the Line 3A Equipment as MHC- or AO-owned property. (Darley, Tr. 361:10-361:20; Solinski, Tr. 411:3-411:9). Each year the government, through its Property Administrator at IAAAP, first Judith Morgan ("Morgan"), and then, after 2001, Julie Solinski ("Solinski"), conducted annual or biennial audits of the property records and

property management systems that AO maintained at the plant. (Darley, Tr. 341:6-343:12, 345:11-346:11).

The current IAAAP government Property Administrator, Solinski, understands that she has a duty to ensure that AO properly marks and records both AO property and government property. (Solinski, Tr. 404:11-405:6; Exhibit 1, page AO008350). Solinski confirmed her understanding that she serves to "ensure that the government's assets are not confused with contractor property." (Solinski, Tr. 405:7-405:17; Exhibit 1, page AO008384, § C.3.7). To fulfill the Property Administrator's duty, Solinski and Morgan conducted annual or biennial audits to evaluate the contractor's process of properly identifying government property. (Solinski, Tr. 405:18-406:15, 410:22-411:2; Darley, Tr. 346:5-346:11; Exhibit 52, page AO000197). Neither Morgan nor Solinski ever identified AO's tagging and recording of the Line 3A Equipment as contractor-owned to be erroneous. (Solinski, Tr. 411:15-412:15, 432:14-433:12; Darley, Tr. 355:24-356:5). Had the ownership of an entire production line been incorrectly recorded or improperly tagged, the error would have been noted as a deficiency in the Property Administrator's audit. (Solinski, Tr. 406:16-407:7).

Instead, the records on AO's property books related to the M795 Contract were subject to sampling in a 1999 audit, and the Property Administrator noted no deficiencies regarding identification of any property. (Solinski, Tr. 407:8-408:9; Exhibit 52, page AO000184, AO000197). The 1999 audit report concluded that "no deficiencies were found during the review" of "the contractor's process of properly identifying Government property," and that "assets are labeled, tagged or otherwise identified according to the

approved property control procedures upon fabrication or receipt." *Id*. Neither Morgan nor Solinski ever identified any deficiency regarding the Line 3A Equipment tagging and records during any annual audit, and instead found AO's records to be satisfactory. (Solinski, Tr. 411:20-412:15).

Up through 2007, the government's Property Administrators at IAAAP had complete access to AO's property records at all times, verified that AO properly identified government property, and reviewed on numerous occasions the property records AO submitted to the government, including during annual property audits the administrators conducted. (Darley, Tr. 351:3-352:5 and 354:18-355:7; Solinski, Tr. 409:25-410:15).

The government admitted in its discovery responses that, prior to 2001, government personnel at IAAAP were aware that the Line 3A Equipment was not recorded as government-owned property in the AO-maintained property records. (Exhibit 61, page 7, Request for Admission No. 7). IAAAP ACO James Nelson ("Nelson") testified during his deposition that MHC recorded the Line 3A Equipment as its property in the 1996 timeframe, and that he was aware of such recording during that time. (Exhibit D-17, Deposition of Nelson, 26:19-27:10). ACO Nelson further testified that it was "pretty obvious" during the time frame of 1996 to 2006 that the Line 3A Equipment was tagged as MHC- or AO-owned equipment. (Exhibit D-17, Deposition of Nelson, 88:17-88:22). Solinski confirmed that tags on the Line 3A Equipment were conspicuously placed, and could be located without significant effort. (Solinski, Tr. 422:24-423:15, 430:16-431:7). In addition, the government produced during discovery a

list prepared on July 13, 2000 of AO-owned property on Production Line 3A, including the Line 3A Equipment, that the government Property Administrator could generate from the AO property record system. (Exhibit 54; Darley, Tr. 328:24-331:8).

As production of the M795 projectiles progressed to completion under the Contract, certain events further confirmed MHC's ownership of the Line 3A Equipment. ACO Nelson admitted having full knowledge of MHC's and AO's classification of the Line 3A Equipment as contractor-owned property since 1996. (Exhibit D-17, Deposition of Nelson, 26:19-27:10; 88:17-88:22). On February 13, 1998, the Army recognized MHC's ownership of equipment at IAAAP and MLAAP in a Justification and Approval for the Facility Use and Management of Iowa and Milan Ammunition Plants (the "J&A"), signed by Kenneth J. Oscar, Acting Assistant Secretary of the Army. The J&A notes that lead time would be required to "replace contractor-owned equipment" at both plants, and that "current contractor investment in equipment at the two sites has an estimated replacement value of $19.5 million," including the Line 3A Equipment. (Exhibit 48, pages AO008312, 8313, 8318; Daniel, Tr. 56:14-57:13, 59:20-60:24). Also in 1998, IAAAP CO Trudy Hallgren made a presentation to high-ranking Army officials, including Assistant Secretary Oscar, in which she recognized MHC's ownership of the Line 3A Equipment as a "contractor investment reduc[ing] government risks." (Exhibit 49, pages 9 and 16; Daniel, Tr. 56:14-57:4, 63:20-64:9, 66:6-68:23). In the same 1998 timeframe MHC and General Dynamics Ordnance Systems, Inc. merged to form a joint venture that became AO. (Daniel, Tr. 55:21-56:13). As part of the joint venture, each venture party contributed certain monies and property to the new entity. (Daniel, Tr.

