**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMERICAN ORDNANCE LLC,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES,<br><br>Defendant. | Case No. 07-867C<br>Judge Wheeler |

**PLAINTIFF AMERICAN ORDNANCE LLC'S RESPONSE TO GOVERNMENT'S OPENING POST-TRIAL BRIEF**

Pursuant to the Court's Post-Trial Scheduling Order entered on August 15, 2008, plaintiff, American Ordnance ("AO"), respectfully submits its Response to the Opening Post-Trial Brief (the "Brief" or "Govt. Brief") filed on August 29, 2008, by the defendant, the United States (the "government") [Docket No. 53].

## INTRODUCTION

In the government's Brief, the government continues to assert its untenable position that the language of the definitized contract at issue in this case (the "M795 Contract" or "Contract") is clear on its face, and that the M795 Contract's plain language provides title in the government to certain equipment comprising Production Line 3A (the "Line 3A Equipment" or "Equipment"). Govt. Brief at 8. This assertion contradicts the Court's order dated August 1, 2008, the M795 Contract, and the evidence presented at trial. Indeed, even the government's counsel admitted at trial that no provision exists in

the M795 Contract that expressly provides ownership in the Line 3A Equipment to the government. (Government Counsel, Tr. 36:16-37:19; Court, Tr. 814:24-815:815:6).

Nevertheless, the entirety of the government's Brief essentially is based upon this flawed position that the M795 Contract's plain language resulted in government title to the Line 3A Equipment. In support of this position, the government mischaracterizes the evidence presented at trial, and fails to support the facts it proposes in its Brief. Importantly, the government does not even address the overwhelming evidence presented at trial (and summarized in AO's Proposed Findings of Fact and Conclusions of Law ("AO Facts") [Docket No. 54]) establishing the parties' clear intent to vest title to the Line 3A Equipment in MHC, and later to MHC's successor-in-interest, AO, by virtue of the terms that the parties incorporated into the definitized M795 Contract. For these reasons, and as described in additional detail below, the proposed findings of fact and conclusions of law contained in the government's Brief are unsupported, and should not be adopted by the Court in rendering its decision in this matter.

## **DISCUSSION**

The government mischaracterizes much of the evidence presented at trial. The government contends, for example, that amortization of certain facilitization costs over the production quantity of M795 Projectiles delivered under the M795 Contract was a prerequisite to MHC's ownership of the Line 3A Equipment. At trial, however, the government's own witnesses disclaimed the existence of any amortization prerequisite.

The government further contends that the M795 Contract required MHC to deliver the Line 3A Equipment to the government. The trial testimony regarding the contractual

provisions that the government cites as support for this conclusion, however, confirms that such provisions do not require MHC to acquire the Equipment for the government. Similarly, the government contends, without any support, that Modification P00003 ("P00003") impacted the parties' agreement that MHC take title to the Line 3A Equipment, and that MHC's Invoice and Form DD-250 evidenced MHC's "delivery" of the Equipment to the government. On the contrary, the trial testimony confirms that P00003 was executed for the exclusive purpose of accommodating the government's delay in delivering government furnished materials ("GFM") needed for production of M795 Projectiles, and that the Invoice and DD-250 mirrored the language the parties incorporated into the M795 Contract with the intent of vesting MHC with title in the Equipment.

The government also argues in its Brief that "it is not clear" that the government was aware of MHC's (and later AO's) marking and recording of the Line 3A Equipment as contractor-owned property, and that "there would have been no reason" to make any issue of title to the Line 3A Equipment. This government argument has no basis in the trial record. Indeed, even prior to trial, the government admitted in its discovery responses that it was aware of MHC's (and later AO's) tagging and recording of the Line 3A Equipment. Moreover, at trial, the government's own Property Administrator at Iowa Army Ammunition Plant ("IAAAP") admitted that a duty existed on the part of the responsible government representatives to ensure proper records and tagging were maintained in the Line 3A Equipment.

