# In the United States Court of Federal Claims

No. 07-867C

(Filed:  September 12, 2008)

*************************************  *
                                        *
AMERICAN ORDNANCE LLC,                  *
                                        *
                    Plaintiff,          *
                                        * Contract Interpretation;  Ownership  of
                                        * Manufacturing  Equipment  in  Government
v.                                      * Owned, Contractor-Operated Facility; Review
                                        * of  Extrinsic  Evidence  to  Determine  Parties'
                                        * Intent; Government Claim Barred by Six-Year
THE UNITED STATES,                      * Limitations Period in Contract Disputes Act.
                                        *
                    Defendant.          *
                                        *
*************************************  *

*Steven M. Masiello*, with whom was *Timothy R. Odil*, McKenna Long & Aldridge LLP, Denver, Colorado, for Plaintiff.

*Joan M. Stentiford*, with whom were *Gregory G. Katsas*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades*, Assistant Director, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

This case presents the issue of which party, American Ordnance LLC ("AO") or the United States Army, owns the Line 3A manufacturing equipment at the Iowa Army Ammunition Plant in Middletown, Iowa.  Line 3A is used to manufacture M795 projectiles.  The dispute stems from a December 12, 1995 letter contract[1] between Mason & Hanger Corporation ("Mason & Hanger") and

---

[1]  A "letter contract" is a preliminary contractual instrument that authorizes a contractor to begin performance immediately pending the definitization of a formal agreement.  Federal Acquisition Regulation ("FAR") ¶ 16.603-1 (2008).  Federal agencies may award letter contracts when there is insufficient time to negotiate a definitive contract.  FAR ¶ 16.603-2(a).  A letter contract limits the Government's liability to the contractor's need for funds before definitization. FAR ¶ 16.603-2(d).  The Government's use of letter contracts must be approved by the head of the agency's contracting activity or a designee.  FAR ¶ 16.603-3.

the Army that the parties definitized on August 15, 1996.  AO is the successor-in-interest to Mason & Hanger in operating the Iowa plant for the Government.  The Court agreed to hear this case on an expedited basis because the Government wants to provide the manufacturing equipment as "government-furnished property" in a competitive acquisition.  AO objects to this approach, arguing that the Government does not own the property.  AO seeks a declaratory judgment that it is the owner of the Line 3A equipment.

The Court has jurisdiction of this matter under the Contract Disputes Act ("CDA"), 41 U.S.C. § 609(a)(1) (2006).  AO filed suit on December 10, 2007, after receiving the Contracting Officer's September 26, 2007 final decision.  The Army's assertion of ownership of the Line 3A manufacturing equipment is a claim by the Government against the contractor under 41 U.S.C. § 605(a).  The Contracting Officer's final decision did not result from a claim submitted by the contractor.  The property ownership dispute arose only when the Army elected in 2007 to alter its position regarding the Line 3A equipment from the prior eleven years.  The Court conducts a *de novo* review under 41 U.S.C. § 609(a)(3).

The issue before the Court is one of contract interpretation.  In considering the parties' June 30, 2008 cross-motions for summary judgment, the Court found the definitive contract ambiguous as to which party owns the Line 3A equipment.  While the definitive contract provides for the reimbursement to the contractor of the agreed fixed price of the Line 3A equipment ($9,310,071), it does not specify which party, Mason & Hanger or the Government, was to take ownership of the equipment.  Accordingly, on August 1, 2008, the Court denied both motions for summary judgment.  The Court conducted a trial during August 12-15, 2008, at which it received evidence outside the four corners of the contract to determine the parties' intent.[2]  The Court considered provisions that were removed from the letter contract when it was definitized, the parties' correspondence in negotiating the definitive contract, and the actions of the parties before and after definitization.  The Court endeavored to harmonize all of the definitive contract provisions with the intentions and actions of the parties.

At the conclusion of trial, the Court issued a bench ruling that AO is the owner of the Line 3A manufacturing equipment.  Originally, the letter contract indicated that the Army was to take title to this equipment, but the Army reversed its position during negotiations leading to the definitive contract.  After analyzing the risks and responsibilities of ownership, Mason & Hanger agreed to accept title to the equipment.  The correspondence between the parties, coupled with the changes made in the definitive contract, make this conclusion crystal clear.  If any doubt remained, the

---

[2]  The witnesses at trial in order of appearance were: Marilyn S. Daniel, former General Counsel of Mason & Hanger; Jeffrey B. Hibler and Daniel W. Darley, Mason & Hanger and AO employees; Julie Solinski, a property administrator for the Government; Steven M. Talmadge, a contract specialist from Picatinny Arsenal, New Jersey; David Banashefski, a Contracting Officer from Picatinny Arsenal; Charles Smith, a Contracting Officer at the Iowa Army Ammunition Plant; and Michael Walker, an auditor from the Defense Contract Audit Agency.  The trial record also includes 59 exhibits, and 12 demonstrative exhibits.

parties' conduct before and after the definitization of the contract confirms their intent. At all times from May 16, 1996 (the date of a key Contracting Officer letter) until September 6, 2007 (the date that the Government first asserted ownership), the parties acted consistently with the conclusion that Mason & Hanger, and now AO, owns the equipment. The Government's attempt to paint a different picture at trial contradicts the contemporaneous record and lacks credibility. The Court by this Opinion and Order formalizes the declaratory judgment in Plaintiff's favor issued at the close of trial.

AO asserts in the alternative that the Government's claim is barred by the six-year limitations period contained in the CDA, 41 U.S.C. § 605(a). That section provides that "[e]ach claim by a contractor against the government relating to a contract *and each claim by the government against a contractor relating to a contract* shall be submitted within 6 years after the accrual of the claim." Id. (emphasis added). The Court finds that the Government's claim of ownership of the Line 3A equipment accrued not later than October 21, 1997, the date when the Contracting Officer confirmed that Mason & Hanger had successfully completed the installation of the equipment. By that date, Mason & Hanger had placed property ownership tags on the equipment, and had recorded the equipment on its records as property owned by Mason & Hanger. Accordingly, the Court further concludes that the Government's claim of ownership of the Line 3A equipment, first asserted in September 2007, is barred by the CDA's six-year statute of limitations.

<u>Findings of Fact</u>[3]

A. <u>Background</u>

The Iowa Army Ammunition Plant ("IAAP") is a Government-owned, contractor-operated facility located in Middletown, Iowa. The plant occupies approximately 19,000 acres of land, and includes production and storage facilities, as well as an administration building. A wide range of munitions is produced at the plant. From 1951 to 1998, Mason & Hanger operated the IAAP for the Army. (Daniel, Tr. 72).[4] In 1998, Mason & Hanger and General Dynamics Ordnance Systems, Inc. formed a joint venture known as American Ordnance LLC ("AO"). (Daniel, Tr. 55-56). AO has operated the IAAP from 1998 to the present. Before 1990, Mason & Hanger operated the IAAP under cost-plus-fixed-fee contracts. (Daniel, Tr. 72-73). Beginning in the early 1990s, the Government started replacing cost-plus-fixed fee contracts with "facilities use" contracts, requiring

---

[3] This statement of the facts constitutes the Court's principal findings of fact under Rule 52(a) of the Rules of the Court of Federal Claims. Other findings of fact and rulings on mixed questions of fact and law are set forth in the later analysis.