53:2-53:16). MHC's contribution included the Line 3A Equipment, which was listed as a contractor-owned asset. (Daniel, Tr. 53:2-53:16 and 159:14-160:1).

In 1999, the government's auditors, the Defense Contract Audit Agency ("DCAA"), initiated a post-award audit of the M795 Contract. After completing its audit investigation, DCAA issued on August 12, 1999 its letter summarizing the findings and results of its inquiry, stating that its auditors found Army correspondence indicating clearly that the government did not want title to the facility and equipment. (Exhibit 50, page 2). DCAA concluded it would not pursue any further investigation of AO's cost accounting for the Line 3A Equipment, "*buying in*" to AO's audit response position verifying AO's ownership of the Equipment and the "unique nature of the situation surrounding the M795 facilities." (Exhibit 53 at 2-3; Exhibit D-17, Dep. of DCAA auditor Michael Walker ("Walker"), 27:8-27:13 and 29:24-30:8). Walker shared both DCAA audit letters, as well as AO's response, with the ACOs at IAAAP, Nelson and Taylor. (Walker, Tr. 802:3-802:9). Walker concluded, after conducting the investigation and consulting with relevant ACOs responsible for administering the M795 Contract, that he had no reason to believe that AO did not own the Line 3A Equipment. (Walker, Tr. 788:15-788:22).

Between 1996, when MHC retagged the Line 3A Equipment as its property, until 2007, no government representative challenged AO's ownership, tagging, recording, or use of the Line 3A Equipment as its own property. (Darley, Tr. 355:24-356:5). There was no exhibit introduced at trial and no testimony received evidencing any government

objection to AO's claim of ownership for the Line 3A Equipment or its classification and recording of the Equipment as AO property until issuance of the Final Decision in 2007.

### E. <u>The 2007 Army Procurement</u>

In August 2007, the Army initiated a competitive procurement for a follow-on contract for operation and maintenance of IAAAP and MLAAP. (Smith, Tr. 725:16-725:22; 748:13-749:24). CO Charles Smith ("Smith") was instructed by the procurement competition team to review the ownership of the Line 3A Equipment. (Smith, Tr. 749:25-750:25). Smith's review consisted only of review of the documents cited in the Final Decision. Smith, Tr. 730:8-730:14). Smith was not involved in any activities regarding the drafting or performance of the M795 Contract, and Smith did not interview any individual who was involved with the drafting or execution of the M795 Contract before issuing the Final Decision. (Smith, Tr. 730:15-731:16). AO did not submit any issue relating to the Line 3A Equipment to Smith for consideration; on the contrary, the government procurement team submitted the Equipment title issue to Smith for consideration. (Smith, Tr. 733:1-733:18; Exhibit 55). Smith issued the Final Decision pursuant to the disputes clause in the M795 Contract, initiating the disputes process leading to this appeal of the Final Decision consistent with the M795 Contract's terms and the Contract Disputes Act ("CDA"). (Exhibit 56, page AO00574; Smith, Tr. 733:23-734:10).

After issuance of the Final Decision, on October 26, 2007, the Army ordered AO to re-tag the Line 3A Equipment as government-owned property, and to change its property records to reflect government ownership of the Equipment, in preparation for

the Army's competitive procurement for the follow-on contract for operation and maintenance of the two ammunition plants. On October 30, 2007, AO complied with the Army's directive and re-tagged the Line 3A Equipment as government-owned property and revised its property records and logs to reflect government ownership of the Equipment. On February 21, 2008, after AO had re-tagged the Equipment and modified its property records in compliance with the Army's directive, the Army issued Request for Proposal No. W52PIJ-06-R-0201 (the "2008 RFP") for the operation and maintenance of IAAAP and MLAAP. As part of the 2008 RFP, the Army contemplates that the Line 3A Equipment will be offered to prospective bidders as government-furnished property any new contractor could use for its own production activities. (Darley, Tr. 359:14-360:19).

Significantly, before the Army's action directing AO to reverse all records of ownership for the Line 3A Equipment to reflect government ownership, prospective bidders were allowed to inspect the facilities at IAAAP that would be made available as "government-furnished property" in connection with the solicitation and procurement. (Solinski, Tr. 424:13-426:9; Darley, Tr. 356:17-358:3). However, much of the Line 3A Equipment was excluded from the bidder site inspection. (Solinski, Tr. 428:8-429:19; Darley, Tr. 357:4-359:13). To prevent representatives of the prospective bidders from inspecting the proprietary equipment MHC and AO possessed to manufacture the M795 projectiles, AO covered the Line 3A Equipment, an action that government representatives acknowledged and fully accepted just ten months prior to issuance of the Army's Final Decision. *Id.* Only after issuance of the Final Decision did any

government official instruct AO to uncover the Line 3A Equipment during procurement site visits. (Solinski, Tr. 425:9-425:23; Talmadge, Tr. 487:2-487:6, 492:13-492:18).