Finally, the government persists with its argument that AO cannot assert a "claim" to title in the Line 3A Equipment by adverse possession. Importantly, however, AO appeals from a government claim to title in the Line 3A Equipment asserted in a contracting officer final decision. Accordingly, AO makes no "claim" to the Line 3A Equipment based upon adverse possession. Rather, in its appeal, AO asserts that the parties to the M795 Contract intended to, and did, in fact, vest title to the Equipment in MHC (and later AO). As established at trial, the parties' conduct subsequent to their execution of the M795 Contract confirms the parties' intent that MHC take title in the Equipment. AO's appeal from the government's claim in its final decision, therefore, does not rely on any adverse possession theory. Thus, the government's position set forth in its Brief should be rejected.

**A. <u>No Credible Evidence Supports the Government's Contention That Amortization Was a "Condition" on Title to the Line 3A Equipment.</u>**

In its Brief, the government continues to press the contention that the government imposed a "condition" on MHC's title to the Line 3A Equipment requiring that MHC agree to amortize a portion of its costs over the production quantity of M795 Projectiles. Govt. Brief at 10. On the contrary, as AO demonstrated at trial and in its Proposed Findings of Fact, the government directed MHC to take title to the Equipment, and, after internal discussion of the risks involved, MHC agreed to take title under the M795 Contract. *See* AO Facts, pp. 12-15.

In fact the issue of MHC's cash flow (the issue that the government refers to as "amortization") was addressed in the context of the parties' efforts to provide for MHC's

title to the Equipment. The parties generated "Action Item 2," which was "to determine how to present facilitization clause language so M&H cash flow is not negatively impacted yet M&H ultimately owns the equipment." (Exhibit 25 at 2; Daniel, Tr. 99:20-100:4 and 133:16-134:8). The government's contract specialist who negotiated the M795 Contract, Steven Talmadge ("Talmadge"), admitted that he revised the M795 Contract's Contract Line Item Number ("CLIN") structure specifically to ensure that both goals of Action Item 2 were given effect – that MHC's cash flow would not be negatively impacted, and that MHC would own the Line 3A Equipment. (Talmadge, Tr. 502:22-503:13, 505:21-507:4, and 510:16-511:13).

One week after Talmadge first sent the revised CLIN structure to MHC, on June 25-27, 1996, MHC representatives held a further negotiation session with the government at the Army research and development unit, ARDEC. (Hibler, Tr. 227:13-227:17; Exhibit 30). At the meeting, the parties discussed when MHC would receive payment for the portion of its M795 Projectile price that involved estimated costs relating to facilitization, including the Line 3A Equipment. (Exhibit 30, p. AO003519; Hibler, Tr. 229:4-231:9). MHC explained to the government that its cash flow would be negatively impacted if it could not liquidate a substantial portion of its M795 Projectile price until the entire production run of M795 Projectiles was completed. MHC suggested that a separate, smaller lot be added against which the portion of MHC's price involving estimated costs for facilitization could be liquidated. *Id.* On the last day of the meeting, June 27, 1996, Contracting Officer ("CO") David Banashefski ("Banashefski") provided to MHC the government's offer that did just that – addressing MHC's cash flow concerns

by adding a new line item for the first 1,000 production units, against which the relevant portion of MHC's M795 Projectile price could be liquidated. (Exhibit 30, pp. 3524, 3529; Hibler, Tr. 231:4-234:9). Banashefski's reassignment of the CLIN for 1000 ea M795 Projectiles against which the relevant portion of MHC's M795 Projectile price could be liquidated was specifically accomplished to resolve the payment concerns of both MHC and the government, while also requiring that MHC take title in the Line 3A Equipment. (Hibler, Tr. 232:22-233:5).

The government's contention that MHC would have had to amortize its price in some manner different than that provided for through the parties' negotiations under the CLIN for 1000 ea M795 Projectiles to take title to the Equipment is not supported by the evidence presented at trial. The government asserts in its Brief that "Banishefski [sic] testified that in a letter dated May 30, 1996, trial exhibit 16, the Government explained to Mason and Hanger that in order for it to take title to the Line 3A equipment the cost of the equipment would have to be amortized over the unit price of the entire production quantity." Govt. Brief at 10.