[4] In this opinion, the Court will refer to the trial transcript by witness and page as "Name, Tr. __," and to Plaintiff's trial exhibits as "PX __." Plaintiff's demonstrative exhibits are referred to as "PDX __." Defendant's exhibits are all duplicates of Plaintiff's exhibits, and were not offered into evidence. For multi-page exhibits, the Court has included citations to page numbers or to the parties' Bates numbers used during this case.

contractors to make capital investments in equipment and personal property in the government facility. (Daniel, Tr. 74).

    B. <u>M795 Contract Negotiations</u>

    On October 11, 1995, the Army issued Request for Proposal ("RFP") No. DAAE30-96-R-0004 for the production of M795 projectiles at the IAAP. (PX 2). The M795 projectile had never been mass-produced before, and therefore no production history existed permitting an assessment of the manufacturing process. (Daniel, Tr. 77-78). The RFP contained a Contract Line Item ("CLIN") 0001AA under "Basic Requirement" directing the contractor to "Design, Fabricate and install equipment in accordance with statement of work Section C.3.9." (PX 2 at 5). The Statement of Work, Section C.3.9, provided:

> <u>Equipment</u> – Equipment purchased/fabricated by the contractor under this procurement shall be property of the U.S. government. A partial list of equipment includes: Preheat Ovens, Grid Melter, Melt Kettles, Pour Machines, Controlled Cooling Apparatus, and Post Cyclic Conditioners.

<u>Id.</u> at 10. CLIN 0001AA called for delivery of the Line 3A equipment to the Government. (Talmadge, Tr. 468-69).

    The RFP also contained a Government Property clause for fixed-price contracts, FAR ¶ 52.245-2, Alternate I (July 1995). This clause provided in pertinent part:

> (c)(3) Title to each item of facilities and special test equipment acquired by the Contractor for the Government under this contract shall pass to and vest in the Government when its use in performing this contract commences or when the Government has paid for it, whichever is earlier, whether or not title previously vested in the Government.

(PX 2 at 64-66). The parties were aware of this Government Property clause during the negotiations that followed, including the terms vesting title of facilities and equipment in the Government under certain circumstances. (Daniel, Tr. 105-06).

    On November 28, 1995, Mason & Hanger submitted a proposal to the Army in response to the RFP. (PX 4). For the equipment required in CLIN 0001AA, Mason & Hanger proposed a firm fixed price of $10,004,379. <u>Id.</u> at AO2106. On December 12, 1995, the Army awarded Letter Contract No. DAAE30-96-C-0013 to Mason & Hanger for production of M795 projectiles at the IAAP. (PX 5). The Army employed a letter contract due to anticipated long lead times for the acquisition of "slow cool equipment." (Daniel, Tr. 107). The letter contract incorporated the RFP's Statement of Work, and thus carried forward the Army's intention to acquire title to the equipment provided under the contract. (PX 5 at AO585). For CLIN 0001AA, the letter contract authorized a ceiling price of $5,002,190, representing 50 percent of Mason & Hanger's proposed price, and

stated that the equipment should be delivered 21 months after award. Id. at AO580, AO586. Mason & Hanger's Vice President, Darl Heffelbower, signed the letter contract on December 13, 1995, and the Contracting Officer, David Banashefski, signed it on December 14, 1995. Id. at AO579.

In a December 12, 1995 letter accompanying the award, Mr. Banashefski directed Mason & Hanger to "proceed immediately to commence performance of work, and to pursue such work with all diligence to the end that the supplies may be delivered or services performed . . . ." Id. at AO578. The letter contract authorized only the purchase and installation of manufacturing equipment. (Daniel, Tr. 163-64). The "Contract Definitization" clause of the letter contract provided that the parties would negotiate the terms of a firm fixed price definitive contract not later than April 29, 1996. (PX 5 at AO584).[5]

On March 14, 1996, to begin the definitization effort, Mason & Hanger and the Government exchanged a list of 24 action items resulting from a telephone conference earlier that day between representatives of Mason & Hanger and the Army Research and Development Command ("ARDEC"). (PX 6). The parties assigned responsibility for each action item either to Mason & Hanger or ARDEC. Id. at AO2246. Item No. 5, assigned to ARDEC, stated "[d]etermine how facilitization SOW [statement of work] gets into the contract." Id. Item No. 10, also assigned to ARDEC, stated in relevant part "[c]larify that progress payments are applicable to the facilitization piece of the contract." Id. The parties executed Modification P00001 to the letter contract on April 30, 1996, by inserting a Progress Payments clause, FAR ¶ 52.232-16 Alternate II, into the letter contract. (PX 8). The use of the progress payments clause alleviated some of Mason & Hanger's cash flow concerns. (Daniel, Tr. 110).

Mason & Hanger prepared a draft outline, dated May 14, 1996, showing the equipment upgrades and installations that would occur in each of ten buildings at the IAAP for the facilitization scope of work. (PX 9). In meetings held on May 13-14, 1996, however, the Government completely changed its position regarding title to the Line 3A equipment. (Daniel, Tr. 89-90; Talmadge, Tr. 478-79). Government representatives, including the Contracting Officer, Mr. Banashefski, advised Mason & Hanger that the Government would not take title to, or be responsible for, the Line 3A equipment to manufacture the M795 projectiles. (Daniel, Tr. 88-90, 112, 118-22).

On May 16, 1996, to confirm the Government's position regarding equipment ownership, Mr. Banashefski sent a letter to Mason & Hanger stating:

> Note: It is important that the parties fully understand that this requirement is a *production contract for the LAP* [load, assemble, pack] *of M795 projectiles and is not a facilities contract.* Any facilities being procured are being done solely to meet the required LAP capacity for the M795

---

[5] Based upon the evidentiary record, the parties apparently waived the April 29, 1996 deadline for the definitive contract by continuing their negotiations after the deadline had passed. As will be shown, the parties did not agree to a definitive contract until August 15, 1996.

> projectile.  As such, the Government will not have title to the equipment
> and therefore, will not be responsible for maintenance of the same.

(PX 10 at 2; emphasis in original).  This letter contained the signature and legal concurrence of a Government lawyer, Denise Scott.  Id.  The Government's change in position "was very surprising to [Mason & Hanger] because this is just the opposite of what the RFP had said." (Daniel, Tr. 113).