## PROPOSED CONCLUSIONS OF LAW

Consistent with the Court's bench ruling entered on August 15, 2008, Plaintiff proposes conclusions of law that AO holds title to all items of Line 3A Equipment based on the terms of the M795 Contract and the parties' conduct in performing their agreement. As a separate and independent factual finding and conclusion of law, AO holds title to the Line 3A Equipment because the government had full notice and knowledge that AO asserted ownership of the Line 3A Equipment, and the government's claim to title in the Equipment accrued more than six years before its issuance of the Final Decision, contrary to the requirements of the Contract Disputes Act, 41 U.S.C. § 605(a).

### A. Analysis of the M795 Contract

The Court's first task in construing a contract is to discern the parties' intent from the plain language of the agreement, considering the contract language in its entirety. "Provisions of a contract must be so construed as to effectuate [the] spirit and purpose [of the contract] . . . and interpreted so as to harmonize and give meaning to all of its provisions." *Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1057-58 (Fed. Cir. 1983). To that end, an interpretation that gives meaning to the entire agreement will be favored over one that renders a portion of the agreement meaningless. *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed. Cir. 1985). The words used in the contract should be read consistently with their common meaning or, if technical,

consistently with their technical definition unless the agreement provides for the use of a different definition. *Restatement (Second) of Contracts* § 202 (1981); *see Kearfott Guidance & Navigation Corp.*, ASBCA No. 45536, 01-2 B.C.A. ¶ 31,496, at 155,555 (*citing Corning Glass Works v. Brennan*, 417 U.S. 188, 201-02 (1974) and *Shell Petroleum, Inc. v. United States*, 182 F.3d 212, 217 (3d Cir. 1999)).

In reviewing the M795 Contract, the Court "must interpret a contract as a whole and 'in a manner which gives reasonable meaning to all of its parts and avoids conflict or surplusage of its provisions." *Arko Executive Servs., Inc. v. United States*, 78 Fed. Cl. 420, 424 (2007) (*citing United Int'l Investigative Serv. v. United States*, 109 F.3d 734, 737 (Fed. Cir. 1997). In the realm of government contracts, this interpretive principle applies "with particular force in the context of the FAR, which, after all, is designed to provide a set of integrated procurement rules." *Arko Executive Servs., Inc.*, 78 Fed. Cl. at 424.

Specifically, the parties urge the Court to conclude that the standard government property clause incorporated in firm, fixed-price contracts and derived from FAR § 52.245-2 entitles that party to judgment in its favor. The property clause included in the M795 definitized contract provides, in part, that "[t]itle to each item of facilities and special test equipment acquired by the Contractor for the Government under this contract shall pass to and vest in the Government." Exhibit 36, M795 Contract, Part II, Section I.8; *see* also 48 C.F.R. § 52.245-2(c)(3) (1996). The phrase "acquired . . . for the [g]overnment," therefore, is central to the proper interpretation of the M795 Contract concerning whether title to the Line 3A Equipment was transferred to the government.

The plain and ordinary meaning of the phrase "acquired . . . for the government," supports AO's interpretation of the M795 Contract's relevant provision. Further, the FAR Council has verified the long-established understanding that the phrase "acquired . . . for the government" results in title transferring to the government under a FFP contract only for those items specifically identified as a deliverable end item. *See* 48 C.F.R. § 45.402 (2008). The relationship between different provisions in the FAR as it existed at the time of the parties' agreement establishes that "acquired . . . for the government" relates to and requires title transfer to the government only for those items specifically provided for in the contract or the accompanying SOW. Accordingly, the M795 Contract's FFP Property Clause mandates that, for title to transfer to the government, the FFP contract must require the contractor to acquire something and deliver it to the government.

FAR Subpart 45.1 dictates that contractors under FFP contracts ordinarily are required to furnish "all property necessary to perform Government contracts . . . ." 48 C.F.R. § 45.102 (2008). This means that upon completion of performance of all the obligations of a FFP contract, title to all property which had not been delivered to, and accepted by the government, or which had not been incorporated in supplies delivered to and accepted by the government, remains vested in the contractor. *See* 48 C.F.R. § 52.245-2(c). Logically, unless a contractor is permitted to retain title to its property that it uses in performance of a FFP contract, the government would gradually acquire all property of its contractors performing FFP contracts. Consequently, title to contractor-acquired property under FFP contracts will result in the government owning

such property only if the contract contains a special term or separate CLIN directing the contractor to acquire and to deliver to the government the relevant property.