To the contrary, Banashefski admitted that CO Valerie Colello's May 30, 1996 letter did <u>not</u> contain any amortization condition on MHC's taking title to the Line 3A Equipment. (Banashefski, Tr. 666:5-667:5). Similarly, when asked by his own counsel at his deposition whether it would make "any difference to title" whether MHC had amortized its price over the entire production quantity, Banashefski testified, "Not in my eyes, it wouldn't." (Banashefski, Tr. 710:14-712:9).

Like Banashefski, Talmadge testified during his deposition on June 2, 2008, that whether MHC retained title to the Line 3A Equipment had nothing to do with whether MHC amortized its costs for facilitization over the M795 Projectile production unit prices. (Talmadge, Tr. 496:3-496:19; 497:13-498:4). Talmadge admitted in his trial testimony that MHC was required to amortize its facilitization costs over the M795 Projectile unit prices to retain title to the Line 3A Equipment was different than the testimony he had given during his deposition. (Talmadge, Tr. 498:5-500:1). Accordingly, no credible evidence was presented at trial that supports the government's contention that amortization was a "condition" on MHC's title in the Line 3A Equipment under the M795 Contract.

**B. <u>The M795 Contract Required Delivery of M795 Projectiles Only.</u>**

The government, in its Brief, holds to the flawed view that the Line 3A Equipment was a deliverable item under the M795 Contract. The parties did not identify the Line 3A Equipment as separate deliverable under the M795 Contract. In fact, both AO's and the government's trial witnesses confirmed that the M795 Contract was a fixed price contract for projectiles only.

Marilyn Daniel, for example, testified that government negotiators Banashefski and Talmadge both advised the MHC negotiation team that the M795 Contract would be a "production-only contract," not a facilities contract, and that the government would not accept title to the Line 3A Equipment. (Daniel, Tr. 50:15-50:21; 123:8-123:13). According to MHC negotiator Jeff Hibler, the government negotiators "redefined" the M795 Contract as a production contract with Banashefski's May 16, 1996 letter, making

it clear to MHC that the government would not take title to the Line 3A Equipment, and never deviated from that position through the execution of the Contract. (Hibler, Tr. at 210:18 to 211:8; 214:16 to 214:24; 239:16 to 240:3). The government's own witness, CO Banashefski, the government's lead negotiator on the M795 Contract, testified without qualification that the Contract was "always a production contract." (Banashefski, Tr. at 605:7 to 605:11; 659:22 to 660:19). Thus, the government's view in its Brief that the Line 3A Equipment was a deliverable item under the M795 Contract finds no support in the trial record.

### C. No Provision in the M795 Contract's Statement of Work or Elsewhere Requires Delivery of the Line 3A Equipment or Otherwise Conveys Title to the Government in the Equipment.

The government advances, once again, its misinterpretation of the standard Federal Acquisition Regulation ("FAR") firm, fixed price property clause (the "FFP Property Clause"), contending in its Brief that "any equipment used in performing this contract . . . becomes property of the Government . . . when it is either put to use or the Government pays for it." Govt. Brief at 10. As AO explained in its summary judgment briefs, and as the Court has observed, the government's position is flawed because it omits the key predicate for government ownership – that the equipment is acquired "for the government." (Exhibit 36, M795 Contract, § I.8(c)(3), p. 68 of 81 (FOIA 000068); *see also* AO Facts, pp. 31-33).

In apparent recognition that its interpretation of the FFP Property Clause is wrong, the government cites four contractual provisions that the government contends "clearly" require the delivery of, and/or convey to the government title in the Line 3A Equipment.

Govt. Brief at 8-9. The trial testimony does not support the government's contention with respect to <u>any</u> of these cited contractual provisions:

(1) <u>Statement of Work ("SOW") Paragraph C.3.1.1</u>

Without argument or record citation, the government cites paragraph C.3.1.1 of the M795 Contract's SOW as a "clear" provision that requires delivery of the Line 3A Equipment to the government. Govt. Brief at 8-9. Paragraph C.3.1.1 instead addresses only MHC's requirement to deliver projectiles in accordance with the technical data package ("TDP"), as well as the other components of the projectile, including supplemental charges, liner cups, and spacers. (Hibler, Tr. 242:5-242:21). The paragraph does not require delivery of the Line 3A Equipment. (Hibler, Tr. 242:11-242:14).