After receiving the Contracting Officer's May 16, 1996 letter, Mason & Hanger reevaluated how the proposed ownership change would affect its position.  (Daniel, Tr. 90-93; Hibler, Tr. 210-11).  Mason & Hanger was concerned about the risks it would assume through ownership of the equipment.  (Daniel, Tr. 91-92).  The company understood that it would bear the risk of selecting and installing the necessary equipment, and for properly maintaining the equipment.  (Daniel, Tr. 77-78, 92-93).  Also, the contract was to be a firm fixed price contract, and Mason & Hanger had not previously produced the M795 projectile.  (Daniel, Tr. 48, 77-78).  Mason & Hanger would be responsible for insurance costs and risk of loss if the equipment were damaged or destroyed, and would be required to demobilize and dispose of the property when the equipment was no longer needed. (Daniel, Tr. 91-93; Hibler, Tr. 211-12, 225-26).  The company required time to assess these and other perceived risks, and to develop further cost information.  (Daniel, Tr. 93).  Company representatives shared and discussed equipment and cost information with the Government.  (PX 11, 13, 15).  Mason & Hanger's Mr. Hibler sent an e-mail to Mr. Banashefski on May 17, 1996 stating that "[w]ith the ARDEC position that M&H will own the equipment, . . . M&H has to discuss this internally and will get back to you." (PX 11 at AO2263).

Mr. Banashefski recognized that benefits would flow to the Government from Mason & Hanger's acceptance of title to the Line 3A equipment.  In particular, Mr. Banashefski understood that Mason & Hanger would perform all maintenance of the equipment, and would assume all of the risk of producing acceptable projectiles.  (Banashefski, Tr. 671-72).

On May 30, 1996, in the midst of continuing negotiations, Mr. Banashefski was unavailable to sign a letter to Mason & Hanger, so another Contracting Officer, Valerie E. Colello, signed in his place.  (Talmadge, Tr. 451, 552; Banashefski, Tr. 644; PX 16 at AO2275).  In this six-page letter, the Government reiterated its intent that Mason & Hanger, and not the Government, would acquire ownership to the Line 3A manufacturing equipment.  This letter stated in pertinent part:

> After thoroughly reviewing M&H's draft SOW for the facilitization
> efforts needed to meet the required LAP production delivery schedules,
> the Government has determined that such language is not necessary for
> this contract.  As previously mentioned in ARDEC's letter dated 16 May
> 96, Subject: M795 Projectile LAP Negotiations, this is a production
> requirement for the LAP of the M795 projectile, and is not in any way a
> facilitization contract.  In the RFP, the Government had asked the
> contractor to separately break out the costs for any necessary facilitization
> efforts for evaluation purposes only.  Although the parties may end up

negotiating the costs associated with the equipment/facilities separately from the production deliverables, in order to better understand the price of the facilitization efforts vs. the unit price of the end item; understand that the contractor will solely be responsible for performing whatever facilitization efforts are necessary to meet the required delivery schedules within the final negotiated overall price of the basic contract. In fact, it has been determined that in order to alleviate any further misunderstanding regarding the facilitization efforts, the resultant contract *will not* have a separate CLIN for the facilitization costs, but rather such costs will be included in the LAP production CLIN for the basic quantity.

(PX 16 at AO2270; emphasis in original). The Contracting Officer, Ms. Colello, further explained:

As delineated above, in order to alleviate any misunderstanding by the parties that this requirement is a production effort, and is not a facilities contract, the resultant definitized contract will be constructed in such a manner that their [sic] will be *no separate line item* for any facilitization efforts which M&H would have to accomplish in order to meet the required basic/option delivery requirements of the contract. Rather, the costs of the facilitization efforts will be evenly distributed over the 79,468 projectiles being delivered as part of the basic contract deliverables. Therefore, the payment of the 25% unliquidated costs incurred for facilitization efforts not covered under progress payments will be paid out in increments over the projectile quantities delivered and provisionally accepted pending lot acceptance.

Id. at AO2273 (emphasis in original).

Based upon Ms. Colello's May 30, 1996 letter, the parties understood that the Government intended to remove from the definitive contract any CLIN for the facilitization effort, thereby providing Mason & Hanger with title to the Line 3A equipment. (Daniel, Tr. 94-95). The parties also intended to remove any reference to facilitization requirements from the Statement of Work, in keeping with the Government's position that "[t]his is only a production contract, and the Government will not take title to the equipment." (Daniel, Tr. 95).

On June 5, 1996, with negotiations continuing, Colonel James Unterseher, Project Manager for Sense and Destroy Armor, sent a letter to Mason & Hanger's Mr. Heffelbower complaining that negotiations were "apparently diverging with each new offer presented." (PX 18). Colonel Unterseher stated:

My concern is that we are rapidly deviating from a fair and mutually beneficial agreement. Without your direct and expedient intervention, the

> schedule will probably slip and costs will grow to the point of negatively impacting the program. Timely negotiation and contract award with Mason & Hanger are still achievable. However, unless we can resolve this situation, I may be forced to consider other alternatives.

Id. Colonel Unterseher sent a copy of this letter to Mason & Hanger's General Counsel, Marilyn Daniel, and invited a response from Mr. Heffelbower "so we can openly discuss methods to resolve the differences, satisfactorily complete negotiations, and achieve a timely contract award." Id. at 2. Internal discussions continued at Mason & Hanger. (Daniel, Tr. 93). On June 6, 1996, Mr. Banashefski reiterated to Mason & Hanger representatives that "ARDEC was considering [the M795 Contract] a production contract only." (PX 19 at 1).

Mason & Hanger's Mr. Heffelbower responded to Colonel Unterseher by letter dated June 18, 1996. (PX 23). Mr. Heffelbower stated that "[w]e have . . . agreed to take title to the equipment acquired as a part of our facilitization efforts under this proposed contract" and that "[s]ince we have agreed to take title to the facilitization equipment, the abnormal maintenance and the demilitarization /decontamination of the facilities equipment . . . is no longer an issue." Id. at 2-3. Mr. Heffelbower concluded by stating that "[o]ur negotiation team will be available on a 48 hour notice to negotiate and are prepared to stay until an agreement has been attained . . . [y]ou have my personal commitment!" Id. at 3. Mr. Banashefski recalled seeing Mason & Hanger's June 18, 1996 response letter during the negotiation process, and understood that Mason & Hanger was agreeing to take title to the Line 3A equipment. (Banashefski, Tr. 638-39).[6]

In a revised action item list accompanying a June 18, 1996 Mason & Hanger memorandum to the Government, Item No. 2 stated "ARDEC to determine how to present facilitization clause language so M&H cash flow is not negatively impacted yet M&H ultimately owns the equipment." (PX 24 at AO3631). In response to this action item, the Army's contract specialist, Mr. Talmadge, proposed a revised list of CLINs with an asterisk next to CLIN 0001AA, First Article Test. (PX 25 at 2). The asterisk language stated that "[t]he FAT subclin price includes the costs associated with any special tooling, equipment, and/or facilitization efforts required by the contractor to perform the M795 projectile LAP contract." Id. In a later iteration of the CLIN structure, with the parties still discussing Mason & Hanger's cash flow issues, the Government separated the first 1,000 projectiles as CLIN 0001AB, and placed the equipment cost language with this line item. (PX 30 at AO3529). These discussions continued to reflect the parties' understanding that Mason & Hanger would acquire title to the Line 3A manufacturing equipment, as the Contracting Officer first stated on May 16, 1996, but that the timing of the equipment cost payments to Mason & Hanger remained in negotiation. (Daniel, Tr. 158-59; Hibler, Tr. 235, 239-40, 262-63).