The plain and ordinary meaning of the operative title-vesting phrase "acquired . . . for the government" of the FFP Property Clause supports this shared interpretation that an FFP contract must specifically require the contractor's acquisition and delivery of property to the government for title transfer to occur. Where a contractor simply acquires and uses a part of the facilities or equipment in connection with its production of some product or service delivered to the government, the contractor is not "acquiring" the facilities or equipment "for the government." Rather, as here, the contractor is acquiring the facility or equipment for itself – to provide the product or service to the government that is the subject matter of the contract.

Finding that the FFP Property Clause phrase "acquired . . . for the government" means that title transfers to the government only for those items specifically required to be acquired and delivered by the contractor is consistent with the principles set forth in the FAR describing FFP contracts. A fixed price contract "places upon the contractor maximum risk and full responsibility for all costs and resulting profit and loss." 48 C.F.R. § 16.202-1 (2008). Thus, a FFP contract anticipates a situation where a contractor is responsible for performing the contract, including acquiring and maintaining whatever equipment and property is necessary to perform the contract for the fixed price. The government, on the other hand, assumes no such risk in a FFP contract and receives the items specifically set forth in the contract. To allow the government to assume title to property such as the Line 3A Equipment – equipment that it did not purchase or maintain,

for which it bore no risk beyond its mere payment of the fixed-price for the delivery of the M795 Projectiles, and which was not included in the Contract as a deliverable – is contrary to the plain and ordinary meaning of the FFP Property Clause in the context of the principles set forth in the FAR governing fixed-price contracts.

The inquiry may begin with the Court's interpretation of the FFP Property Clause, but it does not end there. The Court must "construe contract language so as to give consistent meaning to all of the terms of a contract." *See Bataco Indus., Inc. v. United States*, 29 Fed. Cl. 318, 325 (1993); *see also Fortec Constructors*, 760 F.2d at 1292 (interpretation that gives meaning to all parts of the contract is preferred to one that leaves portions of the contract meaningless); *PCL Constr. Servs., Inc. v. United States*, 47 Fed. Cl. 745, 784 (2000) (same). No contract provision should be "construed as being in conflict with another [provision] unless no other reasonable interpretation is possible." *See United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir. 1983). Comparison of the terms contained in both the Letter Contract and the definitized M795 Contract, including the evolution of the terms and conditions between both agreements, discloses that several provisions relevant to the question of title to the Line 3A Equipment changed materially over time. Certain provisions remained throughout each successive version of the contract, but with different terms and structure. Other terms, conditions, and provisions appearing in earlier contract versions were removed entirely from later versions.

Taking into account the fundamental principles of contract construction that must guide the Court, the combined provisions of the M795 Contract, including the

government property clause and the other contract provisions that provide it context and meaning, do not resolve the question of ownership for the Line 3A Equipment. The parties do not dispute that no single provision of the M795 Contract declares which party owns the Line 3A Equipment. The Government's counsel specifically admitted, upon questioning by the Court, that no such "ownership" provision could be found. (Government Counsel, Tr. 36:16-37:19). Consistent with the principles of construction discussed above, the Court concluded, both in its August 1, 2008 Order on Cross-Motions for Summary Judgment, and in its August 15, 2008 bench ruling, that the contract terms themselves, taken together and in context, are inherently ambiguous and do not establish conclusively whether the parties intended to vest title to the Line 3A Equipment in the government or its contractor, AO. Consequently, given the absence of a clear and unambiguous contractual statement of the parties' intention regarding ownership of the Equipment, together with the deletion from the definitized M795 Contract of specific Letter Contract clauses that addressed the government's ownership of the Line 3A Equipment, the lack of required FAR clauses for facilities contracts, and delivery terms that apply only to projectiles, the Court must examine the parties' conduct in negotiating and performing the M795 Contract as well as relevant extrinsic evidence to decide the question of ownership.

**B. <u>The Parties' Conduct and Performance of the M795 Contract</u>**

Where, as here, a contract ambiguity exists, the Court may examine the parties' conduct to determine their contractual intent. Actions related to an agreement that are consistent with the language of the agreement may always be considered to determine the

parties' intent. *Restatement (Second) of Contracts* § 212 cmt. b (1981); *see also Johnson Controls World Servs., Inc. v. United States,* 48 Fed. Cl. 479, 493 (2001). The parties' actions before a controversy arose are highly relevant in determining their intent and may reveal more about their intent than the language of the agreement alone. *Tilley Constructors & Eng'rs, Inc. v. United States*, 15 Cl. Ct. 559, 565 (1988) (relevant evidence of conduct connected with the controversy rendered other evidence inapt to determine intent of parties); *Aluminum Co. of Am. v. United States*, 2 Cl. Ct. 771, 777 (1983) (recognizing that "contemporaneous 'external indications of the parties' joint understanding'" may be considered in contract interpretation). *See Johnson Controls*, 48 Fed. Cl. at 494; *Saul Subsidiary II Ltd. P'ship v. Barram*, 189 F.3d 1324, 1326 (Fed. Cir. 1999) (noting "[i]t is a familiar principle of contract law that the parties' contemporaneous construction of an agreement, before it has become the subject of a dispute, is entitled to great weight in its interpretation"), *citing Blinderman Constr. Co. v. United States*, 695 F.2d 552, 558 (Fed. Cir. 1982); *Coastal Gov't Servs., Inc.*, ASBCA No. 50283, 01-1 B.C.A. 31,353 at 154,832. Thus, in construing the meaning of the M795 Contract regarding ownership of the Line 3A Equipment, "great weight" should be given to "the parties' contemporaneous actions . . . in determining their intentions." *Coastal Gov't Serv., Inc.*, 01-1 B.C.A. at 154,832.