(2) <u>SOW Paragraph C.3.2.1</u>

The government cites paragraph C.3.2.1 of the M795 Contract's SOW as another provision that requires delivery of the Line 3A Equipment to the government, apparently referring to the statement that "[t]he contractor shall be responsible for procuring all materials and equipment required to conduct the First Article Test ("FAT") under the contract." Govt. Brief at 9. The trial testimony confirms that paragraph C.3.2.1 instead addresses only MHC's requirement to "procure whatever materials we feel are needed in order to conduct a first article test under the contract." (Hibler, Tr. 243:2-243:19). The only deliverable items for the FAT are projectiles. (Hibler, Tr. 243:17-243:19).

(3) <u>Section H.8</u>

The government contends that a special provision relating to progress payments in Section H.8 of the M795 Contract somehow requires delivery of the Line 3A Equipment to the government. Govt. Brief at 9. The trial testimony verifies instead that the progress payments provision was inserted in the M795 Contract based upon discussions early in the parties' negotiations, in response to "Action Item 10." (Exhibit 5, p. AO002246; Daniel, Tr. 109:24-110:14). Action Item 10 was undertaken by ARDEC to "[c]larify that progress payments are applicable to the facilitization piece of the contract," and to ensure that "MHC gets paid should ballistic tests not be shot and analyzed within 30 days of shipment." *Id*. The progress payments provision addresses MHC's cash flow, not delivery of, or title in, the Line 3A Equipment. (Daniel, Tr. 110:8-110:14).

(4) <u>Section I.8</u>

The government cites the FFP Property Clause, asserting that the provision requires that the government acquired title in the Line 3A Equipment. Govt. Brief at 9. As explained above, and in AO's briefs, the FFP Property Clause does not transfer title in the Line 3A Equipment to the government because the Equipment was not acquired "for the government." AO also has addressed the government's argument on this issue in its Findings of Fact. *See* AO Facts, pp. 31-33. As Ms. Daniel succinctly put it during her trial testimony, the FFP Property Clause does not substantively transfer title to anything, it only addresses the issue of under what circumstances title to items acquired by the contractor for the government could pass to the government. (Daniel, Tr. 173:18-174:3).

As admitted by the government's counsel, the M795 Contract does not contain any provision that expressly conveys title to the government in the Line 3A Equipment. (Government Counsel, Tr. 36:16-37:19; Court, Tr. 814:24-815:6). Accordingly, the government's contention that certain provisions found in the M795 Contract convey title to the government lacks any support in the trial record.

**D. <u>P00003, MHC's Invoice, and the Form DD250 Have Nothing To Do With Title to the Line 3A Equipment.</u>**

In its Brief, the government appears to persist with its contention that Modification P00003 to the M795 Contract, MHC's Invoice, and the Form DD-250 impact the parties' agreement under the M795 Contract regarding title to the Line 3A Equipment. Govt. Brief at 6. The trial record does not support this government contention.

Modification P00003 was executed for the exclusive purpose of addressing the government's inability timely to deliver GFM in accordance with the contract schedule. (Daniel, Tr. 142:20-144:19). Because it did not have the needed parts from the government, MHC could not timely produce and deliver M795 Projectiles to the government. *Id*. P00003 had no effect on title to the Line 3A Equipment. (Daniel, Tr. 144:16-144:19). Talmadge confirmed that he negotiated P00003, and that it has "nothing to do with who owns the Line 3A Equipment." (Talmadge, 519:13-519:22).

Similarly, MHC's Invoice reflects the contractual amounts that were due and payable under the M795 Contract for completion of FAT delivery, not delivery of Line 3A Equipment. (Daniel, Tr. 149:14-150:20). Two government witnesses testified concerning MHC's Invoice - Talmadge and Banashefski. Talmadge testified that he had

no involvement in processing MHC's Invoice, and that he had never seen MHC's Invoice until this litigation arose. (Talmadge, Tr. 526:11-526:19; 528:6-528:15; Exhibit 47, p. AO000001). Moreover, Banashefski could not recall lodging any objection to MHC invoicing the government for FAT delivery, either with MHC or any other government officials. (Banashefski, Tr. at 691:11 to 693:18). No evidence at trial exists, therefore, to support the government's view that MHC's Invoice somehow suggests that government acquired title in the Equipment.