---

[6] The Contracting Officer, Mr. Banasheski, characterized Mason & Hanger's June 18, 1996 letter to Colonel Unterseher as going "outside the negotiation chain in regards to the negotiation process." (Banashefski, Tr. 576). Mr. Banashefski's characterization is not credible, since Mason & Hanger simply responded to Colonel Unterseher's June 5, 1996 letter.

C.  The Definitive M795 Contract

The Army and Mason & Hanger definitized the letter contract by Modification PZ001 on August 15, 1996.  (PX 36).  In definitizing the letter contract, the parties made four major changes to reflect their intent that Mason & Hanger would acquire title to the Line 3A manufacturing equipment:

- The parties deleted Section C.3.9 from the Statement of Work.  (PX 36 at 18).  This section previously had specified that equipment purchased or fabricated would be "property of the U.S. government."  (PX 2 at 10).

- The parties deleted the separate CLIN previously dedicated to the design, fabrication and installation of the manufacturing equipment.  (PX 5 at AO580).  Instead, the definitive contract contains CLIN 0001AB for 1,000 M795 projectiles, with an asterisk next to the price of $9,483,991.  The text accompanying the asterisk states:

  > * = This subclin includes the costs for 1,000 ea M795 Projectiles (1,000 units X $173.92 = $173,920) as well as $9,310,071 in costs associated with special tooling, equipment, and facilitization efforts required by the contractor to perform the M795 LAP contract.

  (PX 36 at 12).  The total CLIN price of $9,483,991 is the sum of $173,920 for 1,000 projectiles, and $9,310,071 for the Line 3A equipment.

- Whereas the letter contract had included a delivery date for equipment of 21 months after award, the definitive contract did not include any date for the delivery or installation of equipment.  (PX 36 at 31).

- Section C.3.9 previously contained examples of the required equipment, but the definitive contract did not contain any itemization of the equipment that Mason & Hanger would purchase and install.  Such information would be expected if the Government were acquiring title to the property.  Mason & Hanger had been preparing a detailed itemized list of equipment prior to definitization, until the Government indicated that such information would not be necessary.

The definitive contract included the same Government Property clause for fixed-price contracts, FAR ¶ 52.245-2, Alternate I (July 1995), that had been included in the RFP.  (PX 36 at 66, ¶ I.8).  This clause provided that title of facilities and special test equipment would vest in the Government if "acquired by the Contractor *for the Government*."  Id. at 68, ¶(c)(3) (emphasis added). This clause would not apply to property owned by Mason & Hanger.  The fact that the Government reimbursed the fixed price of the Line 3A equipment to Mason & Hanger does not mean that the Government thereby owned the equipment.  The parties' intent was to the contrary.

By letter dated August 20, 1996, Mr. Fred Taylor, Administrative Contracting Officer at the IAAP, confirmed the Government's understanding that Mason & Hanger would acquire title to the Line 3A manufacturing equipment. (PX 38 at 2). Mr. Taylor's letter to the Contracting Officer, Mr. Banashefski, stated:

> We understand that all new facilities (equipment and buildings) acquired by Mason & Hanger under the facilitization phase of the M795 program will not be called out as deliverables under the contract even though they are being direct costed versus being depreciated. The Government does not intend to take title to the facilities even though they are to be direct costed.

Id. Mr. Talmadge sent a copy of this letter to Mason & Hanger. Id. at 1. There is no credible evidence that Mr. Banashefski or any other Government official disagreed with Mr. Taylor's understanding.[7]

D. Contract Performance and the Line 3A Equipment

By letter dated February 18, 1997, the Contracting Officer notified Mason & Hanger that the dates for First Article Testing under the definitive contract would slip due to the unavailability of certain metal parts. (PX 42). Mason & Hanger responded to this letter on March 3, 1997, stating:

> . . . Mason & Hanger Corporation (M&H) would like to request final payment of the Facilitization cost be included under Sub CLIN 0001AA, First Article Test quantities, instead of Sub CLIN 0001AB, which is for delivery of the first production lot of 1,000 units. M&H is requesting this consideration since Facilitization has been accelerated and is expected to be completed by the time the FAT units are complete which should be in July 1997. Production is not scheduled to begin until November which places M&H in the unfavorable position of having incurred Facilitization costs four (4) to five (5) months prior to full reimbursement for these costs. Approximately $2.3 million of cost is at stake which has a major impact on M&H's cash flow position.

---

[7] Mr. Banashefski testified that Mr. Taylor "didn't understand what was in the contract," and that he sent a letter to Mr. Taylor "to indicate that his understanding of the contract was incorrect." (Banashefski, Tr. 581). While acknowledging that he presently does not possess such a letter, Mr. Banashefski maintains that the "contract file" or the "central file" should have contained such a letter, but "for whatever reason . . . it was not there." Id. Mr. Banashefski admitted during cross-examination that he did not know what the substance of any "missing document" may have been. (Banashefski, Tr. 719). Neither the purported letter nor the "contract file" that Mr. Banashefski claims to have reviewed are in evidence. The Court declines to attach any credence to this testimony of Mr. Banashefski.

(PX 44). Consistent with Mason & Hanger's request, the parties executed Modification P00003 to the definitive contract on March 13, 1997. (PX 45). This modification accelerated the reimbursement of Mason & Hanger's costs for the Line 3A equipment simply by moving the asterisk from CLIN 0001AB (delivery of 1,000 projectiles) to CLIN 0001AA (First Article Test). Id. at AO2547. The modification also extended the delivery date for First Article Test from March 31, 1997 to July 31, 1997. Id. at AO2546. No other changes were made to the definitive contract. (Talmadge, Tr. 515-17).

On October 21, 1997, the Contracting Officer confirmed that Mason & Hanger "has successfully completed the necessary special tooling, equipment and facilitization efforts under CLIN 0001AA of the contract." (PX 46). The Contracting Officer invited Mason & Hanger to submit an invoice for approval. Id. Mason & Hanger submitted an invoice on October 24, 1997 for $3,678,972.22, representing the balance due less progress payments for facilitization costs plus 24 first article units. (PX 47). The Government approved this payment on a DD Form 250, Material Inspection and Receiving Report. Id. at 2. The Government's approval signature appears in the "Destination" block rather than the "Origin" block. Id. The destination of the first article units was Yuma, Arizona (PX 36 at 31), whereas the Line 3A manufacturing equipment had been installed in the IAAP. Thus, the "Destination" approval on the DD Form 250 applies to the first article units. Id.