Of equally great weight in construing the Contract is the conduct of the parties in the negotiation of the agreement. *Johnson Controls*, 48 Fed. Cl. at 493; *Tilley Constructors*, 15 Ct. Cl. at 777. In particular, deleting terms, conditions, and provisions of the agreement through successive drafts can reveal as much as, and perhaps more than,

the remaining terms alone. *Hol-Gar Manufacturing Corp. v. United States*, 169 Ct. Cl. 384, 395, 351 F.2d 972, 975 n.4 (1965) (finding it "quite appropriate" to compare language of original specification with change made by modification); *Teg-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) (directing that meaning of language must be as "derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances") (emphasis added); *Fireguard Sprinkler Sys., Inc. v. Scottsdale Ins. Co.*, 864 F.2d 648, 651 (9th Cir. 1988) ("Words deleted from a contract may be the strongest evidence of the intention of the parties"); *Royal Indem. Co. v. John F. Cawrse Lumber Co.*, 245 F. Supp. 707, 711 (D. Or. 1965) (deletion of the only language that specifically dealt with a subject is "of more than ordinary significance" when attempting to discovery the parties' intent).

Measuring the parties' conduct in negotiating and performing the final, definitized M795 Contract against the preceding standards for determining contractual intent, it is clear that MHC and the government intended that MHC and, later, AO acquire and retain title to the Line 3A Equipment, as the Court declared in its bench ruling. (Court, Tr. 814:1-814:13). Looking at the record of the negotiations and correspondence the parties exchanged, followed by the performance of the contract consistent with those clearly expressed intentions, the conclusion is inescapable: The government would not take title to the Line 3A Equipment and insisted that MHC accept title to the Equipment, along with all the attendant risks and burdens, including maintenance costs and risk of loss or damage.

Once the parties agreed that MHC would own the Line 3A Equipment, the parties signed the final, definitized M795 Contract that had been carefully structured to accomplish the agreed ownership. Once the contract was signed, both the government and MHC, then later AO, conducted themselves until 2007 as if AO owned the Equipment, from tagging and recording the Equipment as contractor-owned property and through the annual government property audits that, *sub silentio*, confirmed the agreement the parties had reached regarding title. Moreover, in a 1998 J&A signed by the most senior Army officials, the Army recognized MHC's ownership of the Equipment. (Exhibit 48). Also in 1998, in a separate presentation to senior Army officials, Trudy Hallgren, PCO for the IAAAP facilities use contract at the time, presented a slide entitled "Examples of Existing Contractor Investment" specifically referring to the $10 million value of the M795 production equipment, noting that "contractor investment reduced government risk." (Exhibit 49, page AO000534).

Central to the conclusion that AO owns the Equipment is the testimony and documentary record of negotiations between the government and MHC during 1996. Beginning with the Banashefski Letter to MHC on May 16, 1996, the government emphatically made clear its position on ownership of the Line 3A Equipment: "The Government will not have title to the equipment and will not be responsible for maintenance of same." (Exhibit 10, page 2). To reemphasize that understanding, exactly two weeks later, and with an explicit reference to the Banashefski Letter, another government contracting officer, Colello, sent MHC an additional letter addressing title to the Line 3A Equipment. "To alleviate any misunderstanding by the parties that this

requirement is a production effort," Colello declared that the final M795 Contract would be structured to remove any separate CLIN for any MHC facilitization required to produce the M795 Projectiles, a statement which ultimately resulted in the parties' removal of the Line 3A Equipment from the final M795 Contract as a deliverable. (Exhibit 16, page 3, ¶ 12).

On June 18, 1996, after further prodding from the government, Heffelbower, for MHC, advised the government that the company would accept title to the Line 3A Equipment. The government has presented no credible evidence, in any form, demonstrating a change in the government's position regarding title to the Line 3A Equipment, either before or after the June 18, 1996 Heffelbower Letter advising the government of MHC's decision to accept ownership. Significantly, after specific written communications from three separate government representatives in less than a month, all addressing the title issue – it is significant that no government representative ever sent any MHC representative a written communication advising of a further change in the government's position to reacquire title to the Equipment.