The Form DD-250 that accompanied payment under MHC's Invoice for CLIN 0001AA does not reflect delivery of any Line 3A Equipment. (Daniel, Tr. 150:21-151:13; Exhibit 47, p. AO000002). The DD-250 does not contain any information under the column "Quantity" or "Unit." *Id*. The form indicates acceptance at destination, which was the Yuma, Arizona proving grounds. (*Id*.; *see also* Exhibit 36, page 31 of 81, § F.2; Banashefski, Tr. 712:10-714:25). The DD-250 simply echoes the "asterisk language" of the M795 Contract: language that Talmadge admitted was substantially the same as the asterisk language he developed in response to Action Item No. 2 conveying to MHC title in the Line 3A Equipment. (Talmadge, Tr. 508:17-509:18; 510:16-513:5).

Moreover, no evidence was introduced at trial that could support the government's view of the significance of the Form DD-250 to the ownership of the Line 3A Equipment. Talmadge, for example, testified only that he had seen the Form DD-250 in the contract file, but he could not recall when; that he did not recall any discussion with government personnel about the form; and that when he saw the form, he didn't communicate any problem with title to MHC, AO, or to any other person within the government.

(Talmadge, Tr. 529:1-529:25). Banashefski did not object to the MHC Invoice to the government for FAT delivery, either to MHC or any other government official. (Banashefski, Tr. at 692:9 to 693:18.) Additionally, Banashefski testified unequivocally that the DD-250 did not change the terms to which the parties agreed in the M795 Contract (Banashefski, Tr. at 691:4-691:10). Thus, neither P00003, MHC's Invoice, nor the Form DD-250 impact the parties' intent or the relevant title provisions set forth in the M795 Contract providing title to MHC (and later AO) in the Line 3A Equipment.

### E. **The Evidence Presented at Trial Clearly Demonstrates That the Government Was Aware of MHC's (and AO's) Ownership of the Line 3A Equipment.**

The government argues in its Brief that "[i]t is not clear that the Government was aware that AO had incorrectly marked the equipment," and that "there would have been no reason for any Government employee to review AO's property records, or to make an issue of title to the Line 3A equipment." Govt. Brief at 11-12. The government's argument cannot be harmonized with the following evidence established at trial:

- The government's admission in its discovery responses that, prior to 2001, government personnel at IAAAP were aware that the Line 3A Equipment was not recorded as government-owned property in the AO-maintained property records. (Exhibit 61, page 7, Request for Admission No. 7).
- IAAAP ACO James Nelson's ("Nelson") deposition testimony that MHC recorded the Line 3A Equipment as its property in the 1996 timeframe, and that he was aware of such recording during that time. (Exhibit D-17, Deposition of Nelson, 26:19-27:10).

- ACO Nelson's deposition testimony that it was "pretty obvious" 1996 through 2006 that the Line 3A Equipment was tagged as MHC- or AO-owned equipment. (Exhibit D-17, Deposition of Nelson, 88:17-88:22).
- The government produced during discovery a list prepared on July 13, 2000 of AO-owned property on Production Line 3A, including the Line 3A Equipment, that the government Property Administrator could generate from the AO property record system. (Exhibit 54; Darley, Tr. 328:24-331:8).
- Property Administrator Solinski's confirmation that tags on the Line 3A Equipment were conspicuously placed, and could be located without significant effort. (Solinski, Tr. 422:24-423:15, 430:16-431:7).
- Solinski's confirmation that some of the property tags were MHC tags, indicating that they had been in place since at least 1998. (Solinski, Tr. 411:3-411:9).
- Solinski's understanding that she had the following duties as Property Administrator to ensure that: (1) AO's property management system is adequate and correct; (2) AO properly marks property as either government-owned or contractor-owned; (3) AO properly marks government property; and (4) government assets are not confused with contractor property and used for unauthorized purposes. (Solinski, Tr. 404:6-405:17).

- CO Smith's understanding that the Property Administrator had a duty to inspect IAAAP property and determine whether it had been correctly recorded and identified. (Smith, Tr. 732:9-732:25).