The Line 3A manufacturing equipment is located in six or seven main operating buildings and extends "a couple of miles" in length. (Darley, Tr. 283). The facilities use contract at the IAAP requires Mason & Hanger and AO to identify ownership of all property and equipment. (Darley, Tr. 283-84). Pursuant to AO's procedures, all significant items of property and equipment are assigned a property number, and AO maintains a logbook that tracks the sequential property numbers as they are assigned. (Darley, Tr. 284; PX 59).

AO also employs an equipment tagging system under which a color-coded tag is applied to each piece of property. (Darley, Tr. 289). Different tags are assigned to designate who owns the property, and whether the value of the property exceeds $5,000. (Darley, Tr. 289-90). Government-owned property is assigned either a white or pink tag, and AO property is assigned either a blue or gold tag. Id. The property tags are approximately 1-1/4 inches by 3-3/4 inches in size, and contain the property number and bar code information. (Darley, Tr. 290-97; PDX 9-16). The tags also state whether AO or the U.S. Government owns the property. (Darley, Tr. 290-97; PDX 9-16).

After installation of the Line 3A equipment at the IAAP, Mason & Hanger applied tags to the equipment indicating ownership by Mason & Hanger. (Daniel, Tr. 159; Darley, Tr. 296). Some of the first acquired equipment had to be re-tagged, due to the original expectation in the letter contract that the Government would own the equipment. (Darley, Tr. 360-61). These tags were changed to reflect Mason & Hanger ownership after execution of the definitive contract. Id.

AO maintains a computerized data system showing government and contractor property at the IAAP. (Darley, Tr. 301; PX 58). The Government has access to both the logbook and the

computerized records, and typically performs annual reviews of the contractor's property control system. (Darley, Tr. 288, 350-52). Between 1996 and 2007, the Government did not indicate that the Line 3A equipment was tagged improperly, or that the records showing Mason & Hanger and AO ownership were incorrect. (Darley, Tr. 354-56; Solinski, Tr. 411-12, 432-33).

In reviewing the question of Line 3A equipment ownership in August 1999, the Defense Contract Audit Agency ("DCAA") confirmed that Mason & Hanger and its successor, AO, owned the equipment. (PX 50). The DCAA's August 12, 1999 letter to AO stated:

> We have reviewed all the negotiation correspondence provided by AO and the Army concerning the M795 Basic Contract Negotiations. We can find no documents indicating the Army ever intended for the facility and equipment to be "special purpose." In fact to the contrary, we found Army correspondence indicating clearly that the government did not want title to the facility and equipment.

Id. at 2.

E. The 2007 Army Procurement

In August 2007, the Army initiated a competitive procurement for a follow-on contract for operation and maintenance of the IAAP and the Milan Army Ammunition Plant, located in Tennessee. (Smith, Tr. 725, 748-49). The Army's procurement competition team asked the Contracting Officer, Charles Smith, to review the ownership of the Line 3A equipment. (Smith, Tr. 749-50). Mr. Smith reviewed various documents identified in his September 26, 2007 final decision. (Smith, Tr. 730; PX 56). Mr. Smith had not been involved in any of the 1996 negotiations with Mason & Hanger, or in the drafting or performance of the M795 contract. (Smith, Tr. 730-31).

On September 6, 2007, Mr. Smith notified AO that the property records for the Line 3A equipment were incorrect, and that discrepancies would need to be eliminated. (PX 55). Mr. Smith attached a copy of the October 1997 DD Form 250 in which the Army had accepted at "Destination" the first article units. Id. at AO545. He also attached a cost breakdown of Line 3A equipment that Mason & Hanger had provided to the Government on July 16, 1996. Id. at AO546-57.

On September 26, 2007, Mr. Smith issued a Contracting Officer's final decision finding that the Army owns the Line 3A manufacturing equipment. (PX 56). The Contracting Officer based his position on his review of the definitive contract, and the assertion that the Army paid Mason & Hanger for the equipment and therefore must own it. Id. at 8. The Contracting Officer also noted that Mason & Hanger's costs for the Line 3A equipment were not amortized over the production units of M795 projectiles, but were reimbursed to Mason & Hanger as a direct cost. Id. On October 26, 2007, the Army directed AO to re-tag the Line 3A equipment as government-owned property, and to change its records to reflect government ownership. (PX 57).

On February 21, 2008, after AO had re-tagged the equipment and modified its property records as the Army had directed, the Army issued RFP No. W52PIJ-06-R-0201 for the operation and maintenance of the IAAP and the Milan, Tennessee plant.[8]  The RFP contemplates that the Line 3A equipment will be offered to prospective bidders as government-furnished property, which any new contractor could use for its own production activities. (Darley, Tr. 359-60).  Before the Army had directed AO to reverse all records of ownership for the Line 3A equipment, the Army permitted prospective bidders to inspect the facilities at the IAAP that would be made available as government-furnished property under the new RFP. (Solinski, Tr. 424-26; Darley, Tr. 356-58).  However, much of the Line 3A equipment was excluded from the bidder site inspection. (Solinski, Tr. 428-29; Darley, Tr. 357-59).  AO, with the Government's consent, covered the Line 3A equipment to prevent the prospective bidders from viewing it. (Solinski, Tr. 428-29; Darley, Tr. 357-59).  After the Contracting Officer's September 26, 2007 final decision, the Army directed AO to uncover the Line 3A equipment to allow bidder inspection. (Solinski, Tr. 425-26).

Discussion

A. <u>Contract Interpretation Standards</u>

In a contract interpretation case, the Court's objective "is to determine the intent of the parties at the time they contracted." <u>Veit & Co., Inc. v. United States</u>, 56 Fed. Cl. 30, 34 (2003) (quoting <u>Greco v. Dept. of Army</u>, 852 F.2d 558, 560 (Fed. Cir. 1988).  "It has been a fundamental precept of common law that the intention of the parties to a contract control[s] its interpretation." <u>Beta Sys., Inc. v. United States</u>, 838 F.2d 1179, 1185 (Fed. Cir. 1988) (quoting <u>Firestone Tire & Rubber Co. v. United States</u>, 444 F.2d 547, 551 (Ct. Cl. 1971)).  The intent of the parties is determined by a review of the contract, and if necessary, other objective evidence. <u>Flexfab, LLC v. United States</u>, 424 F.3d 1254, 1262 (Fed. Cir. 2005).  If the terms of the contract are clear and unambiguous, there is no need to resort to extrinsic evidence for its interpretation. <u>Barron Bancshares, Inc. v. United States</u>, 366 F.3d 1360, 1375 (Fed. Cir. 2004); <u>Interwest Constr. v. Brown</u>, 29 F.3d 611, 615 (Fed. Cir. 1994); <u>Alaska Lumber & Pulp Co. v. Madigan</u>, 2 F.3d 389, 392 (Fed. Cir. 1993); <u>Sea-Land Serv., Inc. v. United States</u>, 553 F.2d 651, 658 (Ct. Cl. 1977), <u>cert. denied</u> 434 U.S. 1012 (1978).  If ambiguity exists, however, the Court's role is to give legal effect to the intent of the parties at the time the agreement is made. <u>King v. Dept. of Navy</u>, 130 F.3d 1031, 1033 (Fed. Cir. 1997).