Between June 18, 1996 and execution of the final definitized M795 Contract on August 15, 1996, the parties' efforts focused, in large part, on implementing in the final M795 Contract MHC's ownership of the Equipment. Government representatives, particularly Talmadge, took the initiative in developing the CLIN structure that would achieve Action Item No. 2, "present[ing] facilitization clause language so M&H cash flow is not negatively impacted yet M&H ultimately owns the equipment." (Exhibit 21, page 2, Action Item No. 2). Although certain other contract terms and provisions also

had to be completed and agreed upon, Action Item No. 2, and the exhibits and testimony presented at trial, including Talmadge's admissions, demonstrate conclusively that the parties worked jointly to implement their agreement through the revised CLIN structure and the asterisked language therein: MHC ownership of the Equipment.

The final M795 Contract, taken as a whole, demonstrates an agreement between the parties to vest title to the Equipment in MHC, and now in AO. The carefully crafted CLIN structure itself conditions payments solely in terms of M795 projectiles. There is no separate CLIN identifying the Line 3A Equipment. There is also no M795 Contract provision directing MHC or AO to acquire the Equipment, nor is there any provision requiring AO's delivery of any acquired Equipment to the government. The Government's counsel admitted as much upon questioning by the Court. (Government Counsel, Tr. 36:16-37:19). All deliverables under the Contract are stated in terms of M795 projectiles. Consistent with the absence of any CLIN or deliverable provision relating to the Line 3A Equipment is the specific deletion of Paragraph C.3.9 from the original Letter Contract's Scope of Work.

Performance of the final definitized M795 Contract between August 1996 and September 2007 is remarkable for its conduct, by the government and MHC or AO, thoroughly consistent with the terms to which the parties had agreed. That eleven-year period is occasionally punctuated by episodes that confirm and underscore MHC's ownership of the Line 3A Equipment. First, only five days after the final M795 Contract was signed, ACO Taylor advised Banashefski of his understanding that the contract does not call out the Equipment as deliverables and that "the Government does not intend to

take title to the facilities [i.e., the Equipment]." Taylor advised Banashefski that he intended to administer the Contract based on those twin understandings regarding MHC ownership of the Equipment.

Confronted with Taylor's statement of understanding, a position directly contrary to the government's current position in this litigation, the great weight of the evidence at trial established that Banashefski did not challenge Taylor's interpretation of the agreement. In Taylor's September 4, 1996 memorandum of record for a telephone conversation that day with Banashefski, Taylor wrote that Banashefski had told him that Banashefski "may approach M&H and ask them to turn the title on the equipment over to the Government on the facilities contract." (Exhibit 39 ¶ 4). Then, a month later, in a letter to Taylor expressly referencing Taylor's August 20, 1996 memorandum outlining his understanding that MHC owned the Equipment, Banashefski does not even raise the ownership question, despite the opportunity to do so. (Exhibit 41).

Then, in 1999, the Defense Contract Audit Agency conducted an investigation of AO's claim that it owned the Line 3A Equipment. After interviewing principals from the government and AO and reviewing negotiation documents relating to title, DCAA issued its written conclusions to AO, stating that it "found Army correspondence indicating clearly that the government did not want title to the facility and equipment." Again, the responsible government representatives authorized to administer the M795 Contract's property terms at the IAAAP were fully informed of the DCAA's audit letters and AO's response – all of which expressed the fact that AO owned the Line 3A Equipment.

Throughout the contract performance period MHC or AO tagged the Line 3A Equipment as contractor-owned property and recorded it as such in the official IAAAP property records. During that same period, Solinski, the current government property administrator at IAAAP, and her predecessor, Morgan, conducted regular property audits at IAAAP, never citing MHC or AO for failing to properly identify the Line 3A Equipment as government-owned property. Even as the government prepared for the current procurement and planned to offer prospective bidders the use of Line 3A Equipment as government-furnished material, AO covered the Line 3A Equipment during onsite inspections of IAAAP by representatives of the prospective bidders, an action the government not only did not challenge, but accepted as proper.

Taken together, the evidence overwhelmingly supports a single conclusion: AO owns the Line 3A Equipment. The conduct of the parties during the negotiations that resulted in the final M795 Contract and the relevant extrinsic evidence demonstrates a mutual agreement between MHC and the government that MHC would take title to the Equipment, and that MHC would clearly not acquire such Equipment for the government. Eleven years of contract performance, and the post-contract extrinsic evidence and the parties' conduct that provide relevant information on the question of ownership of the Equipment, all demonstrate conclusively that the government and AO behaved as if AO at all times owned the Equipment. In short, the testimony and exhibits presented at trial affirmatively establish that the government intended, in fact demanded, that MHC and, later, AO own the Line 3A Equipment, and that MHC and/or AO would not acquire any of the Line 3A Equipment for the government. Once the final M795 Contract was

signed, memorializing the parties' agreement on ownership of the Line 3A Equipment, the parties then performed the Contract consistent with their mutual intention and agreement.