MHC (and AO) correctly tagged the Line 3A Equipment upon acquisition according to the recordkeeping policies that it has followed since at least 1996. (Darley, Tr. 289:1-289:22; 296:2-296:10). Mr. Darley, AO's Materiel Director, explained that when a new piece of property is acquired, AO (or previously, MHC) reviews the contract language, and raises any questions with contract administration and the individuals involved in negotiating the contract. (Darley, Tr. 375:376:22). Mr. Darley testified that his predecessor followed the same policy. (Darley, Tr. 376:16-377:1). Moreover, Mr. Darley testified that if a problem with property recordkeeping is identified, MHC (or AO) speaks to the government Property Administrator, or the Property Administrator will speak with MHC (or AO). (Darley, Tr. 377:2-377:22). Under these circumstances, the evidence presented at trial establishes that the Line 3A Equipment was known to be tagged and recorded as contractor-owned since 1996, but not raised as an issue prior to 2007, because all parties considered the Equipment to be properly tagged – not that there was "no reason" for the government to care how the Equipment was recorded and tagged.

### F. <u>AO Appeals From a Government Claim; AO's Appeal of the Government's Claim Does Not Involve "Adverse Possession"</u>

As it did in prior briefs, the government characterizes AO's position as a claim to title in the Line 3A Equipment by "adverse possession," and dismisses the conduct of the

parties following execution of the M795 Contract as irrelevant. The government's characterization lacks any basis in law or fact.

In this case, AO appeals from a government claim asserted under the Contract Disputes Act (41 U.S.C. § 601, *et seq*.) in CO Charles M. Smith's ("Smith") Final Decision. (Smith, Tr. 733:1-734:10; see also Exhibit 56, Final Decision dated September 26, 2007). Smith confirmed that the Final Decision was prepared at the sole direction of the government, and that AO had not submitted any issue or "claim" to him for consideration. (Smith, Tr. 733:1-733:18). CO Smith explained that the Army's source selection team's property team directed him to review ownership of the Line 3A Equipment, and to prepare the Final Decision. (Smith, Tr. 748:13-750:25). Accordingly, AO makes no "claim" to the Line 3A Equipment based upon adverse possession. Rather, in its appeal from the government's claim in its Final Decision, AO asserts, as it has since the execution of the M795 Contract, that the parties to the M795 Contract vested title to the Equipment in MHC (and later to AO). The parties' conduct subsequent to the M795 Contract execution confirms the parties' intent.

The Court may confirm the parties' agreement the under the M795 Contract by reference to the parties' conduct and actions. Actions related to an agreement that are consistent with the language of the agreement always may be considered to determine the parties' intent. Restatement (Second) of Contracts § 212 cmt. b (1981); *see also Johnson Controls World Servs., Inc. v. United States*, 48 Fed. Cl. 479, 493 (2001). Parties' actions prior to the time a controversy arose are highly relevant in determining intent. *Tilley Constructors & Eng'rs, Inc. v. United States*, 15 Cl. Ct. 559, 565 (1988) (relevant

evidence of conduct connected with the controversy rendered other evidence inapt to determine intent of parties); *Aluminum Co. of Am. v. United States*, 2 Cl. Ct. 771, 777 (1983) (recognizing that "contemporaneous 'external indications of the parties joint understanding'" may be considered in contract interpretation). AO has presented to the Court evidence of the parties' conduct and actions that serves to confirm the parties' understanding of the relevant terms of the M795 Contract. AO's appeal from the government's claim does not rely on any adverse possession theory. Thus, the government's characterization of AO's position should be rejected.

## CONCLUSION

For the reasons set forth above, AO respectfully requests that the Court decline to adopt the proposed findings of fact and conclusions of law set forth in the government's Brief.

Respectfully submitted this 5th day of September, 2008.

*s/ Steven M. Masiello*

Steven M. Masiello
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
Telephone: (303) 634-4000
Facsimile: (303) 634-4400
E-mail: smasiello@mckennalong.com

ATTORNEY FOR PLAINTIFF,
AMERICAN ORDNANCE LLC

Of Counsel:

Timothy R. Odil
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
Telephone: (303) 634-4000
Facsimile: (303) 634-4400
E-mail: todil@mckennalong.com

DN:32147936.6