If an ambiguity exists, the Court must interpret extrinsic evidence in a manner that gives meaning to all of the contract's provisions. <u>McAbee Constr., Inc. v. United States</u>, 97 F.3d 1431, 1434 (Fed. Cir. 1996) (citing <u>Hughes Comm. Galaxy, Inc. v. United States</u>, 998 F.2d 953, 958 (Fed. Cir. 1993).  Extrinsic evidence also should not be used "to justify reading a term into an agreement that is not found there." <u>Fox v. Office of Pers. Mgmt.</u>, 100 F.3d 141, 145 (Fed. Cir. 1996).  On the other hand, the Court may use extrinsic evidence if the contract is ambiguous "to the extent the final

---

[8]  AO asserted this fact in its June 30, 2008 Proposed Findings of Uncontroverted Fact, para. 93.  Defendant did not dispute this fact in its July 29, 2008 Response to Plaintiff's Proposed Findings of Fact.

expression is not contradicted." W&F Bldg. Maint. Co., Inc. v. United States, 56 Fed. Cl. 62, 69 (2003) (citing McAbee, 97 F.3d at 1434-35). The context in which the parties made the contract also may be significant. Metric Constructors, Inc. v. United States, 169 F.3d 747, 752 (Fed. Cir. 1999) ("Excluding evidence of trade practice and custom because the contract terms are 'unambiguous' on their face ignores the reality of the context in which the parties contracted, [which] . . . may well reveal that the terms of the contract are not, and never were, clear on their face.").

B. Interpretation of the M795 Contract

In the present case, the August 15, 1996 definitive contract represents the final agreement between Mason & Hanger and the Army. As a first step, the Court would look only to the definitive contract to interpret its terms, but this contract does not indicate clearly which party owns the Line 3A manufacturing equipment. The ambiguity arises not from any contradictory or confusing terms in the definitive contract, but from the absence of any clear contract term specifying ownership. In progressing from the December 12, 1995 letter contract to the August 15, 1996 definitive contract, the parties deleted provisions from the letter contract that would indicate government ownership, but the definitive contract did not explicitly specify contractor ownership. Accordingly, the Court determined that the definitive contract was ambiguous, and resorted to extrinsic evidence to determine the parties' intent. Defendant's counsel conceded during her opening statement that no provision exists in the definitive contract granting the Government ownership in the Line 3A equipment. (Tr. 36-37; see also Tr. 814-15, Court's reference during bench ruling).

The extrinsic evidence, however, reveals the parties' intent precisely. As detailed in the Findings of Fact above, the Army began with the intention of owning the Line 3A equipment. The October 11, 1995 RFP and the December 12, 1995 letter contract with Mason & Hanger were constructed with the understanding that the Government would take title to the property. The letter contract contained CLIN 0001AA, requiring Mason & Hanger to "Design, Fabricate and install equipment in accordance with the statement of work Section C.3.9." (PX 2 at 5). Section C.3.9 in turn provided that the equipment purchased under the contract "shall be [the] property of the U.S. Government." Id. at 10. Section C.3.9 also included a partial listing of the equipment to be provided, such as preheat ovens, a grid melter, melt kettles, pour machines, controlled cooling apparatus, and post cyclic conditioners. Id. The letter contract called for the Line 3A equipment to be delivered to the Army within 21 months after award. (PX 5 at AO586).

The negotiations for the definitive contract began with the same understanding that the Government would own the Line 3A equipment. At meetings on May 13-14, 1996, however, the Government completely reversed its position, asserting that Mason & Hanger should own the Line 3A equipment. The Contracting Officer, Mr. Banashefski, confirmed the Government's new position in a May 16, 1996 letter to Mason & Hanger. (PX 10). The Contracting Officer explicitly stated that "this requirement is a production contract . . ., and is not a facilities contract," and that "the Government will not have title to the equipment." Id. at 2. A follow-up letter from another Contracting Officer, Ms. Colello, on May 30, 1996, further confirmed the Government's new

position, stating "[a]s previously mentioned [in the May 16, 1996 letter], this is a production requirement . . ., and is not in any way a facilitization contract." (PX 16 at AO2270).

The Government's reversal of position placed increased risk and responsibility on Mason & Hanger. First, Mason & Hanger would be bound by its fixed price for the equipment. If the cost of the equipment exceeded the agreed price, Mason & Hanger would assume the risk of any cost overrun. Second, Mason & Hanger would bear responsibility that the manufacturing line it designed and installed would produce satisfactory projectiles at the desired rate. For the M795 projectile that had not been mass produced previously, the fixed price limitation and the responsibility for satisfactory production represented significant risks. Third, Mason & Hanger had to perform all maintenance and repair, and bear the risk of any loss or damage to equipment. Finally, Mason & Hanger had to demobilize and dispose of the property when the equipment was no longer needed. Mason & Hanger regarded all of these concerns as significant risks that it would need to evaluate before agreeing to the Government's new position.

Mason & Hanger also was concerned about cash flow. As a mid-sized company, it did not possess unlimited resources to invest up to $9.5 million of its own capital without assurance of prompt reimbursement. (Daniel, Tr. 91-92, 110). Mason & Hanger's chief objectives during the negotiation of the definitive contract were to make sure it could manage the significant risks associated with equipment ownership, and to obtain reasonably early reimbursement of the equipment purchase and installation costs. Consistent with these objectives, a June 18, 1996 action item list included as Item No. 2 that "ARDEC to determine how to present facilitization clause language so M&H cash flow is not negatively impacted yet M&H ultimately owns the equipment." (PX 24 at AO3631).

Ultimately, when the parties reached agreement on a definitive contract on August 15, 1996, the Government's new position on equipment ownership, and Mason & Hanger's acceptance of equipment ownership, occurred through deletion of terms from the letter contract. This methodology of deleting unnecessary terms explains why the definitive contract alone does not specify which party owns the Line 3A equipment. To achieve the desired outcome, the Government deleted Section C.3.9 from the statement of work, eliminated the separate CLIN previously dedicated to the design, fabrication and installation of the manufacturing equipment, removed any delivery date for the manufacturing equipment, and provided that Mason & Hanger would receive reimbursement of $9,310,071 when the first 1,000 M795 projectiles were delivered. (PX 36 at 6). Through Modification P00003, dated March 13, 2007, the parties moved the reimbursement for equipment to coincide with delivery of the first article test quantity, due to a government delay in providing metal parts needed for the first production quantity. (PX 45).