### C. **The Government's Claim of Ownership for the Line 3A Equipment Is Time-Barred.**

In the alternative, AO is entitled to Declaratory Judgment because the government is barred by the statute of limitations from asserting its claim under the M795 Contract to title to the Line 3A Equipment. In its summary judgment briefing, the government argued that 28 U.S.C. § 2415(c) precludes any statutory limitation period from barring the government's right to assert "title to, or right of possession of, real or personal property." The government's assertion is incorrect, however, because it is the statute of limitation set forth in the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. § 601, *et. seq.*, that governs the government's claim in this case. The CDA requires that the government assert its claim of ownership within six years after the claim accrues:

> All claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer. Each claim by a contactor against he government relating to a contract and each claim by government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim. The preceding sentence does not apply to a claim by the government against a contractor that is based on a claim by the contractor involving fraud.

41 U.S.C. § 605(a) (emphasis added).

A claim accrues under the CDA statute of limitations when (1) the events that fix the alleged liability have occurred, and (2) the claimant knows or should have known

about such events. *Axion Corp. v. United States,* 68 Fed. Cl. 468, 481 (2005). Similarly, the FAR defines "accrual of a claim" as follows:

> "Accrual" of a claim means the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known. For liability to be fixed, some injury must have occurred. However, monetary damages need not have been incurred.

48 C.F.R. § 33.201 (2008). Each of these elements was satisfied at the time the M795 Contract was executed, resulting in the government's claim accruing well in excess of the six-year limitations period applicable to its September 26, 2007 Final Decision. The government has asserted throughout this case that its ownership of the Line 3A Equipment derives directly from the M795 Contract itself, and has provided Equipment ownership to the government since the Contract was executed in 1996. Thus, only two events fix liability in this case: First, the parties' execution of the M795 Contract on August 15, 1996; and, second, AO's possession, ownership, and control of the Equipment inconsistent with the government's purported ownership. *Axion Corp.,* 68 Fed. Cl. at 481.

Once MHC or AO took <u>any</u> action after the M795 Contract was signed that was inconsistent with the government's purported ownership, liability was fixed and legal injury had occurred. It is established by the undisputed evidence presented at trial that AO began acquiring equipment that became the Line 3A Equipment following execution of the Letter Contract, tagging and recording each such item of Equipment as government-owned property pursuant to Paragraph C.3.9 of the Letter Contract. (Darley,

Tr. 360:20-361:20). However, once the final definitized Contract was signed on August 15, 1996, MHC retagged and re-recorded the Line 3A Equipment as contractor-owned property. *Id*.

**1. Facts Supporting the Application of the Six-Year Statute of Limitations in the Contract Dispute Act.**

If, as the government claims, AO were required to acquire the Line 3A Equipment for the government pursuant to the M795 Contract, and the government owned the Line 3A Equipment, then AO breached the M795 Contract immediately upon execution by failing to deliver the Line 3A Equipment, and instead tagged and recorded the Equipment as AO-owned property, rather than government-owned property. If the government owned the Line 3A Equipment by virtue of the M795 Contract as it claims, then the government was injured when MHC asserted ownership of the Equipment and labeled and recorded that title interest on the official property records of IAAAP.

When a party is on notice that it has, or may have, a potential claim, the statute of limitations begins to run. *Gray Pers., Inc.,* ASBCA. No. 54652, 06-2 B.C.A. at 165,476. Moreover, a potential claimant is charged with constructive notice of a possible claim "when the underlying facts of a claim become known or knowable." *Sankey v. United States*, 22 Cl. Ct. 743, 745 (1991). When Taylor, the government's administrative contracting officer for the M795 Contract, advised Banashefski five days after the Contract was executed that he would administer the Contract to require MHC to take title to the Line 3A Equipment, the government had notice of MHC's ownership of the Equipment.

Even if Taylor's August 20, 1996 memorandum is not sufficient to put the government on notice of MHC's title to the Equipment, the company's conspicuous and continuous possession, ownership, and control of the Line 3A Equipment unequivocally provided notice to the government. The evidence presented at trial conclusively demonstrates that the government, as of August 1996, but certainly no later than 1999, knew or should have known that MHC, and then AO, owned the Equipment, whether from: (1) ACO Taylor's August 20, 1996 statement that the Contract would be administered to require MHC to take title, or (2) the regular government property audits showing the Equipment recorded as AO-owned property, or (3) from the conspicuous AO property tags on the Equipment itself, or (4) Hallgren's 1998 presentation to the Acting Assistant Secretary of the Army and/or the J&A presented to this senior Army official for signature by the team of Army procurement professionals and leaders identifying the Line 3A Equipment as contractor-owned property, or (5) from the conclusions of the 1999 DCAA audit report finding Army correspondence specifically shared with the cognizant ACOs at IAAAP responsible for the M795 Contract stating "clearly that the government did not want title to the facility and equipment." Based on this substantial record of essentially undisputed evidence, the government knew almost immediately after the M795 Contract was executed that MHC and then, AO, asserted ownership in the Line 3A Equipment, providing both notice and the required legal injury to trigger the applicable CDA limitation period.