The parties' actions after executing the definitive agreement on August 15, 1996 uniformly support the conclusion that Mason & Hanger, and later AO, owned the Line 3A equipment. The Government changed its position in this regard only in September 2007 when it decided to offer the Line 3A equipment as government-furnished property in an upcoming competitive procurement. However, based upon the clear intent of the parties, the Government did not own the Line 3A

equipment, and could not offer the equipment as "government-furnished property." As the Court observed at the close of trial in issuing a bench ruling (Tr. 815-16), it is difficult to understand how the Army could "pull a fast one" on the contractor as it did, abrogating the crystal clear manifestation of mutual intent in 1996 that Mason & Hanger would own the equipment. See Brandt v. Hickel, 427 F.2d 53, 57 (9th Cir. 1970) ("To say to these appellants, 'The joke is on you. You shouldn't have trusted us,' is hardly worthy of our great government."); Menges v. Dentler, 33 Pa. 495, 500 (1859) ("Men naturally trust in their government, and ought to do so, and they ought not to suffer for it.").

C. The Government's Litigation Position is Not Credible.

Defendant has constructed a litigation position in this case that contradicts all of the negotiations that occurred during May 16, 1996 through August 15, 1996. Defendant's position also is at odds with the parties' conduct for the next eleven years, through September 2007, where they uniformly affirmed that Mason & Hanger, and later AO, owned the Line 3A equipment. Defendant advances its position as if all of those events did not take place, and as if the Army did not mean what it represented to Mason & Hanger. Nevertheless, the Court will assess Defendant's contentions, difficult as it may be to comprehend why the Government has elected to pursue this matter in the face of its prior actions.

Defendant's position is premised upon (1) its reading of the FAR Government Property clause, stating that in certain circumstances title to facilities and special equipment vests in the Government, and (2) its assertion that reimbursement of the direct costs of the Line 3A equipment to Mason & Hanger, rather than payment to Mason & Hanger of an amortized amount spread over the number of projectiles produced, should result in Government ownership of the equipment. Each of these contentions is addressed below.

1. The Government Property Clause

The standard Government Property clause used in the definitive M795 contract is found at FAR ¶ 52.245-2, Alternate I (July 1995). The clause provides in part that "[t]itle to each item of facilities and special test equipment acquired by the Contractor *for the Government* under this contract shall pass to and vest in the Government." (PX 36 at 68, ¶ I.8 (c)(3)) (emphasis added). The phrase "acquired . . . for the Government" is central to the interpretation of the M795 contract.

The provisions of FAR ¶ 45.402, "Title to contractor-acquired property," explain the meaning of "acquired . . . for the Government." The regulation states "[u]nder fixed price type contracts, the contractor retains title to all property acquired by the contractor for use on the contract, except for property identified as a deliverable end item." FAR ¶ 45.402(a) (2008). The parties' agreement in the definitive contract to delete the separate CLIN for delivery of Line 3A equipment therefore would have the effect of maintaining ownership of the equipment with Mason & Hanger.

FAR Subpart 45.1 states as policy that "[c]ontractors are ordinarily required to furnish all property necessary to perform Government contracts." FAR ¶ 45.102(a). Upon completion of

contract performance, title to all property which has not been delivered to and accepted by the Government remains vested in the contractor. Where a contractor simply acquires and uses a part of the facilities or equipment in connection with its production of some product or service delivered to the Government, the contractor is not thereby "acquiring" the facilities or equipment "for the Government." If this were the case, the Government gradually would acquire all property of its contractors performing government contracts.

The evidence in this case demonstrates that the Army consciously avoided all of the risks and responsibilities of equipment ownership by having Mason & Hanger, and later AO, acquire equipment ownership of Line 3A. For the Court now to allow the Government to assume ownership of equipment that it did not purchase or maintain would contradict the plain meaning of the Government Property clause. Moreover, the evidence is overwhelming that the parties made changes in the definitive contract by deleting provisions from the letter contract that would have vested title in the Government. The only way to harmonize all of the definitive contract terms is to give the Government Property clause the interpretation provided above. To apply the much broader interpretation of the Government Property clause urged by Defendant would conflict with virtually every other term and event relevant to the parties' intent. This the Court will not do.

## 2. The Government's Amortization Argument

The fact that the Army reimbursed the costs to Mason & Hanger for designing, purchasing and installing the Line 3A manufacturing equipment does not thereby vest title to the property in the Government. Rather, the analysis above of the standard Government Property clause for fixed-price contracts governs the title-vesting issue. Procuring agencies routinely reimburse contractors for the costs associated with government contract performance. While the costs of facilities and equipment often are reimbursed to contractors as indirect costs, here the parties agreed to reimburse Mason & Hanger's direct costs at an early stage of performance to improve the company's cash flow. There simply is no authority, and Defendant cites none, establishing that the Government's payment of funds for equipment used in performing a contract establishes the Government's ownership of that equipment. Contract payments are unrelated to the determination of title and ownership of property.

Defendant contends that the Army imposed a "condition" on Mason & Hanger during the 1996 negotiations that the company must agree to amortize a portion of its costs over the production quantity of M795 projectiles to obtain title to the Line 3A equipment. The evidence, however, is otherwise. In essence, the Army directed Mason & Hanger to accept title to the equipment because the Army did not want to assume the risks of equipment ownership. After assessing the risks and responsibilities that were involved on the project, Mason & Hanger agreed to take title. The parties' discussion of payment and cash flow was in the context of how the Army could reimburse Mason & Hanger as expeditiously as possible.

In June 1996, the parties generated "Action Item 2" which was "to determine how to present facilitization clause language so M&H cash flow is not negatively impacted yet M&H ultimately owns the equipment." (PX 24 at AO3631; Daniel, Tr. 98-100, 133-34). The Army's contract

-17-

specialist, Mr. Talmadge, agreed that he revised the definitive contract CLIN structure specifically to ensure that both goals of Action Item 2 were given effect – that Mason & Hanger's cash flow would not be negatively impacted and that Mason & Hanger would own the Line 3A equipment. (Talmadge, Tr. 502-03, 505-07, 510-11).

During negotiations on June 25-27, 1996, Mason & Hanger suggested that a separate smaller lot of projectiles be added to the CLIN structure against which the portion of Mason & Hanger's price involving the costs for facilitization could be liquidated.  (PX 30 at AO3519; Hibler, Tr. 227-30).  Toward the end of these negotiations, the Contracting Officer agreed to add a new line item for the first 1,000 production units, against which the facilitization costs could be liquidated.  (PX 30 at AO3524; Hibler, Tr. 231-34).  The Contracting Officer's proposal was intended specifically to resolve the payment concerns of both Mason & Hanger and the Government, while also requiring that Mason & Hanger take title to the Line 3A equipment.  (Hibler, Tr. 232-33).