### 2. Law Relating to the Applicable Statute of Limitations.

If the Court were to adopt the government's argument that 28 U.S.C. § 2415 constitutes the proper limitation period for determining ownership of the Line 3A Equipment, instead of the limitation period set forth in the CDA, 41 U.S.C. 605(a), then 28 U.S.C. § 2415 would preempt 41 U.S.C. § 605(a) in this and in any similar cases involving a contract-based claim of property ownership, effectively reading the six-year limitations period in the Contract Disputes Act out of the law. On the contrary, the statutory limitations period imposed by 28 U.S.C. § 2415 never has applied to actions arising under the CDA. Rather, such actions are governed exclusively by the statute of limitations contained in the CDA, 41 U.S.C. § 605(a). *See Motorola, Inc. v. West*, 125 F.3d 1470, 1472-73 (Fed. Cir. 1997). As the Federal Circuit has explained, "28 U.S.C. § 2415 is inapplicable on its face" as to CDA claims brought pursuant to a contracting officer's decision. *Motorola*, 125 F.3d at 1472-73.

The government's claim in this case is that the M795 Contract requires that AO convey the Line 3A Equipment to the government by modifying its property records and re-tagging each piece of Line 3A Equipment as government-owned. This government claim is expressed in its Final Decision. Because the government's Final Decision purports to remove ownership of the Line 3A Equipment from AO, it seeks validation of its interpretation of the M795 Contract terms, and requires AO to adjust its tagging and records, the decision both seeks adjustment and interpretation of contract terms and seeks other relief arising under or relating to the M795 Contract. Even the government author of the Final Decision readily admitted at trial that he issued his decision pursuant to the

disputes clause in the M795 Contract, pursuant to the CDA, and at the direction of the Army alone. (Smith, Tr. at 733:1-733:18, 733:23-734:10, 749:25-750:25). Accordingly, the government is clearly asserting a contract claim in its Final Decision. *Sarang Corp. v. United States*, 76 Fed. Cl. 560, 564 (2007) (48 C.F.R. § 2.101 defines a "claim" as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract."); *see also Precision Pine & Timber, Inc. v. United States*, 62 Fed. Cl. 635, 643 (2004) (a final decision by a contracting officer that demanded "something due or believed to be due" constitutes a claim by the government).

The CDA applies to all contract claims. 41 U.S.C. § 609(a)(1); 28 U.S.C. § 1491(a)(1) and (2); *Tex. Health Choice, L.C. v. Office of Pers. Mgmt.*, 400 F.3d 895, 898 (Fed. Cir. 2005) ("'The CDA exclusively governs Government contracts and Government contract disputes.'") (*quoting Cecile Indus., Inc. v. Cheney*, 995 F.2d 1052, 1055 (Fed. Cir. 1993)); *see also Burnside-OTT Aviation Training Center v. Dalton*, 170 F.3d 854, 859 (Fed. Cir. 1997) (the Contract Disputes Act cannot be waived by contract). Indeed, this Court's jurisdiction, to which the government has not objected, is based upon the CDA. Accordingly, the proper limitations period to apply to the government's claim of ownership is Section 605(a) of the Contract Disputes Act. Thus, the government's Final Decision states a government claim under the CDA, which requires application of the CDA's six-year statute of limitations. AO, therefore, is entitled to Declaratory

Judgment because the government's claim to title in the Line 3A Equipment is time-barred.

**CONCLUSION**

WHEREFORE, AO prays for the following relief:

A. That the Court enter under Count I a declaratory judgment that under fact and law: (1) AO has title to the Line 3A Equipment; (2) the government has no title to the Line 3A Equipment; (3) AO had no obligation to change its property records and property tags so as to show government ownership of the Line 3A Equipment; (4) AO may revise its property records and property tags to show AO ownership of the Line 3A Equipment; (5) the government's Final Decision is null and void and of no legal force or effect; and (6) the government may not take any action that manifests government ownership of the Line 3A Equipment;

B. That, in the alternative, the Court enter under Count II judgment that under fact and law: (1) the government's claim of title to Line 3A Equipment is barred by 41 U.S.C. § 605(a); and (2) AO holds title in the Line 3A Equipment; and

C. That the Court grant such other relief as it deems appropriate.

Respectfully submitted this 29th day of August, 2008.

*s/ Steven M. Masiello*

Steven M. Masiello
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
Telephone: (303) 634-4000
Facsimile: (303) 634-4400
E-mail: smasiello@mckennalong.com

ATTORNEY FOR PLAINTIFF,
AMERICAN ORDNANCE LLC

Of Counsel:

Timothy R. Odil
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
Telephone: (303) 634-4000
Facsimile: (303) 634-4400
E-mail: todil@mckennalong.com

DN:32147413.10