Defendant's contention that Mason & Hanger needed to amortize its equipment costs to take title to the equipment contradicts the testimony of its own witnesses.  The Contracting Officer admitted that the May 30, 1996 letter from Valerie Colello (PX 16) did *not* contain any amortization condition on Mason & Hanger taking title to the Line 3A equipment.  (Banashefski, Tr. 666-67).  At another point, when asked whether Mason & Hanger's amortization of costs would make "any difference to title," the Contracting Officer testified "[n]ot in my eyes, it wouldn't."  (Banashefski, Tr. 710-12) (referring to deposition testimony).  Similarly, the Army's contract specialist testified that Mason & Hanger's acceptance of title to the Line 3A equipment had nothing to do with whether Mason & Hanger amortized its facilitization costs over the production units of M795 projectiles. (Talmadge, Tr. 496-98) (referring to deposition testimony).  There simply is no credible evidence supporting Defendant's position that Mason & Hanger's agreement to amortize equipment costs was a condition to equipment ownership.  The great weight of the evidence is to the contrary.

D. Statute of Limitations

AO contends that the Contracting Officer's September 26, 2007 final decision constitutes a "government claim" under the Contract Disputes Act ("CDA"), and that the Army's claim of ownership of the Line 3A manufacturing equipment is barred by the six-year limitations period in 41 U.S.C. § 605(a).  That subsection provides that "[e]ach claim by a contractor against the government relating to a contract *and each claim by the government against a contractor relating to a contract* shall be submitted within 6 years after the accrual of the claim."  Id. (emphasis added).

In opposition, Defendant argues that 28 U.S.C. § 2415 governs this case instead of the CDA. That section imposes a six-year limitations period on contract claims brought by the Government for money damages, but expressly precludes any time limit for government actions to establish title to, or right of possession of, real or personal property.  See 28 U.S.C. § 2415 (a), (c) (2006). Defendant thus contends that there is no time limit for the Government's assertion of a claim of ownership to real or personal property.  The Court must determine whether the CDA or 28 U.S.C. § 2415 governs this case.

The United States Court of Appeals for the Federal Circuit has held that 28 U.S.C. § 2415 does not apply to "[g]overnment claims that cannot be asserted in federal court before issuance of a contracting officer's final decision." Motorola, Inc. v. West, 125 F.3d 1470, 1472 (Fed. Cir. 1997); see also S.E.R. Jobs for Progress, Inc. United States, 759 F.2d 1, 5 (Fed. Cir. 1985). The terms of 28 U.S.C. § 2415 apply to claims for "money damages brought by the United States," and "do not cover a CDA claim, which necessarily arises only after issuance of an administrative decision." Motorola, 125 F.3d at 1473. Here, the Army's claim of ownership of the Line 3A equipment is not an "action for money damages by the United States," 28 U.S.C. § 2415(a), but is an action brought by AO only after the Contracting Officer issued a final decision. Therefore, the provisions of 28 U.S.C. § 2415(a) do not apply to this case.

Anticipating this outcome, Defendant further contends that, even if the Army's claim of ownership is governed by the CDA, 28 U.S.C. § 2415(c) still exempts government actions to establish title to property. Under this contention, § 2415(c) would take precedence over any provision in the CDA and result in no limitations period for government property claims. However, Defendant's argument is contradicted by the plain language of the statute. The provisions of 28 U.S.C. § 2415(c) state that "*[n]othing herein* shall be deemed to limit the time for bringing an action to establish the title to, or right of possession of, real or personal property." § 2415(c) (emphasis added). The words "nothing herein" refer exclusively to section 2415, not to the CDA. Subsection 2415(c) has no independent preemptive force, and therefore, Defendant cannot shield itself from the CDA's statute of limitations through this provision. See Davidson v. Fed. Deposit Ins. Corp., 44 F.3d 246, 249-50, (5th Cir. 1995) ("The plain meaning of section 2415(c) . . . is to clarify or confirm *that section (a) does not apply* to actions relating to land titles."). To suggest otherwise would effectively read the CDA's statute of limitations out of the law.

Furthermore, Defendant's position conflicts with the purpose of 28 U.S.C. § 2415(c). The Senate report accompanying 28 U.S.C. § 2415 makes clear that the legislative intent was to prevent citizens from acquiring title to property of the United States through adverse possession. See S. Rep. No. 89-1328, at 2 (1966), as reprinted in 1966 U.S.C.C.A.N. 2502, 2505. At no time has AO claimed ownership of the Line 3A equipment based on a theory of adverse possession, despite Defendant's insistence otherwise. The Court has already concluded, based on the parties' conduct before and after definitization of the 1996 contract, that the Army intended for Mason & Hanger to take title to the Line 3A equipment. Therefore, AO does not seek to acquire property to which the Government already has title.

The remaining issue before the Court is to determine when the Army's claim of property ownership accrued. The CDA does not define when a claim's accrual begins. Axion Corp. v. United States, 68 Fed. Cl. 468, 480 (2005). However, the FAR includes the following definition:

> Accrual of a claim means the date when all events, that fix the alleged
> liability of either the Government or the contractor and permit assertion
> of the claim, were known or should have been known. For liability to be

fixed, some injury must have occurred. However, monetary damages
need not have been incurred.

FAR ¶ 33.201.  A claim thus accrues on the date when all the events have occurred which fix the
contractor's liability and entitle the claimant to institute an action.  See SAB Constr., Inc. v. United
States, 66 Fed. Cl. 77, 88 (2005) (quoting Kinsey v. United States, 852 F.2d 556, 557 (Fed. Cir.
1988)).  In a breach of contract claim, the claim accrues when the aggrieved party knew or should
have known it had incurred injury.  See SAB Constr., Inc., 66 Fed. Cl. at 88 (quoting Ariadne Fin.
Servs. Pty. Ltd. v. United States, 133 F.3d 874, 878 (Fed. Cir. 1998)); Axion Corp., 68 Fed. Cl. at
480-81.

    The Court finds that the Government's claim of ownership of the Line 3A equipment
accrued not later than October 21, 1997, the date when the Contracting Officer confirmed that
Mason & Hanger had successfully completed the installation of the equipment.  By that date, Mason
& Hanger had placed property ownership tags on the equipment, and had recorded the equipment
on its records as property owned by Mason & Hanger.  The Government had access to Mason &
Hanger's and AO's property ownership records for eleven years thereafter and performed annual
reviews of their property control system.  Between 1996 and 2007, the Government did not indicate
that the Line 3A equipment was tagged improperly, or that the records showing Mason & Hanger
and AO ownership were incorrect.  (Darley, Tr. 354-56; Solinski, Tr. 411-12, 432-33).

    The Court therefore concludes that the six-year limitations period of the CDA, 41 U.S.C. §
605(a), bars Defendant from claiming ownership of the Line 3A equipment.

<u>Conclusion</u>

    Based upon the foregoing, the Court hereby issues a declaratory judgment that AO is the
owner of the Line 3A manufacturing equipment at the Iowa Army Ammunition Plant.  Pursuant to
Rule 54(d), the Court awards costs to Plaintiff.

    IT IS SO ORDERED.

                                        s/Thomas C. Wheeler
                                        THOMAS C. WHEELER
                                        Judge